FILED

2024 Apr-29  PM 04:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| STATE OF ALABAMA; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF SOUTH CAROLINA; INDE-PENDENT WOMEN'S LAW CENTER; INDEPENDENT WOMEN'S NET-WORK; PARENTS DEFENDING EDU-CATION; and SPEECH FIRST, INC., | Case No. _____ |
| *Plaintiffs*, | |
| v. | |
| MIGUEL CARDONA, in his official capac-ity as the U.S. Secretary of Education; and U.S. DEPARTMENT OF EDUCATION, | |
| *Defendants*. | |

## COMPLAINT

Starting August 1, 2024, the Biden administration will repeal the Trump administra-tion's Title IX rule and replace it with one of its own. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024). While different administrations can have different policy views, they cannot override the text that Congress enacted in 1972 or overrule the binding precedent of this circuit. The Biden rule does both—to the detriment of the States, their schools, and their students. For a host of reasons, this new rule violates the Administrative Procedure Act and should be set aside. Most pressingly, this Court should stay the rule's effective date, keeping the Trump rule in place while the parties litigate cross-motions for summary judgment.

## PARTIES

1.     Plaintiff Alabama is a sovereign State with around 2,000 K-12 schools and 60 colleges. Steve Marshall is its Attorney General. He is authorized to sue on the State's behalf, including its public schools and its citizens.

2.     Plaintiff Florida is a sovereign State with around 7,000 K-12 schools and 70 colleges. Ashley Moody is its Attorney General. She is authorized to sue on the State's behalf, including its public schools and its citizens.

3.     Plaintiff Georgia is a sovereign State with around 3,000 K-12 schools and 90 colleges. Christopher Carr is its Attorney General. He is authorized to sue on the State's behalf, including its public schools and its citizens.

4.     Plaintiff South Carolina is a sovereign State with around 1,600 K-12 schools and 55 colleges. Alan Wilson is its Attorney General. He is authorized to sue on the State's behalf, including its public schools and its citizens.

5.     Independent Women's Law Center is a project of the Independent Women's Forum, a nonprofit, nonpartisan 501(c)(3) organization founded by women to foster education and debate on legal, social, and economic policy issues. IWLC supports this mission by advocating—in the courts, in Congress, and before administrative agencies—for equal opportunity, freedom of expression, and individual liberty, especially on matters of concern to women.

6.     Independent Women's Network is a project of Independent Women's Voice in partnership with Independent Women's Forum. IWN, a membership association of forward-

thinking, patriotic women, provides members access to interesting articles, networking opportunities, and resources to fight for the causes they're passionate about. It has chapters across the country, including in South Carolina and Florida. IWN has members who are enrolled in universities across the country.

7.     Plaintiff Parents Defending Education is a nationwide, grassroots membership organization whose members include parents, students, and other concerned citizens. A 501(c)(3), PDE's mission is to prevent—through advocacy, disclosure, and, if necessary, litigation—the politicization of K-12 education. PDE has members whose children are enrolled in public schools in Alabama, Georgia, Florida, South Carolina, and other States.

8.     Plaintiff Speech First is a nationwide membership organization of students, alumni, and other concerned citizens. A 501(c)(3), Speech First is dedicated to preserving civil rights secured by law, especially the freedom of speech and due process. Speech First seeks to protect the rights of college students through litigation and other lawful means. Speech First has members who are enrolled in universities across the country.

9.     Defendant Miguel Cardona is the U.S. Secretary of Education and runs the U.S. Department of Education. He enforces the challenged rule. Secretary Cardona is sued in his official capacity.

10.     Defendant U.S. Department of Education is a federal agency. It enforces Title IX and promulgated the challenged rule. The Department of Education "is authorized and directed to effectuate" Title IX "by issuing rules, regulations, or orders of general applicability … consistent with achievement of the objectives of the statute." 20 U.S.C. §1682. The Department can enforce Title IX itself, *id.*, and the Supreme Court has recognized a private right

3

of action under Title IX for damages and injunctive relief, *see Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022) (en banc) (citing *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60 (1992); and *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)).

## JURISDICTION AND VENUE

11.    This Court has subject-matter jurisdiction under 28 U.S.C. §1331 because this case raises questions of federal law under Title IX of the Education Amendments of 1972, 20 U.S.C. §§1681-88, and the Administrative Procedure Act, 5 U.S.C. §§553, 701-06.

12.    Any sovereign immunity that Defendants might have has been waived by 5 U.S.C. §702. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). The challenged rule is final agency action that's reviewable under the APA. 5 U.S.C. §§704, 706.

13.    Venue is proper under 28 U.S.C. §1391(e)(1) because Defendants are U.S. agencies or officers sued in their official capacities, Alabama resides here, no real property is involved, and a substantial part of the relevant events will occur here. *See Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1982); *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020). Alabama's largest public university—the University of Alabama at Tuscaloosa, with nearly 40,000 enrolled students—is located here. The Tuscaloosa County school district has 36 primary and secondary schools that serve around 20,000 students.

## BACKGROUND

14.    Title IX was enacted in 1972. It states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a).

15.     Title IX was passed to ensure that females and males receive equal educational opportunities. 20 U.S.C. §1681(a)(2) (referring to "both sexes"); §1681 (a)(6)(B) (referring to "Men's" and "Women's" organizations, "the membership of which has traditionally been limited to persons of one sex"). The statute requires that, if opportunities "are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex." §1681(a)(8).

16.     At the time of enactment, no one doubted that the law's use of "sex" referred to biological sex. And all relevant indicators confirmed what everyone understood: "sex," as used in Title IX, means biological sex and does not include "gender identity" or sexual orientation.

17.     Title IX prohibits schools and other recipients of federal funding from discriminating. In 1999, the Supreme Court held that, in some cases, a school's failure to adequately address sexual harassment can constitute a form of unlawful sex discrimination prohibited by Title IX, even when the harasser is a student (as opposed to an employee of the school). *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999). But Title IX is not a freestanding sexual harassment tort. In fact, sexual harassment violates federal law only when "members of one sex are exposed to disadvantageous [conditions] to which members of the other sex are not exposed." *Harris v. Forklift*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring) (discussing workplace sexual harassment under Title VII). Moreover, a school violates Title IX's ban on sex discrimination only for "its own misconduct." *Davis*, 526 U.S. at 640, 643. The Supreme Court has made clear that a school can only be held liable for sexual harassment under Title IX where the school itself discriminates or is deliberately indifferent to harassment that is "so severe,

5

pervasive, *and* objectively offensive that it *denies* its victims the equal access to education." *Id.* at 652 (emphases added). This standard intentionally excludes "a single instance of one-on-one peer harassment," even if "sufficiently severe." *Id.* at 652-53. When crafting the *Davis* standard, the Court noted that it chose this stringent definition to avoid First Amendment concerns. *E.g., id.* at 648-49, 652-53.

18.     Relatedly, the executive branch has long read Title IX to require "prompt and equitable" grievance procedures to investigate and resolve complaints of sex discrimination. *See Sexual Harassment Guidance*, OCR (1997), perma.cc/KU9S-FWE3; *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, OCR (Jan. 2001), perma.cc/7UY9-QP7W. Those procedures cannot deny due process to the accused, or unfairly favor one sex over the other.

19.     These basic principles—the statute's equal-opportunity/anti-discrimination mandate, the meaning of "sex," the definition of actionable harassment, and the procedures for resolving grievances—began to unravel, however, with the Obama administration.

## I.     The Obama administration, through guidance and investigations, unsuccessfully tries to inject gender identity into Title IX, broaden the scope of sexual harassment, and relax procedural protections.

20.     The Obama administration sought to remake Title IX. Through guidance and aggressive investigations, that administration tried to expand Title IX to include gender identity, broaden the scope of actionable sexual harassment, and relax procedural protections for the accused.

21.     Start with gender identity. Following the presidential transition in January 2009, activists launched an aggressive campaign lobbying Congress and the White House to recognize gender identity as a protected class under federal civil-rights laws.

22.     Those early lobbying efforts focused on democratically enacted laws. In October 2009, for example, Congress passed hate-crimes legislation that included "gender identity" and "sexual orientation" as independent protected characteristics alongside other protected traits like race, religion, and national origin. 18 U.S.C. §249(a)(2).

23.     After the Republican Party won a majority of the House in 2010, however, the pressure campaign shifted to unilateral executive action. *See, e.g.*, *NCTE 2010 Annual Report* 8, Nat'l Ctr. for Transgender Equality, perma.cc/3AB5-Q7JK ("While we do not anticipate significant federal legislative victories for 2011, we … are planning for key wins in several federal administrative policy areas. In particular, we wil[l] [a]dvocate with the federal government to interpret existing civil rights laws such as … Title IX … to cover transgender people.").

24.     In 2013, Congress considered a bill to extend Title IX's sex-based provisions to gender identity. According to the "findings" section of that proposed law, congressional action was necessary because "federal statutory protections expressly address discrimination on the basis of race, color, sex, religion, disability, and national origin" but "do not expressly include 'sexual orientation' or 'gender identity.'" H.R. 1652, 113th Cong. (2013). The bill failed.

25.     Tellingly, the same year that it rejected the bill to expand Title IX, Congress reauthorized the Violence Against Women Act, and, in the process, amended the law to prohibit recipients of federal grants from discriminating "on the basis" of "sex" *or* "gender identity" *or* "sexual orientation." *See* 34 U.S.C. §12291(b)(13)(A). Right after listing "sex," "gender

identity," and "sexual orientation" as distinct concepts, the law emphasizes that "nothing in this paragraph shall prevent any … program or activity from consideration of an individual's sex" if "*sex segregation* or *sex-specific* programming is necessary to the essential operation of [the] program." §12291(b)(13)(B) (emphases added). And today, Section 12291 also prohibits "female genital mutilation or cutting," which it defines in explicitly biological terms. §12291(a)(15) (incorporating definition of female genital mutilation in 18 U.S.C. §116).

26.     In 2014, the Department's Office for Civil Rights published a "guidance" document asserting that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity" and "sexual orientation." *Questions and Answers on Title IX and Sexual Violence* B-2, OCR (Apr. 29, 2014) (2014 letter), perma.cc/5HV5-RVUK.

27.     In 2015, Congress considered a new bill that proposed to do what the Department claimed to have already accomplished through its 2014 letter: extend Title IX's protections to differential treatment based on gender identity. *See* S.439, 114th Cong. (2015). The bill was nearly identical to the one that Congress rejected in 2013. Once again, Congress did not pass the legislation.

28.     As the failed attempts to amend Title IX piled up, so did the pressure from outside groups demanding that the government change Title IX through unilateral executive action.

29.     In May 2016, the Department issued a "Dear Colleague" letter informing educational institutions that took federal funding about their new "Title IX obligations regarding transgender students." *2016 Dear Colleague Letter on Title IX and Transgender Students* 2, U.S. Dep'ts of Educ. & Justice (May 13, 2016) (2016 letter), perma.cc/2VTQ-RUYP. Among other

things, the letter announced that the Department would "trea[t] a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations." *Id.*

30. The 2016 letter informed schools that because a student who asserts a female gender identity must be treated identically to a biologically female student under Title IX, any attempt to restrict shower, bathroom, or locker-room use according to biological sex would be unlawful. *Id.* at 3. It also warned schools that failing to "use pronouns and names consistent with a student's gender identity" constituted unlawful harassment under Title IX. *Id.* at 2.

31. Thirteen States sued, alleging that the 2016 letter was unlawful under the APA. *See Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016). The Northern District of Texas agreed and issued a preliminary injunction. *Id.* at 815. The court held that the Department's purported interpretive guidance "failed to comply with" the APA by, among other things, "contradict[ing] the existing legislative and regulatory texts." *Id.*

32. The Northern District of Texas was right. When Congress enacted Title IX in 1972, "'sex' was commonly understood to refer to physiological differences between men and women—particularly with respect to reproductive functions." *Neese v. Becerra*, 2022 WL 1265925, at *12 (N.D. Tex. Apr. 26); *see Sex*, Webster's Third International Dictionary 2081 (1971) ("The sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segmentation and recombination which underlie most evolutionary change …."); *Sex*, American Heritage Dictionary 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions."). Then and now, "the overwhelming majority of dictionaries" define "sex" based on "biology and reproductive function." *Adams*, 57 F.4th at 812; *accord*

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632 (4th Cir. 2020) (Niemeyer, J., dissenting) ("virtually every dictionary definition of 'sex' referred to the *physiological* distinctions between males and females, particularly with respect to their reproductive functions"). "Reputable dictionary definitions of 'sex' from the time of Title IX's enactment show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, *i.e.*, discrimination between males and females." *Adams*, 57 F.4th at 812.

33.     What dictionaries suggest, context confirms. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("[R]easonable statutory interpretation must account for both the specific context in which language is used and the broader context of the statute as a whole." (cleaned up)). Neighboring provisions recognize only two sexes. Section 1681(a)(2) distinguishes between institutions that "admi[t] only students of *one sex*" and institutions that "admi[t] students of *both sexes*." 20 U.S.C. §1681(a)(2) (emphases added). Section 1681(a)(8) likewise refers to sex in binary terms. Under that provision, if father-son or mother-daughter activities are provided for "one sex," then comparable activities must be provided for "the other sex." §1681(a)(8); *see* §1686 (letting educational institutions maintain separate living facilities for "the different sexes").

34.     Judicial opinions from the first several decades of Title IX's existence reinforce that "sex" was widely understood to refer to immutable, biological differences between males and females. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996) (VMI must "afford members of each sex privacy from *the other sex*" (emphasis added)); *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) ("sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth"); *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d

1126, 1131 (9th Cir. 1982) ("due to average physiological differences, males [will] displace females to a substantial extent if they [are] allowed to compete" in women's sports, and "athletic opportunities for women [will] be diminished" as a result).

35.     The law's implementing regulations are similarly clear. They specify, for example, that discrimination against a student "on the basis of pregnancy" constitutes discrimination "on the basis of sex." 34 C.F.R. §106.40(b)(1). Federal courts have recognized this rule as a valid corollary to Title IX's ban on sex-based discrimination based on the understanding that "sex" refers to "the 'structural' and 'functional' differences between male and female bodies." *Conley v. Nw. Fla. State Coll.*, 145 F. Supp. 3d 1073, 1077 (N.D. Fla. 2015); *see Muro v. Bd. of Supervisors of LSU*, 2019 WL 5810308, at *3 (E.D. La. Nov. 7, 2019) ("[A]n adverse action taken against a student on the basis of pregnancy or pregnancy-related conditions is taken *because of* her sex.").

36.     Title IX regulations governing intramural athletics also refer to sex in terms of physical and biological realities. *See* 34 C.F.R. §106.41(a) ("No person shall, on the basis of sex, be excluded from participation in ... any interscholastic, intercollegiate, club or intramural athletics."); §106.41(b) (authorizing sex-specific competitions for "contact sports" such as boxing, football, and any "other sports the purpose or major activity of which involves bodily contact"). Congress mandated those regulations only two years after it enacted Title IX. In 1974, Congress passed the Javits Amendment, which directed the Department to promulgate rules "implementing the provisions of Title IX," including "reasonable provisions considering the nature of the particular sports." Public Law 93-380 (H.R. 69), §844, 88 Stat. 484 (Aug. 21, 1974). To ensure that the Department fulfilled Title IX's purpose, the Javits Amendment

stated that Congress would review the sports-related regulations to assess whether they were "inconsistent with the Act from which [they] deriv[e] [their] authority." *Id.* These longstanding regulations strongly suggest that sex cannot be read to mean something other than biological sex. *See Bittner v. United States*, 598 U.S. 85, 97 (2023) ("[T]he government has repeatedly issued guidance to the public at odds with the interpretation it now asks us to adopt. And surely that counts as one more reason yet to question whether its current position represents the best view of the law." (cleaned up)); *Niz-Chavez v. Garland*, 593 U.S. 155, 168 (2021) (similar).

