FILED

2024 May-08  AM 11:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| State of ALABAMA, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Miguel CARDONA, in his official<br>Capacity as U.S. Secretary of<br>Education, *et al.*,<br><br>*Defendants*. | No. 7:24-cv-533-GMB |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
## STAY OF EFFECTIVE DATE AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................... iii

Introduction .................................................................................................................... 1

Background ...................................................................................................................... 3

    A.    The challenged rule redefines "sex" to include "gender identity." ........................... 5

    B.    The challenged rule redefines "sex-based harassment." ............................................. 6

    C.    The challenged rule eliminates procedures for the accused. .................................... 7

Argument ....................................................................................................................... 11

    I.    Plaintiffs will likely succeed on the merits. ................................................. 11

        A.    The rule illegally redefines Title IX's prohibition on "sex" discrimination. ...................................................................................... 11

        B.    The rule illegally redefines "sex-based harassment." ............................ 27

        C.    The rule illegally changes procedures. ................................................. 37

    II.    The other factors also favor Plaintiffs. ...................................................... 46

    III.    This Court should stay the rule's effective date or enter a preliminary injunction. ...................................................................................................... 48

Conclusion .................................................................................................................... 49

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
 585 U.S. 579 (2018)..................................................................................................45

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.,*
 57 F.4th 791 (11th Cir. 2022) (en banc)..............................................................passim

*Ala. Ass'n of Realtors v. HHS,*
 594 U.S. 758 (2021)..................................................................................................46

*Alabama v. U.S. Army Corps. of Eng'rs,*
 382 F. Supp. 2d 1301 (N.D. Ala. 2005) ...................................................................47

*All. for Hippocratic Med. v. FDA,*
 78 F.4th 210 (5th Cir. 2023) .....................................................................................47

*Arkansas v. U.S. Dep't of Educ.,*
 No. 4:24-cv-636 (E.D. Mo. May 7, 2024)................................................................10

*Averett v. Hardy,*
 2020 WL 1033543 (W.D. Ky. Mar. 3) ......................................................................42

*Biden v. Nebraska,*
 143 S.Ct. 2355 (2023)................................................................................................18

*Bidi Vapor LLC v. FDA,*
 47 F.4th 1191 (11th Cir. 2022) ...........................................................................25, 26

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs,*
 781 F.3d 1271 (11th Cir. 2015) ................................................................................47

*Bostock v. Clayton Cnty.,*
 590 U.S. 644 (2020)..............................................................................................passim

*BST Holdings, LLC v. OSHA,*
 17 F.4th 604 (5th Cir. 2021) ...............................................................................45, 46

*California v. Green,*
 399 U.S. 149 (1970)..................................................................................................37

*Clark v. Martinez,*
 543 U.S. 371 (2005)..............................................................................................30, 31

*Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.,*
 677 F.3d 1073 (11th Cir. 2012) ................................................................................19

*CS Wind Viet. Co. v. United States,*
 832 F.3d 1367 (Fed. Cir. 2016).................................................................................31

*Data Mktg. P'ship, LP v. DOL,*
 45 F.4th 846 (5th Cir. 2022) ...............................................................................19, 36

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) ............................................................................... passim

*Democratic Exec. Comm. of Fla. v. Lee*,
915 F.3d 1312 (11th Cir. 2019) ...................................................................... 46

*DHS v. Regents*,
140 S.Ct. 1891 (2020) ...................................................................................... 23

*Doe v. Baum*,
903 F.3d 575 (6th Cir. 2018) ...................................................................... 37, 41

*Doe v. Brandeis Univ.*,
177 F. Supp. 3d 561 (D. Mass. 2016) ...................................................... 37, 40, 41

*Doe v. Claremont McKenna Coll.*,
25 Cal. App. 5th 1055 (2018) ......................................................................... 40

*Doe v. Grinnell Coll.*,
473 F. Supp. 3d 909 (S.D. Iowa 2019) ........................................................... 40

*Doe v. Miami Univ.*,
882 F.3d 579 (6th Cir. 2018) ...................................................................... 40, 41

*Doe v. Purdue Univ.*,
928 F.3d 652 (7th Cir. 2019) ...................................................................... 41, 42

*Doe v. Univ. of Cincinnati*,
872 F.3d 393 (6th Cir. 2017) ......................................................................... 37

*Doe v. Univ. of Scis.*,
961 F.3d 203 (3d Cir. 2020) ....................................................................... 37, 40

*Donohue v. Baker*,
976 F. Supp. 136 (N.D.N.Y. 1997) ............................................................... 37

*Eagle Broad. Grp. v. FCC*,
563 F.3d 543 (D.C. Cir. 2009) ...................................................................... 20

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
485 U.S. 568 (1988) ....................................................................................... 30

*Eknes-Tucker v. Gov'r of Ala.*,
80 F.4th 1205 (11th Cir. 2023) .............................................................. 12, 13, 14

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................................. 38, 39, 40, 41

*Franciscan All. v. Burwell*,
227 F. Supp. 3d 660 (N.D. Tex. 2016) ........................................................... 17

*Georgia v. President*,
46 F.4th 1283 (11th Cir. 2022) .................................................................. 45, 48

*Gonzales v. Oregon,*
 546 U.S. 243 (2006) ................................................................... 18

*Gorman v. Univ. of R.I.,*
 837 F.2d 7 (1st Cir. 1988) .......................................................... 37

*Griffin v. HM Fla.-ORL, LLC,*
 144 S.Ct. 1 (2023) ...................................................................... 48

*Hand v. Scott,*
 888 F.3d 1206 (11th Cir. 2018) ................................................. 45

*Health Freedom Def. Fund v. Biden,*
 599 F. Supp. 3d 1144 (M.D. Fla. 2022) ..................................... 47

*Holloman ex rel. Holloman v. Harland,*
 370 F.3d 1252 (11th Cir. 2004) ................................................. 35

*Hunt v. Univ. of New Mexico,*
 792 F. App'x 595 (10th Cir. 2019) ............................................ 32

*Judulang v. Holder,*
 565 U.S. 42 (2011) ..................................................................... 39

*Keefe v. Adams,*
 840 F.3d 523 (8th Cir. 2016) ..................................................... 32

*KH Outdoor, LLC v. City of Trussville,*
 458 F.3d 1261 (11th Cir. 2006) ................................................. 46

*Khan v. Yale Univ.,*
 347 Conn. 1 (2023) ..................................................................... 37

*Kiakombua v. Wolf,*
 498 F. Supp. 3d 1 (D.D.C. 2020) ............................................... 48

*L.W. ex rel. Williams v. Skrmetti,*
 83 F.4th 460 (6th Cir. 2023) ........................................... 14, 21, 45

*Labrador v. Poe ex rel. Poe,*
 144 S.Ct. 921 (2024) .................................................................. 48

*Lane v. United States,*
 2018 WL 11441015 (S.D. Ga. Feb. 27) ..................................... 11

*League of Women Voters of U.S. v. Newby,*
 838 F.3d 1 (D.C. Cir. 2016) ....................................................... 46

*Louisiana v. U.S. Dep't of Educ.,*
 No. 3:24-cv-563 (W.D. La. Apr. 29, 2024) ............................... 10

*Louisiana v. U.S. Dep't of Energy,*
 90 F.4th 461 (5th Cir. 2024) ................................................ 24, 26

*Meritor Sav. Bank, FSB v. Vinson*,
  477 U.S. 57 (1986) ........................................................................................27

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) .........................................................................14

*Messeri v. DiStefano*,
  480 F. Supp. 3d 1157 (D. Colo. 2020) ..........................................................37

*Mexican Gulf Fishing Co. v. Dep't of Com.*,
  60 F.4th 956 (5th Cir. 2023) ...................................................................30, 36

*Michigan v. EPA*,
  576 U.S. 743 (2015) ......................................................................................36

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ......................................................................................48

*Muldrow v. City of St. Louis*,
  144 S.Ct. 967 (2024) .....................................................................................25

*Neese v. Becerra*,
  2022 WL 1265925 (N.D. Tex. Apr. 26) .........................................................18

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ......................................................................................16

*Oklahoma v. Cardona*,
  No. 5:24-cv-461 (W.D. Okla. May 6, 2024) ..................................................10

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) .......................................................................46

*PDE v. Linn Mar Cmty. Sch. Dist.*,
  83 F.4th 658 (8th Cir. 2023) .........................................................................36

*PDE v. Olentangy Loc. Sch. Dist.*,
  2023 WL 4848509 (S.D. Ohio July 28) .........................................................34

*Pelcha v. MW Bancorp, Inc.*,
  988 F.3d 318 (6th Cir. 2021) .........................................................................14

*Prasad v. Cornell Univ.*,
  2016 WL 3212079 (N.D.N.Y. Feb. 24) ..........................................................37

*Rapides Par. Sch. Bd. v. U.S. Dep't of Educ.*,
  No. 1:24-cv-567 (W.D. La. Apr. 30, 2024) ....................................................10

*Rowles v. Curators of Univ. of Mo.*,
  983 F.3d 345 (8th Cir. 2020) .........................................................................32

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001) ......................................................................................30

*South Dakota v. Dole,*
   483 U.S. 203 (1987) ................................................................................... 15

*Speech First, Inc. v. Cartwright,*
   32 F.4th 1110 (11th Cir. 2022) ........................................................... passim

*Speech First, Inc. v. Fenves,*
   979 F.3d 319 (5th Cir. 2020) ..................................................................... 29

*Speech First, Inc. v. Khator,*
   603 F. Supp. 3d 480 (S.D. Tex. 2022) ....................................................... 29

*Tennessee v. Cardona,*
   No. 2:24-cv-72 (E.D. Ky. Apr. 30, 2024) ................................................. 10

*Tennessee v. U.S. Dep't of Educ.,*
   615 F. Supp. 3d 815 (E.D. Tenn. 2022) ...................................................... 4

*Tex. Educ. Agency v. U.S. Dep't of Educ.,*
   992 F.3d 350 (5th Cir. 2021) ..................................................................... 17

*Texas v. Biden,*
   20 F.4th 928 (5th Cir. 2021) ..................................................................... 23

*Texas v. Biden,*
   646 F. Supp. 3d 753 (N.D. Tex. 2022) ...................................................... 47

*Texas v. EPA,*
   829 F.3d 405 (5th Cir. 2016) ..................................................................... 46

*Texas v. United States,*
   201 F. Supp. 3d 810 (N.D. Tex. 2016) ........................................................ 3

*Texas v. United States,*
   No. 2:24-cv-86 (N.D. Tex. Apr. 29, 2024) ............................................... 10

*Troxel v. Granville,*
   530 U.S. 57 (2000) ..................................................................................... 26

*U.S. Telecom Ass'n v. FCC,*
   855 F.3d 381 (D.C. Cir. 2017) ................................................................... 18

*United States v. Lopez,*
   514 U.S. 549 (1995) ................................................................................... 17

*United States v. Varner,*
   948 F.3d 250 (5th Cir. 2020) ..................................................................... 21

*W.V. ex rel. Morrisey v. U.S. Dep't of the Treasury,*
   59 F.4th 1124 (11th Cir. 2023) ................................................... 16, 45, 46

*Wages & White Lion Invs. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ..................................................... 24, 44, 46

*Wages & White Lion Invs. v. FDA,*
 90 F.4th 357 (5th Cir. 2024) (en banc)................................................22

*West Virginia v. EPA,*
 597 U.S. 697 (2022)..........................................................................17, 18

*Yetman v. Garvey,*
 261 F.3d 664 (7th Cir. 2001)...............................................................20

