IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

State of ALABAMA, et al.,

                     *Plaintiffs*,

v.                                     Case No. 7:24-cv-533-GWB

Miguel CARDONA, in his official capacity
as the U.S. Secretary of Education, et al.,

                     *Defendants*.

## DECLARATION OF RICHARD WOODS
### (GEORGIA)

1. I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2. I am the State Superintendent of Education for the Georgia State Department of Education. I have been in this position since 2015.

3. As superintendent, my responsibilities include the oversight and implementation of federal education grant programs. I have personal knowledge about Georgia's relationship with the federal government, especially the U.S. Department of Education (or ED).

4. My department supports the education of approximately 1.6 million K-12 students in Georgia. The State has over 2,300 public schools, including 21 city systems, 159 county systems, 29 state and commission charter schools, and 3 state schools. The State also has over 750 private schools.

5. ED administers the distribution of state and federal funds to all K-12 public schools in Georgia. All K-12 public-schools receive federal funds and are subject to the requirements of Title IX.

6. Public primary and secondary education institutions were awarded approximately $1.4 billion in U.S. Department of Education funding in fiscal year 2023-2024.

7. I understand that, on April 29, 2024, the U.S. Department of Education published a new regulation under Title IX, titled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. That regulation, among other things, redefines "sex" to include gender identity and sexual orientation, broadens the definition of sexual harassment, and creates new enforcement procedures under Title IX.

8. Unless a court steps in, this new rule will harm Georgia, its schools, and its children.

9. The rule conflicts with Georgia laws that govern K-12 institutions. *See, e.g.*, Ga. Code Ann. §20-2-786 (Parents' Bill of Rights).

10. If any program or activity at one of Georgia's public primary and secondary education institutions is determined not to comply with the requirements of Title IX, ED can terminate federal funding to that program or activity.

11. But if schools do not bring their policies in line with ED's rule, they face severe consequences. If any program or activity at one of Georgia's K-12 institutions is determined not to be in compliance with the requirements of Title IX, ED can terminate federal funding to that program or activity. Georgia's K-12 institutions use federal funds for many purposes, including providing supplemental educational support, materials, and enrichment for students;

providing non-academic support for students; providing professional learning opportunities for teachers; and providing technology for student use. The loss of federal funds to Georgia's K-12 institutions would require these institutions either to eliminate certain educational services currently offered or to seek new funding to pay for those services. And these proceedings—even just investigations by the federal government—are expensive, time-consuming, and distracting for schools, school districts, school officials, and the State.

12. On the other hand, compliance with the new rule is burdensome and costly. The rule is over a thousand pages long; it will take substantial time and money to review the rule and existing policies, to determine what the rule requires, and to act to come into compliance with it. To take one example, public-school districts in Georgia have Title IX policies that are *Davis*-compliant that will need to be changed to comply with the rule. *See, e.g., Board Policy JCAC: Sexual Harassment of Students*, DeKalb Cnty. Sch. Dist., bit.ly/3U1vA1h. All these policies will have to be reviewed, rewritten, and reapproved, which is costly and burdensome. It will also take time and money to train officials on the rule and the new policies implementing it.

13. The rule also substantially expands recipients' enforcement obligations. The rule not only adds responsibility over gender identity and sexual orientation and expands the definition of harassment, but also requires recipients "to promptly and effectively end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects"—even when not deliberately indifferent, even when there is no complaint (oral or written), even when the complaint is withdrawn. And it requires recipients to provide supportive measures when there is no complaint, during investigations and grievance

procedures, and even after a complaint is dismissed. Following these broader requirements is more onerous than following the current, narrower ones. If the rule goes into effect, compliance costs and burdens for Georgia schools will increase substantially.

