IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

State of ALABAMA, *et al.*,

*Plaintiffs*,

v.

Miguel CARDONA, in his official capacity as the U.S. Secretary of Education, *et al.*,

*Defendants*.

Case No. 7:24-cv-533-GMB

## DECLARATION OF TIM HARDEE
## (SOUTH CAROLINA)

1. I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2. I am the President of the South Carolina Technical College System. I have been in this position since 2016.

3. The South Carolina Technical College System is the state's largest higher education system, serving more than 144,000 South Carolinians each year. It is comprised of 16 colleges located strategically across the state. The system is dedicated to furthering economic and workforce development in South Carolina.

4. I have personal knowledge about South Carolina's relationship with the federal government.

5. All of South Carolina's technical colleges receive federal funds and are subject to the requirements of Title IX.

6. South Carolina's technical colleges received approximately $341,075,580.00 in federal funding in fiscal year 2022-2023.

1

7. I understand that, on April 29, 2024, the U.S. Department of Education published a new regulation under Title IX, titled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. That regulation, among other things, redefines "sex" to include gender identity and sexual orientation, broadens the definition of sexual harassment, and creates new enforcement procedures under Title IX.

8. Unless a court steps in, this new rule will harm South Carolina, its technical colleges, and its students.

9. If colleges do not bring their policies in line with the Department's rule, they face severe consequences. If any program or activity at one of South Carolina's technical colleges is determined not to be in compliance with the requirements of Title IX, the Department can terminate federal funding to that program or activity. South Carolina's technical colleges use federal funds for many purposes, including student loans, student grants, research, and veterans' affairs. The loss of federal funds to South Carolina's technical colleges would require these institutions either to eliminate certain educational services currently offered or to seek new funding to pay for those services. And these proceedings—even just investigations by the federal government—are expensive, time-consuming, and distracting for colleges, college officials, and the State.

10. On the other hand, compliance with the new rule is burdensome and costly. The rule is over a thousand pages long; it will take substantial time and money to review the rule and existing policies, to determine what the rule requires, and to act to come into compliance with it.

11. The rule also substantially expands recipients' enforcement obligations. The rule not only adds responsibility over gender identity and sexual orientation and expands the definition of harassment, but also requires recipients "to promptly and effectively end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects"—even when not deliberately indifferent, even when there is no complaint (oral or written), even when the complaint is withdrawn. And it requires recipients to provide supportive measures when there is no complaint, during investigations and grievance procedures, and even after a complaint is dismissed. Following these broader requirements is more onerous than following the current, narrower ones. If the rule goes into effect, compliance costs and burdens for Alabama schools will increase substantially.

12. The Department agrees. It estimates that the compliance costs will be "$4.6 million to $18.8 million over ten years." 89 Fed. Reg. at 33,851, 33,861. It "acknowledges" that "it will take some time to review requirements and revise policies and procedures to align with [the rule's] requirements." *Id.* at 33,851. It will cost "time," and money "reading and understanding the regulations; revising policies; publishing notices of nondiscrimination; training Title IX Coordinators; updating training materials;" "conduct[ing] additional training"; and more. *Id.* at 33,851, 33,548. The Department also admits that recipients will see "an increase in Title IX complaints" they must administer, a "10 percent increase in the number of investigations" they must conduct, an "increase" in the "supportive measures" they must provide, and an "increase" in "responsiveness to all reports and complaints of sex discrimination." *Id.* at 33,483, 33,492, 33,850, 33,862, 33,868-69. These estimates are, in my view, overly conservative at best.

13. The rule also exposes South Carolina and its technical colleges to litigation costs and liability. Lawsuits are expensive, time-consuming, and distracting for schools, school officials, and the State. And the threat of liability, including large awards of attorney's fees, can be devastating.

14. By expanding the definition of harassment and removing deliberate indifference as a liability requirement, the rule puts colleges in a catch-22. If they do not adopt the Department's new definition of harassment, then they risk enforcement actions by the Department. But if they do adopt the Department's definition, then they risk lawsuits alleging that the definition violates the First and Fourteenth Amendments.

15. The same is true for the rule's provisions reducing procedural protections for the accused. Some of these procedures are mandatory. And though some purport to be optional, colleges will feel substantial pressure to adopt them because the Department can and has brought enforcement actions against recipients who lack them. *See* 89 Fed. Reg. at 33,636 (warning recipients that they can violate Title IX by having procedures that the Department deems insufficient); *Doe v. Univ. of Scis.*, 961 F.3d 203, 213 & n.6 (3d Cir. 2020) (describing how through enforcement actions the Department has coerced schools into adopting the single-investigator model). But if recipients decrease procedural protections for the accused, they risk litigation for sex-based discrimination or due-process violations. Federal courts have found these claims viable. *E.g.*, *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019); *Doe v. Univ. of Scis.*, 961 F.3d 203 (3d Cir. 2020); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940 (9th Cir. 2020); *Doe v. Regents of Univ. of Calif.*, 23 F.4th 930 (9th Cir. 2022).

16. The same is also true for the rule's redefinition of "sex discrimination" to include gender identity. The rule requires eliminating female-only spaces, even in sensitive areas like bathrooms and locker rooms, which the Eleventh Circuit has said implicates women's "right" to privacy. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 804-08 (11th Cir. 2022) (en banc). Lawsuits alleging violations of the constitutional right to privacy have already been filed against schools that adopted the same policy. *E.g.*, *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018). The Sixth Circuit, moreover, has held that a university policy against "misgendering" violates the First Amendment. *See Meriwether v. Hartop*, 992 F.3d 492, 503-11 (6th Cir. 2021).

17. The Department, again, acknowledges these costs. Though it unrealistically minimizes the problem, it admits that each key component of the rule will impose on recipients at least "some … costs associated with litigation." 89 Fed. Reg. at 33,851 (definition of harassment), 33,858 (inclusion of gender identity), 33,876 (enforcement procedures).

18. In short, the rule will impose significant costs on South Carolina's technical college system.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 8, 2024

_____
Tim Hardee