FILED
2024 May-08  AM 11:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

|  |  |
|---|---|
| State of ALABAMA, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Miguel CARDONA, in his official capacity as the U.S. Secretary of Education, *et al.*,<br>*Defendants*. | Case No. 7:24-cv-533-GWB |

## DECLARATION OF ELLEN E. WEAVER
## (SOUTH CAROLINA)

1.  I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2.  I am the State Superintendent of Education for the South Carolina Department of Education ("SCDE"). I was inaugurated on January 11, 2023 and have been in this position ever since.

3.  My responsibilities include the oversight and implementation of federal grant programs. I have personal knowledge about the relationship between South Carolina and the federal government, including the U.S. Department of Education ("Department").

4.  The SCDE provides organization, operation, and support for the state system of public education in South Carolina. The state system of public education consists of 790,112 pre-Kindergarten through twelfth grade students distributed among 1,105 traditional schools and 95 charter schools. These 1,200 institutions fall within 85 Local Education Agencies ("LEAs").

1

5.      The SCDE administers the distribution of state and federal funds to these schools. All public school districts and public charter school authorizers receive federal funds and are subject to the requirements of Title IX.

6.      By the end of the 2023-2024 fiscal year, the state system of public education in South Carolina will have expended approximately $1.27 billion of federal funding for education and nutrition in our schools.

7.      On April 29, 2024, the Department published a new rule under Title IX, entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* ("Rule"). Among other things, the new Rule redefines "sex" to include gender identity and sexual orientation, broadens the definition of sexual harassment, and creates new enforcement procedures under Title IX.

8.      I was not serving as Superintendent of Education during the public comment period for the proposed rule. However, South Carolina submitted a public comment in September 2022 urging the Department to abstain from rewriting Title IX. During the public comment period for subsequently proposed Title IX regulations related to students' eligibility for athletic teams, I joined with other leaders of South Carolina to provide a letter to Secretary Cardona, urging the Department to abstain from rewriting Title IX's core protections for women and girls.

9.      Unless the Court intervenes, this new Rule will harm South Carolina, its schools, and its children.

10.      The Rule conflicts with multiple South Carolina laws, including S.C. Code § 59-1-500.

11.    If any program or activity at one of South Carolina's 1,200 public education institutions is determined not to comply with the requirements of Title IX, the Department may terminate federal funding to that program or activity.

12.    Any of the 1,200 public education institutions which does not bring its policies in full compliance with the new Rule could face termination of federal funding. South Carolina's public education institutions utilize federal funding for many purposes, including:

- providing enriched and accelerated educational opportunity for students;

- increasing the amount of quality instruction time;

- upgrading the quality of instruction by providing professional development opportunities for teachers;

- affording parents meaningful opportunities to participate in their children's education at home and school;

- providing educational services which support students with special needs;

- providing educational services which support students with disabilities;

- providing educational services which support students in local and state institutions for neglected or delinquent children;

- providing at-risk youth dropout prevention services;

- increasing student achievement consistent with challenging academic standards;

- improving the quality and effectiveness of teachers, principals, and other school leaders;

- providing low-income and minority students greater access to effective teachers, principals, and other school leaders;

- improving school conditions;

- providing opportunities to promote mental health;

- improving the use of technology to improve all students' academic achievement and digital literacy;

- providing afterschool opportunities for remediation and/or enrichment;

- providing support for homeless and migrant children and youth;

- supporting student health and nutrition for academic achievement and well-being of children and youth;

- improving and modernizing career and technical education; and

- ensuring workforce skills align with labor market needs.

13.     Compliance with the new Rule will be burdensome and costly. All the policies for all 85 LEAs will require review and analysis leading to writing and approving new policies, which is costly and unduly burdensome. Additionally, the training associated with the new Rule and new policies will take significant time and non-federal money; resources best spent on the core function of the schools, educating South Carolina's children.

14.     The Rule also substantially expands enforcement obligations of the LEAs. In addition to expanding responsibility over gender identity and sexual orientation matters and attempting to redefine sex, the Rule expands the definition of harassment and requires schools and LEAs "to promptly and effectively end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects." Schools would have to act even

when there is no complaint (oral or written) or a complaint has been withdrawn. The Rule requires school officials to provide supportive measures when there is no complaint, during investigations and grievance procedures, and even after a complaint has been dismissed. Therefore, the Rule is unduly burdensome and the costs associated with compliance in South Carolina will be significant.

15.     The Department's Rule agrees with the above-referenced burdens, as it estimates that the cost of compliance will be "$4.6 million to $18.8 million over ten years." 89 Fed. Reg. at 33,851, 33,861. It "acknowledges" that "it will take some time to review requirements and revise policies and procedures to align with [the Rule's] requirements." *Id.* at 33,851. It will cost "time," and money "reading and understanding the regulations; revising policies; publishing notices of nondiscrimination; training Title IX Coordinators; updating training materials;" "conduct[ing] additional training;' and more. *Id.* at 33,851, 33,548. The Department also admits that schools will experience "an increase in Title IX complaints" they must administer, a "10 percent increase in the number of investigations" they must conduct, an "increase… [in the] supportive measures" they must provide, and an "increase… [in] responsiveness to all reports and complaints of sex discrimination." *Id.* at 33,483, 33,492, 33,850, 33,862, 33,868-69. While the Department's estimates are not insignificant, they are likely far less than the actual fiscal impact that the states will be forced to absorb both in preparing for and in implementing the new Rule.

16.     As the Department admits that the new Rule will cause an increase in Title IX complaints, this will likewise create significant financial exposure to South Carolina's schools and LEAs. South Carolina's schools and LEAs need to focus their time and resources on

educating children. Yet the Department is willingly inviting significant distraction of costly lawsuits associated with Title IX, thus removing the focus from classroom instruction and placing it on litigation and attorney's fees.

17.     Schools and LEAs will be placed in a no-win situation. LEAs will be forced either (1) to adopt the Rule's expanded definition of harassment and risk litigation expenses for violation of the U.S. Supreme Court's definition of Title IX harassment as set forth in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), or (2) to reject the Rule's expanded definition of harassment and risk enforcement actions by the Department.

18.     The Department both acknowledges and is dismissive of the costs that will be incurred by the states under the new Rule. The Department admits that schools and LEAs will incur "*some...* costs associated with litigation." 89 Fed. Reg. at 33,851 (definition of harassment); *id.* at 33,858 (inclusion of gender identity); *id.* at 33,876 (enforcement procedures).

19.     South Carolina has a substantial interest in following the original purposes of Title IX and the protections it affords to students. The new Rule, if upheld by the courts, will substantially harm South Carolina by creating policies which compromise its students' educations, undermining five decades of hard-fought progress under appropriate Title IX implementation. This is not about being against anyone, but about being for fairness, safety, and biological reality. Every child must be treated with understanding and kindness. But we must not jeopardize the safety and wellbeing of women and girls in order to pursue a radical, theoretical agenda with no basis in biological reality.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 3, 2024

Ellen E. Weaver
Superintendent of Education
South Carolina Department of Education