FILED
2024 May-08  AM 11:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

State of ALABAMA, *et al.*,

*Plaintiffs*,

v.

Miguel CARDONA, in his official capacity as the U.S. Secretary of Education, *et al.*,

*Defendants*.

Case No. 7:24-cv-533-GMB

## DECLARATION OF NICOLE NEILY
## (PARENTS DEFENDING EDUCATION)

1. I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2. I am the president of Parents Defending Education.

3. PDE is a 501(c)(3) nationwide, grassroots membership organization whose members are primarily parents of school-aged children. PDE has members throughout the country. PDE's mission is to prevent the politicization of K-12 education, including attempts to usurp parents' rights and to silence students who express opposing views. PDE seeks to stop indoctrination in the classroom and promote the restoration of a healthy, non-politicized education for kids. PDE furthers this mission through network and coalition building; engagement on local, state, and national policies; advocacy; and, if necessary, litigation.

4. One way that PDE uses litigation is to challenge unconstitutional policies at primary and secondary schools. PDE has challenged policies across the country that violate free-speech and parental rights—including bias policies, *PDE v. Wellesley Pub. Sch.*, No. 1:21-cv-11709 (D. Mass. Dec. 8, 2021); speech codes, *PDE v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th

1

658 (8th Cir. 2023); and policies that hide information about students' gender identities from their parents, *id.* But litigation is expensive and time-consuming; any attorney's fees that PDE has recovered were only a small fraction of its expenses.

5.      PDE filed comments in response to the Department's notice of proposed rulemaking here, which preceded the challenged rule. *Comments on the Department of Education's Request for Comments Regarding the Proposed Amendments to the Regulations Implementing Title IX of the Education Amendments of 1972*, PDE (Sept. 12, 2022), perma.cc/GD3Y-LTU7. PDE's specific concerns—and its litigation—are referenced in the final rule.

6.      The challenged rule changes the operative definition of "sexual harassment" under Title IX for so-called hostile-environment harassment. One clear takeaway is that schools must now prohibit "misgendering," where a student refuses to use others' "preferred pronouns" instead of the pronouns that match their biological sex. Worse, the rule makes clear that a single instance of intentional or purposeful misgendering can violate the Department's definition. As can a repeated, but nonsevere, practice of misgendering.

7.      Primary and secondary schools must—and predictably will—change their Title IX policies to ban harassment that satisfies this new definition, including misgendering. The rule prohibits discrimination based on "gender identity," and the Department views that command as requiring the use of "pronouns and names consistent with a student's gender identity." *2016 Dear Colleague Letter on Title IX and Transgender Students* 3 (May 13, 2016), perma.cc/2VTQ-RUYP. The rule cites approvingly (multiple times) a district-court decision against PDE that says it's constitutional for K-12 schools to ban misgendering. *See* 89 Fed. Reg. at 33,504, 33,506 (citing *PDE v. Olentangy Loc. Sch. Dist.*, 2023 WL 4848509, at *2 (S.D.

Ohio July 28)). The Department disavows and disagrees with a prior memorandum that said "refusing to treat a student consistent with their gender identity generally would not violate Title IX." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41390, 41536-37 (July 12, 2022) (citing *Memorandum re: Bostock v. Clayton Cnty.* 1 (Jan. 8, 2021), perma.cc/CJE3-GH52); 89 Fed. Reg. at 33,807 (maintaining that the prior memorandum is wrong). And the Department is currently investigating a school that did not punish students who refused to use a classmate's preferred pronouns. *See* 89 Fed. Reg. at 33,516 (not responding to a comment asking the Department to explain "a recent resolution letter finding that a school district violated Title IX when it failed to effectively respond to misgendering of a student"); *see also* Braceras, *Wisconsin School Opens Title IX Sexual Harassment Investigation into Boys Who 'Misgendered' Classmate*, IWF (May 27, 2022), perma.cc/9CVE-RXT4. Primary and secondary schools will understand that, if they deviate from the Department's rule, they can be investigated and punished by the Department too, risking their reputation and their federal funding.