37.     This commonsense reading of Title IX's reference to "sex" has been reinforced by congressional action (and inaction) in recent years. Twice in the past decade, Congress has considered legislation to amend Title IX to apply to gender identity. *See, e.g.*, H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015). Yet "Congress has not amended the law to state as much"; so "it is questionable," to put it mildly, "whether the Secretary can alter the term 'sex' by administrative fiat." *Neese*, 2022 WL 1265925, at *13.

38.     During floor debates over Title IX before its enactment, members of the Senate discussed Title IX's application solely in the context of biological sex and stated that the law would require *equality* between the sexes, not erase sexual distinctions altogether. *See, e.g.*, 117 Cong. Rec. 30,407 (1971) (statement of Sen. Bayh) ("I do not read this as requiring integration of dormitories between the sexes, nor do I feel it mandates the [sexual] desegregation of football fields … [or] that the men's locker room be [sexually] desegregated."). And in the House, Representative Thompson of Georgia, concerned about Title IX's impact on privacy rights, introduced an amendment stating that nothing in the law "shall preclude any education institution from maintaining separate living facilities because of sex." 117 Cong. Rec. 39,260

(1971). The amendment passed. 117 Cong. Rec. 39,263 (1971); *see* 20 U.S.C. §1686 ("Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes.").

39.     Contemporary scholarship and commentary likewise reflect a broad public consensus that Title IX's distinctions are grounded in biological realities rather than self-conceptions of maleness or femaleness. Three years after Title IX's passage, then-Professor Ruth Bader Ginsburg wrote an op-ed in the Washington Post advocating for constitutional guarantees of the privacy rights recognized by Title IX. *See* Ginsburg, *The Fear of the Equal Rights Amendment* A21, Wash. Post (Apr. 7, 1975) ("Separate places to disrobe, sleep, perform personal bodily functions are permitted, in some situations required, by regard for individual privacy."). Two years later, the U.S. Commission on Civil Rights addressed the same issue and published a report concluding that "the personal privacy principle permits maintenance of separate sleeping and bathroom facilities" for males and females under Title IX. *Sex Bias in the U.S. Code* 216, U.S. Commission on Civil Rights (1977).

40.     This widespread agreement about the meaning of Title IX's reference to "sex" lasted for nearly four decades. Until the Obama administration.

41.     The Obama administration also sought to broaden what counted as sexual harassment under Title IX and to force universities to adopt certain grievance procedures. In 2011, the Department issued a Dear Colleague letter about "Title IX's requirements related to student-on-student sexual harassment" and "schools' responsibility to take immediate and effective steps to end sexual harassment and sexual violence." *2011 Dear Colleague Letter on Sexual*

*Violence* 2, OCR (Apr. 4, 2011) (2011 letter), perma.cc/8HJG-P7YZ. Contra the Supreme Court in *Davis*, the Department asserted that "a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe." *Id.* at 3. The Department also stated that schools must use the preponderance-of-the-evidence standard rather than the higher clear-and-convincing standard. *See id.* at 11.

42.     The Obama administration also used enforcement actions to coerce schools to change their Title IX procedures. For example, in 2013, the Department's Office for Civil Rights published its findings from an investigation into the University of Montana and the details of its agreement with the university. *University of Montana*, DOJ Case No. DJ 169-44-9, OCR Case No. 10126001 (May 9, 2013), perma.cc/EYT7-8VFK. The Department declared that the agreement would "serve as a blueprint for colleges and universities throughout the country to protect students from sexual harassment and assault." *Id.* at 1.

43.     This "blueprint" stated that sexual harassment must "broadly" cover "'*any* unwelcome conduct of a sexual nature,'" including "verbal" conduct. *Id.* at 4, 8 (emphasis added). The verbal conduct need not be "objectively offensive"; mere subjective offense could establish sexual harassment. *Id.* at 9. The Department recognized that its definition of sexual harassment deviated from *Davis* by covering "severe *or* pervasive" verbal conduct that merely "*limit[s]* a student's ability to participate in or benefit from the school's program." *Id.* at 5 (emphases added); *see id.* at 9 (same).

44.     As to the grievance procedures, the blueprint reiterated the Obama administration's view that schools must use the preponderance standard. *Id.* at 10.

14

## II.    The Trump administration issues a notice-and-comment rule that aligns Title IX to first principles and Supreme Court precedent.

45.    In May 2020, for the first time in almost two decades, the Department promulgated a notice-and-comment rule addressing Title IX's application to schools and universities. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,036 (May 19, 2020) (2020 rule).

46.    The 2020 rule acknowledged several public comments urging the Department to "maintain" the requirements outlined in the 2016 letter—in other words, to treat gender identity the same as biological sex and to subject students to formal discipline for failing to use a classmate's preferred pronouns—but the Department declined those requests. *See id.* at 30,177.

47.    The 2020 rule also "adopt[ed]" the Supreme Court's definition of sexual harassment from *Davis* "verbatim." 85 Fed. Reg. at 30,036. Broader definitions of harassment, the Department found, have "infringed on constitutionally protected speech" and have led "'many potential speakers to conclude that it is better to stay silent.'" *Id.* at 30,164-65 & nn.738-39. The *Davis* standard "ensures that speech … is not peremptorily chilled or restricted" because it applies only when harassment rises to the level of "serious *conduct* unprotected by the First Amendment." *Id.* at 30,151-52 (emphasis added); *accord id.* at 30,162-63. The 2020 rule thus defined "[s]exual harassment" to mean, in relevant part, "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, *and* objectively offensive that it effectively *denies* a person equal access to the recipient's education program or activity." 34 C.F.R. §106.30(a) (emphases added).

15

48.     Finally, the 2020 rule strengthened the rights of students accused of sexual har-
assment under Title IX. The rule required schools to, among other things, provide the accused
with written notice of the charges against them, 85 Fed. Reg. at 30,571, let a representative
accompany them to disciplinary hearings, *id.* at 30,577, and let that counsel cross-examine
witnesses, *id.* It specified that schools could choose between a preponderance or clear-and-
convincing standard to adjudicate accusations of Title IX misconduct, but only if they used
the same standard for "all formal complaints of sexual harassment," including "formal com-
plaints against employees." *Id.* at 30,575.

49.     All attempts to vacate the 2020 rule through litigation failed. *E.g.*, *Pennsylvania v.
DeVos*, 480 F. Supp. 3d 47, 59-60 & n.11 (D.D.C. 2020); *New York v. U.S. Dep't of Educ.*, 477
F. Supp. 3d 279, 287-88 (S.D.N.Y. 2020). One court ruled that one partial provision prohibit-
ing adjudicators from considering "all statements not subject to cross-examination" was arbi-
trary and capricious because the Department failed to consider one aspect of the problem.
*Victim Rts. L. Ctr. v. Cardona*, 2021 WL 3516475, at *1 (D. Mass. Aug. 10); *Victim Rts. L. Ctr. v.
Cardona*, 552 F. Supp. 3d 104, 132-34 (D. Mass. 2021); *see* 34 C.F.R. §106.45(6)(i). The Biden
administration chose not to appeal that ruling. Every other challenge to the 2020 rule failed,
and every other part of the rule that was challenged was upheld.

50.     One month after the Department promulgated the final version of the 2020
rule, the Supreme Court decided *Bostock v. Clayton County*, which held that an employer violated
Title VII when it fired an employee solely because of the employee's asserted gender identity
or sexual orientation. 590 U.S. 644, 667-69 (2020). *Bostock*, a case about Title VII, is irrelevant

to Title IX. The Court "agree[d] that homosexuality and transgender status are distinct concepts from sex," but it concluded that firing employees "based on homosexuality or transgender status" still triggers Title VII's protections because the employer's action "necessarily entails" a decision made "in part because of the affected individuals' sex." *Id.* at 669. The Court's decision thus hinged on the premise that sex is binary and immutable, and that an employee's biological sex is a necessary component of any determination about whether "discrimination because of sex" has occurred under Title VII. And the Court made clear that it did not "prejudge" questions about whether its decision "swe[pt] beyond Title VII to other federal or state laws that prohibit sex discrimination"; nor did it "purport to address bathrooms, locker rooms, or anything else of the kind" for "Title VII," let alone Title IX. *Id.* at 681.

51.    The Department's initial assessment of *Bostock* tracked this reasoning. In January 2021, the Department published a memo analyzing the *Bostock* decision and clarifying that *Bostock* did not affect any aspect of the 2020 rule. *See Memorandum re: Bostock v. Clayton Cnty.* 1, OCR (Jan. 8, 2021), perma.cc/CJE3-GH52. This memo reiterated that the Department's "longstanding construction of the term 'sex' in Title IX to mean biological sex, male or female," is "the only construction consistent with the ordinary public meaning of 'sex' at the time of Title IX's enactment." *Id.*

52.    The *Bostock* memo noted that "Title IX['s] text is very different from Title VII['s] text in many important respects." *Id.* Like the Sixth and Eleventh Circuits and other federal courts, the memo observed that the Supreme Court "decided [*Bostock*] narrowly, specifically refusing to extend its holding to Title IX and other differently drafted statutes." *Id.* The memo

emphasized that "[u]nder Title IX and its regulations, a person's biological sex *is* relevant for the considerations involving athletics, and distinctions based thereon are permissible." *Id.* at 7. The memo further specified that "schools *must* consider students' biological sex when determining whether male and female student athletes have equal opportunities to participate." *Id.* (emphasis added).

53.     In short, the *Bostock* memo concluded that "statutory and regulatory text and structure, contemporaneous Supreme Court authorities, and the Department's historic practice demonstrate that the ordinary public meaning of the term 'sex' at the time of Title IX's enactment could *only* have been … 'biological distinctions between male and female.'" *Id.* at 2.

54.     The *Bostock* memo mirrored the Department's other pronouncements. On October 16, 2020, for instance, the Department's Office of Civil Rights settled a complaint against Franklin Pierce University alleging that the university violated Title IX by "permitting transgender athletes to participate in women's intercollegiate athletic teams." *Letter to Kim Mooney* 1, OCR (Oct. 16, 2020), perma.cc/PY8L-VJWB. The settlement required the university "to rescind the Policy [and] cease any and all practices related" to it. *Id.* at 6. It also explained the Department's view of *Bostock* and Title IX:

> [I]f *Bostock*'s reasoning under Title VII were applied to policies regarding single-sex sports teams under Title IX, it would *confirm that the Department's regulations authorize single-sex teams only based on biological sex.* In *Bostock*, the Court took the position that "homosexuality and transgender status are inextricably bound up with sex," such that "when an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex." Under that logic, special exceptions from single-sex sports teams based on homosexuality or transgender status would themselves generally constitute unlawful sex discrimination, because homosexuality and transgender status are not physiological differences relevant to the separation of sports teams based on sex. In other words, if *Bostock* applies, it would require that a male student-athlete who identifies as female not be treated better or worse than other male student-athletes. If the school offers separate-sex

teams, the male student-athlete who identifies as female must play on the male team, just like any other male student-athlete.

*Id.* at 5 (emphasis added) (quoting *Bostock*, 590 U.S. at 660-61, 665).

## III.  The Biden administration publishes unlawful guidance, then engages in notice-and-comment rulemaking, ending with the rule challenged here.

55.    On June 22, 2021, the Department, yet again, tried to modify the scope of Title IX without any input from Congress or the public. *See Enforcement of Title IX of the Education Amendments of 1972 with Respect to Discrimination on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021). In an abrupt reversal from its own analysis just six months prior, the Department claimed that *Bostock* required new interpretive guidance. *Id.* at 32,637-39. It didn't explain why it now disagreed with its previous stance or make any other effort to justify its departure.

56.    Like the 2016 letter, the 2021 guidance was quickly challenged and enjoined by a federal court. The Eastern District of Tennessee held that the guidance was, in substance, a legislative rule that should have gone through the notice-and-comment process. *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 815, 837 (E.D. Tenn. 2022). Far from applying "the Supreme Court's reasoning in *Bostock*" to Title IX, the Department "advance[d] *new* interpretations" and "impose[d] *new* legal obligations" on States and educational institutions. *Id.* at 817, 833.

57.    In July 2022, the Department published a notice of proposed rulemaking that reasserted its position in the 2021 guidance, along with many other significant revisions to the Title IX landscape. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390 (July 12, 2022).

58.     Like the enjoined 2021 guidance, the proposed rule scrapped the Department's biology-based definition of sex based on little more than boilerplate citations to *Bostock*, again brushing aside its previous analysis. *Id.* at 41,410. The proposed rule acknowledged the *Bostock* memo's conclusion that "sex" under Title IX refers to "biological sex," but it rejected that conclusion as unreliable because the memo "did not … explain how a school should determine a student's 'biological' sex." *Id.* at 41,531. The Department did not explain its newfound confusion about how biology works.

59.     The proposed rule also jettisoned the *Davis* standard for actionable sexual harassment, *id.* at 41,568-69; removed procedural protections for accused students, such as the right to present witnesses, *id.* at 41,485, 41,497, the right to inspect all the evidence against them, *id.* at 41,488, 41,500, the right to a live hearing, *id.* at 41,577-78, and secondary students' right to participation by a representative, *id.* at 41,577.

60.     The proposed rule was met with significant opposition from concerned observers spanning both sides of the aisle, numerous major faith groups, and generations old and new. In all, the Department received over 240,000 comments on the proposed rule, 89 Fed. Reg. at 33,477—the vast majority of which were negative.

61.     Still, after many delays, the Department published a "final rule" on April 29, 2024, that was materially indistinguishable from the proposed rule. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024). The Department set the rule's effective date for August 1, 2024. *Id.* at 33,476. This final rule has all the same legal and constitutional infirmities as the proposed rule.

**A.      The challenged rule redefines "sex" to include "gender identity" and sexual orientation.**

62.      The challenged rule redefines "sex" to include "gender identity" and "sexual orientation," declares unlawful longstanding policies requiring individuals to use bathrooms matching their biological sex, and upends the foundation of women's sports. All illegal.

63.      The rule's first move is to redefine "sex" to include "gender identity" and "sexual orientation." It declares that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." *Id.* at 33,886 (34 C.F.R. §106.10). The Department does not provide an express definition for "sex" but also does not dispute that "sex" means what it has always meant: "biological sex." The Department instead contends that "even assuming 'sex' means 'biological sex,'" "Title IX's prohibition on sex discrimination encompasses sexual orientation and gender identity discrimination." *Id.* at 33,807; *accord id.* at 33,804 ("Title IX's coverage of discrimination based on sexual orientation and gender identity does not depend on whether sex is defined to encompass only certain biological characteristics."). But the Department is playing word games; it's clear that the Department is trying to inject, for the first time, gender ideology into Title IX, contrary to longstanding practice and the statute's original public meaning.

64.      The Department states that its new conception of sex discrimination applies in "any academic, extracurricular, research, occupational training, or other education program or activity." *Id.* at 33,887 (34 C.F.R. §106.31(a)(1)). Though it admits that Title IX allows "different treatment or separation on the basis of sex" in "limited circumstances," the rule states that, even in those exempted circumstances, recipients cannot "subjec[t] a person to more than de

minimis harm." *Id.* (34 C.F.R. §106.31(a)(2)). And preventing someone from participating "consistent with [that] person's gender identity" is *always* "more than de minimis harm." *Id.*

65.     The rule then states what it views as those "limited circumstances" where sex discrimination is allowed: "20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations §§106.12 through 106.15," "20 U.S.C. 1686 and its corresponding regulation §106.32(b)(1)," and "§106.41(b)." *Id.* Absent from this list is the Department's regulation on separate bathrooms and locker rooms: 34 C.F.R. §106.33.