**Statutes**

20 U.S.C. §1681 ............................................................................. 1, 5, 11

20 U.S.C. §1686 .................................................................................5, 11

5 U.S.C. §705 ...........................................................................................47

5 U.S.C. §706 ...........................................................................................11

**Other Authorities**

118 Cong. Rec. 16,842 (May 11, 1972) ....................................................1

118 Cong. Rec. 6,277 (Mar. 1, 1972) .......................................................1

*2016 Dear Colleague Letter on Title IX and Transgender Students,*
 U.S. Dep't of Educ. & Justice (May 13, 2016) .....................................7

*ACLU Comment on U.S. Department of Education's Final Title IX Rule,*
 Press Release (Apr. 19, 2024), perma.cc/8XWJ-54FK .........................7

Flores, *States Have Become More Polarized on Transgender Civil Rights,*
 PRRI (Dec. 6, 2023), perma.cc/AC32-D48S..........................................1

Jones, *More Say Birth Gender Should Dictate Sports Participation,*
 Gallup (June 12, 2023), perma.cc/F78B-ATGV ......................................1

Minock, *Loudoun Schools Explore Replacing Boys and Girls Bathrooms with All-Gender,*
 *Single Stalls,* ABC7 News (Apr. 12, 2023), perma.cc/CN4W-WU52..................................24

*Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation,*
 86 Fed. Reg. 7023 (Jan. 25, 2021) .......................................................18

*Standards of Care for the Health of Transgender and Gender Diverse People,*
 World Prof. Ass'n Transgender Health (8th ed. 2022) ..........................22

States' Amicus Br., *Loper Bright Enters. v. Raimondo,*
 No. 22-451 (SCOTUS July 24, 2023) ...................................................30

U.S. Amicus Br., *B.P.J. v. W.V. State Bd. of Educ.,*
 Nos. 23-1078, 23-1130 (4th Cir. Apr. 3, 2023) ...................................20

U.S. Statement of Interest, *B.P.J. v. West Virginia,*
 No. 2:21-cv-316 (S.D. W. Va. June 17, 2021) ....................................20

**Regulations**

34 C.F.R. §106.30 .................................................................................................... 7, 33

34 C.F.R. §106.32 ............................................................................................................ 14

34 C.F.R. §106.33 .................................................................................................. 7, 14, 24

34 C.F.R. §106.41 ............................................................................................................ 14

34 C.F.R. §106.45 ............................................................................................................ 10

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 40 Fed. Reg. 24,128 (June 4, 1975) ........................................................ 24

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) .............................................. passim

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390 (July 12, 2022) ............................................... 5

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) .......................................... passim

**Constitutional Provisions**

U.S. Const. art. I, §8 ...................................................................................................... 15

## INTRODUCTION

Congress passed Title IX in 1972 by large margins (88-6 in the Senate and 275-125 in the House). *See* 118 Cong. Rec. 6,277 (Mar. 1, 1972); 118 Cong. Rec. 16,842 (May 11, 1972). Its core prohibition is only 37 words: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a).

When Congress approved that language in 1972, *no one* was voting to let boys use the girls' bathroom or to let men play women's sports. A bill that imposed those policies wouldn't even pass today. Nearly 70% of Americans "say transgender athletes should only be allowed to compete on sports teams that conform with their birth gender"—a number that is growing over time. Jones, *More Say Birth Gender Should Dictate Sports Participation*, Gallup (June 12, 2023), perma.cc/F78B-ATGV. Americans feel the same about bathrooms. *See* Flores, *States Have Become More Polarized on Transgender Civil Rights*, PRRI (Dec. 6, 2023), perma.cc/AC32-D48S.

Though they're losing the democratic debate, the minority who support these policies are currently running the executive branch; and they have decided to threaten nonconformists with the loss of billions of dollars in federal funding. A new rule from the U.S. Department of Education fundamentally rewrites Title IX in ways that Congress never did, would, or could. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024). The rule redefines "sex" to include "gender identity," insisting that men must be allowed in women's bathrooms, locker rooms, and showers (and paving the way for them to compete in women's sports). The rule then punishes

1

students who speak out against this received orthodoxy by defining "sex-based harassment" so broadly that it covers controversial speech, including a student's refusal to use another student's "preferred pronouns." And for any student accused of violating these dictates, the rule slashes the process they are due—marking a return, for no apparent reason, to the much-maligned kangaroo courts that once pervaded college campuses.

The Department's new rule turns Title IX on its head and violates the Administrative Procedure Act. In fact, the Department *knew* its major provisions couldn't be enforced in this circuit. Eleventh Circuit precedent already holds that Title IX's use of "sex" unambiguously means "biological sex"—not "gender identity" or "transgender status"—and that Title IX allows schools to maintain separate bathrooms for students based on their biological sex. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc). While the Department "declines to adopt the Eleventh Circuit's reasoning," 89 Fed. Reg. at 33,821, courts in this circuit don't have that option. Binding circuit precedent further holds that, when public schools adopt the definition of "harassment" that the rule now requires, they violate the First Amendment. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1115 (11th Cir. 2022). The Department's insistence that schools must adopt policies that litigants have already challenged and defeated in court is not the product of reasoned decisionmaking.

The rule becomes effective on August 1, 2024. Because this Court will likely vacate the rule, it should freeze the rule while the parties litigate cross-motions for summary judgment. This Court should stay the rule's effective date before August 1. At a minimum, it should preliminarily enjoin the Department from enforcing the rule in the Plaintiff States. Anything less will inflict immediate and irreparable harm on students, States, and schools.

## BACKGROUND

Title IX's ban on sex discrimination is straightforward; and for decades, common sense and caselaw created a stable consensus on three key points. First, the original public meaning of "sex" is biological sex and does not include "gender identity." Second, schools can be liable for sex discrimination if they tolerate sexual harassment on campus, but only if they are deliberately indifferent to harassment that is "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1999). And third, schools must adopt prompt and equitable procedures to resolve complaints of sex discrimination that neither deny due process nor unfairly favor one sex over the other. *See generally* Compl. (Doc. 1) ¶18.

These basic principles were tested, however, by the Obama administration. Through guidance and aggressive investigations, the Obama-era Department sought to remake Title IX. It used guidance to expand Title IX to include "gender identity." It used investigations to force schools to adopt broader definitions of sexual harassment than the one articulated by the Supreme Court in *Davis*. And it relaxed key procedural protections for the accused. These maneuvers faced significant pushback, and some were even invalidated in court. *See generally* Compl. ¶31 (citing *Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016)).

The Trump administration took a different path. In 2020, for the first time in almost two decades, the Department promulgated a notice-and-comment rule codifying Title IX's first principles. *See* 85 Fed. Reg. 30,026, 30,036 (May 19, 2020) (2020 rule). The 2020 rule declined to illegally redefine sex to include gender identity and sexual orientation. *Id.* at 30,177. It "adopt[ed]" the Supreme Court's definition of sexual harassment from *Davis* "verbatim."

3

*Id.* at 30,036. And it strengthened procedural protections for students accused of sexual mis-conduct by requiring schools to, among other things, let a representative accompany them to live hearings, *id.* at 30,577, let that counsel cross-examine witnesses, *id.*, and not use a single-investigator model where the same person investigates, prosecutes, and sentences students, *id.* at 30,366-72. All attempts to vacate the 2020 rule through litigation failed. *See* Compl. ¶49.

Then came the Biden administration. It immediately sought to undo the Trump ad-ministration's Title IX rule. It first resumed the Obama administration's strategy of using ag-gressive guidance to inject gender identity into Title IX, but that guidance was quickly ruled illegal. *See Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 815, 837 (E.D. Tenn. 2022) (invali-dating 86 Fed. Reg. 32,637 (June 22, 2021)). The administration eventually sought input from the public via notice-and-comment rulemaking. 87 Fed. Reg. 41,390 (July 12, 2022). Its pro-posed rule scrapped the biology-based understanding of sex discrimination, *id.* at 41,410; jet-tisoned the *Davis* standard for sexual harassment, *id.* at 41,568-69; and eliminated procedural protections for the accused, *id.* at 41,485-88, 41,497-500, 41,577-78. These proposals were met with significant opposition from concerned observers spanning both sides of the aisle, numer-ous major faith groups, and generations old and new. In all, the Department received over 240,000 comments on the proposed rule—the vast majority of which were negative. 89 Fed. Reg. at 33,477.

Still, after many delays, the Department published a "final rule" that was materially indistinguishable from the proposed rule. The rule's effective date is August 1, 2024. *Id.* at 33,476. It walks back none of the proposed rule's three key infirmities.

**A.      The challenged rule redefines "sex" to include "gender identity."**

Against 50 years of consensus and practice, the Department's new rule redefines "sex" to include "gender identity." This shift renders unlawful longstanding policies maintaining separate bathrooms for individuals based on their biological sex and upends the foundation of women's sports.

The rule first redefines "sex discrimination" to include "gender identity discrimination." It declares that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, … and gender identity." 89 Fed. Reg. at 33,886 (Proposed 34 C.F.R. §106.10). The Department does not provide an express definition for "sex" or dispute that "sex" means what it's always meant: "biological sex." The Department instead contends that, "even assuming 'sex' means 'biological sex,'" Title IX's "prohibition on sex discrimination encompasses … gender identity discrimination." *Id.* at 33,807.

Though the Department admits that Title IX allows "different treatment or separation on the basis of sex" in "limited circumstances," the rule states that, even in those exempted circumstances, recipients cannot "subjec[t] a person to more than de minimis harm." *Id.* at 33,816 (Proposed 34 C.F.R. §106.31(a)(2)). And preventing someone from participating "consistent with [that] person's gender identity" is *always* "more than de minimis harm." *Id.* The rule then states what it views as those "limited circumstances" where sex discrimination is allowed. *Id.* (citing 20 U.S.C. §§1681(a)(1)-(9), 1686; 34 C.F.R. §§106.12-.15, 106.32(b)(1), 106.41(b)). Absent from this list is the Department's regulation on separate bathrooms and locker rooms: 34 C.F.R. §106.33.

Though the rule doesn't expressly rescind §106.33, the Department says that its own regulation is null and void. That regulation is not backed by a "statutory exception," the Department claims, and the Department "declines to adopt the Eleventh Circuit's reasoning in *Adams* that the statutory carve out for living facilities" justifies that regulation. 89 Fed. Reg. at 33,819, 33,821. In other words, the rule declares §106.33 invalid without formally rescinding it and proclaims that excluding transgender or nonbinary students from using their preferred bathroom is illegal. *Id.* The Department acknowledges, though, that this new approach to bathrooms is unlawful under existing Eleventh Circuit precedent. *Id.* at 33,820-21. And it tries to deny that its redefinition of sex discrimination affects athletics. *See id.* at 33,817-18.

**B.   The challenged rule redefines "sex-based harassment."**

The 2020 rule defined hostile-environment harassment by adhering "verbatim" to the Supreme Court's definition in *Davis*: "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, *and* objectively offensive that it effectively *denies* a person equal access to the recipient's education program or activity." 34 C.F.R. §106.30(a)(2) (emphases added); *accord Davis*, 526 U.S. at 652. The rule challenged here defines harassment far more broadly. It prohibits "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe *or* pervasive that it *limits* or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884 (Proposed 34 C.F.R. §106.2) (emphases added).

The Department concedes that its new definition of harassment is "broader" than the definition in the 2020 rule and *Davis*. *Id.* at 33,498. The rule applies even if the harassment merely "limits" a person's "ability to participate in or benefit from" a program or activity, *id.*

6

at 33,884, rather than "denies" a person "access to the educational opportunities or benefits provided by the school," *Davis*, 526 U.S. at 651-53. The rule also expands Title IX to cover harassment that's "severe *or* pervasive," 89 Fed. Reg. at 33,884, rather than "severe *and* pervasive," *Davis*, 526 U.S. at 652-53. Broader still, the rule requires recipients to "promptly and effectively end any sex discrimination," regardless whether they were deliberately indifferent to it. *See* 89 Fed. Reg. at 33,889 (Proposed 34 C.F.R. §106.44(f)(1)); *contra Davis*, 526 U.S. at 650-52.