14. ED agrees. It estimates that the compliance costs will be "$4.6 million to $18.8 million over ten years." 89 Fed. Reg. at 33,851, 33,861. It "acknowledges" that "it will take some time to review requirements and revise policies and procedures to align with [the rule's] requirements." *Id.* at 33,851. It will cost "time," and money "reading and understanding the regulations; revising policies; publishing notices of nondiscrimination; training Title IX Coordinators; updating training materials;" "conduct[ing] additional training"; and more. *Id.* at 33,851, 33,548. ED also admits that recipients will see "an increase in Title IX complaints" they must administer, a "10 percent increase in the number of investigations" they must conduct, an "increase" in the "supportive measures" they must provide, and an "increase" in "responsiveness to all reports and complaints of sex discrimination." *Id.* at 33,483, 33,492, 33,850, 33,862, 33,868-69. These estimates are, in my view, overly conservative at best.

15. The rule also exposes Georgia and its schools to litigation costs and liability. Lawsuits are expensive, time-consuming, and distracting for schools, school districts, school officials, and the State. And the threat of liability, including large awards of attorney's fees, can be devastating.

16. By expanding the definition of harassment and removing deliberate indifference as a liability requirement, the rule puts schools in a catch-22. If they do not adopt ED's new definition of harassment, then they risk enforcement actions by ED. But if they do adopt ED's definition, then they risk lawsuits alleging that the definition violates the First and Fourteenth

Amendments. Georgia sits in the Eleventh Circuit, which has already held that a harassment policy like the one mandated by the rule is likely unconstitutional in the university setting. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022). Notably, the rule demands that schools depart from the definition of harassment under Title IX that comes from the Supreme Court's decision in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), a case that involved a K-12 school.

17. The same is true for the rule's provisions reducing procedural protections for the accused. Some of these procedures are mandatory. And though some purport to be optional, schools will feel substantial pressure to adopt them because ED can and has brought enforcement actions against recipients who lack them. *See* 89 Fed. Reg. at 33,636 (warning recipients that they can violate Title IX by having procedures that ED deems insufficient); *Doe v. Univ. of Scis.*, 961 F.3d 203, 213 & n.6 (3d Cir. 2020) (describing how through enforcement actions ED has coerced schools into adopting the single-investigator model). But if recipients decrease procedural protections for the accused, they risk litigation for sex-based discrimination or due-process violations. Federal courts have found these claims viable. *E.g., Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019); *Doe v. Univ. of Scis.*, 961 F.3d 203 (3d Cir. 2020); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940 (9th Cir. 2020); *Doe v. Regents of Univ. of Calif.*, 23 F.4th 930 (9th Cir. 2022).

18. The same is also true for the rule's redefinition of "sex discrimination" to include gender identity. The rule requires eliminating female-only spaces, even in sensitive areas like bathrooms and locker rooms, which the Eleventh Circuit has said implicates girls' "right" to privacy. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 804-08 (11th

Cir. 2022) (en banc). Lawsuits alleging violations of the constitutional right to privacy have already been filed against schools that adopted the same policy. *E.g., Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018). Other courts, moreover, have held that K-12 policies against "misgendering" violate the First Amendment. *E.g., Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 739-43 (Va. 2023); *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 666-69 (8th Cir. 2023). And constitutional lawsuits have been filed against schools that refuse to notify or tell parents information about their children's professed gender identity at school. *E.g., Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees*, 680 F. Supp. 3d 1250, 1275-78 (D. Wyo. 2023); *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, 2022 WL 1471372, at *7-9 (D. Kan. May 9); *Linn Mar*, 83 F.3d at 665-66.

19. ED, again, acknowledges these costs. Though it unrealistically minimizes the problem, it admits that each key component of the rule will impose on recipients at least "some … costs associated with litigation." 89 Fed. Reg. at 33,851 (definition of harassment); *id.* at 33,858 (inclusion of gender identity); *id.* at 33,876 (enforcement procedures).

20. The State of Georgia also has less control over the policies and practices of its private schools and charter schools. Yet the rule will directly change the policies and practices at those schools. Georgia has a substantial interest in ensuring that none of its female students are discriminated against by being forced to compete against men in athletics or share sensitive and private spaces with them. And it harms Georgia if its students' educations are compromised by policies that prevent the free exchange of ideas, that punish students without adequate process, or that "affirm" students' claimed gender identity without the input or consent of their parents.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 6, 2024

Richard Woods
Georgia Superintendent of Education