8. PDE and other groups who defend students' rights believe the challenged rule's new definition of harassment is facially unconstitutional under the First and Fourteenth Amendments, especially with respect to misgendering. *See* PDE Briefs in *Olentangy*, Docs. 28 & 79, No. 13-3630 (6th Cir. Sept. 25 & Nov. 14, 2023); Amicus Br. of FIRE in *Olentangy*, Doc. 60, No. 13-3630 (6th Cir. Oct. 2, 2023). The Supreme Court explained in *Davis v. Monroe County Board of Education*—a case involving K-12 education—how to draw the line between harassment that is punishable conduct and harassment that is protected speech: The harassment must be "so severe, pervasive, and objectively offensive that it denies its victims

3

the equal access to education." 526 U.S. 629, 652 (1999). This standard intentionally excludes "a single instance of one-on-one peer harassment," even if "sufficiently severe," and harassment that has only limited effects like a "'decline in grades.'" *Id.* at 652-53. Public-school policies that exceed *Davis*'s narrow, speech-protective definition sweep in a substantial amount of protected speech and compel speech on some of the hottest topics of public concern, even when the compelled speech conflicts with the student's deeply held beliefs. Whenever K-12 schools adopt this definition, it chills and compels speech, both on and off school grounds.

9. The challenged rule declares that it trumps parents' rights, including their right to access their child's information under the Family Educational Rights and Privacy Act and state laws. 89 Fed. Reg. at 33,885, 33,536. Commenters pressed concerns that the rule would bar a recipient from "treat[ing] a student according to their" biological sex "if requested by the parents to do so," "notify[ing] a student's parents of the student's gender transition or gender identity," or letting parents access "their child's educational records, including information about their child's gender identity." 89 Fed. Reg. at 33,821. Rather than deny these concerns, the Department concedes that the rule *can* require such results, even when state law requires these parental rights. 89 Fed. Reg. at 33,821-22.

10. When K-12 schools adopt unconstitutional policies that violate the parental rights of PDE's members or chill the speech of their children, PDE challenges those policies in court. *E.g.*, *Linn Mar*, 83 F.4th 658; *Olentangy*, 2023 WL 4848509; *Wellesley*, No. 1:21-cv-11709 (D. Mass.). PDE's members also benefit from state laws, like Iowa's, that give parents a right to know and participate in decisions about their child's gender identity at school. *See Linn Mar*, 83 F.4th at 665 (discussing Iowa Code §279.78 (2023)).

11. PDE's lawsuits have resulted in settlements that ensure these policies stay off the books. For example, Linn-Mar settled with PDE and agreed to "rescin[d]" and "not reinstate" a policy that prohibited "an intentional and/or persistent refusal by staff or students to respect a student's gender identity." *Linn Mar*, Doc. 57, No. 1:22-cv-78 (Feb. 21, 2024) (attached as Ex. A). The challenged rule effectively undoes that bargain by forcing schools, including Linn-Mar, to adopt policies that ban the same speech. And it purports to override both FERPA and state laws, like Iowa's, that give parents a right to know information about their child's claimed gender identity at school. All of this harms PDE's members, several of whom have children that still attend Linn-Mar. *See Linn Mar*, 83 F.4th at 664.

12. The challenged rule also will divert PDE's resources in ways that harm its mission. For example, as a direct result of the rule's publication, PDE's tip line is experiencing a surge in calls from concerned parents about the safety of their children, and this surge will only worsen as the rule coerces school districts into adopting unlawful policies. Under the rule, moreover, exponentially more K-12 schools will prohibit misgendering under Title IX and stop notifying parents about their child's claimed gender identity at school—ballooning the number of schools that are violating the rights of PDE's members. This upending of the status quo will require PDE to divert its finite resources toward suing (or *re*-suing) schools. These diversions will prevent PDE from using its resources on other projects, including combatting antisemitism at additional K-12 schools and launching new investigations to reveal connections between schools in the United States and foreign countries.

13. The challenged rule will cause public primary and secondary schools to adopt policies that violate the constitutional rights of PDE's members and their children. PDE has

5

members whose children currently attend public schools across the United States, including in the Plaintiff States. PDE has over 700 members within Alabama, Florida, and Georgia alone. I am personally familiar with, and have spoken to, members whose children are enrolled in these schools. Based on those conversations and the other materials I have reviewed, I know the following.

14. A.B. is a Georgian whose children currently attend a Georgia public school. B.W. is a Floridian whose children currently attend a Florida public school. A.O. is a Floridian whose child currently attends a Florida public school. These parents' children will attend schools in these States next year too. For now, these schools do not have a policy that prohibits, for example, "misgendering."

15. PDE's members and their children hold a wide array of different views and opinions on matters such as politics, religion, gender identity, and many other sensitive and controversial topics concerning sex, sexual orientation, and gender identity. These traditional views are unpopular, controversial, and in the minority at their schools.

16. A.B. believes that people are either male or female. A.B. acknowledges that gender dysphoria exists but believes it is historically a rare condition. A.B. believes there is a difference between gender dysphoria and a child's confusion about their gender, which can lead a child to adopt a different name, pronouns, clothing, and so forth. A.B. also believes that confusion about gender can be a part of adolescence and that it does not always persist beyond adolescence. A.B. believes that issues of gender are sensitive issues that should be left to families to discuss and resolve, not to schools. These views stem in part from A.B.'s sincerely held religious beliefs.