66.     Though the rule doesn't expressly rescind §106.33, the Department says that its regulation is null and void. That regulation is not backed by a "statutory exception," the Department claims, and the Department "declines to adopt the Eleventh Circuit's reasoning in *Adams* that the statutory carve out for living facilities" justifies it. 89 Fed. Reg. at 33,821. In other words, the rule declares §106.33 invalid without formally rescinding it and proclaims that excluding transgender or nonbinary students from using the bathroom or locker room of the opposite sex is illegal. *Id.* And the rule *concedes* that its new bathroom regulation is unlawful under existing Eleventh Circuit precedent.

67.     Though the Department understood Title IX differently in 2021, the Department claims that its prior position "was at odds with Title IX's text and purpose and the reasoning of the courts that had considered the issue." *Id.* at 33,807. *Bostock*, the Department says, makes clear "that it is 'impossible to discriminate against a person' on the basis of sexual orientation or gender identity without 'discriminating against that individual based on sex.'"

*Id.* at 33,816 (quoting *Bostock*, 590 U.S. at 660). Never mind that *Bostock* does not extend beyond Title VII and involved a materially different statute with critically different text, history, and context.

68.    And while the rule "strongly agrees" that schools "have a legitimate interest in protecting all students' safety and privacy," *id.* at 33,821, it denies any relationship between that interest and "excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity," *id.* at 33,820, dismissing the privacy and safety concerns as "myth," 87 Fed. Reg. at 41,535.

69.    The new rule also will cause biological men who identify as women to be allowed to compete in women's sports. The rule claims that sex-separate athletic teams can continue because the Department has a regulation that expressly allows it. 89 Fed. Reg. at 33,816-17, 33,839. But the rule defines sex discrimination under Title IX to include discrimination based on gender identity and applies that new definition to circumstances where the Department's regulations expressly allow sex-separate facilities, like restrooms. It applies that new definition because it thinks the restroom regulation is *invalid* to the extent it requires all students to use the restroom that corresponds to their biological sex. *See id.* at 33,819-21. But the Department thinks the exact same thing about the regulation governing same-sex athletics. *See B.P.J. v. West Virginia*, Doc. 42, No. 2:21-cv-316 (S.D. W. Va. June 17, 2021), perma.cc/ZV73-B4P6 (arguing that Title IX and the Constitution invalidate policies that "categorically exclude transgender girls from participating in single-sex sports restricted to girls"). In other words, the Department claims to permit women's sports, so long as women's sports

are open to men. The rule thus requires—or will predictably coerce—schools to allow biological males to compete on athletic teams for women or girls, denying female students equal athletic opportunities, playing time, and fair competition. And it concededly affects sports by changing the rule for sex-separated locker rooms.

70.    Finally, the rule emphasizes that its new definitions "preempt" conflicting state or local law, such as sex-separate restroom policies. *See* 89 Fed. Reg. at 33,540-41; *id.* at 33,885 (34 C.F.R. §106.6(b)). At the same time, the Department concedes that Eleventh Circuit precedent squarely forecloses the rule's ban on separate bathrooms and locker rooms based on biological sex. *Id.* at 33,820-21. *Adams*, the Department concedes, "determined that 'sex' as used in Title IX can only refer to 'biology and reproductive function,' not gender identity, and that restrooms are covered by a statutory provision permitting a recipient to maintain 'separate living facilities for the different sexes.'" *Id.* (quoting *Adams*, 57 F.4th at 812-15). Instead, the Department merely says that it "does not agree" with *Adams* and other courts coming to the same conclusion. *Id.* at 33,820. But its disagreement cannot displace binding precedent's authoritative interpretation of Title IX or the still-in-effect implementing regulations.

## B.    The challenged rule redefines "sex-based harassment."

71.    As discussed, the 2020 rule defined hostile-environment harassment by adhering "verbatim" to the Supreme Court's definition in *Davis*: "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, *and* objectively offensive that it effectively *denies* a person equal access to the recipient's education program or activity." 34 C.F.R. §106.30(a) (emphases added); *accord Davis*, 526 U.S. at 652. The rule challenge here concededly exceeds *Davis* and defines harassment far more broadly.

72.     The challenged rule prohibits "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe *or* pervasive that it *limits* or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment)." 89 Fed. Reg. at 33,884 (34 C.F.R. §106.2).

73.     It adds a non-exhaustive list of facts to consider. "Whether a hostile environment has been created is a fact-specific inquiry that includes consideration of the following":

(i)     The degree to which the conduct affected the complainant's ability to access the recipient's education program or activity;

(ii)    The type, frequency, and duration of the conduct;

(iii)   The parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the effects of the conduct;

(iv)    The location of the conduct and the context in which the conduct occurred; and

(v)     Other sex-based harassment in the recipient's education program or activity.

*Id.*

74.     The Department concedes that its rule is "broader" than the 2020 rule and the *Davis* standard. *See id.* at 33,498 ("The Department's final definition is not identical to *Davis* … because the Department … believes a broader standard is appropriate."). And it is broader. The rule applies even if the harassment merely "*limits*" a person's "ability to participate in or benefit from" a program or activity, *id.* at 33,884 (34 C.F.R. §106.2), rather than "*denies*" a person "access to the educational opportunities or benefits provided by the school"; the rule thus covers mere negative effects like a "'decline in grades,'" a choice to skip class, or a decision not to attend a campus activity, *Davis*, 526 U.S. at 652-53. The rule also expands Title IX to

cover harassment that's "severe *or* pervasive," rather than "severe *and* pervasive"; the rule thus reaches even a single or isolated incident. 89 Fed. Reg. at 33,884 (34 C.F.R. §106.2); *contra* 526 U.S. at 652-53. Worse, under the Department's reading, "severe or pervasive" provides no additional limit: Harassment is "'severe or pervasive,'" the Department says, "if it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,508.

75.     Broader still, the rule requires recipients to "promptly and effectively end any sex discrimination," regardless whether they were deliberately indifferent to it. *See id.* at 33,889 (34 C.F.R. §106.44(f)(1)); *contra* 526 U.S. at 650-52. And the rule uses a "totality-of-known-circumstances approach," which "exacerbates" its breadth. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1121 (11th Cir. 2022).

76.     This new, broader definition of harassment—combined with the Department's inclusion of gender identity—effectively requires recipients to ensure that students use "pronouns and names consistent with a student's gender identity." *2016 Letter* at 3. The Department cites approvingly (multiple times) a district-court decision that says it's constitutional for K-12 schools to ban "misgendering." *See* 89 Fed. Reg. at 33,504, 33,506 (citing *PDE v. Olentangy Loc. Sch. Dist.*, 2023 WL 4848509, at *2 (S.D. Ohio July 28)). It disavows and disagrees with a prior memorandum that said "refusing to treat a student consistent with their gender identity generally would not violate Title IX." 87 Fed. Reg. at 41,536-37 (citing *Memorandum re: Bostock v. Clayton Cnty.* 1 (Jan. 8, 2021), perma.cc/CJE3-GH52); 89 Fed. Reg. at 33,807, 33,820 (maintaining that the prior memorandum is wrong). And the Department is currently investigating a school for not forcing students to use a classmate's preferred pronouns. *See* 89 Fed. Reg. at

33,516 (not responding to a comment asking the Department to explain "a recent resolution letter finding that a school district violated Title IX when it failed to effectively respond to misgendering of a student"). Schools will understand that, if they deviate from the Department's rule, they can be investigated and punished by the Department too, risking their reputation and their federal funding.

77.    This new definition of sexual harassment applies in the broadest possible way, extending to conduct that occurs online, off campus, outside the United States, or even before any of the individuals attended the school. *See* 89 Fed. Reg. at 33,886, 33,527, 33,886.

78.    The rule's prohibition on "retaliation" exacerbates its breadth. The rule requires recipients to "prohibit retaliation, including peer retaliation," defined extraordinarily broadly. *Id.* at 33,896 (34 C.F.R. §106.71). Under the rule, "retaliation" means "intimidation, threats, coercion, or discrimination against any person" for making a complaint or participating in an investigation. *Id.* at 33,884 (34 C.F.R. §106.2).

## C.    The challenged rule eliminates procedural safeguards for the accused.

79.    The rule makes several changes that restrict students' ability to defend themselves from accusations of misconduct under Title IX. The rule, among other changes, eliminates an accused's right to a live hearing, right to cross-examination of the accuser or other witnesses, right to fairly access all evidence, protection against a recipient's use of a single-investigator model, and right to have investigations start with a written complaint. 89 Fed. Reg. at 33,891-95 (34 C.F.R. §§106.45-46). Instead of these protections, the rule lets recipients question the witnesses outside of a hearing; provide only a "description of the relevant and not otherwise impermissible evidence"; have one person serve as the investigator, factfinder,

27

and discipliner; and start an investigation with an oral statement. *Id.* Many of these changes, such as the elimination of the live-hearing right and the authorization to use the single-investigator model, have been almost universally condemned, including by the ACLU. *See ACLU Comment on U.S. Department of Education's Final Title IX Rule*, Press Release (Apr. 19, 2024), perma.cc/8XWJ-54FK.

80.     To begin with, the rule eliminates the accused's right to a live hearing at post-secondary institutions. *See* 89 Fed. Reg. at 33,895 (34 C.F.R. §106.46(g)). Under the 2020 rule, students accused of Title IX misconduct had the right to defend themselves in person. Now, their colleges or universities have full discretion whether to deny requests for in-person hearings, and thus meaningful cross-examination.

81.     Even if schools give the accused some sort of hearing, the accused, through an advisor, still does not have a right to cross-examine the accuser or witnesses. Instead, the rule requires only "a process … that enables the decisionmaker to question parties and witnesses to adequately assess a party's or witness's credibility to the extent credibility is both in dispute and relevant." 89 Fed. Reg. at 33,893 (34 C.F.R. §106.45(f)-(g)).

82.     The rule also limits the opportunity for parties to present witnesses. Parties can present "fact witnesses" that are "relevant and not otherwise impermissible" but no longer expert witnesses. *Id.* at 33,892 (34 C.F.R. §106.45(f)(2)); *id.* at 33,594. And the Title IX coordinator gets to determine whether the fact witness is "relevant" and permissible. *Cf. Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 606 (D. Mass. 2016) (letting a due-process claim go forward where the dean "refused to refer any of John's additional facts, witnesses, or affidavit to the Special Examiner for further consideration").

83. The rule removes the right of students to inspect all the evidence against them. The rule instead allows the parties to access a mere "description" of the "relevant and not otherwise impermissible evidence" unless the parties go out of their way to request an "equal opportunity to access" the evidence. 89 Fed. Reg. at 33,892-94 (34 C.F.R. §§106.45(f), 106.46(e)). And even then, the evidence does not include whatever the decisionmaker has decided is "relevant and not otherwise impermissible." *Id.* at 33,892.

84. The rule also limits when schools can give accused students the benefit of a higher burden of proof. Under the 2020 rule, schools could adopt the preponderance-of-the-evidence standard or the clear-and-convincing-evidence standard as long as the standard was the same for students and employees. 85 Fed. Reg. at 30,575. The challenged rule now only lets recipients use a higher burden of proof (clear and convincing evidence) if they use that higher burden "in all other comparable proceedings, including proceedings relating to other discrimination complaints." 89 Fed. Reg. at 33,893 (34 C.F.R. §106.45(h)(1)).

85. The rule states that college and university students accused of misconduct no longer have a right to have an advisor (lawyer) participate at all proceedings. Instead, the rule allows postsecondary schools to limit their attendance. *Id.* at 33,894 (34 C.F.R. §106.46(e)(2)); *see id.* ("the postsecondary institution may establish restrictions regarding the extent to which the advisor may participate in the grievance procedures, as long as the restrictions apply equally to the parties"); *id.* at 33,720 ("restrictions on advocates are … common and … necessary to ensure orderly and efficient functioning"). The only requirement is that, if the accused has counsel, then the accuser must get counsel too (even though it's the accused, rather than the accuser, whose need for counsel is particularly acute). *Id.* at 33,894.

86.    The rule permits a single-investigator model. The Department will no longer require separation between the Title IX investigator and the decisionmaker. *Id.* at 33,891 (§106.45(b)(2)). Instead, these roles can all fall under the umbrella of a single employee. In other words, the same individual can hear the original allegations, decide whether to investigate, do the investigation, evaluate the evidence, and make a final decision.

87.    The rule now allows an investigation to begin without any formal written complaint. Instead, a recipient need only receive an "oral" statement that a recipient can "objectively" understand as a "request" to "investigate." *Id.* at 33,882 (34 C.F.R. §106.2). Perhaps worse, the rule now permits the Title IX coordinator to initiate a grievance procedure even in "the absence of a complaint or the withdrawal of any or all of the allegations in a complaint." *Id.* at 33,889 (§106.44(f)(1)(v)). The coordinator must make "this fact-specific determination" by considering many factors, including "reasonable safety concerns," "[t]he risk that additional acts of sex discrimination would occur if a complaint is not initiated," "[t]he age and relationship of the parties," and "[t]he availability of evidence." *Id.* (§106.44(f)(1)(v)(A)).

88.    The rule thus empowers Title IX coordinators to go beyond their mandatory reporting duties and, in their discretion, police activities on campus that they determine constitute sex discrimination. Given the rule's overall breadth, this provision appears to give Title IX coordinators and other employees the power to open investigations and start proceedings based solely on what they have heard.

89.    Even if some of these procedures are technically optional, schools will adopt them once the 2020 rule is repealed and replaced. Many agree with them as a matter of policy. *See Comment on Docket No. ED-2021-OCR-0166*, at 61, FIRE (Sept. 12, 2022), perma.cc/PJX5-

RZ3G ("FIRE's research shows that when not required to provide a live hearing, the majority of institutions, regardless of their size, do not. Of the 50 surveyed institutions in FIRE's 2021 Spotlight on Due Process report with non-Title IX sexual misconduct policies, 33 (66%) did not guarantee a meaningful hearing." (citing *2021-22 Spotlight on Campus Due Process*, FIRE (2022), perma.cc/N7SF-8TH7)). And they will reasonably fear enforcement actions or investigations from the Department for having inadequate procedures. *See* 89 Fed. Reg. at 33,636; *Doe v. Univ. of Scis.*, 961 F.3d 203, 213 & n.6 (3d Cir. 2020) (describing how through enforcement actions the Department has coerced schools into adopting the single-investigator model).

## IV. Plaintiffs and this litigation

90.     Each of the State Plaintiffs (Alabama, Florida, Georgia, and South Carolina) and the Private Plaintiffs (IWLC, IWN, PDE, and Speech First) will suffer concrete injuries as a direct result of the Department's rule.

91.     ***Alabama, Florida, Georgia, and South Carolina.*** Each of the State Plaintiffs take federal funds for education programs or activities, subjecting them to Title IX. *See* 89 Fed. Reg. at 33,541 ("[A]ll 50 States have accepted Federal funding for education programs or activities and are subject to Title IX as to those programs and activities."). If any program or activity at one of their covered institutions is determined not to comply, the Department can terminate federal funding. Noncompliance with the rule thus would cause the States to risk billions of dollars of federal funding for education. That loss of federal funds would require these institutions either to eliminate certain educational services or to seek new funding to pay

for those services. And enforcement proceedings—even just investigations by the federal government—are expensive, time-consuming, and distracting for schools, school districts, school officials, and the State.