This new, broader definition of harassment—combined with the Department's inclusion of gender identity—is sweeping. It effectively requires recipients to ensure that students use "pronouns and names consistent with a student's gender identity." *2016 Dear Colleague Letter on Title IX and Transgender Students* 3, U.S. Dep'ts of Educ. & Justice (May 13, 2016) (2016 letter), perma.cc/2VTQ-RUYP. The rule suggests as much. *See generally* Compl. ¶76. And it extends to conduct that occurs online, off campus, outside the United States, or even before the relevant individuals attended the school. 89 Fed. Reg. at 33,886, 33,527. It also broadly requires recipients to "prohibit retaliation, including peer retaliation." *Id.* at 33,896 (Proposed 34 C.F.R. §106.71).

## C.  The challenged rule eliminates procedures for the accused.

The rule makes several changes that restrict students' ability to defend themselves from accusations of misconduct under Title IX. Many of these changes, such as ending the right to a live hearing with cross-examination and resurrecting the single-investigator model, have been almost universally condemned, including by the ACLU. *See ACLU Comment on U.S. Department of Education's Final Title IX Rule*, Press Release (Apr. 19, 2024), perma.cc/8XWJ-54FK ("The

ACLU opposes the provisions in the final regulation" that "[d]o not require universities to provide a live hearing and an opportunity for cross-examination" and that allow "the single investigator model").

To start, the rule eliminates the accused's right to a live hearing with cross-examination by their representative at postsecondary institutions. *See* 89 Fed. Reg. at 33,895 (Proposed 34 C.F.R. §106.46(g)). Under the 2020 rule, students accused of Title IX misconduct had the right to defend themselves in person and have their representative cross-examine witnesses, including their accuser. 85 Fed. Reg. at 30,313-34. Now, their universities can deny requests for in-person hearings and thus meaningful cross-examination. Even if schools give the accused some sort of hearing, the accused still has no right to cross-examine the accuser or witnesses. Instead, the rule requires only that "the decisionmaker" can question parties and witnesses and assess credibility—and only "to the extent credibility is both in dispute and relevant." 89 Fed. Reg. at 33,893 (Proposed 34 C.F.R. §106.45(f)-(g)). College students accused of misconduct also no longer have a right to have an advisor (lawyer) participate at all proceedings. Instead, postsecondary schools can limit their attendance. *Id.* at 33,894 (Proposed §106.46(e)(2)).

The rule removes the right of students to inspect all the evidence against them. Under the 2020 rule, "both parties [had] an equal opportunity to inspect and review *any evidence* obtained as part of the investigation that is directly *related* to the allegations raised in a formal complaint." 34 C.F.R. §106.45(b)(5)(vi) (emphases added). The challenged rule instead allows the parties to access a mere "description" of the "relevant and not otherwise impermissible evidence" unless the parties go out of their way to request an "equal opportunity to access" it. 89 Fed. Reg. at 33,892-94 (Proposed §§106.45(f), 106.46(e)). And even then, the decisionmaker

can withhold any evidence he decides is not "relevant" or "otherwise impermissible," *id.* at 33,892, rather than everything "related to the allegations," 34 C.F.R. §106.45(b)(5)(vi).

The rule permits a single-investigator model. Under the 2020 rule, schools could not use a model that allowed a single employee to be the judge, jury, and executioner of a Title IX complaint. 85 Fed. Reg. at 30,366-72. Under the challenged rule, the Department will no longer require that separation. 89 Fed. Reg. at 33,891 (Proposed §106.45(b)(2)). Instead, the same individual can hear the original allegations, decide whether to investigate, do the investigation, evaluate the evidence, and make a final decision.

The rule also allows an investigation to begin without any formal written complaint. Under the 2020 rule, recipients could begin investigations only in response to a formal written complaint from the accuser. 85 Fed. Reg. at 30,126-35. Under the challenged rule, a recipient need only receive an "oral" statement that a recipient can "objectively" understand as a "request" to "investigate." 89 Fed. Reg. at 33,882 (Proposed §106.2). More, the rule now permits the Title IX coordinator to initiate a grievance procedure even in "the absence of a complaint or the withdrawal of any or all of the allegations in a complaint." *Id.* at 33,889 (Proposed §106.44(f)(1)(v)).

The rule also limits schools' ability to use a higher burden of proof. Under the 2020 rule, schools could adopt the preponderance standard or the clear-and-convincing standard, so long as the standard was the same for complaints against students and employees. 85 Fed. Reg. at 30,575. Now the challenged rule lets recipients use a higher burden of proof (like clear and convincing) only if they use that higher burden "in all other comparable proceedings,

including proceedings relating to other discrimination complaints." 89 Fed. Reg. at 33,893 (Proposed §106.45(h)(1)).

*   *   *

Plaintiffs are four States and four private groups. Each urged the administration not to uproot the 2020 rule. *E.g.*, Weaver Decl. ¶8; Mailman Decl. ¶5; Neily Decl. ¶5; Trump Decl. ¶5. And each will suffer concrete injuries as a direct result of the Department's rule. *E.g.*, Mackey Decl. ¶¶6-17; Purcell Decl. ¶¶9, 13-19; Sikes Decl. ¶¶5-15; Brickhouse Decl. ¶¶4-14; Woods Decl. ¶¶6-20; Hardee Decl. ¶¶6-18; Weaver Decl. ¶¶9-19; Mailman Decl. ¶¶5-23; Neily Decl. ¶¶7-27; Trump Decl. ¶¶5, 7-23. Plaintiffs filed this suit on the day the final rule was published, and they now seek preliminary relief so that the rule doesn't irreparably injure them or their constituents before this case can be litigated to final judgment.

Plaintiffs aren't alone. So far, at least eighteen other States have filed suits challenging the rule's legality under the APA. *E.g.*, *Louisiana v. U.S. Dep't of Educ.*, No. 3:24-cv-563 (W.D. La. Apr. 29, 2024) (Louisiana, Mississippi, Montana, and Idaho); *Texas v. United States*, No. 2:24-cv-86 (N.D. Tex. Apr. 29, 2024) (Texas); *Tennessee v. Cardona*, No. 2:24-cv-72 (E.D. Ky. Apr. 30, 2024) (Tennessee, Kentucky, Indiana, Virginia, West Virginia, and Ohio); *Oklahoma v. Cardona*, No. 5:24-cv-461 (W.D. Okla. May 6, 2024) (Oklahoma); *Arkansas v. U.S. Dep't of Educ.*, No. 4:24-cv-636 (E.D. Mo. May 7, 2024) (Arkansas, Missouri, Iowa, Nebraska, North Dakota, South Dakota, and an individual); *see also Rapides Par. Sch. Bd. v. U.S. Dep't of Educ.*, No. 1:24-cv-567 (W.D. La. Apr. 30, 2024) (school district). More suits are likely.

**ARGUMENT**

This Court should stay the rule's effective date or, at a minimum, preliminarily enjoin the Department from enforcing it in Alabama, Florida, Georgia, and South Carolina. For either form of relief, the relevant factors are the same: likely success, irreparable harm, balance of equities, and public interest. *Lane v. United States*, 2018 WL 11441015, at *2 (S.D. Ga. Feb. 27). All four factors favor Plaintiffs.

## I.     Plaintiffs will likely succeed on the merits.

The Department's new rule violates the APA. It illegally redefines sex discrimination to include "gender identity." It illegally rewrites the Supreme Court's definition of sexual harassment. And it illegally changes key procedures for the accused. In APA parlance, the rule is "arbitrary," "capricious," "not in accordance with law," and "in excess of statutory … authority." 5 U.S.C. §706(2). This Court will likely vacate it.

### A.     The rule illegally redefines Title IX's prohibition on "sex" discrimination.

The challenged rule's redefinition of "sex" to include "gender identity" is illegal for two independent reasons. It conflicts with Title IX's text, context, and purpose. And the Department didn't reasonably justify it.

#### 1.     The redefinition of sex discrimination misreads Title IX.

The rule's redefinition of "sex" to include "gender identity" is not a permissible reading of Title IX. That statute bans discrimination "on the basis of *sex*" in "education program[s] or activit[ies]" that receive federal funds. 20 U.S.C. §1681(a) (emphasis added). It allows recipients to "maintai[n] separate living facilities *for* the different *sexes*"—*i.e.*, "for" males and females. §1686 (emphases added). And Title IX's regulations have long allowed separation of the sexes in housing, 34 C.F.R. §106.32(b), in "toilet, locker room, and shower facilities,"

§106.33, and in athletics, §106.41(b). Title IX clearly does not cover discrimination based on "gender identity."

The Department steamrolls the text, its own regulations, and the history of Title IX. It declares that sex discrimination "includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 (Proposed §106.10). The Department does not define "sex" but also never disputes that "sex" means what it has always meant in Title IX: "biological sex." The Department instead contends that, "even assuming 'sex' means 'biological sex,'" Title IX's "prohibition on sex discrimination encompasses sexual orientation and gender identity discrimination." *Id.* at 33,807; *accord id.* at 33,804. But the Department is playing word games; it's clear that the Department is trying to inject, for the first time, gender ideology into Title IX, contrary to longstanding practice and the statute's original public meaning.

Eleventh Circuit precedent defeats the Department's word games. In *Adams*, the en banc court held that the original public meaning of Title IX's use of "sex" means biological sex and does not include "gender identity," that Title IX clearly permits longstanding practices like sex-separated bathrooms and locker rooms, and that the Supreme Court's decision in *Bostock* is limited to Title VII and does not extend to Title IX. 57 F.4th at 811-17 (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644, 655-56 (2020)). Then in *Eknes-Tucker*, the circuit reaffirmed that *Bostock* was a Title VII decision with "minimal relevance" outside that context. *Eknes-Tucker v. Gov'r of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023).

The Department concedes everything but the part about *Bostock*. The Department agrees that *Adams* holds "that 'sex' as used in Title IX can only refer to 'biology and reproductive function,' not gender identity, and that restrooms are covered by a statutory provision permitting a recipient to maintain 'separate living facilities for the different sexes.'" 89 Fed. Reg. at 33,820-21 (quoting *Adams*, 57 F.4th at 811-15). The Department agrees that Title VII precedent does not automatically apply to Title IX. *See, e.g., id.* at 33,563 ("the Department is not bound by Title VII standards in implementing Title IX"); *id.* at 33,617, 33,645 (similar). And yet it dogmatically injects *Bostock* into Title IX, without acknowledging or addressing the Eleventh Circuit's understanding of *Bostock* in cases like *Adams* and *Eknes-Tucker*.

That the Department couldn't distinguish *Adams* and *Eknes-Tucker* is understandable, but damning for its rule. In reaching the conclusion that "sex" means "biological sex" and that sex-separated bathrooms were obviously permissible under Title IX, the Eleventh Circuit concluded that *Bostock* does not apply to Title IX and is limited to Title VII. *Adams*, 57 F.4th at 811. The dissent in *Adams* thought "*Bostock*'s reasoning" applied in full to Title IX and that "the same reasoning" required letting students use their preferred bathroom. *Id.* at 857-58 (Jill Pryor, J., dissenting). But the majority disagreed. It said reliance on *Bostock* was "faulty" because Title VII and Title IX have crucially different texts, histories, and purposes. *Id.* at 808. For example, "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes." *Id.* at 811. If *Bostock* applied to Title IX, the majority stressed, then *Bostock* "would swallow the carve-outs and render them meaningless." *Id.* at 814 n.7; *accord id.* at 813. It would ignore that the workplace differs critically from schools. *Id.* at

808. And it would mean that Title IX bizarrely provides "more protection against discrimination on the basis of transgender status" than "against discrimination on the basis of sex." *Id.* at 814. Bottom line: *Bostock* doesn't extend to Title IX. The Eleventh Circuit reaffirmed *Adams*'s conclusion that *Bostock* applies only to Title VII, explaining that "*Bostock* relied exclusively on the specific text of Title VII" and "bears minimal relevance" to cases with "a different law … and a different factual context." *Eknes-Tucker*, 80 F.4th at 1228-29.