17. A.B. has raised her children to believe that biological sex is immutable and does not change based on someone's internal feelings. A.B. has taught her children to always tell the truth and stand up for their beliefs, even when those beliefs are unpopular.

18. A.B.'s children believe that sex is immutable and that a child cannot "transition" from one sex to another. A.B.'s children do not want to be forced to "affirm" that a biologically female classmate is actually a male—or vice versa—or that a classmate is "nonbinary" and neither male nor female. Doing so would contradict the deeply held beliefs of A.B.'s family, including A.B.'s beliefs that she has imparted to her children and her children's own sincerely held beliefs. A.B. and her children also believe that a biological male who identifies as female should not be allowed to compete in women's sports and that it is an invasion of privacy for students to share bathrooms with the opposite biological sex. They also believe that children are healthiest when they are raised as part of a nuclear family.

19. B.W. believes that sex is immutable and that people are either male or female. B.W. believes that there is a difference between gender dysphoria and a child's confusion about their gender, which can lead a child to adopt a different name, pronouns, clothing, and so on. B.W. also believes that confusion about gender can be a part of adolescence and that it does not always persist beyond adolescence. B.W. believes that these issues of gender are sensitive and should be left to families to discuss and resolve, not to schools. B.W. has raised his children to believe that biological sex is immutable and that gender does not exist on a spectrum, as many people now claim. B.W. has also taught his children to share their beliefs and to tell the truth.

20. B.W.'s children believe that people are either male or female and that biological sex is unchangeable. They do not want to be forced to "affirm" that a biologically male classmate is actually a female—or vice versa—or that a classmate is "nonbinary" and neither male nor female. They wish to use pronouns consistent with a classmate's biological sex repeatedly and at all times, including inside and outside the classroom, and in and out of the classmate's presence. Being forced to do otherwise would contradict the deeply held beliefs of B.W.'s family, including his beliefs that he has imparted to his children.

21. A.O. believes that people are either male or female and that a child cannot "transition" from one sex to another. He acknowledges that gender dysphoria exists but believes it is historically a rare condition. He believes there is a difference between gender dysphoria and a child's confusion about gender, which can lead a child to adopt a different name, pronouns, and clothing. He also thinks that confusion about gender can be a part of adolescence and that it does not always persist beyond adolescence. He believes that a biological male who identifies as female should not be allowed to compete in women's sports and that it is an invasion of privacy for students to share bathrooms with the opposite biological sex. Further, A.O. believes that marriage is only between a man and a woman and that children are healthiest when they are raised as part of a nuclear family. A.O. believes that issues of sex, gender identity, and sexual orientation are sensitive and should be left to families to discuss and resolve, not to schools. When they arise at school, A.O. wants his child to express all these opinions that he has instilled in his child.

22. A.O. does not want his child to be forced to "affirm" that a biologically female classmate is actually a male—or vice versa—or that a classmate is "nonbinary" and neither

male nor female. Specifically, A.O. does not want his child to use pronouns consistent with a classmate's biological sex repeatedly and at all times, including inside and outside the classroom, and in and out of the classmate's presence.

23. PDE's members and their children want to be able to have open and robust intellectual debates and discussions about these issues at school and in their communities. When a classmate or another member of the school community voices contrary views about these and other controversial topics, PDE's members and their children want to point out the flaws in their arguments and convince them to change their minds. PDE's members and their children want to speak directly about these topics, and they want to talk frequently and repeatedly on these issues. Given their views, PDE's members and their children know that many of these conversations will be heated, passionate, and targeted. But they want to have these conversations because they feel strongly about these issues.

24. PDE's members and their children will be subject to the policies and practices that the challenged rule causes their schools to adopt. Their children will limit their speech because they reasonably fear it will be considered "harassment" or "misgendering." From self-censoring, their children will steadily lose self-esteem, self-confidence, and the educational benefits of free-flowing debate and the exchange of ideas.

25. If the challenged rule becomes effective, PDE's members will be unable to effectively exercise their fundamental rights as parents to guide the upbringing of their children and to instill their children with important values. The rule will give PDE's members constant anxiety that their children will be questioned or punished for the views they wish to express and forced to violate their privacy by sharing private spaces with the opposite sex. Being

threatened for stating their fundamental beliefs will inflict mental and psychological harm on their children by forcing them to "choose" between expressing their beliefs and following the rules. The rule will prevent PDE's members from directing their children to seek and facilitate open, robust intellectual discussions on religion, gender identity, and many other sex-related topics with other students, with the goal of changing those students' minds or, at a minimum, helping those students understand their perspectives. At a minimum, it will force these parents to have difficult discussions about sex and gender identity with their children before the children are ready.