92.     Compliance with the new rule, however, will be burdensome and costly. The rule is over a thousand pages long; it will take substantial time and money to review the rule and existing policies, to determine what the rule requires, and to act to come into compliance with it. To take just one example, virtually every public university in the Plaintiff States has a Title IX policy that tracks the 2020 rule—the lengthy regulation that this new rule will repeal and replace. Similarly, public-school districts in the Plaintiff States have Title IX policies that are *Davis*-compliant and that will need to be changed to comply with the rule. All those policies will have to be reviewed, rewritten, and reapproved, which is costly and burdensome. It will also take time and money to train officials on the rule and the new policies implementing it.

93.     The rule also substantially expands recipients' enforcement obligations. The rule not only adds responsibility over gender identity and sexual orientation and expands the definition of harassment, but also requires recipients "to promptly and effectively end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects"—even when not deliberately indifferent, even when there is no complaint (oral or written), and even when the complaint is withdrawn. And it requires recipients to provide supportive measures when there is no complaint, during investigations and grievance procedures, and even after a complaint is dismissed. Following these broader requirements is more onerous than following the current, narrower ones. If the rule goes into effect, compliance costs and burdens for the Plaintiff States' schools will increase substantially.

94.     The Department agrees. It estimates that the compliance costs will be "$4.6 million to $18.8 million over ten years." 89 Fed. Reg. at 33,851, 33,861. It "acknowledges" that "it will take some time to review requirements and revise policies and procedures to align with [the rule's] requirements." *Id.* at 33,851. It will cost "time" and money "reading and under-standing the regulations; revising policies; publishing notices of nondiscrimination; training Title IX Coordinators; updating training materials;" "conduct[ing] additional training"; and more. *Id.* at 33,851, 33,548. The Department also admits that recipients will see "an increase in Title IX complaints" they must administer, a "10 percent increase in the number of inves-tigations" they must conduct, an "increase" in the "supportive measures" they must provide, and an "increase" in "responsiveness to all reports and complaints of sex discrimination." *Id.* at 33,483, 33,492, 33,850, 33,862, 33,868-69. These estimates are overly conservative at best.

95.     Each of the State Plaintiffs have adopted their laws, policies, and practices and established sex-specific restrooms, showers, residence halls, locker rooms, and other living facilities in reliance on longstanding Department regulations that Title IX and its implementing regulations permit these laws, policies, and practices. The challenged rule upsets those reliance interests.

96.     The rule conflicts with many of the State Plaintiffs' laws that govern public in-stitutions of higher education and primary and secondary education, including laws involving

harassment,[1] bathrooms,[2] sports,[3] parental rights,[4] and more.[5] The rule thus impedes the State Plaintiffs' sovereign authority to enforce and administer their laws and creates pressure on the State Plaintiffs to change their laws and practices.

---

[1] *See, e.g.*, Ala. Code §16-68-2(4) ("Harassment. Expression that is so severe, pervasive, and objectively offensive that it effectively denies access to an educational opportunity or benefit provided by the public institution of higher education."); Ala. Code §16-68-3(a)(10) ("That the public institution of higher education shall prohibit harassment in a manner consistent with the definition provided in this chapter, and no more expansively than provided herein."); Ga. Code Ann. §20-4-11.1(a)(5) ("'Student-on-student harassment' means unwelcome conduct or expressive activity directed at a student that is so severe, pervasive, and objectively offensive that a student is effectively denied equal access to educational opportunities or benefits provided by the public institution of higher education. This term shall not apply to or govern any employment policy of a public institution of higher education relating to harassment.").

[2] *See, e.g.*, Ala. Code §16-1-54(b) ("A public K-12 school shall require every multiple occupancy restroom or changing area designated for student use to be used by individuals based on their biological sex."); Fla. Stat. Ann. §553.865 (same); *Rule 20*, Collier County Public Schools, perma.cc/9TCE-HBNU (same); *Policy 5.08: Bathrooms, Locker Rooms and Overnight Trips*, Duval County Public Schools, perma.cc/8RRG-ZPDD (same).

[3] *See, e.g.*, Ala. Code §16-1-52 ("Participation in athletic events to be based on biological sex of athletes."); Fla. Stat. Ann. §1006.205 (same); S.C. Code Ann. §59-1-500 (same).

[4] *See, e.g.*, Ala. Code §26-2-5 ("No nurse, counselor, teacher, principal, or other administrative official at a public or private school attended by a minor shall do either of the following: (1) Encourage or coerce a minor to withhold from the minor's parent or legal guardian the fact that the minor's perception of his or her gender or sex is inconsistent with the minor's sex. (2) Withhold from a minor's parent or legal guardian information related to a minor's perception that his or her gender or sex is inconsistent with his or her sex."); Fla. Stat. Ann. §1014.01-06 (Parents' Bill of Rights); Ga. Code §20-2-786 (Parents' Bill of Rights).

[5] *See, e.g.*, Fla. Stat. Ann. §1000.071(1)-(2) ("It shall be the policy of every public K-12 educational institution that is provided or authorized by the Constitution and laws of Florida that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex…. An employee, contractor, or student of a public K-12 educational institution may not be required, as a condition of employment or enrollment or participation in any program, to refer to another person using that person's preferred personal title or pronouns if such personal title or pronouns do not correspond to that person's sex.").

97.     The rule also exposes the State Plaintiffs, their universities, and their K-12 schools to litigation costs and liability. Lawsuits are expensive, time-consuming, and distracting for schools, school officials, and the State. And the threat of liability, including large awards of attorney's fees, can be devastating.

98.     By expanding the definition of harassment and removing deliberate indifference as a liability requirement, the rule puts universities in a catch-22. If they do not adopt the Department's new definition of harassment, then they risk enforcement actions by the Department. But if they do adopt the Department's definition, then they risk lawsuits alleging that the definition violates the First and Fourteenth Amendments. For example, Alabama, Florida, and Georgia sit in the Eleventh Circuit, which has already held that a harassment policy like the one mandated by the rule is likely unconstitutional. *See Cartwright*, 32 F.4th at 1110.

99.     The same is true for the rule's provisions reducing procedural protections for the accused. Some of these procedures are mandatory. And though some purport to be optional, schools will feel substantial pressure to adopt them because the Department can and has brought enforcement actions against recipients who lack them. But if recipients decrease procedural protections for the accused, they risk litigation for sex-based discrimination or due-process violations. Federal courts have found these claims viable. *E.g.*, *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019); *Univ. of Scis.*, 961 F.3d 203; *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940 (9th Cir. 2020); *Doe v. Regents of Univ. of Calif.*, 23 F.4th 930 (9th Cir. 2022).

100.    The same is also true for the rule's redefinition of "sex discrimination" to include gender identity. The rule requires eliminating female-only spaces, even in sensitive areas

like bathrooms and locker rooms, which the Eleventh Circuit has said implicates women's "right" to privacy. *Adams*, 57 F.4th at 804-08. Lawsuits alleging violations of the constitutional right to privacy have already been filed against schools that adopted the same policy. *E.g.*, *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018). Other courts, moreover, have held that school policies against students "misgendering" other students violate the First Amendment. *E.g.*, *PDE v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 666-69 (8th Cir. 2023) (K-12). And constitutional lawsuits have been filed against schools that refuse to notify or tell parents information about their children's professed gender identity at school. *E.g.*, *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees*, 680 F. Supp. 3d 1250, 1275-78 (D. Wyo. 2023); *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, 2022 WL 1471372, at *7-9 (D. Kan. May 9); *Linn Mar*, 83 F.3d at 665-66.

101.    The Department, again, acknowledges these costs. Though it unrealistically minimizes the problem, it admits that each key component of the rule will impose on recipients at least "some … costs associated with litigation." 89 Fed. Reg. at 33,851 (definition of harassment), 33,858 (inclusion of gender identity), 33,876 (enforcement procedures).

102.    The State Plaintiffs also have less control over the policies and practices of their private schools, and no control over schools in other States where thousands of their students attend with the intent to come back. Yet the rule will directly change the policies and practices at those schools. The State Plaintiffs have a substantial interest in ensuring that none of their female students are discriminated against by being forced to compete against men in athletics or share sensitive and private spaces with them. And it harms the State Plaintiffs if their stu-

dents' educations—and ability to come back and contribute to their economies—are compromised by policies that prevent the free exchange of ideas or that punish students without adequate process.

103.    Each Plaintiff State submitted comments urging the Department not to uproot the 2020 rule. *See Montana's Comment Regarding Docket ID ED-2021-OCR-0166*, RIN 1870-AA16 (Sept. 12, 2022), perma.cc/J798-EPFM (joined by Alabama, Georgia, and South Carolina); *Tennessee's Comment Regarding Docket ID ED-2021-OCR-0166*, RIN 1870-AA16 (Sept. 12, 2022), perma.cc/C7KM-4LHD (joined by Alabama, Georgia, and South Carolina); *Florida's Comment Regarding Docket ID ED-2021-OCR-0166*, RIN 1870-AA16 (Sept. 12, 2022), perma.cc/3UNA-CFNK.

104.    **Independent Women's Law Center & Independent Women's Network.** IWLC and IWN have spent substantial time and resources defending the Trump administration's Title IX rule—the same 2020 rule that the Biden administration is now repealing. IWLC intervened in *Pennsylvania v. Devos* to defend the 2020 rule, *see* Minute Order, No. 1:20-cv-01468 (D.D.C. July 6, 2020), and the court upheld that rule as lawful, 480 F. Supp. 3d 47 (D.D.C. 2020). IWLC also helped defeat proposals to delay the 2020 rule's effective date. *See Letter to Secretary DeVos and Assistant Secretary Marcus*, IWLC & Speech First (Apr. 9, 2020), perma.cc/4ME3-43CS. And IWLC filed comments in response to the Department's notice of proposed rulemaking to repeal the 2020 rule here. *Comment Regarding Free Speech Concerns with Proposed Rule Redefining Unlawful Harassment under Title IX*, IWLC & IWF (Sept. 12, 2022), perma.cc/756B-UN6B; *Comment Regarding Lack of Due Process and Fundamental Fairness in Proposed Title IX Rule*, IWLC & IWF (Sept. 12, 2022), perma.cc/3DTM-M7VB; *Comment Regarding the*

*Separation of Powers and Constitutional Violations in the Department of Education's Proposed Title IX Rule*, IWLC & IWF (Sept. 12, 2022), perma.cc/5ZNE-2Z48; *Comment Regarding Parental Rights Affected by Proposed Title IX Rule*, IWLC & IWF (Sept. 12, 2022), perma.cc/4ARM-5PJ4; *Comment Regarding Implications of the Department of Education's Proposed Title IX Rule*, IWLC & IWF (May 15, 2023), perma.cc/H54T-SHVN.

105.    IWN has members who are current students at colleges and universities throughout the United States, including within the Plaintiff States. Many of these members are current athletes for their colleges.

106.    Regina Baird is a freshman at Ave Maria University in Florida. She competes for her college team in track and cross country, primarily running in the 800, 1500, and 5,000 meter races. Her school participates in the National Association of Intercollegiate Athletics. The NAIA currently does not allow biological males to participate in women's sports. Baird has participated in nearly a dozen NAIA meets in Florida.

107.    Savvy Barbosa and Sarah Scott are freshmen at another university in Florida. Savvy plays goalkeeper and Sarah plays midfield on their school's women's lacrosse team. The team competes across the country. The 2024 season is ongoing with 16 games played so far, including in Florida, North Carolina, South Carolina, New York, Pennsylvania, and Indiana.

108.    Mary Grace Tibbs is a freshman at Virginia Commonwealth University. She plays midfield on her college's women's lacrosse team. VCU's team competes across the country. The 2024 season is ongoing with 17 games played so far, including in Virginia, Pennsylvania, North Carolina, D.C., Massachusetts, and New York.

109.    Haley Olive is a freshman at Webber International University in Florida. She plays for her college's lacrosse team. Webber's team participates in the NAIA, which again currently does not allow biological males to participate in women's sports. The 2024 season is ongoing with 16 games played so far, including in Florida, North Carolina, Kentucky, Missouri, and Georgia.

110.    IWN's members support the scientific consensus that, like most mammals, human beings are born either male or female and that it is not possible to "become" male or female based on subjective feelings, cosmetics, style of dress, medication, or surgical procedures. They do not want to be forced to "affirm" that a man is really a "woman" just because he decides to identify or present as one.

111.    The new rule will allow biological men who identify as women to compete in women's sports. It requires—or will predictably coerce—schools to allow biological males to compete on athletic teams for women or girls, denying IWN's members and other female students equal athletic opportunities, resources, playing time, and fair competition.

112.    IWN's members do not want to compete *against* biological males in their sports, as they believe that allowing males to compete in women's sports is unfair and unsafe.

113.    Nor do they want to compete *with* biological males on their teams, as they or one or more of their female teammates would lose a roster spot, playing time, opportunities to compete, access to resources, and, in some cases, awards and potential scholarships. They believe that allowing males to take athletic opportunities, resources, and awards from female athletes is wrong and even discriminates against females in violation of Title IX.

114.     IWN's members do not believe that biological males should be able to share traditionally female-only spaces with women, such as locker rooms and other sensitive spaces. The rule requires schools to adopt policies that let men use women's most sensitive spaces based on an asserted, presumably feminine, gender identity. These policies impinge on IWN's members' privacy interests in using locker rooms away from the opposite sex and in shielding their bodies from the opposite sex. Individuals have a privacy interest when their nude or partially nude bodies are exposed to others, especially when persons of the opposite sex are present. Allowing males into female-only spaces puts women's safety at risk and has the potential to harm them mentally, emotionally, and psychologically.

115.     IWN's members do not want to share locker rooms or other sensitive spaces with biological males, and they do not consent to such practices. IWN's members believe that a school that forces female athletes to undress in front of naked male athletes without their consent has committed unlawful sexual harassment in violation of Title IX.

116.     The challenged rule will also subject IWN's members to speech codes and disciplinary procedures on their campuses and in their leagues.

117.     IWN's members want to be able to have open and robust intellectual debates and discussions about controversial issues—such as biological males participating in women's sports or using women's spaces based on their gender identity. And they want to be able to engage in discourse surrounding these topics on campus, in their community, and online. When a fellow athlete, classmate, or another member of the university community voices contrary views about these and other controversial topics, IWN's members want to point out the flaws in their arguments and attempt to change their minds. IWN's members want to speak

directly to their classmates about these topics, and they want to talk frequently and repeatedly on these issues. Given their views, IWN's members know that many of these conversations will be heated, passionate, and targeted. But they want to have these conversations because they feel strongly about these issues. If the rule challenged in this case becomes effective, however, IWN's members will limit their speech because they reasonably fear that their speech will be considered "harassment" or "misgendering" under the policies that the rule requires universities to adopt.

118.    IWLC believes that all college students—the majority of whom today are female—benefit from a fair and unbiased process for adjudicating claims of sex discrimination on campus. The challenged rule, however, is anything but fair or unbiased.

119.    The challenged rule will divert IWLC's resources in ways that hinder its ability to accomplish its mission. Before the 2020 rule took effect, IWLC spent significant resources educating students on their due-process rights on campus and doing investigative reporting on kangaroo courts adjudicating sexual-harassment complaints. When the 2020 rule became effective, IWLC was able to spend its resources on other issues, such as defending women's sports, the First Amendment rights of college and K-12 students, and the privacy rights of women through litigation and other means. If the challenged rule becomes effective, IWLC will be forced to divert these resources back to assisting students and faculty who are accused under vague and subjective sexual-harassment policies without adequate procedural protections.

120.    ***Parents Defending Education.*** PDE filed comments in response to the Department's notice of proposed rulemaking here, which preceded the challenged rule. *Comments*

*on the Department of Education's Request for Comments Regarding the Proposed Amendments to the Regulations Implementing Title IX of the Education Amendments of 1972*, PDE (Sept. 12, 2022), perma.cc/CZ5Y-WR3G. PDE's specific concerns—and its litigation—are referenced in the final rule.