Other courts agree. As the Sixth Circuit explained, *Bostock*'s "reasoning applies only to Title VII, as *Bostock* itself and many subsequent cases make clear." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023); *accord Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("Title VII differs from Title IX in important respects," so "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context."). In short, "*Bostock* extends no further than Title VII." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).

The Department doesn't try to distinguish *Adams* or *Eknes-Tucker*; it merely says it "does not agree" with the Eleventh Circuit's binding precedent. 89 Fed. Reg. at 33,820; *accord id.* at 33,821 ("declines to adopt the Eleventh Circuit's reasoning in *Adams*"). While the Department is free to challenge binding circuit precedent, it will have to do so at the Supreme Court, not here. It knew that, under *Adams*, its rule would be immediately invalid in this circuit. Binding precedent thus dooms the rule's redefinition of sex discrimination to include "gender identity."

14

Even if *Bostock* were relevant under Title IX, the rule misapplies it. *Bostock* emphasized that, to determine whether an act "discriminate[s]," a court must use a comparator—*i.e.*, compare the plaintiff to "others who are similarly situated." 590 U.S. at 657 (emphasis added). In *Bostock*, male and female employees were similarly situated because "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 660. Here, by contrast, a student's biology *is* relevant to decisions about athletics, bathrooms, and locker rooms. *See Adams*, 57 F.4th at 811-17. These programs are separated by sex because males and females, no matter how they identify, have different anatomies. Even the Department "strongly agrees" that, for these reasons, schools "have a legitimate interest in protecting all students' safety and privacy." 89 Fed. Reg. at 33,820. Stated another way, prohibiting males from using the girls' restroom is not discrimination based on "gender identity"; it is discrimination based on sex that Title IX expressly permits. In fact, allowing a male to use the girls' restroom because of "gender identity" while prohibiting other males who are not "trans-identified" from using the girls' restroom *would be* discrimination based on "gender identity." So even if *Bostock*'s reasoning applied, the Department unreasonably explained and applied it here.

If any doubts remain, the Spending Clause and the major-questions doctrine should extinguish them. Both doctrines require that Title IX *clearly* cover gender identity and sexual orientation—something the statute obviously doesn't do.

**Spending Clause**: The rule's redefinition of sex discrimination implicates the constitutional limits on Congress's authority under the Spending Clause. U.S. Const. art. I, §8. Title IX is a Spending Clause statute. *Adams*, 57 F.4th at 815. The Spending Clause authorizes Congress to "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203,

206-07 (1987). It works like a "'contract: in return for federal funds, the States agree to comply with federally imposed conditions.'" *Adams*, 57 F.4th at 815. But this power is "not unlimited." *Dole*, 483 U.S. at 207. Congress's condition must be "unambiguous," such that the States can "exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* (cleaned up). In other words, "spending restrictions imposed by Congress must be ascertainable to be enforceable." *W.V. ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1143 (11th Cir. 2023). Congress also may not use its spending power to "indirectly coerc[e] a State to adopt a federal regulatory system as its own." *NFIB v. Sebelius*, 567 U.S. 519, 578 (2012) (op. of Roberts, C.J.).

The rule violates these limitations. For one, the rule jeopardizes *billions* of dollars for each State—a significant amount of these States' education-related federal funding—if they refuse or otherwise violate the Department's new reimagination of Title IX, leaving the States with "no real option but to acquiesce." *Id.* at 582; *e.g.*, Purcell Decl. ¶¶8-9; Mackey Decl. ¶¶5-6; Woods Decl. ¶¶5-6; Weaver Decl. ¶¶5-6. For another, the new regulations can't survive "the Spending Clause's clear-statement rule." *Adams*, 57 F.4th at 815. As the Eleventh Circuit explained, "schools across the country separate bathrooms based on biological sex"; "colleges and universities across the country separate living facilities based on biological sex"; and schools, colleges, and universities separate "sports teams" based on biological sex. *Id.* at 816-17. Yet the rule "call[s] into question the validity" of all these longstanding practices that are the core of Title IX. *Id.* at 817. The idea that schools, colleges, and universities "could or should have been on notice" that these practices violate Title IX "is untenable." *Id.* at 816.

16

It is no answer to say, as the Department does, that its rule is prospective and the new regulations provide the needed clarity. 89 Fed. Reg. at 33,805. An *agency's rule* can't provide the needed clarity because that clarity "must come directly from the *statute.*" *Morrisey*, 59 F.4th at 1147 (emphasis added) (cleaned up). As the Fifth Circuit once explained: "Regulations that interpret statutes are valid only if they either match Congress's unambiguous command or are clarifying a statutory ambiguity. Relying on regulations to present the clear condition, therefore, is an acknowledgment that Congress's condition was not unambiguous, so that method of analysis would not meet the requirements of" the clear-statement rule. *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021) (cleaned up).

Even if a rule could provide the needed notice, this rule doesn't. The Department fails to adequately define key terms like "gender identity," identify how recipients can properly "verify" a student's or teacher's "gender identity," or explain how schools can deal with "non-binary" students or teachers. Nor does it explain whether the inclusion of "gender identity" in Title IX will require recipients to punish "misgendering," hide a school-age child's "gender identity" from their parents, or "affirm" a school-age child's "gender identity" when the parents tell the recipients not to. *See generally* 89 Fed. Reg. at 33,821-22 (parental rights); 33,516 ("misgendering"); 33,809 (vague "descri[ption]" of "gender identity"); 33,819 (vague "verification" guidance); 33,818 (nonbinary).

**Major Questions**: The challenged rule can't survive the major-questions doctrine either. The Department "seeks to intrude into an area that is the particular domain of state law": education. *West Virginia v. EPA*, 597 U.S. 697, 744 (2022) (Gorsuch, J., concurring) (cleaned up); *see United States v. Lopez*, 514 U.S. 549, 564 (1995) ("education [is] where States historically

have been sovereign"). And in trying to redefine "sex," the Department breaks new ground on issues of "'political significance.'" *West Virginia*, 597 U.S. at 721; *see Franciscan All. v. Burwell*, 227 F. Supp. 3d 660, 687 (N.D. Tex. 2016) ("the scope and meaning of sex discrimination prohibited by Title IX" "undoubtedly implicates significant policy questions"). The Department received 240,000 comments (most of which were negative), thrice delayed the issuance of the rule, and took nearly three years to issue it because of the extraordinary significance of its decision. 89 Fed. Reg. at 33,477. Members of Congress have repeatedly tried—and failed— to amend Title IX to add "gender identity" and "sexual orientation." *See West Virginia*, 597 U.S. at 731-32; *Neese v. Becerra*, 2022 WL 1265925, at *13 (N.D. Tex. Apr. 26) ("Legislators tried to amend Title IX to include 'sexual orientation' and 'gender identity' on multiple occasions, but those attempts failed."). And sex-separated facilities and athletics "'rais[e] questions that are personal and emotionally charged, hitting fundamental issues'" of our time, *Biden v. Nebraska*, 143 S.Ct. 2355, 2373-74 (2023), and are plainly "the subject of an 'earnest and profound debate' across the country," *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006); *accord West Virginia*, 597 U.S. at 743 (Gorsuch, J., concurring). The President has publicly weighed in on the issue too, which "only underscores [its] enormous significance." *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 423-24 (D.C. Cir. 2017) (Kavanaugh, J., dissental); *e.g.*, 86 Fed. Reg. 7023 (Jan. 25, 2021).

Taking everything together, the rule tries to answer a major question, so the Department must "point to 'clear congressional authorization'" for it. *West Virginia*, 597 U.S. at 723. It can't. As explained, the best interpretation of Title IX is that "sex" doesn't include "gender identity." So there's certainly no clear authorization for the opposite view.

2. **The redefinition of sex discrimination is arbitrary and capricious.**

Even if the rule could have been squared with text and precedent, the Department's attempt to do so is arbitrary and capricious. It violates the APA's demand for reasoned decisionmaking in at least six ways. It unreasonably renders its own bathroom regulations inconsistent. It fails to consider sports. It leaves key questions about "gender identity" unresolved. It ignores real reliance interests and costs on recipients. It adopts a "de minimis harm" standard without a sufficient basis. And it fails to grapple with the conflicts it creates with parental rights.

**Bathrooms**: The rule makes a mess of the Department's own regulations. On the one hand, the rule announces that schools violate Title IX if they don't allow transgender students access to the bathroom reserved for the opposite biological sex. 89 Fed. Reg. at 33,820-21. On the other hand, the Department acknowledges that an existing regulation allows schools to have sex-separated bathrooms, and that the best reading of that regulation is that schools *can* reserve access to sex-separated bathrooms based on biological sex. *Id.* And then the Department says, bizarrely, that it is *leaving that existing bathroom regulation in place. Id.* at 33,821. The Department says the existing regulation is void because it violates Title IX itself, *id.*, leaving the regulation in a zombie-like state where it still appears on the books but supposedly has no force. Perhaps the Department didn't want to take the political hit of actually saying that it is forcing schools to let males into female bathrooms, locker rooms, and showers. But creating a scheme where its regulations are now in direct conflict—confusing recipients and students alike—was not a reasonable approach to rulemaking. *See Data Mktg. P'ship, LP v. DOL*, 45

19

F.4th 846, 857 (5th Cir. 2022); *Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.*, 677 F.3d 1073, 1078 n.10 (11th Cir. 2012).

**Sports**: The redefinition of sex discrimination to include gender identity fails to reasonably handle athletics, one of the most important aspects of the problem. Instead of considering how its redefinition affects sports, the Department tries to punt. It claims that the rule has no effect on athletics because the Department has a regulation that expressly allows sex-separate sports. 89 Fed. Reg. at 33,817-18, 33,839. Yet the same was true for bathrooms, and the Department bulldozed that regulation by claiming it is invalid. *See id.* at 33,819-21. Sports are different, the Department says, because that regulation was prompted by the so-called Javits Amendment, and Congress actually reviewed that regulation before it went into effect. *Id.* at 33,816-17. But the bathroom regulation was part of that same batch of regulations, all of which the Department created in response to the Javits Amendment and Congress did not disapprove. *See* 40 Fed. Reg. 24,128, 24,141 (June 4, 1975); 34 C.F.R. §106.33.

Worse, the Department hides the ball by omitting that, just like the bathroom regulation, it thinks the sports regulation is invalid. *See B.P.J. v. West Virginia*, Doc. 42, No. 2:21-cv-316 (S.D. W. Va. June 17, 2021) (arguing that Title IX and the Constitution invalidate policies that "categorically exclude transgender girls from participating in single-sex sports restricted to girls"); U.S. Amicus Br. 24-27, *B.P.J. v. W.V. State Bd. of Educ.*, Nos. 23-1078, 23-1130 (4th Cir. Apr. 3, 2023) (same). Arbitrarily treating like things as unalike does not satisfy the APA. *See Eagle Broad. Grp. v. FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009) ("an agency may not treat like

cases differently"); *Yetman v. Garvey*, 261 F.3d 664, 669 (7th Cir. 2001) ("A long line of precedent has established that an agency action is considered arbitrary when the agency has offered insufficient reasons for treating similar situations differently.").