26. These members also do not want their children sharing restrooms with the other biological sex, regardless of asserted gender identity. Before the challenged rule, their children attended schools that did not permit transgender individuals to use a bathroom that does not match their biological sex. The rule now requires schools to adopt policies that permit biological boys to use the girl's bathroom and biological girls to use the boy's bathroom, based on their asserted gender identity. The rule thus impinges on students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex. Individuals have a privacy interest when their nude or partially nude bodies are exposed to others, especially when persons of the opposite sex are present. School-age children are still developing emotionally and physically as well, heightening the privacy concerns. The prospect of the presence of the opposite sex, let alone their actual presence, would be a significant intrusion on PDE's members' children's privacy and would psychologically and emotionally harm them. *See* Amicus Br. of PDE in *Metropolitan Sch. Dist. of Martinsville v. A.C.*, No. 23-392 (U.S. Nov. 13, 2023), perma.cc/YXY7-GVNL.

27. The challenged rule threatens these children's due-process rights too. Especially because the rule's definitions are so broad and vague, PDE's members' children could easily cross the line and be reported and investigated for harassment or misgendering. Disciplinary proceedings without notice of the charges, adjudication by a neutral decisionmaker, cross-examination, and other basic protections are fundamentally unfair and risk erroneous decisions with life-altering consequences for these students. A finding of guilt, or even the opening of an investigation, can create a permanent and life-altering stigma that irreparably harms a student's educational, professional, and social prospects, even if the finding is later reversed or the investigation is dropped. And it severely distracts them from their studies.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 8, 2024.

_____
Nicole Neily
President, Parents Defending Education

# Exhibit A

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into on the date of signature of the last signatory to this Agreement ("Effective Date") by and between Parents Defending Education, Inc. ("PDE") on the one hand and Linn-Mar Community School District ("Linn-Mar" or "the District") on the other (collectively, the "Parties"), as follows:

A. WHEREAS, on April 25, 2022, Linn-Mar adopted Policy 504.13-R ("Policy"), entitled "Administrative Regulations Regarding Transgender Students Nonconforming to Gender Role Stereotypes," *See* D. Ct. Dkt. 3-11 (Ex. I) at 43-50;

B. WHEREAS, by complaint filed on August 2, 2022, PDE brought the matter styled *Parents Defending Education v. Linn-Mar Community School District, et al.*, No. 22-CV-78 (N.D. Iowa) ("Action"), asserting claims concerning Policy 504.13-R against Linn-Mar Community School District; Shannon Bisgard, in his official capacity as Superintendent of Linn-Mar; Brittania Morey, Clark Weaver, Barry Buchholz, Sondra Nelson, Matt Rollinger, Melissa Walker, and Rachel Wall, in their official capacity as members of the Linn-Mar School Board (collectively, "Defendants");

C. WHEREAS, PDE brought its claims on behalf of its members, including Parents A, B, C, D, E, F, and G and their children;

D. WHEREAS, Parents A, B, C, D, E, F, and G actively participated in and supported the Action;

E. WHEREAS, PDE was authorized by Parents A, B, C, D, E, F, and G to represent them in the Action;

F. WHEREAS, Defendants have denied, and continue to deny, any and all liability in this Action;

G. WHEREAS, on August 5, 2022, PDE moved for a preliminary injunction relating to its claims concerning the Policy;

H. WHEREAS, Defendants opposed PDE's motion;

I. WHEREAS, in September 2022, the U.S. District Court for the Northern District of Iowa denied PDE's motion for a preliminary injunction. *See Parents Defending Educ. v. Linn-Mar Cmty. Sch. Dist.*, 629 F. Supp. 3d 891 (N.D. Iowa 2022); *Parents Defending Educ. v. Linn-Mar Cmty. Sch. Dist.*, No. 22-CV-78 CJW-MAR, 2022 WL 4232912 (N.D. Iowa Sept. 12, 2022).

J. WHEREAS, in March 2023, Defendants voluntarily and in their sole discretion rescinded the Policy;

K. WHEREAS, on September 29, 2023, the U.S. Court of Appeals for the Eighth Circuit issued an opinion "vacat[ing]" the district court's orders and "remand[ing] with directions to grant a preliminary injunction against enforcement of the portion of the policy prohibiting an

intentional or persistent refusal 'to respect a student's gender identity.'" *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 669 (8th Cir. 2023).