121.    PDE uses litigation to challenge unconstitutional policies at primary and secondary schools. PDE has challenged policies across the country that violate free-speech and parental rights—including bias policies, *PDE v. Wellesley Pub. Sch.*, No. 1:21-cv-11709 (D. Mass. Dec. 8, 2021); speech codes, *Linn Mar*, 83 F.4th 658; and policies that hide information about students' gender identities from their parents, *id.* But litigation is expensive and time-consuming; any attorney's fees that PDE has recovered were only a small fraction of its expenses.

122.    The challenged rule changes the operative definition of "sexual harassment" under Title IX for so-called hostile-environment harassment. One clear takeaway is that schools must now prohibit "misgendering," where a student refuses to use others' "preferred pronouns" instead of the pronouns that match their biological sex. Worse, the rule makes clear that a single instance of intentional or purposeful misgendering can violate the Department's definition. As can a repeated, but non-severe, practice of misgendering.

123.    Primary and secondary schools must—and predictably will—change their Title IX policies to ban harassment that satisfies this new definition, including misgendering. Primary and secondary schools will understand that, if they deviate from the Department's rule, they can be investigated and punished by the Department too, risking their reputation and their federal funding.

124.    PDE and other groups who defend students' rights believe the challenged rule's new definition of harassment is facially unconstitutional under the First and Fourteenth Amendments, especially with respect to misgendering.

125.    The challenged rule declares that it trumps parents' rights, including their right to access their child's information under the Family Educational Rights and Privacy Act and state laws. Commenters pressed concerns that the rule would bar a recipient from "treat[ing] a student according to their" biological sex "if requested by the parents to do so," "notify[ing] a student's parents of the student's gender transition or gender identity," or letting parents access "their child's educational records, including information about their child's gender identity." 89 Fed. Reg. at 33,821. Rather than deny these concerns, the Department concedes that the rule *can* require such results, even when state law requires these parental rights.

126.    When K-12 schools adopt unconstitutional policies that violate the parental rights of PDE's members or chill the speech of their children, PDE challenges those policies in court. *E.g.*, *Linn Mar*, 83 F.4th at 658; *Olentangy*, 2023 WL 4848509, at *1; *Wellesley*, No. 1:21-cv-11709 (D. Mass.). PDE's members also benefit from state laws, like Iowa's, that give parents a right to know and participate in decisions about their child's gender identity at school. *See Linn Mar*, 83 F.4th at 665 (discussing Iowa Code §279.78 (2023)).

127.    PDE's lawsuits have resulted in settlements that ensure these policies stay off the books. For example, Linn-Mar settled with PDE and agreed to "rescin[d]" and "not reinstate" a policy that prohibited "'an intentional and/or persistent refusal by staff or students to respect a student's gender identity.'" Settlement Agreement ¶1 (Doc. 57-1), *Linn Mar*, No. 1:22-cv-78 (Feb. 21, 2024). The challenged rule effectively undoes that bargain by forcing

schools, including Linn-Mar, to adopt policies that ban the same speech. And it purports to override both FERPA and state laws, like Iowa's, that give parents a right to information about their child's claimed gender identity at school. All of this harms PDE's members, several of whom have children that still attend Linn-Mar. *See Linn Mar*, 83 F.4th at 664.

128.   The challenged rule also will divert PDE's resources in ways that harm its mission. For example, as a direct result of the rule's publication, PDE's tip line is experiencing a surge in calls from concerned parents about the safety of their children, and this surge will only worsen as the rule coerces school districts into adopting unlawful policies. Under the rule, moreover, exponentially more K-12 schools will prohibit misgendering under Title IX and stop notifying parents about their child's claimed gender identity at school—ballooning the number of schools that are violating the rights of PDE's members. This upending of the status quo will require PDE to divert its finite resources toward suing (or *re*-suing) schools. These diversions will prevent PDE from using its resources on other projects, including combating antisemitism at additional K-12 schools and launching new investigations to reveal connections between schools in the United States and foreign countries.

129.   The challenged rule will cause public primary and secondary schools to adopt policies that violate the constitutional rights of PDE's members and their children. PDE has members whose children currently attend public schools across the United States, including in the Plaintiff States. PDE has over 700 members within Alabama, Florida, and Georgia alone.

130.   For example, A.B. is a Georgian whose children currently attend a Georgia public school. B.W. is a Floridian whose children currently attend a Florida public school. And

A.O. is a Floridian whose child currently attends a Florida public school. These parents' children will attend schools in these States next year too. For now, these schools do not have a policy that prohibits, for example, "misgendering."

131.    PDE's members and their children hold a wide array of different views and opinions on matters such as politics, religion, "gender identity", and many other sensitive and controversial topics concerning sex, sexual orientation, and gender identity. These traditional views are unpopular, controversial, and in the minority at their schools.

132.    A.B. believes that people are either male or female. A.B. acknowledges that some people suffer from gender dysphoria. A.B. believes there is a difference between gender dysphoria, which is historically rare, and a child's confusion about their gender, which can lead a child to adopt a different name, pronouns, clothing, and so forth. A.B. also believes that confusion about gender can be a part of adolescence and that it does not always persist beyond adolescence. A.B. believes that these issues are sensitive and should be left to families to discuss and resolve, not to schools.

133.    A.B. has taught her children that biological sex is immutable and cannot change based on someone's internal feelings. A.B. has taught her children to always tell the truth, even when doing so is unpopular.

134.    A.B.'s children believe that sex is immutable and that a child cannot "transition" from one sex to another. A.B.'s children do not want to be forced to "affirm" that a biologically female classmate is actually a male—or vice versa—or that a classmate is "nonbinary," meaning neither male nor female. Doing so would contradict the deeply held beliefs of A.B.'s family, including A.B.'s beliefs that she has imparted to her children and her children's own

sincerely held beliefs. A.B. and her children also believe that a biological male who identifies as female should not be allowed to compete in women's sports and that it is an invasion of privacy for students to share bathrooms with the opposite biological sex.

135.    B.W. believes that sex is immutable and that people are either male or female. B.W. believes that there is a difference between gender dysphoria and a child's confusion about their gender, which can lead a child to adopt a different name, pronouns, clothing, and so on. B.W. also believes that confusion about gender can be a part of adolescence and that it does not always persist beyond adolescence. B.W. believes that these issues of gender are sensitive and should be left to families to discuss and resolve, not to schools. B.W. has taught his children that biological sex is immutable and that gender does not exist on a spectrum, as many people now claim. B.W. has also taught his children to share their beliefs and tell the truth.

136.    B.W.'s children believe that people are either male or female and that biological sex is unchangeable. They do not want to be forced to "affirm" that a biologically male classmate is actually a female—or vice versa—or that a classmate is "nonbinary," meaning neither male nor female. They wish to use pronouns consistent with a classmate's biological sex repeatedly and at all times, including inside and outside the classroom, and in and out of the classmate's presence. Being forced to do otherwise would contradict the deeply held beliefs of B.W.'s family, including his beliefs that he has imparted to his children.

137.    A.O. believes that people are either male or female and that a child cannot "transition" from one sex to another. He acknowledges that gender dysphoria exists but believes it is historically a rare condition. He believes there is a difference between gender dysphoria and a child's confusion about gender, which can lead a child to adopt a different name,

pronouns, and clothing. He also thinks that confusion about gender can be a part of adolescence and that it does not always persist beyond adolescence. He believes that a biological male who identifies as female should not be allowed to compete in women's sports and that it is an invasion of privacy for students to share bathrooms with the opposite biological sex. Further, A.O. has and imparts to his children traditional views about marriage. A.O. believes that issues of sex, gender identity, and sexual orientation are sensitive and should be left to families to discuss and resolve, not to schools. When they arise at school, A.O. wants his child to express all these opinions that he has instilled in his child.

138.    A.O. does not want his child to be forced to "affirm" that a biologically female classmate is actually a male—or vice versa—or that a classmate is "nonbinary" and neither male nor female. Specifically, A.O. does not want his child to use pronouns consistent with a classmate's biological sex repeatedly and at all times, including inside and outside the classroom, and in and out of the classmate's presence.

139.    PDE's members and their children want to be able to have open and robust intellectual debates and discussions about these issues at school and in their communities. When a classmate or another member of the school community voices contrary views about these and other controversial topics, PDE's members and their children want to point out the flaws in their arguments and convince them to change their minds. PDE's members and their children want to speak directly about these topics, and they want to talk frequently and repeatedly on these issues. Given their views, PDE's members and their children know that many of these conversations will be heated, passionate, and targeted. But they want to have these conversations because they feel strongly about these issues.

140.    PDE's members and their children will be subject to the policies and practices that the challenged rule causes their schools to adopt. Their children will limit their speech because they reasonably fear it will be considered "harassment" or "misgendering." From self-censoring, their children will steadily lose self-esteem, self-confidence, and the educational benefits of free-flowing debate and the exchange of ideas.

141.    If the challenged rule becomes effective, PDE's members will be unable to effectively exercise their fundamental rights as parents to guide the upbringing of their children and to instill their children with important values. The rule will give PDE's members constant anxiety that their children will be questioned or punished for the views they wish to express and forced to violate their privacy by sharing restrooms with the opposite sex. Being threatened for stating their fundamental beliefs will inflict mental and psychological harm on their children by forcing them to "choose" between expressing their beliefs and following the rules. The rule will prevent PDE's members from directing their children to seek and facilitate open, robust intellectual discussions with other students related to science, religion, gender identity, and many other important sex-related topics, with the goal of changing those students' minds or, at the very least, helping those students understand their perspectives. At a minimum, it will force these parents to have difficult discussions about sex and "gender identity" with their children before the children are ready.

142.    These members also do not want their children sharing restrooms with members of the opposite sex, regardless of asserted gender identity. Before the challenged rule, their children attended schools that required all students to use a bathroom that corresponds to their biological sex. The rule now requires schools to adopt policies that permit biological

boys to use the girl's bathroom and biological girls to use the boy's bathroom, based on their asserted gender identity. The rule thus impinges on students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex. Individuals have a privacy interest when their nude or partially nude bodies are exposed to others, especially when persons of the opposite sex are present. School-age children are still developing emotionally and physically as well, heightening the privacy concerns. The prospect of the presence of the opposite sex, let alone their actual presence, would be a significant intrusion on PDE's members' children's privacy and would psychologically and emotionally harm them.

143.    The challenged rule threatens these children's due-process rights too. Especially because the rule's definitions are so broad and vague, PDE's members' children could easily cross the line and be reported and investigated for harassment or misgendering. Disciplinary proceedings without notice of the charges, adjudication by a neutral decisionmaker, cross-examination, and other basic protections are fundamentally unfair and risk erroneous decisions with life-altering consequences for these students. A finding of guilt, or even the opening of an investigation, can create a permanent and life-altering stigma that irreparably harms a student's educational, professional, and social prospects, even if the finding is later reversed or the investigation is dropped. And it severely distracts them from their studies.

144.    ***Speech First.*** Speech First has spent substantial time and resources defending the Trump administration's Title IX rule—the same 2020 rule that the Biden administration is now repealing. Speech First intervened in *Pennsylvania v. Devos* to defend the 2020 rule, *see* Minute Order, No. 1:20-cv-01468 (D.D.C. July 6, 2020), and that court upheld the 2020 rule

as lawful, 480 F. Supp. 3d 47 (D.D.C. 2020). Speech First also helped defeat proposals to delay the 2020 rule's effective date. *Letter to Secretary DeVos and Assistant Secretary Marcus*, IWLC & Speech First (Apr. 9, 2020), perma.cc/4ME3-43CS. And Speech First filed comments in response to the Department's notice of proposed rulemaking to repeal the 2020 rule here. *Comment to Docket ID No. ED-2021-OCR-0166*, Speech First (Sept. 9, 2022), perma.cc/JV45-ZCPC. Speech First's specific concerns—and its litigation—are referenced in the final rule numerous times. *See, e.g.*, 89 Fed. Reg. at 33,501-02, 33,505-06.

145.   Speech First uses litigation to challenge unconstitutional speech codes at public universities. Speech First has used litigation to challenge speech codes across the country—including, for example, bias-reporting policies, *e.g.*, *Cartwright*, 32 F.4th at 1122-24; *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763-67 (6th Cir. 2019); computer policies, *e.g.*, *Speech First, Inc. v. Cartwright*, 2021 WL 3399829, at *7 (M.D. Fla. July 29, 2021); *Speech First, Inc. v. Sands*, 2021 WL 4315459, at *1 (W.D. Va. Sept. 22); Order (Doc. 33) 19-28, *Speech First, Inc. v. McCall*, No. 1:23-cv-411 (W.D. Tex. Sept. 1, 2023); and residence-hall policies, *e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 324-27 (5th Cir. 2020). But litigation is expensive and time-consuming; Speech First's expenses always dwarf the small amount of attorney's fees it recovers, if it recovers them at all.

146.   The challenged rule changes the operative definition of "sexual harassment" under Title IX for so-called hostile-environment harassment. Schools must—and predictably will—change their Title IX policies to ban harassment that satisfies this new definition. Universities understand that, if they deviate from the Department's definitions, they can be investigated and punished by the Department, risking their reputation and their federal funding.

The Department has, in fact, used its enforcement authority to force universities to adopt policies that contain its preferred definition of harassment. And after the Trump administration issued the 2020 rule, virtually every university adopted that rule's definition of harassment verbatim in their Title IX policies, even though many universities disagreed with that definition as a matter of law and policy.

147.    Speech First and other groups who defend students' rights believe that the rule's new definition of harassment is facially unconstitutional under the First and Fourteenth Amendments.

148.    When universities adopt unconstitutional harassment policies that chill the speech of Speech First's members, Speech First challenges those policies in court. *E.g.*, *Fenves*, 979 F.3d 319 (University of Texas); *Cartwright*, 32 F.4th 1110 (University of Central Florida); *Khator*, 603 F. Supp. 3d 480 (University of Houston); *Speech First, Inc. v. Shrum*, 92 F.4th 947 (10th Cir. 2024) (Oklahoma State University); *Speech First, Inc. v. McCall*, No. 23-50633 (5th Cir. Sept. 6, 2023) (Texas State University). Speech First has won that harassment policies exceeding *Davis*—including policies virtually identical to the one that the new rule will make universities adopt—are unenforceable under the First and Fourteenth Amendments. *E.g.*, *Cartwright*, 32 F.4th at 1120-22, 1125-29; *Khator*, 603 F. Supp. 3d at 481-82.

149.    In most of these cases, the universities signed settlement agreements with Speech First that brought the school's harassment policy in line with *Davis*:

   a.   The University of Central Florida agreed to "promptly amend" its harassment policy to comply with *Davis* and to "not reinstate the version of the policy that Speech First challenged." Agreement and Release ¶2 (Doc. 64), No. 6:21-cv-313 (M.D. Fla. Sept. 23, 2022).

b. The University of Houston agreed to "not reinstate the version of the [Harassment] Policy challenged by Speech First." Agreement ¶1 (Doc. 31), No. 4:22-cv-582 (S.D. Tex. June 10, 2022). It agreed to adopt a harassment policy that, with respect to nonemployee students, complies with *Davis*.

c. The University of Texas agreed to adopt a harassment policy that tracks *Davis* and to not reinstate its harassment policy that exceeded *Davis*. Agreement ¶¶1-2 (Doc. 39), No. 1:18-cv-1078 (W.D. Tex. Dec. 12, 2020).

d. Oklahoma State University also agreed to adopt a harassment policy that tracks *Davis* and to not reinstate its harassment policy that exceeded *Davis*. Agreement and Release ¶¶1-2 (Doc. 55), No. 5:23-cv-29 (W.D. Okla. Apr. 15, 2024). Unlike the other universities, however, Oklahoma State required Speech First to agree that it would "not challenge" that university's Title IX policy if that policy adopts the definition of sexual harassment that the Department has now promulgated.