More fundamentally, the Department cannot save for later an important aspect of the problem when the validity of its current rule depends on the answers. And that's the case with sports: The soundness of the Department's interpretation of sex discrimination depends on context and the history of Title IX, for which sports has always been central. *See Adams*, 57 F.4th at 816 (stressing that a decision about bathrooms "would have broad implications for sex-separated sports"). Nor could the Department meaningfully consider the practicability or wiseness of its policy decisions without factoring in sports. *See id.* at 821 (Lagoa, J., concurring) (explaining that a bathroom determination "would open the door to eroding Title IX's beneficial legacy for girls and women in sports" and "har[m] not only girls' and women's prospects in sports, but also … their development and opportunities beyond the realm of sports"). The unfairness of letting men dominate sports is one of the core reasons why Congress passed Title IX; it is not something the Department could pretend is not part of the debate over its redefinition of sex to include gender identity.

**Gender Identity**: The Department also fails to adequately define "gender identity." The Department's reasoning on this issue renders its rule vague and impossible to apply. The Department declines to provide "a specific definition of 'gender identity.'" 89 Fed. Reg. at 33,809. At the same time, it defines "gender identity" as "an individual's sense of their gender, which may or may not be different from their sex assigned at birth." *Id.* This (non)definition is unworkable. It provides schools no guidance on what "gender identities" they must accept

or how they can "verify" them. "It oversimplifies matters to say that gender dysphoric people" merely identify "opposite from their birth sex." *United States v. Varner*, 948 F.3d 250, 256 (5th Cir. 2020). "Gender identity" is not a "'discrete'" category but "can describe 'a huge variety of gender identities and expressions.'" *L.W.*, 83 F.4th at 487. According to some, "gender is not binary but rather a three-dimensional 'galaxy.'" *Varner*, 948 F.3d at 257. One of the Department's leading sources, WPATH, insists that someone can be "more than one gender identity simultaneously or at different times (*e.g.*, bigender)," "not have a gender identity or have a neutral gender identity (*e.g.*, agender or neutrois)," "have gender identities that encompass or blend elements of other genders (*e.g.*, polygender, demiboy, demigirl)," or "have a gender that changes over time (*e.g.*, genderfluid)." *Standards of Care for the Health of Transgender and Gender Diverse People*, S80, World Prof. Ass'n Transgender Health (8th ed. 2022) (cited at 89 Fed. Reg. at 33,819 & n.90 as a "well-established medical organizatio[n]"). They "may use the pronouns they/them/theirs, or neopronouns which include e/em/eir, ze/zir/hir, er/ers/erself among others." *Id.*

And how are districts supposed to verify a student's gender identity? The rule doesn't say. It says the Department is "aware" that "many recipients rely on a student's consistent assertion," but the Department never approves that approach. 89 Fed. Reg. at 33,819. It only warns that "requiring a student to submit to invasive medical inquiries or burdensome documentation" is not allowed. *Id.* But that one example of "what not to do" is a far cry from reasonable guidance about how to navigate this real and obvious issue. The Department hasn't given recipients fair notice of their obligations, even though it must. *See Wages & White Lion Invs. v. FDA*, 90 F.4th 357, 374 (5th Cir. 2024) (en banc).

The Department also fails to reasonably explain how its rule coherently applies to "nonbinary" (or "bisexual" or "questioning") individuals. Even assuming *Bostock* applies to Title IX, nonbinary persons do not remotely satisfy *Bostock*'s but-for test for sex discrimination. The "but-for test directs us to change one thing at a time and see if the outcome changes," and "[s]o long as the plaintiff's sex was one but-for cause of that decision, that is enough." *Bostock*, 590 U.S. at 656. But a school with a policy of not allowing nonbinary students to use the bathroom of the opposite sex would not discriminate based on "sex" because "changing the [person's] sex would [not] have yielded a different choice by the" school. *Id.* at 659-60. Otherwise, a policy of allowing students to use the bathroom in line with their "gender identity" would also violate Title IX if it did not provide a third bathroom for gender-neutral students. *Contra* 89 Fed. Reg. at 33,818. And some claimed nonbinary gender identities do not hinge to sex at all. The Department failed to adequately address the expansiveness, and arbitrariness, of its rule.

**Reliance**: The Department inadequately considers reliance interests. For decades, recipients relied on regulations that unambiguously permit separation based on biological sex. *Adams*, 57 F.4th at 812-17. The States, for example, structured their athletics programs and intimate spaces based on that basic understanding. *E.g.*, Mackey Decl. ¶¶16-17; Purcell Decl. ¶¶14, 19; Woods Decl. ¶¶18-29; Sikes Decl. ¶¶14-15; Weaver Decl. ¶¶10, 19. The Department failed to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing concerns." *DHS v. Regents*, 140 S.Ct. 1891, 1915 (2020).

Similarly, the Department failed to adequately consider alternatives "within the ambit of the existing policy." *Id.* at 1913 (cleaned up); *accord Texas v. Biden*, 20 F.4th 928, 992 (5th Cir. 2021), *rev'd on other grounds*, 597 U.S. 785 (2022) ("'considering less disruptive alternatives'"). The Department was dead-set on repealing and replacing the Trump rule, instead of considering more moderate amendments that are tailored to its asserted concerns. For example, the Department failed to adequately consider the alternative of single-occupancy bathrooms. The Department does not explain how a policy that lets students who do not want to use the bathroom that aligns with their biological sex to use a single-occupancy bathroom results in more than de minimis harm or violates Title IX. When a commenter raised the option of single-occupancy bathrooms, the Department brushed it off because it would need "to seek public comment on this issue" first. 89 Fed. Reg. at 33,820. But commenters raised this alternative, so the Department had to address it. It is not a reasonable explanation to say that the alternative might be costly. "'[C]osts and burdens' do not excuse the Government from considering the full panoply of alternatives to its chosen action in repealing" an effective policy. *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 476-77 (5th Cir. 2024).

Nor was it reasonable for the Department to flatly assert that recipients can "tak[e] nondiscriminatory steps to ensure privacy and safety for all students in a recipient's sex-separate facilities." 89 Fed. Reg. at 33,820; *see Wages & White Lion Invs. v. FDA*, 16 F.4th 1130, 1138 (5th Cir. 2021) ("'We do not defer to the agency's conclusory or unsupported suppositions.'"). The Department does not explain how this is possible, and it failed to consider that increasing privacy and safety in sex-separate facilities that are used by both sexes would be extremely costly. An estimate in Loudoun County shows that bathroom renovations alone will cost that

school district $11 million dollars for two of its eighteen high schools. *See* Minock, *Loudoun Schools Explore Replacing Boys and Girls Bathrooms with All-Gender, Single Stalls*, ABC7 News (Apr. 12, 2023), perma.cc/CN4W-WU52. This figure excludes the other sixteen high schools, sixty-five elementary schools, and twenty-one middle schools in that district alone.

The Department didn't adequately consider effects on the educational environment either. Though the Department cursorily dismissed concerns about the "mere presence" in "single-sex space[s]," 89 Fed. Reg. at 33,820, it didn't address intimate settings where women and children will be partially or fully undressed. The Department didn't reasonably consider that "people have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating." *Adams*, 57 F.4th at 805 (cleaned up). That privacy interest is heightened for "school-age children" who "'are still developing, both emotionally and physically.'" *Id.* at 804. The Department again disregarded "important aspect[s] of the problem." *Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1202 (11th Cir. 2022).

**De Minimis Harm**: The rule's new "more than de minimis harm" requirement is arbitrary and capricious because the Department failed to consider relevant and binding precedent. The Department relies heavily on *Bostock*, a Title VII case, but fails to square its interpretation of Title IX with the Supreme Court's most recent case on Title VII and *Bostock*. Title VII, the Court explained in *Muldrow*, does not ask how much harm a discriminatory action imposes. *Muldrow v. City of St. Louis*, 144 S.Ct. 967, 976 (2024). The Court rejected any requirement that the "injury" be "'significant,' 'material,' or 'serious.'" *Id.* at 975 n.2. The Department

failed to consider this relevant issue, let alone explain why this recent interpretation of Title VII does not unravel its heavy reliance on the concept of "de minimis harm."

**Parental Rights**: Finally, the Department injected gender identity into Title IX without adequately considering parental rights. The rule says it trumps parents' rights, including their right to access their child's information under FERPA and state laws. *See, e.g.*, 89 Fed. Reg. at 33,885 (Proposed 34 C.F.R. §106.6(e)). Commenters pressed concerns that the rule would bar a recipient from "treat[ing] a student according to their" biological sex "if requested by the parents to do so," "notify[ing] a student's parents of the student's gender transition or gender identity," or letting parents access "their child's educational records, including information about their child's gender identity." *Id.* at 33,821-22. Rather than deny these concerns, the Department concedes that the rule *can* require such results, even when state law guarantees these parental rights, and then "declines to opine" on any specifics. *Id.* at 33,822. But "bare acknowledgment is no substitute for reasoned consideration." *Louisiana*, 90 F.4th at 473. An agency can't adopt a radical change and then not directly address the significant consequences of its amendment by stating that it is saving the tough judgments for later. Especially when the change affects a constitutional right like parents' right to make decisions about the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 66 (2000).

Each of these errors dooms the rule. And none of the Department's errors are harmless. "[A]n agency decision is harmless only 'when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of the decision reached.'" *Bidi*, 47 F.4th at 1205. These legal violations *are* the substance of the decision.

**B.      The rule illegally redefines "sex-based harassment."**

Title IX bans discrimination based on sex, and recipients can violate that prohibition if, in certain limited circumstances, they fail to address sexual harassment by students against other students. Recipients have long known what those circumstances are because the Supreme Court defined them in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999). The challenged rule, however, rejects *Davis*'s interpretation of Title IX and imports the Title VII standard for sexual harassment instead. This redefinition is contrary to law and arbitrary and capricious.

**1.      The redefinition of sexual harassment is contrary to law.**

The Supreme Court has already defined Title IX's obligations for sexual harassment. In *Davis*, the Court held that recipients can violate Title IX only if they have "actual knowledge" of sexual harassment and are "deliberately indifferent" to it. 526 U.S. at 650. And the harassment in question must be "so severe, pervasive, *and* objectively offensive that it *denies* its victims the equal access to education." *Id.* at 652 (emphases added). This standard intentionally excludes "a single instance of one-on-one peer harassment," even if "sufficiently severe," and harassment that has only negative effects like "a mere 'decline in grades.'" *Id.* at 652-53.

When crafting the *Davis* standard, the Supreme Court made clear that it chose this stringent definition in part to avoid constitutional concerns. *E.g.*, *id.* at 648-49, 652-53. In the dissent, Justice Kennedy had argued that, if schools are liable for student-on-student harassment, then they will adopt "campus speech codes" that "may infringe students' First Amendment rights." *Id.* at 682; *see id.* at 667 (noting that schools' "power to discipline its students"

for harassment is "circumscribed by the First Amendment"). In response, the majority explained that its narrow definition accounts for "the practical realities of responding to student behavior." *Id.* at 652-53 (citing the dissent). Those "practical realities," the Court agreed, include the need to comply with the First Amendment. *See id.* at 649 (agreeing with the dissent that schools face "legal constraints on their disciplinary authority" and explaining that its interpretation of Title IX would not require universities to risk "liability" via "constitutional … claims").

Notably, *Davis* refused to adopt the definition of harassment that governs the workplace under Title VII. While actionable harassment under Title VII can be "severe *or* pervasive," students are not employees and Title IX's "severe *and* pervasive" standard reflects the greater First Amendment concerns that arise in the educational context. *See id.* at 651 (emphases added; distinguishing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). In short, "the school is not the workplace." *Adams*, 57 F.4th at 808 (discussing *Davis*).