L.  WHEREAS, on October 2, 2023, the U.S. District Court for the Northern District of Iowa issued a preliminary injunction enjoining Defendants from enforcing during the pendency of the litigation "the portion of Board Policy 504.13-R that prohibits an intentional or persistent refusal 'to respect a student's gender identity,'" *see* D. Ct. Dkt. 49;

M.  WHEREAS, the Parties have determined that it is in their mutual interests to amicably resolve all issues between them;

NOW, THEREFORE, in consideration of the foregoing and of the mutual undertakings of the Parties set out herein, the Parties agree as follows:

1.  Linn-Mar has rescinded and will not reinstate the Policy as adopted by the Board on April 25, 2022 with respect to the portion of the Policy that prohibits "[a]n intentional and/or persistent refusal by staff or students to respect a student's gender identity." *See* D. Ct. Dkt. 3-11 (Ex. I) at 43-50.

2.  Within five days of the Effective Date, Linn-Mar will pay PDE Twenty Thousand Dollars ($20,000.00). The Parties shall otherwise bear their respective attorneys' fees, costs, and expenses relating to the Action and this Agreement. Payment will be made by an electronic transfer of funds to a bank account specified by PDE. Upon the filing of the Joint Stipulation of Dismissal, the Parties will promptly exchange the documentation necessary to effectuate and complete this payment in an expeditious manner.

3.  Within three business days of the Effective Date, PDE shall file a Joint Stipulation of Dismissal with Prejudice of the Action in the form attached hereto as Exhibit A.

4.  In consideration of the good and valid consideration set forth in this Agreement, PDE and its representatives, predecessors, and successors hereby release and discharge Defendants, the Linn-Mar Community School District, EMC Insurance Company, and their insurers, parent companies, subsidiaries, divisions, affiliates, directors, officers, agents, employees, volunteers, shareholders, successors, assignees, indemnitors, indemnitees and attorneys, predecessors, successors, legal representatives and assigns for the foregoing persons and entities, from any and all claims, demands and causes of action, and requests for relief that were sought or could have been brought to challenge the Policy as adopted by the Board on April 25, 2022, as of the effective date of this Agreement. PDE further warrants and represents that it has not filed nor caused to be filed on its behalf, and will not file or cause to be filed on its behalf, any claim, action, demand, or other matter of any kind covered by the above release or covenant not to sue as of the date and time of the execution of this Agreement, other than Case No. 22-CV-78 (N.D. Iowa). This release and covenant not to sue does not apply to any future policies adopted by the District or new claims accruing after the effective date of this Agreement.

5.  Within five business days of the effective date of this Agreement, PDE will provide Parents A, B, C, D, E, F, and G with a copy of the Agreement.

6. Nothing contained in this Agreement shall be deemed as an admission of any liability or lack of merit in any claim or defense, by any Party. This Agreement is a compromise settlement and shall not be interpreted to confer prevailing party status on any Party.

7. This Agreement represents the full and complete agreement between the Parties to resolve their dispute. Any representations, warranties, promises, or conditions, whether written or oral, not specifically incorporated into this Agreement shall not be binding on the Parties. All other discussions, negotiations, and writings have been and are merged into this Agreement. The terms of this Agreement are contractual, not a mere recital, and may be enforced by the Parties.

8. Neither this Agreement nor any terms or provision hereof may be changed, waived, discharged, or terminated except by an instrument in writing duly signed by the Party against which enforcement of the change, waiver, discharge, or termination is sought.

9. This Agreement shall be governed and construed in accordance with the laws of the State of Iowa applicable to contracts made and to be performed wholly within the State of Iowa, without regard to its conflict-of-laws provisions.

10. All Parties hereto agree that in the event of any ambiguity or dispute regarding the interpretation of this Agreement, the Agreement will be interpreted as if each Party hereto participated equally in the drafting hereof.

11. The unenforceability or invalidity of any provision or provisions of this Agreement shall not render unenforceable or invalid any other provision or provisions thereof.

12. This Agreement may be signed in two original counterparts, each of which shall for all purposes be considered an original of this Agreement. Execution and delivery of this Agreement by electronic means (including via e-mail or .pdf) shall be sufficient for all purposes and shall be binding on any person or Party who so executes.

13. This Agreement is subject to approval by the District's Board of Education. Should the Board fail to accept this Agreement, this Agreement shall be null and void in its entirety.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date set forth above.

Date: 2/19/24

_____
Parents Defending Education

Date: 2/19/24

_____
By L. Buck
Linn-Mar Community School District

By: _____

4 of 4