150. The challenged rule will, in critical respects, nullify these settlement agreements and deprive Speech First's members of the benefit of these bargains. The challenged rule instructs these universities to change their *Davis*-compliant policies to non-*Davis*-compliant policies, recreating the very regime that Speech First contracted with these universities to eliminate for sex, sexual orientation, and gender identity.

151. The challenged rule will also divert Speech First's resources in ways that harm its mission. Under the 2020 rule, several schools had constitutional harassment policies overall (because they followed *Davis* already or lost lawsuits to Speech First); and all schools had constitutional harassment policies under Title IX (because they adopted the 2020 rule's *Davis*-compliant definition). But thanks to the rule, all public universities will have Title IX policies that deviate from *Davis*, ballooning the number of universities that are violating the First Amendment rights of Speech First's members. This will require Speech First to divert its finite

resources toward suing (or *re*-suing) universities who adopt the rule's definition. Those re-sources would otherwise be spent launching a new initiative that focuses on shaping legislative policy to better defend students' speech rights on campuses. This new initiative would include drafting and promoting model policies, reaching out to and working with local organizations on state-level policy recommendations, participating in local and regional conferences to pro-mote Speech First's work, and reaching out to and meeting with lawmakers and educating them on Speech First's research findings.

152.   The challenged rule will also cause universities to violate the constitutional rights of Speech First's members. Speech First has many members who are current students at public universities within the United States, including within the Plaintiff States. Speech First's members hold a wide array of different views and opinions on politics, religion, gender identity, abortion, and many other sensitive and controversial topics concerning sex, sexual orientation, and gender identity. Many of those students attend schools where Speech First has reached a favorable settlement that, until the challenged rule, protected their rights.

153.   A student from Speech First's case against Oklahoma State, for example, is a rising senior. As she explained in that case, she believes that sex is immutable and that there is no such thing as a "gender spectrum." She thinks the exponential growth in adolescents and young adults who identify as transgender or "non-binary" is evidence that many people now claim a certain "gender identity" because they want attention or affirmation. She believes abor-tion is wrong and has strong pro-life views that she wants to express in vivid terms. *See generally* Doc. 3-4, No. 5:23-cv-29 (W.D. Okla. Jan. 10, 2023).

154.    A student from Speech First's case against Houston is a rising senior. As he explained in that case, he believes that human beings are either male or female, and that someone cannot "transition" from one sex to the other based on whether he or she "feels" like a man or a woman. He doesn't want to be forced to call someone a "he" or a "she" (or to use some other form of "preferred pronouns") just because that person has decided that "their truth" involves being transgender or non-binary. He believes it is deeply unfair to allow biological males who identify as females to compete in women's sports. He believes that those men are stealing athletic opportunities away from actual women who have earned them. He also has strong beliefs about abortion and marriage that stem from his Christian faith. *See generally* Doc. 3-4, No. 4:22-cv-582 (S.D. Tex. Feb. 28, 2022).

155.    Another student from Speech First's case against Houston is a rising senior (but who plans to graduate in May 2026). As she explained in that case, she believes that allowing biologically male athletes who identify as female to compete in women's sports is unjust. Men and women have innate physiological differences that cannot be erased simply because someone chooses to "identify" as a member of the opposite sex. She believes that school administrators who ignore those differences are prioritizing identity politics and political correctness over the interests of women. As a woman, she does not want to be forced to "affirm" that a man is really a "woman" just because he decides to identify as one. She also has strong pro-life views that she wants to express in vivid terms. *See generally* Doc. 3-6, No. 4:22-cv-582 (S.D. Tex. Feb. 28, 2022).

156.    A student from Speech First's case against the University of Central Florida is a rising senior. She believes that human beings are created either male or female, and that

someone cannot "transition" from one sex to the other based on whether they "feel" that they are a man or a woman. She doesn't want to be forced to call someone a "he" or a "she" (or to use some other form of "preferred pronouns") just because that person has decided that "their truth" is that their "real gender" is male or female or "non-binary." As a woman, she believes it is deeply unfair to allow biological males who identify as females to compete in women's sports. These men are taking athletic opportunities away from actual female athletes who deserve them. She also has strong pro-life views that she wants to express in vivid terms.

157. Speech First's members, including the students above, want to be able to have open and robust intellectual debates and discussions about these issues on campus, in their community, and online. When a classmate or another member of the university community voices contrary views about these and other controversial topics, Speech First's members want to point out the flaws in their arguments and convince them to change their minds. Speech First's members want to speak directly to their classmates about these topics, and they want to talk frequently and repeatedly on these issues. Given their views, Speech First's members know that many of these conversations will be heated, passionate, and targeted. But they want to have these conversations because they feel strongly about these issues.

158. The rule challenged in this case will subject Speech First's members to speech codes and the risk of discipline on their campuses. Speech First's members will limit their speech if the rule becomes effective because they reasonably fear that their speech will be considered "harassment" under the policies and practices that the rule requires their universi-

ties to adopt. They will be especially reluctant to openly express their opinions or have conversations about controversial topics related to sex, gender identity, and sexual orientation. Hence why they helped Speech First challenge virtually identical policies in prior litigation.

159.    The challenged rule also eliminates an accused's right to a live hearing, his right to cross-examination of the accuser or other witnesses, his right to fairly access all evidence, his protection against a recipient's use of a "single-investigator model," and the requirement that a written complaint starts an investigation. The challenged rule empowers recipients to question the witnesses outside of a hearing; provide only a "description of the relevant and not otherwise impermissible evidence"; have one person serve as the investigator, factfinder, and discipliner; and start an investigation with an oral statement. Even if some of these procedures are technically optional, universities will adopt them once the 2020 rule is repealed and replaced. Many agree with them as a matter of policy. And they will reasonably fear enforcement actions or investigations from the Department for having inadequate procedures.

160.    The challenged rule thus deprives Speech First's members of their due-process rights. These members are current college students on campus now. Especially because the rule's definitions are so broad and vague, Speech First's members could easily cross the line and be reported and investigated for violations of their university's Title IX policy. Disciplinary proceedings without notice of the charges, adjudication by a neutral decisionmaker, cross-examination, and other basic protections are fundamentally unfair and risk erroneous decisions with life-altering consequences for these students. A finding of guilt, or even the opening of

an investigation, can create a permanent and life-altering stigma that irreparably harms a student's educational, professional, and social prospects, even if the finding is later reversed or the investigation is dropped. And it severely distracts them from their studies.

161.    Speech First is also harmed by the provision of the rule that changes the definition of "sex" to include gender identity and sexual orientation. Absent that change, harassment policies under Title IX could not chill its members' speech on those topics, and universities could not abrogate Speech First's settlement agreement with respect to those topics.

## COUNT I
### Redefinition of "Sex" to Include "Gender Identity" and "Sexual Orientation"

162.    Plaintiffs incorporate and reallege parts I-II, III.A, and IV.

163.    The challenged rule is final agency action under the APA. 5 U.S.C. §704. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." §706(2).

164.    The rule, both as a whole and in several particulars, violates the APA. It violates Title IX itself, asserts power that exceeds the agency's lawful authority, and rests on reasoning (or a lack thereof) that is arbitrary and capricious.

165.    The challenged rule's redefinition of "sex" under 20 U.S.C. §1681 to include "gender identity" and "sexual orientation" is illegal. Courts must interpret a statute's "words consistent with their ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up). There is no evidence from the time

of Title IX's enactment—and the Department offers none—to indicate that "sex" referred to anything other than biological differences between males and females.

166.    As the Department concedes, the en banc Eleventh Circuit held in *Adams* "that 'sex' as used in Title IX can only refer to 'biology and reproductive function,' not gender identity, and that restrooms are covered by a statutory provision permitting a recipient to maintain 'separate living facilities for the different sexes.'" 89 Fed. Reg. at 33,820-21 (quoting *Adams*, 57 F.4th at 812-15). Indeed, the Eleventh Circuit evaluated the text, history, purpose, and statutory context of Title IX and held that the meaning of "sex" was "clear[ly]" "biological sex" and that sex-separated bathroom policies were obviously permissible under Title IX. *Adams*, 57 F.4th at 812-15.

167.    The Department's only real response is the Supreme Court's decision in *Bostock*, but that opinion about Title VII does not dictate another result for Title IX, as the Eleventh Circuit, along with many other circuits, have held. In *Bostock*, the Court held that discrimination "because of sex" under Title VII prohibited employers from terminating employees because of their transgender status. 590 U.S. at 667-69. The Court "agree[d] that homosexuality and transgender status are distinct concepts from sex," but concluded that firing employees "based on homosexuality or transgender status" triggers Title VII's protections because the employer's action "necessarily entails" a decision made "in part because of the affected individuals' sex." *Id.* The Court's decision rested on the premise that sex is binary and immutable, and that an employee's biological sex is a necessary component of any determination about whether "discrimination because of sex" has occurred under Title VII. Put differently, whether an adverse action against a transgender employee violates Title VII under *Bostock* depends not

on the specific nature of the employee's gender identity but on how the *employer* treats the employee as compared to *other employees of the same biological sex.*

168.   *Bostock*'s reasoning doesn't apply here. "The *Bostock* decision only addressed sex discrimination under Title VII; the Supreme Court expressly declined to 'prejudge' how its holding would apply to 'other federal or state laws that prohibit sex discrimination' such as Title IX." *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 833 (E.D. Tenn. 2022) (quoting *Bostock*, 590 U.S. at 681). For good reasons: Title IX and Title VII are different laws with different statutory language enacted under different congressional authority. And workplace environments are fundamentally different from educational environments and carry a different set of considerations. Title IX was enacted to create educational and athletic opportunities for women and girls, yet the Department's understanding of *Bostock* would do the opposite: eliminate educational opportunities for women and girls, particularly in those areas where biological sex is most relevant. Unlike Title VII, moreover, Title IX and its implementing regulations contain several unique carve-outs that reject any importation of *Bostock*.

169.   For these reasons, several federal courts, including the Eleventh Circuit, have recognized that "the rule in *Bostock* extends no further than Title VII." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *see, e.g., L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023) (*Bostock*'s "text-driven reasoning applies only to Title VII, as *Bostock* itself and many subsequent cases make clear"); *Eknes-Tucker v. Gov'r of Ala.*, 80 F.4th 1205, 1228-29 (11th Cir. 2023) (similar); *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 621 (N.D. Tex. 2021) (similar). Most notably, *Adams* rejected a Title IX challenge to a policy requiring students to use bathrooms based on their biological sex rather than their gender identity. *See*

57 F.4th at 811. In reaching that result, the court held that *Bostock*'s reasoning didn't apply to Title IX. *See id.* ("We cannot, as the Supreme Court did in *Bostock*, decide only whether discrimination based on transgender status necessarily equates to discrimination on the basis of sex."). *Bostock* was distinguishable, the court held, "because Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes." *Id.* The Eleventh Circuit noted that if Title IX's reference to "'sex' were ambiguous enough to include 'gender identity,'" then those "carve-out[s], as well as the various carveouts under the implementing regulations, would be rendered meaningless." *Id.* at 813.

170.    Regardless, even if *Bostock* were relevant for Title IX, the rule's application of it is wrong. *Bostock* emphasized that to determine whether an act "discriminate[s]," a court must use a comparator—*i.e.*, compare the plaintiff to "others who are *similarly situated.*" *Bostock*, 590 U.S. at 657 (emphasis added). In *Bostock*, male and female employees were similarly situated because "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 660. Here, by contrast, a student's biology is relevant to decisions about athletics, bathrooms, and locker rooms. The Department "strongly agrees" that schools "have a legitimate interest in protecting all students' safety and privacy." 89 Fed. Reg. at 33,820. Even if *Bostock*'s reasoning applied, the Department unreasonably explained and applied it here.

171.    If any doubts remain, two clear-statement rules—under the major-questions doctrine and the Spending Clause—should extinguish them.

172.    Start with the major-questions doctrine. Even when there's a "colorable textual basis" about the scope of an agency's authority, an agency cannot make broad "assertion[s]" of authority on issues of "economic and political significance" without clear congressional

authorization. *West Virginia. v. EPA*, 597 U.S. 697, 721-22 (2022); *see Biden v. Nebraska*, 143 S.Ct. 2355, 2372-75 (2023); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295-96 (11th Cir. 2022). Despite the intense public debate over gender-identity laws in recent years, the challenged rule imposes the Department's own views on the matter—promulgated under formal rulemaking for the first time—onto the vast majority of American educational institutions. *Cf. West Virginia*, 597 U.S. at 721. Congress has repeatedly declined to provide such authorization, most recently in 2013 and 2015. So even if Title IX's command were ambiguous, the rule would still violate the major-questions doctrine.

173.   The challenged rule is also contrary to law because it violates the Spending Clause and its clear-statement requirement. U.S. Const. art. I, §8. "Congress passed Title IX pursuant to its authority under the Spending Clause." *Adams*, 57 F.4th at 815. The Supreme Court has understood the Spending Clause to authorize Congress to "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987). But this power is "not unlimited." *Id.* at 207.

174.   Two limits are relevant here. One, "if Congress desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* (cleaned up). In other words, "spending restrictions imposed by Congress must be ascertainable to be enforceable." *W.V. ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1143 (11th Cir. 2023). Two, Congress may not use its spending power to "indirectly coerc[e] a State to adopt a federal regulatory system as its own." *NFIB v. Sebelius*, 567 U.S. 519, 578 (2012) (op. of Roberts, C.J.).

175.    The challenged rule violates both limitations. The Department violates "the Spending Clause's required clear-statement rule," *Adams*, 57 F.4th at 815, because the rule purports to impose obligations on the States that Congress did not "'unambiguously'" enact in Title IX, *Morrisey*, 59 F.4th at 1142. The rule also jeopardizes a significant amount of the States' education-related federal funding if they refuse or otherwise violate the Department's new interpretation of Title IX, leaving the States with "no real option but to acquiesce." *NFIB*, 567 U.S. at 582.

176.    In any event, the Department concedes that §106.31(a)(2), and its asserted application to bathrooms and locker rooms, is illegal. The Department understands §106.31(a)(2) to prevent recipients from barring individuals from using the bathroom or locker room that does not match their biological sex. *See* 89 Fed. Reg. at 33,819-21. But the Department equally understands that the Eleventh Circuit's holding in *Adams* forecloses the Department's rule and position. *See, e.g.*, *id.* at 33,820-21 (explaining that the Department "does not agree" with the Eleventh Circuit's "interpretation of Title IX" and "declines to adopt the Eleventh Circuit's reasoning in *Adams*").

177.    For all these reasons, the rule is contrary to law and in excess of statutory authority, so it must be set aside—*i.e.*, vacated. 5 U.S.C. §706(2)(C). "The default rule is that vacatur is the appropriate remedy." *Data Mktg. P'ship v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022); *see, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *Black Warrior River-keeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015) ("vacatur is the

62

ordinary APA remedy" (cleaned up)). No special reason exists to depart from that ordinary course.

178.   The rule is also arbitrary and capricious in many respects. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Courts must ensure "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* Agencies must engage in "reasoned deci-sionmaking." *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015). They must rest their actions "on a consideration of the relevant factors" and "important aspect[s] of the problem." *Id.* The Court's "review is 'not toothless'" but has "serious bite." *Data Mktg.*, 45 F.4th at 856; *see, e.g.*, *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 470 (5th Cir. 2024) (same); *Abbott v. Biden*, 70 F.4th 817, 826 (5th Cir. 2023) (same).