Hence why the Trump administration "adopt[ed]" the *Davis* standard "verbatim." 85 Fed. Reg. at 30,036; *accord id.* at 30,151-52, 30,164-65 & nn.738-39; 34 C.F.R. §106.30(a). Broader definitions of harassment, the Department found, have "infringed on constitutionally protected speech" and have led "'many potential speakers to conclude that it is better to stay silent.'" 85 Fed. Reg. at 30,164-65 & nn.738-39. According to the Department then, the *Davis* standard "ensures that speech … is not peremptorily chilled or restricted" because it applies only when harassment rises to the level of "serious *conduct* unprotected by the First Amendment." *Id.* at 30,151-52 (emphasis added); *accord id.* at 30,162-63.

The Department now thinks the Supreme Court's definition isn't good enough; its new definition deviates from *Davis* in several key ways. The rule expands Title IX to cover conduct that's "severe *or* pervasive" rather than "severe *and* pervasive," so the rule necessarily reaches single and isolated incidents. 89 Fed. Reg. at 33,884 (Proposed §106.2); *contra Davis*, 526 U.S. at 652-53. A recipient also can violate Title IX if the harassment "*limits*" a person's ability to participate in, or benefit from, a program or activity, 89 Fed. Reg. at 33,884 (Proposed §106.2), instead of *Davis*'s requirement that the harassment "*denies* the victims of access to the educational opportunities or benefits provided by the school," 526 U.S. at 652-53. So the new rule covers, contra *Davis*, all negative effects like "a mere 'decline in grades,'" a choice to skip class, or a decision not to attend a campus activity. *Id.* at 653; *see* 89 Fed. Reg. at 33,511 ("[A] complainant must demonstrate *some impact* on their ability to participate or benefit from the education program or activity, but the definition does not specify any particular limits or denials." (emphasis added)). The rule also requires a recipient to "promptly and effectively end any sex discrimination," regardless whether it has been deliberately indifferent. *See id.* at 33,889 (Proposed §106.44(f)(1)); *contra Davis*, 526 U.S. at 650-52.

These deviations from *Davis* are not minor or technical. The Eleventh Circuit has already held that a harassment definition materially similar to the rule's harassment definition, when adopted by a public university, likely violates the First Amendment. In *Cartwright*, a university defined "'Hostile Environment Harassment'" as "[d]iscriminatory harassment that is so severe *or* pervasive that it unreasonably interferes with, *limits*, deprives, or alters the terms or conditions of education … or participation in a university program or activity … when viewed from both a subjective and objective perspective." 32 F.4th at 1114-15 (emphases

added). The Eleventh Circuit held that this policy was "almost certainly unconstitutionally overbroad" and "an impermissible content- and viewpoint-based speech restriction." *Id.* at 1125. Other courts agree. *E.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 337 n.16 (5th Cir. 2020) (similar non-*Davis*-compliant harassment policy objectively chilled protected speech); *Speech First, Inc. v. Khator*, 603 F. Supp. 3d 480, 482 & n.6 (S.D. Tex. 2022) ("Speech First will likely succeed on the merits because the original [harassment] policy does not comport with the standard adopted by the Supreme Court" in *Davis*.). The Department's rule thus walks public universities into a First Amendment trap—the very trap that the *Davis* standard is designed to avoid.

In short, *Davis* authoritatively defined when sexual harassment by students makes a school liable for sex discrimination under Title IX. The Department had no power to adopt a different definition or eliminate *Davis*'s key limitations. Even if *Chevron* deference were a valid doctrine, *but see* States' Amicus Br., *Loper Bright Enters. v. Raimondo*, No. 22-451 (SCOTUS July 24, 2023), the Department could not use it to override Title IX's unambiguous meaning, as interpreted by the Supreme Court. Especially because that interpretation was adopted to avoid "grave constitutional concerns." *Mexican Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 966 (5th Cir. 2023); *see Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 574-75 (1988).

2.    **The redefinition of sexual harassment is arbitrary and capricious.**

The Department also fails to reasonably address relevant issues and important aspects of the problem. The Department tries to minimize *Davis* and binding Eleventh Circuit precedent, but its explanations are themselves arbitrary and capricious. The Department also fails to explain inconsistencies in its new definition of harassment and ignores commenters' many concerns about speech.

**Davis**: The Department tries to discount *Davis* in many ways, but each attempt is arbitrary and capricious. The Department first contends that it "is not required to adopt the *Gebser/Davis* standard" at all because those cases were private lawsuits, not "administrative enforcement." 89 Fed. Reg. at 33,560. This reasoning makes no sense. The Supreme Court was interpreting Title IX. Whether a private plaintiff is bringing a lawsuit or the Department is bringing an enforcement action, the language of Title IX is the same. *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (courts cannot construe the same statute one way in one factual context and another way in another factual context). As are the concerns that the Court articulated in *Davis*, including the First Amendment concerns that arise by overly broad definitions of harassment. Title IX is not "a chameleon" whose "meaning [is] subject to change depending on the presence or absence of constitutional concerns in each individual case." *Id.* at 382. *Davis* based its standard on what Title IX "makes clear," yet the Department deviates from *Davis*'s clear instruction without a reasoned justification. *Davis*, 526 U.S. at 650. Here, *Davis*'s "lowest common denominator," which takes account for the constitutional concerns, must control. *Clark*, 543 U.S. at 380.

31

It is no answer to say, as the Department does, that deviating from *Davis* is okay because having a different standard for "monetary damages in private litigation" than "administrative enforcement" is a "long-held view." 89 Fed. Reg. at 33,499. An "agency's statement of what it normally does or has done before is not, by itself, an explanation of why its [practice] comports with the statute. Whether it does so in a particular agency decision or in a cited earlier decision, the agency must ground such a normal or past practice in the statutory standard." *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016) (cleaned up). And the Department can't do so here: *Davis* authoritatively interpreted Title IX, and the Department has no authority to adopt a different standard.

At the very least, the Department failed to reasonably explain how one statute can have two meanings. And it failed to explain how a school could adopt one harassment policy to avoid private liability but a different harassment policy to avoid administrative enforcement. If the standards are different, then schools must adopt the more draconian one to avoid penalties—rendering *Davis* a dead letter.

As a last resort, the Department tries to argue that the rule's definition is "sufficiently closely aligned with *Davis*," 89 Fed. Reg. at 33,501, but its explanation is fatally lacking. The Department points to one out-of-circuit precedent: *Rowles v. Curators of University of Missouri*, 983 F.3d 345 (8th Cir. 2020). In the Department's view, *Rowles* held that a university's *Davis*-non-compliant policy did not raise a First Amendment overbreadth problem. 89 Fed. Reg. at 33,494-95 (citing 983 F.3d at 352, 358-59). But *Rowles* is crucially different because it involved a graduate student, which raises unique First Amendment issues not present here. 983 F.3d at 351. Graduate students are arguably more like employees of the university, rather than mere

students, so a lower standard might be justified for regulating their speech. *See, e.g., Keefe v. Adams*, 840 F.3d 523, 529-33 (8th Cir. 2016); *Hunt v. Univ. of New Mexico*, 792 F. App'x 595, 601-06 (10th Cir. 2019). The Department never addresses this crucial distinction, which is fatal. And while the Eighth Circuit said that a severe-*or*-pervasive definition of harassment "tracks" *Davis*'s severe-*and*-pervasive standard, *Rowles*, 983 F.3d at 358, not even the Department thinks that's right. It agrees that its new definition is "broader," a lower "bar," and "not identical to *Davis.*" *See, e.g.*, 89 Fed. Reg. at 33,498 ("The Department's final definition is not identical to *Davis* … because the Department … believes a broader standard is appropriate."); *id.* at 33,500-01 (calling *Davis* "a higher bar"). In fact, the Department's rule reads out the "severe or pervasive" language entirely, insisting that it merely requires that the harassment "limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.* at 33,508.

The Department also tries to say that its "limits or denies" requirement is the same as *Davis*'s "denies" requirement. *Compare id.* at 33,884 (Proposed §106.2) ("limits or denies a person's ability to participate in or benefit from the recipient's education program or activity"), *with Davis*, 526 U.S. at 652 ("denies its victims the equal access to education"). If that were true, then why change the definition from the 2020 rule? As the Department eventually concedes, the word "limits" requires only "*some* impact on [the student's] ability to participate or benefit from the education program or activity," *id.* at 33,511 (emphasis added), while *Davis*'s "deny" condition requires more, *see* 526 U.S. at 652-53 (standard doesn't cover mere negative effects like "'decline in grades,'" a choice to skip class, or a decision not to attend an activity). Simply put, unlike "deny," the word "limit" is vague, "amorphous," and a low bar. *Cartwright*,

32 F.4th at 1121. That the Department deviates from *Davis*, while sometimes admitting and sometimes refusing to admit its deviations, further dooms the rule.

**First Amendment**: The Department also goes astray when it tries to explain away binding circuit precedent about the First Amendment limits on harassment policies at public schools. The Department contends that the Eleventh Circuit's decision in *Cartwright* is distinguishable because it involved a policy that was "broader" and "less protective" of speech than the harassment definition in the rule. 89 Fed. Reg. at 33,501, 33,505-06. According to the Department, its new rule is "far different" from the policy in *Cartwright* because the rule's "definition is narrower, clearer, and tailored to harms that have long been covered by hostile environment laws." *Id.* at 33,505.

The Department does not reasonably explain how—because it can't. As in *Cartwright*, the definition of harassment challenged here reaches pure speech. *E.g.*, *id.* at 33,516 (covers "verbal" acts); *id.* at 33,493 (same); *id.* at 33,505 ("speech" can "constitut[e] hostile environment sex-based harassment"); *id.* at 33,503 (similar); 85 Fed. Reg. at 30,164-65 & nn.738-39 ("[E]vidence that broadly and loosely worded anti-harassment policies have infringed on constitutionally protected speech and academic freedom is widely available."). As in *Cartwright*, the rule uses a "gestaltish 'totality of known circumstances' approach." 32 F.4th at 1121, 1125; *accord* 89 Fed. Reg. at 33,884 (Proposed §106.2) ("based on the totality of the circumstances"). And as in *Cartwright*, the rule "restricts political advocacy" and other speech at the heart of the First Amendment. 32 F.4th at 1125.

34

To try to distinguish *Cartwright*, the Department draws a series of distinctions that are either nonexistent or backward. True, the policy in *Cartwright* reached "condoning or encouraging, or even failing to intervene to stop" harassment. *Id.* at 1126 (cleaned up). But the Department's rule reaches speech that merely "contribut[es] to" harassment. 89 Fed. Reg. at 33,501 n.11. True, the policy in *Cartwright* used "the terms 'unreasonably' and 'alter,'" which the Eleventh Circuit found "amorphous." 32 F.4th at 1121 (cleaned up). But the Department's rule uses the term "limits," which is just as amorphous and would equally "vary from one student to another." *Id.*; *see* 89 Fed. Reg. at 33,501 n.11, 33,505. Especially since the Department defines "limits" to require only "some impact" on a student's education. *Id.* at 33,511.

The Department does no better when it denies that its definition of harassment is viewpoint discriminatory under *Cartwright*. *Id.* at 33,505. Relying on an erroneous district-court opinion that is currently on appeal, the Department says that the "'crux'" of the viewpoint-discrimination inquiry "'is whether the ban applies equally to individuals on either side of a given debate.'" *Id.* at 33,505-06 (quoting *PDE v. Olentangy Loc. Sch. Dist.*, 2023 WL 4848509, at *16 (S.D. Ohio July 28), *appeal filed*, No. 23-1535 (6th Cir.)). According to the Department, its rule prohibits speech "regardless of the view a person expresses or the perspective the person takes when engaging in that conduct." *Id.* But *Cartwright* holds that overbroad harassment policies are viewpoint discriminatory because they ban speech "'on the ground that it expresses ideas that offend.'" 32 F.4th at 1126. And here, the Department boasts that its definition requires the harassing speech be "offensive." 89 Fed. Reg. at 33,501.