179.   The challenged rule is arbitrary and capricious because it leaves undisturbed the regulation on restrooms and justifies its new regulations on the basis that the bathroom regu-lation is invalid because it conflicts with the statute. "But in rescinding a prior action, an agency cannot simply brand it illegal and move on." *Louisiana*, 90 F.4th at 475. That is precisely what the Department does.

180.   The Department also failed to reasonably explain how its rule's application co-herently applies to "nonbinary" (or "bisexual" or "questioning") individuals. Even assuming *Bostock* applies to Title IX, nonbinary persons do not satisfy *Bostock*'s but-for test for deter-mining what classes a statute protects. The "but-for test directs us to change one thing at a time and see if the outcome changes," and "[s]o long as the plaintiff's sex was one but-for

cause of that decision, that is enough to trigger the law." *Bostock*, 590 U.S. at 656. Imagine a student whose sex is male but whose gender identity is "nonbinary." A school with a policy of not allowing nonbinary students to use the bathroom of the opposite sex would not discriminate against this individual based on "sex" because "changing the [person's] sex would [not] have yielded a different choice by the" school. *Id.* at 659-60. Otherwise, a school with a policy of allowing students to use the bathroom in line with their gender identity would also violate Title IX if they did not provide a third bathroom for gender-neutral students. *Contra* 89 Fed. Reg. at 33,818. And some claimed nonbinary gender identities do not hinge to sex at all. The Department failed to adequately address the expansiveness, and arbitrariness, of its rule.

181.    The Department also failed to adequately consider alternatives *within* the ambit of the existing policy. *See DHS v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1913 (2020) ("*State Farm* teaches that when an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." (cleaned up)); *Texas v. Biden* (*MPP*), 20 F.4th 928, 992 (5th Cir. 2021) ("[A]gency action is arbitrary and capricious when it considers *only* the binary choice whether to retain or terminate a program, without also 'considering less disruptive alternatives.'"), *rev'd on other grounds*, 597 U.S. 785 (2022). The Department was dead-set on repealing and replacing the Trump rule, instead of considering more moderate amendments that are tailored to its asserted concerns.

182.    The Department failed to adequately consider the alternative of single-occupancy bathrooms. The Department does not explain how a policy requiring students to use the bathroom that aligns with their biological sex or a single-occupancy bathroom results in more than de minimis harm to trans-identified students or violates Title IX. The Department

even brushes off an alternative that requires offering single-occupancy bathrooms because such an option is "not the only way a recipient could provide nondiscriminatory access its facilities" and the alternative "would likely carry significant cost implications," requiring the Department "to seek public comment on this issue before making any such changes." 89 Fed. Reg. at 33,820. But commenters raised this alternative, and the Department had to address it. It is not a reasonable explanation to say that the alternative might be costly. As the Supreme Court has explained, "'costs and burdens' do not excuse the Government from considering the full panoply of alternatives to its chosen action in repealing" an effective policy. *Louisiana*, 90 F.4th at 476-77 (quoting *Regents*, 140 S.Ct. at 1914-15).

183.    Nor is it reasonable to say that recipients can "tak[e] nondiscriminatory steps to ensure privacy and safety for all students in a recipient's sex-separate facilities." 89 Fed. Reg. at 33,820. The Department does not explain how this is possible, and it failed to consider that it would impose enormous costs and time to actually increase privacy and safety in sex-separate facilities that are used by both sexes. For example, the economic cost of building new bathrooms with adequate privacy protections is extraordinary; practically speaking, individualized re-engineering of hundreds of thousands of facilities is not possible. An estimate in Loudoun County shows that bathroom renovations alone will cost that school district $11 million dollars for *two* of its *eighteen* high schools. Minock, *Loudoun Schools Explore Replacing Boys and Girls Bathrooms with All-Gender, Single Stalls*, ABC7 News (Apr. 12, 2023), perma.cc/CN4W-WU52. This figure excludes the other sixteen high schools, sixty-five elementary schools, and twenty-one middle schools in that district alone.

184. The challenged rule is also arbitrary and capricious because it fails to reasonably handle an important aspect of the problem: athletics. The Department tries to avoid the necessary implications of its position on gender-identity discrimination for women's sports by claiming that sex-separate athletic teams can continue because the Department has a regulation that expressly allows it. 89 Fed. Reg. at 33,817-88, 33,839. The Department ignores, however, its own position that categorical bans on biological males participating in women's sports are invalid. *See B.P.J.*, Doc. 42, No. 2:21-cv-316. Plus, the soundness of the Department's interpretation of discrimination on the basis of sex depends on context and the history of Title IX, which includes sports. *See Adams*, 57 F.4th at 816 (concluding that a decision about bathrooms "would have broad implications for sex-separated sports teams at institutions subject to Title IX, including public schools and public and private universities"). The practicability and wiseness of its policy decisions necessarily depends on how its decision in the rule challenged here affects athletics. *See id.* at 821 (Lagoa, J., concurring) (explaining that a bathroom determination "would open the door to eroding Title IX's beneficial legacy for girls and women in sports" and that "removing distinctions based on biological sex from sports … harms not only girls' and women's prospects in sports, but also hinders their development and opportunities beyond the realm of sports"). The Department cannot save for later an important aspect of the problem when the validity of its current rule depends on the answers. The Department's failure to address sports in the challenged rule renders it arbitrary and capricious.

185. Section 106.31's use of a "more than de minimis harm" requirement is arbitrary and capricious because the Department failed to consider relevant and binding precedent. The Department relies heavily on *Bostock* (a Title VII case) but fails to square its interpretation of

Title IX with another Title VII case from the Supreme Court applying *Bostock*. Title VII, the Supreme Court has explained, does not ask *how much* harm a discriminatory action imposes. *Muldrow v. City of St. Louis*, 144 S.Ct. 967, 976 (2024). The Court rejected any requirement that the "injury" be "'significant,' 'material,' or 'serious.'" *Id.* at 975 n.2. The Department failed to consider this relevant issue, let alone reasonably explain why this recent interpretation of Title VII does not unravel its heavy reliance on the concept of "de minimis harm." That failure renders the action arbitrary and capricious.

186.    It also dooms the rest of the rule. The Department contends that the more-than-de-minimis-harm requirement is a "threshold concept" that is "particularly important in the context of determining when separate or different treatment on the basis of sex may be permitted, and when it constitutes prohibited discrimination under Title IX." 89 Fed. Reg. at 33,815. But the Department's key "threshold concept" is inadequately justified or explained. Because the justification for the Department's other discrimination regulations hinge on the acceptance of the more-than-de-minimis-harm "concept," the other regulations are arbitrary and capricious as well.

187.    The rule is also arbitrary and capricious because the Department failed to reasonably consider parental rights or reasonably explain how the rule interacts with those rights. The challenged rule declares that it trumps parents' rights, including their right to access their child's information under FERPA and state laws. *See, e.g.*, 89 Fed. Reg. at 33,885 (34 C.F.R. §106.6(e)). Commenters pressed concerns that the rule would bar a recipient from "treat[ing] a student according to their" biological sex "if requested by the parents to do so," "notify[ing] a student's parents of the student's gender transition or gender identity," or letting parents

access "their child's educational records, including information about their child's gender iden-

tity." *Id.* at 33,821-22. Rather than deny these concerns, the Department concedes that the rule

can require such results, even when state law guarantees these parental rights. *See id.* at 33,822

("the hypothetical factual scenarios raised by commenters require case-by-case determina-

tions"); *id.* ("The Department declines to opine on how §106.31(a)(2) interacts or conflicts

with any specific State laws because it would require a fact-specific analysis, but refers the

public to §106.6(b), which affirms that a recipient's obligation to comply with Title IX and the

regulations is not obviated or alleviated by any State or local law."). An agency cannot adopt

a radical change and then not directly address the significant consequences of its amendment

by stating that it is saving the tough judgments for later. "[B]are acknowledgment is no sub-

stitute for reasoned consideration." *Louisiana*, 90 F.4th at 473.

188.    None of the Department's errors are harmless. "In administrative law, the

harmless error rule is quite narrow." *Wages & White Lion Invs., LLC v. FDA*, 90 F.4th 357, 389

(5th Cir. 2024) (en banc); *accord Calcutt v. FDIC*, 598 U.S. 623, 628-29 (2023). "[A]n agency

decision is harmless only 'when a mistake of the administrative body is one that clearly had no

bearing on the procedure used or the substance of the decision reached.'" *Bidi Vapor LLC v.

FDA*, 47 F.4th 1191, 1205 (11th Cir. 2022). These legal violations *are* the substance of the

decision.

189.    Because the Department failed to act reasonably or reasonably explain its deci-

sions, the challenged rule is arbitrary and capricious and must be set aside. *See* 5 U.S.C.

§706(2)(A); *see also Data Mktg.*, 45 F.4th at 859; *Black Warrior*, 781 F.3d at 1290. No special

reason exists to depart from that ordinary course. Defendants' action is contrary to law, in

excess of Defendants' statutory and regulatory authority, and arbitrary and capricious. The unlawful parts cannot be severed from the rest. There are substantial doubts that the Department would have adopted its redefinition of sex and the other parts that cross-reference that redefinition on its own. The rule must be vacated.

## COUNT II
### Redefinition of "Sex-Based Harassment"

190.   Plaintiffs incorporate and reallege parts I-II, III.B, and IV.

191.   The challenged rule is final agency action under the APA. 5 U.S.C. §704. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." §706(2).

192.   The rule, both as a whole and in several particulars, violates the APA. It asserts power that exceeds the agency's lawful authority and rests on reasoning (or a lack thereof) that is arbitrary and capricious.

193.   The challenged rule broadens the definition of sex-based harassment and lowers schools' protections from liability. The 2020 rule defined "'sexual harassment'" to include "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, *and* objectively offensive that it effectively *denies* a person equal access to the recipient's education program or activity." 34 C.F.R. §106.30(a) (emphases added). It also adopted *Davis*'s and *Gebser*'s liability requirements of actual knowledge and deliberate indifference: "[a] recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not

69

deliberately indifferent." §106.44(a); *accord Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290-91 (1998); *Davis*, 526 U.S. at 633.

194.    The new definition now reads:

Unwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment). Whether a hostile environment has been created is a fact-specific inquiry that includes consideration of the following:

(i) The degree to which the conduct affected the complainant's ability to access the recipient's education program or activity;

(ii) The type, frequency, and duration of the conduct;

(iii) The parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the effects of the conduct;

(iv) The location of the conduct and the context in which the conduct occurred; and

(v) Other sex-based harassment in the recipient's education program or activity. 89 Fed. Reg. at 33,884 (34 C.F.R. §106.2).

195.    It also requires a recipient to "promptly and effectively end any sex discrimination," even if it's not deliberately indifferent, and wrongly equates sex discrimination with sexual harassment. *See* 89 Fed. Reg. at 33,889 (34 C.F.R. §106.44(f)(1)). This definition, concededly and deliberately, exceeds the Supreme Court's definition of actionable harassment in *Davis* and the deliberate-indifference requirement from *Gebser* and *Davis*. The Department has no right to define actionable harassment under Title IX differently from the Supreme Court.

196.    The challenged rule is also illegal because it raises First Amendment concerns and, at a minimum, the Department failed to engage in reasoned decisionmaking in addressing those concerns. To start, the challenged rule requires educational institutions to define pun-

ishable harassment as any "severe *or* pervasive" act—a formulation that necessarily encompasses single instances of speech, which *Davis* warned against—that "*limits* … a person's ability to participate in or benefit from the recipient's education program or activity." *Id.* The Supreme Court was clear in *Davis*, however, that punishable "harassment" under Title IX must rise to the level of conduct that is "so severe, pervasive, *and* objectively offensive that it *denies* its victims the equal access to education." 526 U.S. at 652 (emphases added). The rule also requires a recipient to "promptly and effectively end any sex discrimination" even if it's not deliberately indifferent. *See* 89 Fed. Reg. at 33,889 (34 C.F.R. §106.44(f)(1)); *contra* 526 U.S. at 650-52. The rule's new hostile-environment definition thus covers a single or isolated incident and all negative effects like "a mere 'decline in grades,'" a choice to skip class, or a decision not to attend a campus activity. *Davis*, 526 U.S. at 652-53; *accord* 89 Fed. Reg. at 33,511 ("[A] complainant must demonstrate some impact on their ability to participate or benefit from the education program or activity, but the definition does not specify any particular limits or denials."). And the rule's new definition would force students and teachers to, for example, use someone's "preferred pronouns."

197.    These deviations from *Davis* are not semantic. The Eleventh Circuit has already held that a harassment definition materially similar to the rule's harassment definition, when adopted by a public university, likely violates the First Amendment. *Cartwright*, 32 F.4th 1110. Courts have concluded that school policies against students "misgendering" other students violate the First Amendment. *E.g.*, *Linn Mar*, 83 F.4th at 666-69. The rule's deviations from *Davis* thus "raise grave constitutional concerns," which requires holding the rule unlawful. *Mexican Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 966 (5th Cir. 2023); *accord Solid Waste*

*Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001) (constitutional-doubt canon is a traditional tool of interpretation); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) (same).

198.    Other aspects of the new rule exacerbate the breadth of the rule. The challenged rule reaches "conduct that occurs in a building owned or controlled by a student organization," 89 Fed. Reg. at 33,886 (34 C.F.R. §106.11); misconduct occurring off campus (online or otherwise) or even "outside the United States," *id.*; and activities that occurred before any of the individuals attended the school, *id.* at 33,527. The rule applies to speech uttered at all points in a student's life, even when at home. But the government's ability to punish speech made off school grounds is limited—even in the K-12 context and especially when it comes to "political or religious speech." *See Mahanoy Area Sch. Dist. v. B L. ex rel. Levy*, 594 U.S. 180, 189-90 (2021). This aspect of the rule raises serious constitutional concerns as well.

199.    The Department's new definition of retaliation makes matters worse. The rule expands the definition of retaliation to cover "intimidation, threats, coercion, or discrimination" and expressly covers "peer retaliation." 89 Fed. Reg. at 33,884 (34 C.F.R. §106.2); *id.* at 33,896 (34 C.F.R. §106.71). The rule also removes the provision clarifying that the exercise of First Amendment rights is not retaliation. Under this broad definition, it is likely that a student would be subjected to a grievance procedure for criticizing or ostracizing a student for participating in the Title IX process. Courts, though, have rejected peer ostracism as a basis for finding retaliation. *See Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000). This part of the rule exacerbates the rule's already serious constitutional concerns.

200.    The Department acted arbitrarily and capriciously. It failed to reasonably consider the constitutional concerns raised by its new sex-based harassment definition, its new geographic scope, and its new retaliation definition individually—let alone taken together. And in deciding to deviate from *Davis*, the Department failed to reasonably address its conflation of Title IX with Title VII, applying workplace standards not only to classroom environments but also to students' personal lives. The Department's failure to engage in reasoned decisionmaking is independently fatal.

201.    Moreover, the Department's deviation from *Davis*'s deliberate-indifference requirement is arbitrary and capricious. Recipients' risk of liability is exacerbated by the rule's requirement that schools respond to allegations of sex discrimination promptly and efficiently, rather than *Davis*'s and *Gebser*'s requirement of deliberate indifference. The 2020 rule adopted the Supreme Court's deliberate-indifference requirement for liability because "the recipient cannot commit its own misconduct unless the recipient first knows of the sexual harassment that needs to be addressed." 87 Fed. Reg. at 41,432 (quoting *Gebser*, 524 U.S. at 292). The Department now changes course, asserting that it "is not required to adopt the *Gebser/Davis* standard" because "the standard for administrative enforcement is not derived from the same implied remedy discussed in *Gebser* and *Davis*." 89 Fed. Reg. at 33,560. This reasoning is arbitrary and capricious. The agency has no authority to override the Supreme Court's interpretations of Title IX. Whether a private plaintiff is bringing a lawsuit or the Department is bringing an enforcement action, the *language* of Title IX is the same. As are the concerns that the Court articulated in *Davis*.