Least persuasive of all is the Department's assurance that, unlike the definition of harassment in *Cartwright*, its definition would survive strict scrutiny. *Id.* at 33,503-05. Even for K-

12 schools, this circuit flatly prohibits policies that discriminate based on viewpoint. *See Cartwright*, 32 F.4th at 1126, 1127 n.6; *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1280 (11th Cir. 2004). And under strict scrutiny, schools will have a difficult time explaining why the Department's definition is narrowly tailored, since schools could follow Title IX and not chill protected speech by simply adopting the *Davis* standard verbatim. 89 Fed. Reg. at 33,503. If the compelling interest in preventing sex discrimination somehow requires banning pure speech, not just harassing conduct that satisfies *Davis*, the Department has failed to reasonably explain why that's the case. It insisted on adopting a definition of sexual harassment that the Eleventh Circuit has already rejected and compelled schools in this circuit to adopt it, without adequately explaining how they could avoid difficult lawsuits under *Cartwright*.

**Misgendering**: Finally, the Department's action is arbitrary and capricious because it fails to reasonably address comments about "misgendering." One commenter raised the Department's "recent resolution letter finding that a school district violated Title IX when it failed to effectively respond to misgendering of a student." 89 Fed. Reg. at 33,516. Other commentators "urged" the Department to state that "misgendering is a form of sex-based harassment that can create a hostile environment." *Id.* Many commentators also noticed that the proposed rule seemed to approvingly cite the 2016 Dear Colleague Letter, where the Department stated that misgendering is punishable harassment. *E.g.*, *id.*

Rather than address these comments or the 2016 letter, the Department did not meaningfully engage with either, stating merely that misgendering and preferred pronouns are "necessarily fact-specific" and that "a stray remark, such as a misuse of language, would not con-

stitute harassment under this standard." *Id.* That terse statement is hardly "'reasoned deci-sionmaking.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015). Commentators put the Department on notice of the 2016 letter and its recent resolution, so the Department had to address those "relevant authorit[ies]" and explain any "inconsistencies" or differences in its current position. *Data Mktg.*, 45 F.4th at 857. And names and pronouns are a central issue raised by the Department's decision to redefine sex discrimination to include "gender identity" while also expanding the definition of hostile-environment harassment to cover speech. The APA doesn't grant the Department "free license to … duc[k] the hard questions" or "bury its head in the sand." *Mexican Gulf Fishing*, 60 F.4th at 973. Especially when those hard questions involve critical constitutional questions that have been the subject of litigation against schools. *See PDE v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 666-69 (8th Cir. 2023).

### C.    The rule illegally changes procedures.

Rather than maintain the 2020 rule's procedural protections for the accused, the Department's new rule undoes them—despite the life-altering stakes of these grievance proceedings. The rule erases procedural protections, raising grave due-process concerns, and does so without reasonably justifying the change or reasonably considering the relevant issues. These changes further illustrate how the rule violates the APA.

**Live Hearing & Cross-examination Through Advisor**: The rule eliminates the right to a live hearing at postsecondary institutions and the right to directly cross-examine witnesses (including the accuser) through a representative. 89 Fed. Reg. at 33,895 (Proposed §106.46(g)). No right to a live hearing exists even in cases that require credibility determinations, and even in cases that involve the worst kinds of accusations (like sexual battery). If schools give the

accused some sort of hearing, the accused (through an advisor) still has no right to directly cross-examine the accuser or the witnesses.

Courts have found that such procedures raise grave due-process concerns. *See, e.g., Gorman v. Univ. of R.I.*, 837 F.2d 7, 14 (1st Cir. 1988); *Prasad v. Cornell Univ.*, 2016 WL 3212079 (N.D.N.Y. Feb. 24); *Doe v. Univ. of Scis.*, 961 F.3d 203, 215 (3d Cir. 2020); *Khan v. Yale Univ.*, 347 Conn. 1, 41 (2023); *Messeri v. DiStefano*, 480 F. Supp. 3d 1157, 1164 (D. Colo. 2020). In serious cases that turn on witness credibility, courts have held that due process requires live, adversarial cross-examination. According to these courts, cross-examination is "essential to a fair hearing," *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 605 (D. Mass. 2016), "like no other procedural device" in its effectiveness, *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401 (6th Cir. 2017), and "the 'greatest legal engine ever invented for the discovery of truth,'" *California v. Green*, 399 U.S. 149, 158 (1970). Courts stress its importance especially in sexual-misconduct cases, given their "he-said-she-said" nature. *See, e.g., Donohue v. Baker*, 976 F. Supp. 136, 147 (N.D.N.Y. 1997). Per one circuit, "[c]ross-examination is essential in cases like [these] because it … 'takes aim at credibility like no other procedural device.' Without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives." *Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018) (cleaned up).

The Department claims that its rule is okay because, when credibility is at issue, the decisionmaker will still question witnesses. In other words, the Department allows indirect rather than direct examination—replacing live adversarial cross-examination by the party's ad-

visor with live questioning by a neutral decisionmaker. 89 Fed. Reg. at 33,731-32. The Department gives two options for its "live questioning": during individual meetings between the witness and the decisionmaker, or during a live hearing where the accused can be present. *Id.* at 33,894.

This approach does not avoid the grave due-process concerns, and neither of the Department's two options are adequately justified. As the Department acknowledges, "some courts have held that questioning by an advisor at a live hearing is required." *Id.* at 33,737. Indeed. Without live adversarial cross-examination, an accused party loses the chance to have his side of the story *meaningfully* heard because such cross-examination subjects an accusation to scrutiny in a way that nothing else can. That's especially true for the Department's option for an individual meeting. When the entire dispute turns on a witness's credibility and demeanor, the accused cannot effectively defend himself if he cannot hear the witness's testimony live and respond to it in person. Given the high stakes in these cases, for all parties, the benefits of live hearings with live adversarial cross-examination overwhelmingly outweigh their costs.

The Department also failed to provide a "detailed justification" for adopting "findings that contradict" the ones underlying the 2020 rule. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Department previously found that the alternatives it now champions were problematic. *See* 85 Fed. Reg. at 30,330-31. "To require a recipient to step into the shoes of an advocate by asking each party cross-examination questions designed to challenge that party's plausibility, credibility, reliability, motives, and consistency would place the recipient in the untenable position of acting partially (rather than impartially) toward the parties, or else

failing to fully probe the parties' statements for flaws that reflect on the veracity of the party's statements." *Id.* at 30,331 (cleaned up). Based on the Department's experience and the available evidence, it found that recipients that used the indirect cross-examination route "stifled the value of cross-examination by, for example, refusing to ask relevant questions posed by a party, changing the wording of a party's question, or refusing to allow follow-up questions." *Id.* at 30,313; *accord id.* at 30,316, 30,330, 30,340. The live-hearing requirement with adversarial cross-examination by the parties "appropriately and reasonably balances the truth-seeking function of" the proceedings "with protections against personal confrontation between the parties." *Id.* at 30,330. The Department ignored its own prior findings and didn't provide "a more detailed justification" for its change. *Fox*, 556 U.S. at 515.

The Department also eliminated this right because "live hearings with advisor-conducted cross-examination" can be "burdensome" and these "resources … could have been spent on other things, including additional training for decisionmakers." 89 Fed. Reg. at 33,732. But "cheapness alone cannot save an arbitrary agency policy." *Judulang v. Holder*, 565 U.S. 42, 64 (2011). Plus, the Department does not explain how a single live hearing is more burdensome than multiple individual meetings with each witness where credibility might be an issue and there are follow-up questions. 89 Fed. Reg. at 33,894. Nor does the Department reasonably explain why the many benefits of a live hearing with adversarial cross-examination are outweighed by increased administrative burdens.

**Single-Investigator Model**: The challenged rule permits schools to use a single-investigator model. The Department will no longer require a separate Title IX coordinator and investigator and decisionmaker. 89 Fed. Reg. at 33,891 (Proposed §106.45(b)(2)). Instead,

40

these roles can all fall under the umbrella of a single school employee. The same individual can hear the original allegations, decide whether to investigate, do the investigation, evaluate the evidence, and make a final decision. The challenged rule threatens to inject bias into the proceedings, raises still more due-process concerns, and risks proceedings that result in sex discrimination.

The 2020 rule separated these roles, and the challenged rule does not adequately consider the Department's own stated concerns with letting a single person investigate, prosecute, and convict. As the Department previously found: "[I]ndividuals who perform both roles may have confirmation bias and other prejudices that taint the proceedings, whereas separating those functions helps prevent bias and prejudice from impacting the outcome." 85 Fed. Reg. at 30,367. The Department now says this reasoning from just a few years ago was wrong. 89 Fed. Reg. at 33,857. But when an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy," agencies must "provide a more detailed justification." *Fox*, 556 U.S. at 515. Here, the Department provides little. Certainly not enough given the "obvious" dangers that courts have highlighted. *Brandeis*, 177 F. Supp. 3d at 606; *accord, e.g.*, *Univ. of Scis.*, 961 F.3d at 216; *Doe v. Grinnell Coll.*, 473 F. Supp. 3d 909, 924 (S.D. Iowa 2019); *Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055, 1072-73 (2018); *Doe v. Miami Univ.*, 882 F.3d 579, 601-05 (6th Cir. 2018).

The Department's backup argument is that it has added protections to reduce (if not eliminate) the risk of unfairness from the single-investigator model. The protections? Regula-

tions saying the single investigator must treat the parties "equitably," that the single investigator can't be "biased" or have a "conflict of interest," and that a party can appeal an adverse decision after the proceedings are over. 89 Fed. Reg. at 33,662-63.

These protections are not reasonably connected to the stated concerns. A simple regulation saying "be equitable" or "don't be biased" does nothing concrete to protect parties or ensure reliability. And an opportunity to appeal is no solace to the accused, where a finding of guilt can bring permanent and life-altering stigma that irreparably harms a student's educational, professional, and social prospects, even if later reversed. *Baum*, 903 F.3d at 582. The 2020 rule added these protections because it found that a "follow the law" directive didn't work and wouldn't work; real protections were necessary. The Department neither reasonably addressed the relevant issues nor "provide[d] a more detailed justification" explaining its reversal. *Fox*, 556 U.S. at 515.

**Notice & Access to Evidence**: Notice, federal courts have explained, means informing the accused of the specific charges and providing him access to the evidence of guilt. *Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019); *Miami*, 882 F.3d at 603; *Brandeis*, 177 F. Supp. 3d at 603-06. The challenged rule undermines these obligations without a reasonable explanation in two key ways.

First, the rule removes the right of students to inspect all the evidence against them. The rule instead allows the parties to access a mere "description" of the "relevant and not otherwise impermissible evidence" unless they go out of their way to request an "equal opportunity to access the evidence." 89 Fed. Reg. at 33,892 (Proposed §106.45(f)). The accused has no way of knowing what relevant evidence was missing (or incompletely summarized in)

the report. And because the rule lets the decisionmaker and the investigator be the same person, the decisionmaker could know and base his decision on information that the parties never got a fair opportunity to contextualize or challenge. This limited access to the evidence raises more due-process concerns. *See, e.g.*, *Purdue*, 928 F.3d at 663; *Averett v. Hardy*, 2020 WL 1033543, *5-8 (W.D. Ky. Mar. 3). The Department did not reasonably explain why providing the accused the evidence without a request, along with a description, is impractical or unwise. Nor did the Department reasonably explain why the broader scope of evidence available under the 2020 rule is problematic. Nor did the Department reasonably address the due-process concerns raised by its new regime.