202.    And the Department failed to reasonably consider the catch-22 that its change causes recipients. When the rule conflicts with the one from *Davis* and *Gebser*, schools must adopt the harsher standard, rendering *Davis* and *Gebser* a dead letter. This forced-choice approach is particularly problematic because decisions like *Davis* were a compromise. Justice Kennedy warned in his dissent for four Justices that "[a] school faced with a peer sexual harassment complaint in the wake of the majority's decision may well be beset with litigation from every side. One student's demand for a quick response to her harassment complaint will conflict with the alleged harasser's demand for due process." *Davis*, 526 U.S. at 682 (Kennedy, J., dissenting). "On college campuses, and even in secondary schools, a student's claim that the school should remedy a sexually hostile environment will conflict with the alleged harasser's claim that his speech, even if offensive, is protected by the First Amendment. In each of these situations, the school faces the risk of suit, and maybe even multiple suits, regardless of its response." *Id.* at 682-83. The majority avoided this problem by stressing the deliberate-indifference requirement to liability and the stringent definition of actionable harassment. By abandoning the deliberate-indifference requirement, the Department unravels *Davis*'s reasoning. And the Department does so without reasonably considering the bind it's putting recipients in.

203.    The Department's hostile-environment definition is also internally inconsistent, rendering the rule arbitrary and capricious. It stresses a "totality of circumstances" test that considers, among other things, "[t]he degree to which the conduct affected the complainant's ability to access the recipient's education program or activity." 89 Fed. Reg. at 33,884 (34 C.F.R. §106.2). But that factor is in tension with the Department's other statement that "sex-

based conduct meets the 'severe or pervasive' standard of sex-based harassment if it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.* at 33,508. The Department reads out "severe or pervasive" from its definition. It is not clear why the degree of harm matters if the only requirement is that the harassment "limits" the individuals' ability to participate in education, and the Department provides no reasonable explanation justifying this tension.

204.   Further, the Department's action is arbitrary and capricious because it fails to reasonably address comments on misgendering. The Department noted that a commenter raised the Department's "recent resolution letter finding that a school district violated Title IX when it failed to effectively respond to a misgendering of a student." *Id.* at 33,516. Other commentators also "urged" the Department to state that "misgendering is a form of sex-based harassment that can create a hostile environment." *Id.* Many commentators also raised the notice of proposed rulemakings seeming approval of the 2016 Dear Colleague Letter, stating that misgendering is punishable harassment. Rather than address these comments or the 2016 letter, the Department did not meaningfully engage with either comment or even cite the 2016 letter, but merely stated that the issue "is necessarily fact-specific" and that "a stray remark, such as a misuse of language, would not constitute harassment under this standard." *Id.* The terse statement is hardly "'reasoned decisionmaking.'" *Michigan*, 576 U.S. at 750. Commentators put the Department on notice of the 2016 letter and the resolution, so the Department was obligated to address those "relevant authorit[ies]" and explain any "inconsistencies" or differences in position. *Data Mktg.*, 45 F.4th at 857.

205. The Department also failed to adequately consider alternatives *within* the ambit of the existing policy. *See Regents*, 140 S.Ct. at 1913; *MPP*, 20 F.4th at 992. The Department was dead-set on repealing and replacing the Trump rule's codification of *Davis*, instead of considering more moderate amendments that are tailored to its asserted concerns.

206. Because the rule purports to preempt all state-law provisions inconsistent with its terms, it will unreasonably and unlawfully force States to walk into liability traps or create an unworkable regime. *See* 89 Fed. Reg. at 33,885 (34 C.F.R. §106.6(b)) ("The obligation to comply with Title IX and this part is not obviated or alleviated by any State or local law or other requirement that conflicts with Title IX or this part."). The Department did not reasonably anticipate or address this problem, or choose a solution within its statutory authority.

## COUNT III
### Removal of Procedures

207. Plaintiffs incorporate and reallege parts I-II, III.C, and IV.

208. The challenged rule is final agency action under the APA. 5 U.S.C. §704. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." §706(2).

209. The rule, both as a whole and in several particulars, violates the APA. It asserts power that exceeds the agency's lawful authority and rests on reasoning (or a lack thereof) that is arbitrary and capricious.

210. The rule challenged here requires schools to overhaul the procedures they use for Title IX grievances. As with the sexual-harassment definition, these changes force schools

to risk liability and costly lawsuits—creating an unworkable regime that the Department did not adequately consider or justify. They also risk harm to the Private Plaintiffs' members and to the State Plaintiffs' students, including students who attend private schools and schools in other States.

211.   The rule eliminates the right to a live hearing at postsecondary institutions and the right to cross-examine witnesses, including the accuser. *See* 89 Fed. Reg. at 33,895 (34 C.F.R. §106.46(g)) ("A postsecondary institution's sex-based harassment grievance procedures may, but need not, provide for a live hearing … with the parties physically present in the same geographic location."). Under the 2020 rule, students accused of Title IX misconduct had the right to defend themselves in person; now, their colleges or universities have full discretion whether to deny requests for live hearings. *Id.* Even if schools give the accused some sort of hearing, the accused (through an advisor or otherwise) still does not have a right to cross-examine the accuser or witnesses. Courts have found that such procedures raise grave due-process concerns. *See, e.g.*, *Gorman v. Univ. of R.I.*, 837 F.2d 7, 14 (1st Cir. 1988) (requiring "something more than an informal interview with an administrative authority of the college"); *Prasad v. Cornell Univ.*, 2016 WL 3212079 (N.D.N.Y. Feb. 24); *Univ. of the Scis.*, 961 F.3d at 215; *Khan v. Yale Univ.*, 347 Conn. 1, 41 (2023); *Messeri v. DiStefano*, 480 F. Supp. 3d 1157, 1164 (D. Colo. 2020).

212.   In serious cases that turn on witness credibility, courts have held that the Due Process Clause requires live cross-examination. They note that cross-examination is "essential to a fair hearing," *Brandeis Univ.*, 177 F. Supp. 3d at 605, "like no other procedural device" in its effectiveness, *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401 (6th Cir. 2017), and "the 'greatest

legal engine ever invented for the discovery of truth,'" *California v. Green*, 399 U.S. 149, 158 (1970). Courts stress its importance especially in sexual-misconduct cases, given the "he-said-she-said" nature of the inquiry. *See, e.g.*, *Donohue v. Baker*, 976 F. Supp. 136, 147 (N.D.N.Y. 1997) (a university student was entitled to cross-examine accuser in a sexual-assault case because the case turned on the accuser's credibility). Per the Sixth Circuit, "[c]ross-examination is essential in cases like [these] because it … 'takes aim at credibility like no other procedural device.' Without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives." *Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018) (cleaned up); *see Univ. of Cincinnati*, 872 F.3d at 402 ("Cross-examination is … 'essential to due process' in a case that turns on credibility."). The elimination of a parties' right to a live hearing with cross-examination, even when credibility is a key issue, is arbitrary and capricious.

213.    The challenged rule states that college students accused of misconduct—charges that could ruin their academic and professional careers if they are found guilty—no longer have a right to be accompanied by counsel at all proceedings. Instead, the rule allows postsecondary schools to limit their attendance as long as the restriction applies equally to all parties. *See* 89 Fed. Reg. at 33,894 (34 C.F.R. §106.46(e)(2)); *id.* at 33,720. The only requirement is that the Title IX coordinator prevent the accuser from being represented by counsel at those same proceedings. *Id.* But it's the accused, rather than the accuser, whose need for counsel is particularly acute. The rule's elimination of the right to adequate participation by a representative raises due-process and sex-discrimination concerns. The Department has not reasonably considered these concerns.

214.     The challenged rule limits the opportunity for parties to present witnesses. Parties can present "fact witnesses" that are "relevant and not otherwise impermissible" but no longer expert witnesses. *See id.* at 33,892 (34 C.F.R. §106.45(f)(2)); *id.* at 33,594. And the Title IX coordinator gets to determine whether the fact witness is "relevant." Courts have already identified due-process concerns with this regime. *See, e.g., Brandeis Univ.*, 177 F. Supp. 3d at 606 (allowing a due-process claim to continue because the accused supplied "additional facts, names of additional witness, and his sworn affidavit" but the dean "refused to refer any of John's additional facts, witnesses, or affidavit to the Special Examiner for further consideration").

215.     The rule removes the right of students to inspect all the evidence against them. The rule instead allows the parties to access a mere "description" of the "relevant and not otherwise impermissible evidence" unless the parties go out of their ways to request an "equal opportunity to access the evidence." *Compare* 89 Fed. Reg. at 33,892 (34 C.F.R. §106.45(f)); *and id.* at 33,894 (34 C.F.R. §106.46(e)), *with* 34 C.F.R. §106.45(b)(5)(vi) ("Provide both parties an equal opportunity to inspect and review *any evidence* obtained as part of the investigation that is directly *related* to the allegations raised in a formal complaint." (emphases added)).

216.     Although the accused is provided a "[n]otice of allegations," only the rare student who is particularly well-versed in Title IX procedures would know about this separate right. 89 Fed. Reg. at 33,891-93 (34 C.F.R. §106.45(c), §106.46(c)). And the parties have no way of knowing what evidence was not included in the report because the recipient determined that the evidence was irrelevant or impermissible. The limited access is especially detrimental because under the challenged rule, the decisionmaker and the Title IX coordinator can be the

79

same person, so the decisionmaker could potentially know and base his decision on information related to the complaint that the parties have not had a fair opportunity to contextualize or challenge. This limited access to the evidence raises more due-process concerns. *See, e.g.,* *Purdue Univ.*, 928 F.3d at 663; *Averett v. Hardy*, 2020 WL 1033543, *5-8 (W.D. Ky. Mar. 3).

217.    The Department did not reasonably explain why providing to the accused the evidence without a request, along with a description, is impractical or unwise. Nor did the Department reasonably explain why the broader scope of evidence inspectable under the 2020 rule is inadequate. Nor did the Department reasonably address the due-process concerns raised by its new regime.

218.    The rule also limits schools' discretion to use a higher burden of proof. Under the 2020 rule, schools could adopt the preponderance-of-the-evidence standard or the clear-and-convincing-evidence standard as long as the standard was the same for complaints against students and employees. 85 Fed. Reg. 30,575. The challenged rule now lets recipients use a higher burden of proof (clear and convincing evidence) only if they use that higher burden "in all other comparable proceedings, including proceedings relating to other discrimination complaints." 89 Fed. Reg. at 33,893 (34 C.F.R. §106.45(h)(1)). The Department many times claims that its many changes are to give recipients increased "flexibility." But the Department does not reasonably explain its justification for constraining recipients' discretion on the burden of proof.

219.    The challenged rule permits schools to use a single-investigator model. The Department will no longer require a separate Title IX coordinator and investigator and decisionmaker. *Id.* at 33,891 (34 C.F.R. §106.45(b)(2)). Instead, these roles can all fall under the

umbrella of a single school employee. The same individual can hear the original allegations, decide whether to investigate, do the investigation, evaluate the evidence, and make a final decision. This rule threatens to inject bias into the proceedings and raises more due-process concerns.

220.     Courts have cautioned against the legality of proceedings where one person serves as the investigator, factfinder, and ultimate decisionmaker. *See, e.g.*, *Brandeis Univ.*, 177 F. Supp. 3d at 606 ("The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious."); *Univ. of Scis.*, 961 F.3d at 216 (finding that "at least as it has been implemented here, the single-investigator model violated the fairness" owed to students accused of sexual misconduct); *Doe v. Grinnell Coll.*, 473 F. Supp. 3d 909, 924 (S.D. Iowa 2019) (suggesting that the single-investigator model can even color the appeal process); *Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055, 1072-73 (2018) (all decisionmakers "must make credibility determinations, and not simply approve the credibility determinations of the one Committee member who was also the investigator"); *Doe v. Miami Univ.*, 882 F.3d 579, 601, 605 (6th Cir. 2018) (court found "legitimate concerns" raised by the investigator's "alleged dominance on the three-person [decisionmaking] panel" because "she was the only one of the three with conflicting roles"). The 2020 rule separated these roles as an important prophylactic measure; and the challenged rule does not adequately consider the significant due-process concerns of a single-investigator model, let alone how its interests militate the grave dangers of allowing a single person investigate, prosecute, and convict.

221.   The challenged rule allows an investigation to begin without any formal written complaint. The accused need only receive an "oral" statement that a person would "objectively" understand as a "request" to "investigate." 89 Fed. Reg. at 33,882 (34 C.F.R. §106.2). But verbal complaints are often vague and imprecise, making it difficult, if not impossible, to provide accurate and adequate written notice. Perhaps worse, the rule now permits the Title IX coordinator to initiate a grievance procedure even in "the absence of a complaint or the withdrawal of any or all of the allegations in a complaint." *Id.* at 33,889 (§106.44(f)(1)(v)). The rule empowers Title IX coordinators to go beyond their mandatory reporting duties and, in their discretion, police activities on campus that they determine constitute sex discrimination. Given the overall breadth of "sex discrimination" and "sex-based harassment" under the rule, this provision likely gives Title IX coordinators and other employees the power to open investigations and start proceedings based solely on what they have heard.

222.   The rule's changes separately and collectively raise grave concerns, opening recipients up to lawsuits raising due-process claims. They also set up a regime that could itself discriminate based on sex, opening recipients up to lawsuits raising sex-discrimination claims. *See, e.g.*, *Univ. of Scis.*, 961 F.3d at 209-10 (agreeing with a plaintiff who alleged the university "limited procedural protections afforded to male students like [the plaintiff] in sexual misconduct cases"); *Baum*, 903 F.3d at 586 (similar); *Doe v. Univ. of Denver*, 1 F.4th 822, 835-36 (10th Cir. 2021) (similar).

223.   These grave concerns render the rule illegal. *See, e.g.*, *Solid Waste Agency*, 531 U.S. at 172-73; *Edward*, 485 U.S. at 574-75; *Mexican Gulf Fishing*, 60 F.4th at 966. The rule is also

arbitrary and capricious because the Department failed to reasonably identify problems needing solving, reasonably consider the relevant issues, reasonably explain its actions, or reasonably craft solutions.

## PRAYER FOR RELIEF

Plaintiffs ask this Court to enter judgment for them and against Defendants and provide the following relief:

a.  a declaration that the rule violates the APA;

b.  vacatur;

c.  a stay of the rule's effective date;

d.  a preliminary and permanent injunction barring enforcement of the rule in the Plaintiff States; and

e.  any other relief that the Court deems just and proper.

Dated: April 29, 2024

Respectfully submitted,

Ashley Moody
  *Attorney General*

Steve Marshall
  *Attorney General*

*s/ James H. Percival*
James H. Percival*
  *Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for Florida*

*s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.
  *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for Alabama*

Christopher M. Carr
  *Attorney General*

*s/ Stephen J. Petrany*
Stephen J. Petrany*
  *Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Georgia*

*s/ Cameron T. Norris*
Cameron T. Norris*
Thomas S. Vaseliou*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for IWLC, IWN, PDE & Speech First*

Alan Wilson
  *Attorney General*

*pro hac vice forthcoming

*s/ Joseph D. Spate*
Joseph D. Spate*
  Assistant Deputy Solicitor General
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for South Carolina*