Second, the challenged rule allows an investigation to begin without any formal written complaint. The accused need only receive an "oral" statement that a person would "objectively" understand as a "request" to "investigate." 89 Fed. Reg. at 33,882 (Proposed §106.2). But verbal complaints are often vague and imprecise, making it difficult (if not impossible) to provide accurate and adequate notice. Perhaps worse, the rule now permits the Title IX coordinator to initiate a grievance procedure even in "the absence of a complaint or the withdrawal of any or all of the allegations in a complaint." *Id.* at 33,889 (Proposed §106.44(f)(1)(v)). The rule thus empowers Title IX coordinators to go beyond their mandatory reporting duties and to police activities on campus that they think constitute sex discrimination. Given the overall breadth of "sex discrimination" and "sex-based harassment" under the rule, this provision gives Title IX coordinators and other employees the power to open investigations and start

proceedings based solely on what they have heard. The Department failed to reasonably address the extraordinary implications of these changes or reasonably explain why a formal written complaint is unfair, impractical, or unwise.

**Burden of Proof**: The rule limits schools' discretion to require a higher burden of proof before punishing the accused under Title IX. The Department lets recipients use a higher burden of proof (clear and convincing, rather than a preponderance) only if they use that higher burden "in all other comparable proceedings, including proceedings relating to other discrimination complaints." 89 Fed. Reg. at 33,893 (Proposed §106.45(h)(1)). Though the Department claims to care about "flexibility," this change is mandatory. Yet the Department nowhere explains what constitutes a "comparable proceedin[g]." *Id.*; *see id.* at 33,704 ("declin[ing] to define that term"). This uncertainty makes the Department's rule a de facto ban on the clear-and-convincing-evidence standard without ever having to justify such a rule.

*     *     *

More broadly, the Department also had no real reason to roll back procedural protections for the accused. Though it says live hearings and cross-examination "may have chilled reporting of sex-based harassment," it admits that it has no "information definitively attributing the decrease to" those procedures, rather than an obvious alternative: "the COVID-19 pandemic." *Id.* at 33,732. The Department also tries to say that the new procedures promote "flexibility" and "relieve administrative burden[s]." *Id.* at 33,660-64. But *of course* procedural requirements reduce flexibility and add burden; they exist to protect the accused from an overly flexible and fast process that is less reliable and fair. As the Department explained for the 2020 rule: "It is unclear what criteria would justify an exemption to the general requirement

44

that the same person cannot investigate and adjudicate a case, particularly because all the conduct described as 'sexual harassment' … is serious conduct." 85 Fed. Reg. at 30,371. If there is an answer, it's not found in the challenged rule.

The Department's appeals to cost saving and flexibility fall flat. 89 Fed. Reg. at 33,857, 33,662-63. It eliminates procedural protections across the board. It does not account for a recipient's size, the number of complaints a recipient typically gets, or the potential severity of the punishment. And "flexibility" is not the Department's watchword for any other part of the rule, which largely forces recipients to adopt the Department's dictates. *E.g.*, *id.* at 33,893 (limiting schools' discretion on burden of proof); *id.* at 33,527, 33,886 (requiring schools to police more speech); *id.* at 33,884 (requiring schools to police more "peer retaliation"); *id.* at 33,804-07, 33,886 (banning longstanding rules for sex-separated bathrooms). If recipients "are well-suited" to balance "any costs" and benefits, then the Department should've given recipients this flexibility elsewhere, or at a minimum, reasonably addressed the inconsistency. *Id.* at 33,662. In any event, flexibility "is great—but only when" it means "consistently following the law." *Wages*, 16 F.4th at 1140.

Worse, at every turn, the Department at most considers the effect of watering down each procedural protection *separately*, which is not reasoned decisionmaking. In other words, the Department failed to reasonably consider the effect of its changes *in combination*. For example, the risk of bias and unreliable outcomes from the single-investigator model is especially pronounced when the rule also gives officials the power to prosecute even "[i]n the absence of a complaint." 89 Fed. Reg. at 33,889 (Proposed §106.44(f)(1)(v)). By disregarding the entire

regime it created, the Department failed to adequately address an important aspect of the problem, thus undermining the entire rule.

## II.     The other factors also favor Plaintiffs.

The remaining factors—irreparable harm, balance of equities, and public interest—also favor Plaintiffs. "When the government is the opposing party, as it is here," the last two "factors merge." *Georgia v. President*, 46 F.4th 1283, 1292 (11th Cir. 2022).

**Irreparable Harm**: The rule's new regulations will inflict irreparable harm on Plaintiffs and the students they represent. The rule conflicts with the States' policies and statutes. *E.g.*, Purcell Decl. ¶14; Mackey Decl. ¶12; Woods Decl. ¶9; Sikes Decl. ¶8; Weaver Decl. ¶10. The "inability to enforce … duly enacted [laws] clearly inflicts irreparable harm on the State[s]." *Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018). The rule also purports to "preempt" conflicting state or local laws. 89 Fed. Reg. at 33,540-41; *id.* at 33,885 (Proposed §106.6(b)). The new regulations thus "affec[t] the States' sovereign authority to" enforce their laws. *Morrisey*, 59 F.4th at 1149. Because the rule is unlawful, the States "would be [irreparably] harmed" if they "could not apply [their] own laws." *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018); *accord L.W.*, 73 F.4th at 421 (same).

Absent preliminary relief, the States also will suffer heavy, unrecoverable compliance costs. The Eleventh Circuit "has recognized that unrecoverable monetary loss is an irreparable harm," *Georgia*, 46 F.4th at 1302, and "complying with a regulation later held invalid almost always produces [that] irreparable harm," *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Here, the rule upends the status quo by requiring state schools to align their procedures with the new regulations. Compliance will be costly. *E.g.*, Mackey Decl. ¶¶6-17; Purcell

Decl. ¶¶9, 13-19; Sikes Decl. ¶¶5-15; Woods Decl. ¶¶6-20; Hardee Decl. ¶¶6-18; Weaver Decl. ¶¶9-19; 89 Fed. Reg. at 33,851, 33,861, 33,548, 33,483, 33,492, 33,850, 33,862, 33,868-69. And it must start immediately, since the rule becomes effective August 1 and schools will try to avoid the disruption that comes from changing policies midsemester. "[M]oney damages cannot adequately compensate the States because the federal government generally enjoys immunity from suit." *Morrisey*, 59 F.4th at 1149. So the States can never "recover the compliance costs they will incur if the Final Rule is invalidated on the merits." *Texas v. EPA*, 829 F.3d 405, 433-34 (5th Cir. 2016). And once those policies are in place, the Private Plaintiffs' members will suffer irreparable harm in the form of chilled speech and the loss of their First and Fourteenth Amendment rights. *See Cartwright*, 32 F.4th at 1128.

**Balance of Harms and Public Interest**: The balance of equities and public interest likewise favor relief. The public has no "interest in enforcing" a rule that's unlawful. *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020); *accord BST Holdings*, 17 F.4th at 618; *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-73 (11th Cir. 2006). To the contrary, its interest lies "in having governmental agencies abide by the federal laws that govern their existence and operations." *Wages*, 16 F.4th at 1143; *accord League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765-66 (2021). Likewise, "the public interest is served when constitutional rights are protected" from government overreach. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). And "[e]nforcing the Spending Clause's limitations helps preserve state sovereignty and the 'two-government system established by the Framers.'" *Morrisey*, 59 F.4th at 1149. Nor would

temporary relief cause any meaningful disruption, since it would simply leave the 2020 rule in place—the same rule that everyone has been operating under for four years.

### III.   This Court should stay the rule's effective date or enter a preliminary injunction.

This Court should grant preliminary relief by simply staying the rule's effective date. Under the APA, this Court can "postpone the effective date of an agency action … pending conclusion of the review proceedings." 5 U.S.C. §705. The effective date here is August 1. Though Plaintiffs expect that this case can be resolved on cross-motions for summary judgment based solely on the administrative record, Plaintiffs doubt that process could begin and end before August 1. The administrative record here is unusually large, and schools must start coming into compliance with the rule well before August 1. A stay of the effective date is thus warranted "to prevent irreparable injury while the court reviews" this new rule. *Alabama v. U.S. Army Corps. of Eng'rs*, 382 F. Supp. 2d 1301, 1314-15 (N.D. Ala. 2005). Granting a §705 stay would preserve the "status quo *ex ante*" until this case is fully briefed, argued, and decided. *Texas v. Biden*, 646 F. Supp. 3d 753, 771, 781 (N.D. Tex. 2022).

Importantly, a stay under §705 would temporarily freeze the whole rule for all recipients. These stays "stop the agency action in total." *Id.* at 781. They are a "temporary form of vacatur" that "temporarily voids" the agency action. *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023), *cert. granted*, 144 S.Ct. 537 (2023). Vacatur—what Plaintiffs will likely get at the end of this case—is "the ordinary APA remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). That remedy "applies to the rule generally, not to just the plaintiffs in a suit." *Health Freedom Def. Fund v. Biden*, 599 F. Supp. 3d 1144, 1176 (M.D. Fla. 2022), *vac'd as moot*, 71 F.4th 888, 890 (11th Cir. 2023); *accord Kiakombua*

*v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C. 2020) (K.B. Jackson, J.) ("'once a rule is vacated, it is vacated for everyone'"). Vacatur is considered a less onerous form of relief than an injunction, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010), and it is authorized by the text of the APA itself, *see* 5 U.S.C. §706(2). It is not implicated by the ongoing debate about the propriety of "nationwide injunctions." *See Labrador v. Poe ex rel. Poe*, 144 S.Ct. 921, 928-34 (2024) (Kavanaugh, J., concurring); *Griffin v. HM Fla.-ORL, LLC*, 144 S.Ct. 1, 2 n.1 (2023) (Kavanaugh, J., concurring). Temporary stays under §705, which are even less onerous than vacatur and are expressly authorized by the APA, do not implicate that debate either.

Alternatively, this Court should preliminarily enjoin Defendants from enforcing the rule in Alabama, Florida, Georgia, or South Carolina. Each of those States is a plaintiff here, so an injunction limited to those States would not extend beyond "the plaintiffs" in this case. *Georgia*, 46 F.4th at 1308. To be sure, that injunction would not provide Plaintiffs "complete relief." *Id.* The State Plaintiffs have citizens, and the Private Plaintiffs have members, who attend college in other States and would remain injured by the policies that the rule makes their universities adopt. But some relief is better than no relief; and students, States, and schools in the Plaintiff States would be protected. What would be untenable is letting the rule—the most crucial parts of which concededly violate existing circuit precedent—go into effect on August 1.

## CONCLUSION

This Court should grant Plaintiffs' motion and stay the rule's effective date.

Dated: May 8, 2024

Respectfully submitted,

Ashley Moody
  *Attorney General*

Steve Marshall
  *Attorney General*

*s/ James H. Percival*
James H. Percival*
  *Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for Florida*

*s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.
  *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for Alabama*

Christopher M. Carr
  *Attorney General*

*s/ Stephen J. Petrany*
Stephen J. Petrany*
  *Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Georgia*

*s/ Cameron T. Norris*
Cameron T. Norris (pro hac vice)
Thomas S. Vaseliou (pro hac vice)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for IWLC, IWN, PDE, Speech First*

Alan Wilson
  *Attorney General*

*s/ Joseph D. Spate*
Joseph D. Spate*
  *Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for South Carolina*

*pro hac vice forthcoming

50