FILED

2024 May-08  AM 11:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

State of ALABAMA, *et al.*,

*Plaintiffs*,

v.

Miguel CARDONA, in his official capacity
as the U.S. Secretary of Education, *et al.*,

*Defendants.*

Case No. 7:24-cv-533-GMB

## DECLARATION OF CHERISE TRUMP
## (SPEECH FIRST)

1.      I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2.      I am the executive director of Speech First, Inc.

3.      Speech First is a 501(c)(3) nationwide membership organization of students, alumni, and others that is dedicated to preserving civil rights. Speech First seeks to protect the rights of students and others at colleges and universities through litigation, reporting, research, petitioning, and other lawful means.

4.      One way that Speech First uses litigation is to challenge speech codes at colleges and universities. A speech code is "any university regulation or policy that prohibits expression that would be protected by the First Amendment in society at large." *What Are Speech Codes?* FIRE, perma.cc/JE2M-SHH2 (archived Apr. 19, 2024). "Any policy … can be a speech code if it prohibits protected speech or expression." *Id.* Speech First has used litigation to challenge speech codes across the country—including, for example, bias policies, *e.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1122-24 (11th Cir. 2022); *Speech First, Inc. v. Schlissel*, 939 F.3d 756,

763-67 (6th Cir. 2019); computer policies, *e.g.*, *Speech First, Inc. v. Cartwright*, 2021 WL 3399829, at *7 (M.D. Fla. July 29); *Speech First, Inc. v. Sands*, 2021 WL 4315459, at *1 (W.D. Va. Sept. 22); *Speech First, Inc. v. McCall*, No. 1:23-cv-411, ECF 33 at 19-28 (W.D. Tex. Sept. 1, 2023); and residence-hall policies, *e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 324-27 (5th Cir. 2020). But litigation is expensive and time-consuming; Speech First's expenses always dwarf the small amount of attorney's fees it recovers, if it recovers them at all.

5.      Speech First has spent substantial time and resources defending the Trump administration's Title IX rule—the same 2020 rule that the Biden administration is now repealing. Speech First intervened in *Pennsylvania v. Devos* to defend the 2020 rule, *see* Minute Order, No. 1:20-cv-01468 (D.D.C. July 6, 2020), and that court upheld the 2020 rule as lawful, 480 F. Supp. 3d 47 (D.D.C. 2020). Speech First also helped defeat proposals to delay the 2020 rule's effective date. *Letter to Secretary DeVos and Assistant Secretary Marcus*, IWLC & Speech First (Apr. 9, 2020), perma.cc/4ME3-43CS. And Speech First filed comments in response to the Department's notice of proposed rulemaking to repeal the 2020 rule here. *Comment to Docket ID No. ED-2021-OCR-0166*, Speech First (Sept. 9, 2022), perma.cc/JV45-ZCPC. Speech First's specific concerns—and its litigation—are referenced in the final rule numerous times. *E.g.*, 89 Fed. Reg. at 33,501-02, 33,505.

6.      The challenged rule changes the operative definition of "sexual harassment" under Title IX for so-called hostile-environment harassment. Under the 2020 rule, that harassment was defined as:

> Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity.

34 C.F.R. §106.30(a)(2). Under the challenged rule, that harassment is now defined as:

> Unwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment). Whether a hostile environment has been created is a fact-specific inquiry that includes consideration of the following:
>
>> (i) The degree to which the conduct affected the complainant's ability to access the recipient's education program or activity;
>>
>> (ii) The type, frequency, and duration of the conduct;
>>
>> (iii) The parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the effects of the conduct;
>>
>> (iv) The location of the conduct and the context in which the conduct occurred; and
>>
>> (v) Other sex-based harassment in the recipient's education program or activity.

7.     Universities must—and predictably will—change their Title IX policies to ban harassment that satisfies this new definition. Universities understand that, if they deviate from the Department's definitions, they can be investigated and punished by the Department, risking their reputation and their federal funding. The Department has, in fact, used its enforcement authority to force universities to adopt policies that contain its preferred definition of harassment. *E.g.*, *University of Montana*, DOJ Case No. DJ 169-44-9, OCR Case No. 10126001 (May 9, 2013), perma.cc/EYT7-8VFK. And after the Trump administration issued the 2020 rule, virtually every university adopted that rule's definition of harassment verbatim in their Title IX policies, even though many universities disagreed with that definition as a matter of law and policy. *See Spotlight on New Title IX Regulations*, in *Spotlight on Speech Codes 2021*, FIRE, perma.cc/K8VR-3LDL.

8.     Speech First and other groups who defend students' rights believe that the rule's new definition of harassment is facially unconstitutional under the First and Fourteenth Amendments. *See* Br. of Speech First in *Cartwright*, 2021 WL 4146131, at *5-6, 23-25; Amicus Br. of FIRE in *Cartwright*, 2021 WL 4726904, at *3-23. The Supreme Court defined actionable harassment for purposes of Title IX in *Davis v. Monroe County Board of Education*. Answering First Amendment objections raised by the dissent, the majority opinion adopted a stringent definition that honors the line between harassment that is *conduct* (which public schools can punish without implicating the First Amendment) and harassment that is *speech* (which the First Amendment generally protects). Under *Davis*, the harassment must be "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education." 526 U.S. 629, 652 (1999). By using the conjunction "and," this standard excludes "a single instance of one-on-one peer harassment," even if "sufficiently severe"; and by using the word "denies," this standard rules out harassment that has only limited effects like a "'decline in grades.'" *Id.* at 652-53. Public policies that exceed *Davis*'s narrow, speech-protective definition of harassment raise grave constitutional problems, since they sweep in a substantial amount of protected speech. Whenever public universities adopt this definition, it chills speech on and off their campus.

9.     When universities adopt unconstitutional harassment policies that chill the speech of Speech First's members, Speech First challenges those policies in court. *E.g.*, *Fenves*, 979 F.3d 319 (University of Texas); *Cartwright*, 32 F.4th 1110 (University of Central Florida); *Khator*, 603 F. Supp. 3d 480 (University of Houston); *Speech First, Inc. v. Shrum*, 92 F.4th 947 (10th Cir. 2024) (Oklahoma State University); *Speech First, Inc. v. McCall*, No. 23-50633 (5th Cir.

Sept. 6, 2023) (Texas State University). Speech First has won that harassment policies exceeding *Davis*—including policies virtually identical to the one that the rule will make universities adopt—are unenforceable. In *Cartwright*, for example, the Eleventh Circuit awarded Speech First a preliminary injunction against a non-*Davis*-compliant policy, finding that the policy likely violated the First Amendment. 32 F.4th at 1120-22, 1125-29. Another court did the same in *Khator*, 603 F. Supp. 3d at 481-82. And in *Fenves*, Speech First won that it had standing to challenge another non-*Davis*-compliant policy because that policy likely chilled students' speech. 979 F.3d at 329-39.

10.     In most of these cases, the universities signed settlement agreements with Speech First that brought the school's harassment policy in line with *Davis*:

a.  The University of Central Florida agreed to "promptly amend" its harassment policy to comply with *Davis* and to "not reinstate the version of the policy that Speech First challenged." Doc. 64, No. 6:21-cv-00313 (M.D. Fla. Sept. 23, 2022) (attached as Ex. A).

b.  The University of Houston agreed to "not reinstate the version of the [Harassment] Policy challenged by Speech First." Doc. 31, No. 4:22-cv-00582 (S.D. Tex. June 10, 2022) (attached as Ex. B). It agreed to adopt a harassment policy that, with respect to nonemployee students, complies with *Davis*. Ex. B at 11.

c.  The University of Texas agreed to adopt a harassment policy that tracks *Davis* and to not reinstate its harassment policy that exceeded *Davis*. Doc. 39, No. 1:18-cv-01078 (W.D. Tex. Dec. 12, 2020) (attached as Ex. C).

d.  Oklahoma State University also agreed to adopt a harassment policy that tracks *Davis* and to not reinstate its harassment policy that exceeded *Davis*. Docs. 55-56, No. 5:23-cv-29 (W.D. Okla. Apr. 15, 2024) (attached as Ex. D). Unlike the other universities, however, Oklahoma State required Speech First to agree that it would "not challenge" that university's Title IX policy if that policy adopts the definition of sexual harassment that the Department has now promulgated. Ex. D ¶6.

11.     The challenged rule will, in critical respects, nullify these settlement agreements and deprive Speech First of the benefit of these bargains. The challenged rule instructs these

universities to change their *Davis*-compliant policies to non-*Davis*-compliant policies, recreating the very regime that Speech First contracted with these universities to eliminate for sex, sexual orientation, and gender identity.

12.     The challenged rule also will divert Speech First's resources in ways that harm its mission. Under the 2020 rule, several schools had constitutional harassment policies overall (because they followed *Davis* already or lost lawsuits to Speech First); and all schools had constitutional harassment policies under Title IX (because they adopted the 2020 rule's *Davis*-compliant definition). But thanks to the rule, all public universities will have Title IX policies that deviate from *Davis*, ballooning the number of universities that are violating the First Amendment rights of Speech First's members. This will require Speech First to divert its finite resources toward suing (or *re*-suing) universities who adopt the rule's definition. Those resources would otherwise be spent launching a new initiative that focuses on shaping legislative policy to better defend students' free-speech rights on campuses. This new initiative would include drafting model policies, reaching out to and working with local organizations on state-level policy recommendations, participating in local and regional conferences to promote Speech First's work, and reaching out to and meeting with lawmakers and educating them on Speech First's research findings.

13.     The challenged rule will also cause universities to violate the constitutional rights of Speech First's members. Speech First has many members who are current students at public universities within the United States. I am personally familiar with, and have spoken to, several of these members and have personal knowledge of their views, beliefs, and fears. Speech First's members hold a wide array of different views and opinions on politics, religion,

gender identity, abortion, and many other sensitive and controversial topics concerning sex, sexual orientation, and gender identity. Many of those students attend schools where Speech First has reached a favorable settlement that, until the challenged rule, protected their rights.

14.     A student from Speech First's case against Oklahoma State, for example, is a rising senior. As she explained in that case, she believes that sex is immutable and that there is no such thing as a "gender spectrum." She thinks the exponential growth in adolescents and young adults who identify as transgender or "non-binary" is evidence that many people now claim a certain "gender identity" because they want attention or affirmation. She believes abortion is wrong and that women should not be allowed to kill innocent babies. Laws that allow a mother and father to decide that a baby should die if its existence is inconvenient have no place in civilized society. She also wants to emphasize Planned Parenthood's eugenicist roots and point out that abortion clinics largely target minority women.

15.     A student from Speech First's case against Houston is a rising senior. As he explained in that case, he believes that human beings are created either male or female, and that someone cannot "transition" from one sex to the other based on whether he or she "feels" like a man or a woman. He doesn't want to be forced to call someone a "he" or a "she" (or to use some other form of "preferred pronouns") just because that person has decided that "their truth" involves being transgender or non-binary. He firmly opposes legalized abortion because he believes that life begins at conception. There are no circumstances that justify allowing women to kill an innocent child. He believes that it is deeply unfair to allow biological males who identify as females to compete in women's sports. Those men are simply stealing athletic opportunities away from actual women who have earned them. He believes that marriage is

between a man and a woman, and that children are best served by being raised by a father and a mother. He thinks that redefining marriage to include any arrangement between two people is a slippery slope that will eventually lead to society being forced to accept marriages among multiple people or something even worse. His beliefs about marriage also stem from his Christian faith.

16.     Another student from Speech First's case against Houston is a rising senior (but who plans to graduate in May 2026). As she explained in that case, she believes that allowing biologically male athletes who identify as female to compete in women's sports is unjust. Men and women have innate physiological differences that cannot be erased simply because someone chooses to "identify" as a member of the opposite sex. She believes that school administrators who ignore those differences are prioritizing identity politics and political correctness over the interests of women. As a woman, she does not want to be forced to "affirm" that a man is really a "woman" just because he decides to identify as one. She believes that abortion is morally wrong, and that people who choose to have abortions are not killing a "fetus" or a "clump of cells"—they're killing another human being. She believes that abortion should be illegal, regardless of whether a pregnancy is "planned" or "wanted."

17.     A student from Speech First's case against the University of Central Florida is a rising senior. She believes that human beings are created either male or female, and that someone cannot "transition" from one sex to the other based on whether they "feel" that they are a man or a woman. She doesn't want to be forced to call someone a "he" or a "she" (or to use some other form of "preferred pronouns") just because that person has decided that "their truth" is that their "real gender" is male or female or "non-binary." As a woman, she believes

that it is deeply unfair to allow biological males who identify as females to compete in women's sports. These men are taking athletic opportunities away from actual female athletes who deserve them. She is strongly pro-life and believes that there are no circumstances that justify allowing women to kill an innocent child. Women who choose to have abortions aren't simply "terminating" a "fetus" or a "clump of cells," they're killing a defenseless baby.

18.     Speech First's members, including the students above, want to be able to have open and robust intellectual debates and discussions about these issues on campus, in their community, and online. When a classmate or another member of the university community voices contrary views about these and other controversial topics, Speech First's members want to point out the flaws in their arguments and convince them to change their minds. Speech First's members want to speak directly to their classmates about these topics, and they want to talk frequently and repeatedly on these issues. Given their views, Speech First's members know that many of these conversations will be heated, passionate, and targeted. But they want to have these conversations because they feel strongly about these issues.

19.     The rule challenged in this case will subject Speech First's members to speech codes and the risk of discipline on their campuses. Speech First's members will limit their speech if the rule becomes effective because they reasonably fear that their speech will be considered "harassment" under the policies and practices that the rule requires their universities to adopt. They will be especially reluctant to openly express their opinions or have conversations about controversial topics involving sex, gender identity, sexual orientation, and abortion. Hence why they helped Speech First challenge virtually identical policies in prior litigation.

20.     The challenged rule also eliminates an accused's right to a live hearing, his right to cross-examination of the accuser or other witnesses, his right to fairly access all evidence, his protection against a recipient's use of a single-investigator model, and the requirement that a written complaint starts an investigation. The challenged rule empowers recipients to question the witnesses outside of a hearing; provide only a description of the relevant and not otherwise impermissible evidence; have one person serve as the investigator, factfinder, and discipliner; and start an investigation with an oral statement.

21.     Even if some of these procedures are technically optional, universities will adopt them once the 2020 rule is repealed and replaced. Most agree with them as a matter of policy. *See Comment on Docket No. ED-2021-OCR-0166*, at 61, FIRE (Sept. 12, 2022), perma.cc/PJX5-RZ3G ("FIRE's research shows that when not required to provide a live hearing, the majority of institutions, regardless of their size, do not. Of the 50 surveyed institutions in FIRE's 2021 Spotlight on Due Process report with non-Title IX sexual misconduct policies, 33 (66%) did not guarantee a meaningful hearing." (citing *2021-22 Spotlight on Campus Due Process*, FIRE (2022), perma.cc/N7SF-8TH7)). And they will reasonably fear enforcement actions or investigations from the Department for having inadequate procedures. *See* 89 Fed. Reg. at 33,636-37; *Doe v. Univ. of Scis.*, 961 F.3d 203, 213 & n.6 (3d Cir. 2020) (describing how through enforcement actions the Department has coerced schools into adopting the single-investigator model).

22.     The challenged rule thus deprives Speech First's members of their due-process rights. These members are current college students on campus now. Especially because the rule's definitions are so broad and vague, Speech First's members could easily cross the line

and be reported and investigated for violations of their university's Title IX policy. Disciplinary proceedings without notice of the charges, adjudication by a neutral decision maker, cross-examination, and other basic protections are fundamentally unfair and risk erroneous decisions with life-altering consequences for these students. A finding of guilt, or even the opening of an investigation, can create a permanent and life-altering stigma that irreparably harms a student's educational, professional, and social prospects, even if the finding is later reversed or the investigation is dropped. And it severely distracts them from their studies.

23.     Speech First is also harmed by the provision of the rule that changes the definition of "sex" to include gender identity and sexual orientation. Absent that change, harassment policies under Title IX could not chill its members' speech on those topics, and universities could not abrogate Speech First's settlement agreement with respect to those topics.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 8, 2024

Cherise Trump
Executive Director of Speech First, Inc.

# Exhibit A

## <u>AGREEMENT AND RELEASE</u>

This Agreement and Release ("Agreement") is entered into on the date of signature of the last signatory to this Agreement ("Effective Date") by and between Speech First, Inc. on the one hand and the University of Central Florida Board of Trustees ("University") on the other (together, the "Parties"), as follows:

A.      WHEREAS, by complaint filed on February 16, 2021, Speech First brought the matter styled *Speech First, Inc. v. Cartwright*, No. 6:21-cv-00313 (M.D. Fla.) ("Action") asserting claims against Alexander Cartwright, in his official capacity as President of the University of Central Florida; Dana Juntenen, in her official capacity as Director of the University of Central Florida Office of Student Rights and Responsibilities; Matthew Hall, in his official capacity as Vice President for Information Technology and Chief Information Officer; Christina Khan, James Mangan, Reshawna Chapple, Jillian Sturdivant, Michelle Fitzgerald, Andrea L. Snead, Kerry Welch, Edwanna Andrews, Michael Preston, Shane Land, Angela Williams, and Ronnie Korosec, all in their official capacities as members of the Just Knights Response Team; and Beverly J. Seay, Tiffany Altizer, Ken Bradley, Bill Christy, Jeff Condello, Joseph Conte, Danny Gaekwad, Joseph Harrington, Sabrina La Rosa, Caryl McAlpin, Harold Mills, Michael Okaty, and John Sprouls, all in their official capacities as members of the University of Central Florida Board of Trustees ("Defendants");

B.      WHEREAS, on February 22, 2021, Speech First moved for a preliminary injunction against four University policies and/or practices: the provision in the Prohibition of Discrimination, Harassment, and Related Interpersonal Violence Policy concerning "discriminatory harassment" (UCF Policy 2-004.2(IV)(B)); the provision in the University's Use of Information Technologies and Resources Policy concerning "harassing or hate messages" (UCF Policy 4-002.2(B)(7)(b)); the provision in the ResNet User Agreement concerning "harassing, invasive, or otherwise unwanted" messages; and the practice relating to bias-related incidents, as administered by the Just Knights Response Team (JKRT), *see* Dkt. 3;

C.      WHEREAS, on February 26, 2021, Speech First and Defendants filed a stipulated dismissal of Speech First's claims against all Defendants other than Cartwright, *see* Dkt. 23;

D.      WHEREAS, on February 26, 2021, Speech First and Defendants further stipulated that any injunctive or declaratory relief or attorney's fees awarded in this action to Speech First against Cartwright in his official capacity would apply to and be binding on the University of Central Florida, *see* Dkt. 23;

E.      WHEREAS, on March 27, 2021, Speech First filed an amended complaint against Cartwright, in his individual and official capacities, *see* Dkt. 30;

F.      WHEREAS, on July 29, 2021, the United States District Court for the Middle District of Florida partially granted Speech First's motion for preliminary injunction, enjoining the University from enforcing the challenged provision of the University's Use of Information Technologies and Resources Policy and denying Speech First's remaining requests, *see* Dkt. 46;

G.      WHEREAS, on July 29, 2021, Speech First timely appealed the District Court's partial denial of its motion for preliminary injunction with respect to the provision concerning "discriminatory harassment" in UCF Policy 2-004.2(IV)(B) and the practice relating to bias-related incidents administered by the JKRT, *see* Dkt. 49;

H.      WHEREAS, on November 29, 2021, the Parties agreed to a settlement on Speech First's claims related to the challenged provisions of the Use of Information Technologies and Resources Policy and ResNet User Agreement (attached as Exhibit A);

I.      WHEREAS, on May 2, 2022, the United States Court of Appeals for the Eleventh Circuit reversed in part and vacated in part the district court's judgment partially denying a preliminary injunction and remanded to the district court for further proceedings consistent with its opinion, *see* Judgment, No. 21-12583 (11th Cir. May 2, 2022);

J.      WHEREAS, on July 12, 2022, the District Court enjoined the University from enforcing the provision on "discriminatory harassment" in UCF Policy 2-004.2(IV)(B), *see* Dkt. 59;

K.      WHEREAS, on July 14, 2022, the District Court granted the Parties' consent motion to stay all pending deadlines until further order of the court, *see* Dkt. 61;

L.      WHEREAS, the Parties have determined that it is in their mutual interests to amicably resolve all issues between them;

NOW, THEREFORE, in consideration of the foregoing and of the mutual undertakings of the Parties set out herein, the Parties agree as follows:

1.      Speech First represents that it brought its claims on behalf of its members, including Students A, B, and C; and that Students A, B, and C actively participated in and supported the action and authorized Speech First to represent them in the action. Speech First intends the Agreement to resolve its claims against the University in the Action, including those arising from the facts articulated by Students A, B, and C.

2.      With respect to UCF Policy 2-004.2, the University will promptly amend that policy per the attached Exhibit B. The University will not reinstate the version of the policy that Speech First challenged in this Action.

3.      With respect to bias-related incidents, the University has discontinued the Just Knights Response Team and associated practices. The University will not reinstate the Just Knights Response Team.

4.      The University will promptly pay Speech First thirty-five thousand dollars ($35,000). The parties shall otherwise bear their respective costs and expenses relating to the Action and this Agreement. Payment will be made by an electronic transfer of funds to a bank account specified by Speech First. Upon the filing of the Joint Stipulation of Dismissal, the Parties will exchange the documentation necessary to complete this payment in an expeditious manner.

5.      For and in consideration of the University's undertakings set forth in numbered paragraphs 2, 3, and 4 above, the sufficiency of which is hereby acknowledged, and intending to be legally bound, Speech First does hereby remise, release, and forever discharge and completely and absolutely release the University and the Defendants (collectively, the "Released Parties") from the claims, causes of action, and requests for relief that were brought or could have been brought to challenge the policies and/or practices in the Action. The Released Parties are each entitled to enforce this Agreement against Speech First without regard for whether the Released Party is a party to this Agreement. In the event that the University revises the policies or practices challenged in the Action in the future, Speech First and its members do not release any right to challenge the revised policies or practices.

6.      Within two (2) business days of the Effective Date, Speech First will file a joint stipulation of dismissal in the form attached as Exhibit C to this Agreement, dismissing the Action pending against Defendants with prejudice.

7.      Nothing contained in this Agreement shall be deemed as an admission of any liability or lack of merit in any claim or defense by any Party.

8.      Speech First reserves the right to challenge any University policy other than the policies challenged in its Complaint or Amended Complaint.

9.      This Agreement represents the full and complete agreement between the Parties to resolve their dispute. Any representations, warranties, promises, or conditions, whether written or oral, not specifically incorporated into this Agreement shall not be binding on the Parties. All other discussions, negotiations, and writings have been and are merged into this Agreement.

10.     Neither this Agreement nor any terms or provision hereof may be changed, waived, discharged, or terminated except by an instrument in writing duly signed by the Party against which enforcement of the change, waiver, discharge, or termination is sought.

11.     This Agreement shall be governed and construed in accordance with the laws of the State of Florida applicable to contracts made and to be performed wholly within the State of Florida, without regard to its conflict-of-laws provisions. All Parties agree that this Agreement and any disputes arising therefrom arise out of the same transaction or occurrence that is the subject matter of the Action and further agree that any disputes with respect to this Agreement are properly heard by the district court in the Action.

12.     The Parties agree that, in the event of any ambiguity or dispute regarding the interpretation of this Agreement, the Agreement will be interpreted as if each Party participated equally in its drafting.

13.     The Parties represent, knowing that all other Parties will rely on such representation, that each signatory has the right, power, and authority to: (i) sign this Agreement and Release; (ii) bind itself to the terms of this Agreement and Release; (iii) with respect to Speech First, to so bind its members, successors, and assigns; and (iv) to receive the consideration set forth in this Agreement and Release.

14.     This Agreement can be signed in two original counterparts, each of which shall for all purposes be considered an original of this Agreement. Execution and delivery of this Agreement by electronic means (including via e-mail or .pdf) shall be sufficient for all purposes and shall be binding on any person or Party who so executes.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

Date: ___9/22/22___

SPEECH FIRST, INC.

By: _____

Date:_____

THE UNIVERSITY OF CENTRAL FLORIDA BOARD OF TRUSTEES

Youndy C. Cook
Digitally signed by Youndy C. Cook
Date: 2022.09.23 10:48:14 -04'00'

By: _____



UNIVERSITY OF CENTRAL FLORIDA

**Office of the President**

| SUBJECT: | Effective Date: | Policy Number | |
|---|---|---|---|
| Nondiscrimination Policy | 9/16/2022 | 2-004.3 | |
| | **Supersedes:** | **Page** | **Of** |
| | 2-004.2 | 1 | 12 |
| | **Responsible Authority:** | | |
| | Director, Institutional Equity | | |

## APPLICABILITY/ACCOUNTABILITY

This policy applies to the university community and acts committed by or against students, university and DSO employees and volunteers, registered student organizations, and third parties when:

- the conduct occurs on campus or other property owned by, controlled by, or affiliated with the university;
- the conduct occurs in the context of a university employment or education program or activity, including, but not limited to, university-sponsored study abroad, research, on-line, or internship programs; or
- the conduct occurs outside the context of a university employment or education program or activity, but has continuing adverse effects on or creates a hostile environment for the university community while on campus or other property owned by, controlled by or affiliated with the university or in any university employment or education program or activity.

## POLICY STATEMENT

The University of Central Florida is committed to maintaining a safe and non-discriminatory learning, living and working environment for all members of the university community. Academic and professional excellence can exist only when each member of our community is assured an atmosphere of safety and mutual respect. All members of the university community are responsible for the maintenance of an environment in which people are free to learn and work without fear of unlawful discrimination, harassment, or interpersonal violence. The University can take corrective action only when it becomes

aware of problems. Many university employees have the duty to report under the *Reporting Requirements Related to Nondiscrimination* Policy (No.2-015). Those who believe that they have experienced or witnessed Prohibited Conduct are encouraged to come forward promptly with their inquiries, reports, or complaints and to seek assistance within the University.

The Office of Institutional Equity ([www.oie.ucf.edu](www.oie.ucf.edu)) is responsible for ensuring and monitoring the university's compliance with federal and state nondiscrimination laws. The university adopts this policy with a commitment to: (1) eliminating, preventing, and addressing the effects of Prohibited Conduct; (2) fostering a safe and respectful university community; (3) cultivating a climate where all individuals are well-informed and supported in reporting Prohibited Conduct; (4) providing a fair and impartial process for all parties in the investigation and resolution of such reports; and (5) identifying the standards by which violations of this policy will be evaluated and disciplinary action may be imposed. In addition, the university conducts ongoing prevention, awareness, and training programs for employees and students to facilitate the goals of this policy. See the university's *Remedial Measures, Prevention, & Education Related to Nondiscrimination* policy (No. 2-016).

The university prohibits unlawful discrimination and harassment on the basis of an individual's Protected Classes in any of its education or employment programs and activities, as well as retaliation against a person for reporting, in good faith, any of these forms of conduct or participating in or being a party to any investigation or proceeding under this policy (collectively, "Prohibited Conduct"). *See also* the university's *Reporting Misconduct and Protection from Retaliation Policy* (No. 2-700). This includes the prohibition of sexual assault, sexual exploitation, relationship violence, stalking, sexual, gender-based, or Title IX sexual harassment, and aiding and abetting in the commission of any act prohibited by this policy, as well as failing to reasonably accommodate based on religion, disability, and/or pregnancy where the accommodation does not impose an undue hardship or fundamentally alter a course or academic program. These forms of Prohibited Conduct are unlawful and undermine the mission and values of our academic community.

At the same time, the university is equally committed to protecting freedom of speech and academic freedom and in preserving the widest possible dialogue within its instructional and research settings. The principles of freedom of speech and freedom of expression in the United States and Florida Constitutions, in addition to being legal rights, are an integral part of our three-part university mission to deliver a high quality academic experience for our students, engage in meaningful and productive research, and provide valuable public service for the benefit of our local communities and the state. A fundamental purpose of an institution of higher education is to provide a learning environment where divergent ideas, opinions, and philosophies can be rigorously debated and critically evaluated. Accordingly, nothing in this policy shall abridge an individual's rights to free speech and expression under the First Amendment of the U.S. Constitution.

## DEFINITIONS

**Coercion.**  An unreasonable pressure for sexual activity. Coercion is more than an effort to persuade, entice, or attract another person to have sex. Conduct does not constitute coercion unless it impairs an individual's freedom of will to choose whether to participate in the sexual activity.

**Complainant.**  An individual who discloses having been subjected to any prohibited conduct under this policy or the *Title IX Grievance Policy* (No. 2-012), regardless of whether that person makes a report or seeks action under these policies. The university recognizes that an individual may choose to self-identify as a victim or a survivor. For consistency in these policies, the university uses the term complainant to maintain the neutrality of the policies and procedures.

**Consent.** An understandable exchange of affirmative words or actions, which indicate a willingness to participate in mutually agreed upon sexual activity. Consent must be informed, freely and actively given. Consent cannot be obtained by force, threat, coercion, manipulation, reasonable fear of injury, intimidation, use of position of influence, or through one's mental or physical helplessness or incapacity. Consent to one form of sexual activity does not imply consent to other forms of sexual activity. The lack of a negative response, lack of resistance or protest, and silence are not consent. An individual who is incapacitated (such as by alcohol and/or other drugs both voluntarily or involuntarily consumed) may not give consent. Consent to sexual activity on a prior occasion does not, by itself, constitute consent to future sexual activity. In cases of prior relationships, the manner and nature of prior communications between the parties and the context of the relationship may have a bearing on the presence of consent. Once consent has been given to a particular sexual activity, it may be withdrawn at any time. An individual who seeks to withdraw consent must communicate, through clear words or actions, a decision to cease the sexual activity. Once consent is withdrawn, the sexual activity must cease immediately.

> *Responsibility*: It is the responsibility of the initiator of the sexual activity to obtain clear and affirmative words or actions of a willingness to participate at each stage of sexual involvement.

> *Incapacitation*:  A state where an individual cannot make rational, reasonable decisions because of age, mental or physical helplessness, sleep, unconsciousness, or lack of awareness that sexual activity is taking place. A person may be incapacitated due to the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition. A person who is incapacitated lacks the capacity to give consent because they cannot understand the facts, nature, or extent of the sexual interaction.  A person seeking to initiate sexual activity is not expected to be a medical expert in assessing incapacitation. The potential initiator must look for the common and obvious warning signs that show that a person may be incapacitated or approaching incapacitation.

Being impaired by alcohol or other drugs is no defense to any violation of this policy.

*Standard*: A determination of whether consent exists will be based on the information the initiator of the sexual act knew or should have known as a sober, reasonable person. Being impaired by alcohol or other drugs does not relieve an initiator of a sexual act from obtaining consent.

**Course of conduct.** Two or more acts, including but not limited to acts in which a person directly, indirectly, or through third-parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property.

**Direct Support Organization.** An organization that is a subsidiary corporation of the university and is certified by the University of Central Florida Board of Trustees per Florida Statute §1004.28 to support the mission and goals of the university and the best interest of the state of Florida.

**Employee.** Any individual employed by the University of Central Florida, including all full-time and part-time faculty, employees classified as Administrative and Professional (A&P), employees classified as University Support Personnel System (USPS), post-doctoral employees, professional research assistants, and OPS non-student employees.

**Force.** The use of physical violence and/or imposing on someone physically to gain sexual access. Force also includes threats, intimidation (implied threats) and/or coercion that overcome resistance.

**Hostile Environment Harassment:** Unwelcome behavior based on Protected Class(es) identified in this policy, where the frequency and severity of the alleged harassing conduct effectively denies the individual's ability to participate in or benefit from the education, employment, or university program or activity, when viewed from both a subjective and an objective perspective. For a hostile environment harassment claim, the record must establish that the Complainant(s) subjectively perceived the environment to be hostile, and that the environment was one that a reasonable person would find objectively hostile.

**Prohibited Conduct.** For purposes of this policy, Prohibited Conduct refers to unlawful discrimination, unlawful harassment, sexual assault, sexual exploitation, relationship violence, stalking, sexual, gender-based, or Title IX sexual harassment, aiding and abetting in the commission of any act prohibited by this policy, and retaliation against a person for reporting, in good faith, any of these forms of conduct or participating in or being a party to any investigation or proceeding under this policy.

**Protected Class(es):** Race, color, ethnicity, national origin, religion, non-religion, age, genetic information, sex (including pregnancy, parental status, gender identity or expression, and sexual orientation), marital status, physical or mental disability (including learning disabilities, intellectual disabilities, and past or present history of mental illness),

veteran's status (as protected under the Vietnam Era Veterans' Readjustment Assistant Act), or membership in any other protected classes as set forth in state or federal law.

**Quid Pro Quo Harassment**: Unlawful harassment where submission to or rejection of unwelcome conduct is used, explicitly or implicitly, as the basis for decisions affecting an individual's education (e.g., admission, academic standing, grades, assignment); employment (e.g., hiring, advancement, assignment); or participation in a university program or activity (e.g., campus housing).

**Respondent.**  Any individual or group who has been accused of violating this policy or the *Title IX Grievance Policy* (No. 2-012).

**Sexual Contact.** Sexual contact includes but is not limited to the following behaviors: (1) touching, kissing, fondling (whether over or under clothing) of an individual for the purpose of sexual gratification; (2) contact, however slight, between the mouth, anus, or sex organ of one individual with either the anus or sex organ of another individual; and/or (3) contact, however slight, between the anus or sex organ of one individual and any other object.

**Student.**  Any individual defined as a student in the University of Central Florida's Regulation UCF-5.006(3) and *The Golden Rule Student Handbook*.

**Substantial Emotional Distress.**  Significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

**Third-Party.**  Any contractor, vendor, visitor, applicant or other non-student or non-employee/volunteer affiliated with the university.

**PROHIBITED CONDUCT UNDER THIS POLICY**

The requirements and protections of this policy apply equally regardless of an individual's Protected Classes. Also, all requirements and protections are equitably provided to individuals regardless of their status as a Complainant, Respondent, or Witness. The following prohibited behaviors may overlap with Florida criminal statutes in some cases and provide greater protection in other instances.

    A. <u>DISCRIMINATION</u>

        Unlawful discrimination is any unlawful distinction, preference, or detriment to an individual that is based upon an individual's Protected Class(es) and that: (1) excludes an individual from participation in; (2) denies the individual the benefits of; (3) treats the individual differently with regard to; or (4) otherwise adversely affects a term or condition of an individual's employment, education, living environment or participation in a university program or activity.

Religious discrimination includes failing to reasonably accommodate an employee's or student's religious practices where the accommodation does not impose an undue hardship nor fundamentally alter a course or academic program. Disability discrimination includes failing to reasonably accommodate the known physical or mental limitations of an otherwise qualified individual with a disability where the accommodation does not impose an undue hardship nor fundamentally alter a course or academic program. Pregnancy discrimination includes failing to reasonably accommodate an employee's or student's pregnancy or pregnancy-related condition where the accommodation does not impose an undue hardship and does not fundamentally alter a course or academic program. For more information regarding discrimination or to seek assistance in obtaining a reasonable accommodation, please visit www.oie.ucf.edu. For students with disabilities seeing an accommodation, please visit www.sas.ucf.edu.

B. <u>UNLAWFUL HARASSMENT</u>

Unlawful harassment consists of conduct based upon an individual's Protected Class(es) meeting the description of either *Hostile Environment Harassment* or *Quid Pro Quo Harassment*, as defined above.

C. <u>SEXUAL, GENDER-BASED, OR TITLE IX SEXUAL HARASSMENT</u>

Sexual harassment is any unwelcome sexual advance, request for sexual favors, or other unwanted verbal, graphic or physical conduct of a sexual nature when the conditions for *Hostile Environment Harassment* or *Quid Pro Quo Harassment* are present.

Gender-based harassment includes unlawful harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal, graphic, or physical, even if the acts do not involve conduct of a sexual nature, when the conditions for *Hostile Environment Harassment* or *Quid Pro Quo Harassment* are present.

Title IX Sexual Harassment is any conduct which occurs within the university's education program or activity against a person located in the United States on or after August 14, 2020, that satisfies one or more of the following: (1) An employee conditioning the provision of an aid, benefit, or service on an individual's participation in unwelcome sexual conduct (i.e., Quid Pro Quo); (2) Unwelcome conduct of a sexual nature determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to an education program or activity (i.e., hostile environment); or (3) Sexual assault, dating violence, domestic violence, or stalking (as defined by the Jeanne Clery Act). University investigations of incidents that meet the Title IX Sexual Harassment

definition will be investigated pursuant to the *Title IX Grievance Policy* (No. 2-012).

D. <u>SEXUAL ASSAULT</u>

Sexual assault consists of sexual contact that occurs without consent. Consent is an understandable exchange of affirmative words or actions, which indicate a willingness to participate in mutually agreed upon sexual activity. Consent must be informed, freely and actively given. Consent cannot be obtained by force, threat, coercion, reasonable fear of injury, intimidation, use of position of influence, or through one's mental or physical helplessness or incapacity. *See* Definitions section above for more information regarding consent.

E. <u>SEXUAL EXPLOITATION</u>

Sexual exploitation is purposely or knowingly doing or attempting to do any of the following:
- Exposing of one's body in such a manner that another party reasonably could be offended or to display sexual behavior which another person reasonably finds offensive;
- Voyeurism, including trespassing, spying, or eavesdropping for the purpose of sexual gratification;
- Soliciting sex acts from a minor by oral, written, or electronic means;
- Possessing, producing, or disseminating child pornography;
- Recording or photographing private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;
- Disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts, or buttocks) without consent;
- Allowing third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or livestreaming of images);
- Subjecting another person to human trafficking; or
- Exposing another person to a sexually transmitted infection or virus without the other's knowledge.

F. <u>RELATIONSHIP VIOLENCE</u>

Relationship violence includes any act of violence or threatened act of violence that occurs between individuals who are involved or have been involved in a sexual, dating, spousal, domestic, or other intimate relationship. Relationship violence includes "dating violence" and "domestic violence," as defined by the Violence Against Women Reauthorization Act of 2013.

# Exhibit B

# AGREEMENT

This Agreement (the "Agreement") is entered into on the date of signature of the last signatory to this Agreement ("Effective Date") by and between Speech First, Inc. ("Speech First") on the one hand and the University of Houston System (the "University") on the other (collectively, the "Parties"), as follows:

A.    WHEREAS, by complaint filed on February 23, 2022, Speech First brought the matter styled *Speech First, Inc. v. Khator*, No. 4:22-cv-582 (S.D. Tex.) ("Action") asserting claims against Renu Khator, in her individual capacity and official capacity as Chancellor of the University of Houston System and President of the University of Houston; Paula Myrick Short, in her individual capacity and official capacity as Senior Vice President for Academic Affairs and Provost; Daniel M. Maxwell, in his individual capacity and official capacity as Vice President of Student Affairs and Enrollment; Donell Young, in his individual capacity and official capacity as Associate Vice President of Student Affairs and Dean of Students; Kamran Riaz, in his individual capacity and official capacity as Associate Dean of Students; Devon Fan, in his individual capacity and official capacity as Equal Opportunity Coordinator and Trainer; and Tilman J. Fertitta, Ricky Raven, Beth Madison, Durga D. Agrawal, Doug H. Brooks, Alonzo Cantu, Steve I. Chazen, John A. McCall Jr., and Jack B. Moore, all in their individual capacities and official capacities as members of the University of Houston System Board of Regents ("Defendants");

B.    WHEREAS, Speech First brought its claims on behalf of its members, including Students A, B, and C;

C.    WHEREAS, Students A, B, and C actively participated in and support the Action;

D.    WHEREAS, Speech First was authorized by Students A, B, and C to represent them in the Action;

E.    WHEREAS, on February 28, 2022, Speech First moved for a preliminary injunction relating to its claim concerning the University's harassment policy ("Policy");

F.    WHEREAS, on May 13, 2022, the University amended the Policy, *see* Dkt. 25;

G.    WHEREAS, on May 19, 2022, the U.S. District Court for the Southern District of Texas issued a preliminary injunction enjoining the University from enforcing the unamended Policy during the pendency of the litigation;

H.    WHEREAS, the Parties have determined that it is in their mutual interests to amicably resolve all issues between them;

NOW, THEREFORE, in consideration of the foregoing and of the mutual undertakings of the Parties set out herein, the Parties agree as follows:

1.    The University will not reinstate the version of the Policy challenged by Speech First in this Action. *See* Dkt. 3-2.

2.      On June 9, 2022, the University will adopt the amendments to the Policy that are attached as Exhibit A to this Agreement.

3.      Within five business days of the Effective Date, the University will pay Speech First thirty thousand dollars ($30,000). The Parties shall otherwise bear their costs, expenses, and remaining attorney's fees relating to the Action and this Agreement. Payment will be made by an electronic transfer of funds to a bank account specified by Speech First. Upon the filing of the Joint Stipulation of Dismissal, the Parties will promptly exchange the documentation necessary to effectuate and complete this payment in an expeditious manner.

4.      On June 10, 2022, Speech First shall file a joint stipulation of dismissal in the form attached as Exhibit B to this Agreement, dismissing the Action pending against Defendants.

5.      Speech First hereby releases and discharges the University and Defendants and their attorneys, agents, employees, officers, directors, regents, shareholders, partners, affiliates, successors, and assigns from the claims, causes of action, and requests for relief that were sought or could have been brought to challenge the Policy in effect as of February 28, 2022.

6.      Nothing contained in this Agreement shall be deemed as an admission of any liability or lack of merit in any claim or defense, by any Party or by Defendants.

7.      All Parties to this Agreement represent that they have been fully advised by counsel with respect to the terms of this Agreement and execute it with full knowledge of the terms and conditions hereof.

8.      This Agreement represents the full and complete agreement between the Parties to resolve their dispute. Any representations, warranties, promises, or conditions, whether written or oral, not specifically incorporated into this Agreement shall not be binding on the Parties. All other discussions, negotiations, and writings have been and are merged into this Agreement.

9.      Neither this Agreement nor any terms or provision hereof may be changed, waived, discharged, or terminated except by an instrument in writing duly signed by the Party against which enforcement of the change, waiver, discharge, or termination is sought.

10.      This Agreement shall be governed and construed in accordance with the laws of the State of Texas applicable to contracts made and to be performed wholly within the State of Texas, without regard to its conflict of laws provisions.

11.      All Parties hereto agree that in the event of any ambiguity or dispute regarding the interpretation of this Agreement, the Agreement will be interpreted as if each Party hereto participated equally in the drafting hereof. In the event of a dispute arising from this Agreement, the Parties agree to litigate such disputes in the state or federal courts presiding in Harris County, Texas.

12.      The unenforceability or invalidity of any provision or provisions of this Agreement shall not render unenforceable or invalid any other provision or provisions hereof.

13.     This Agreement may be signed in two original counterparts, each of which shall for all purposes be considered an original of this Agreement. Execution and delivery of this Agreement by electronic means (including via e-mail or .pdf) shall be sufficient for all purposes and shall be binding on any person or Party who so executes.

14.     The Vice Chancellor for Legal Affairs acknowledges that she has actual authority to enter into this Agreement on behalf of the University Defendants and that any approvals and formalities required to authorize this Agreement have been completed prior to signature. By her signature, the Vice Chancellor for Legal Affairs binds the University Defendants and all employees, officers, agents, attorneys, affiliates, successors, assigns and all other representatives thereof.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date set forth above.

Date: 6/9/2022

_____
Speech First, Inc.

By: _Cherise Trump, Executive Director_

Date: _____

_____
The University of Houston System

By: _____

13.     This Agreement may be signed in two original counterparts, each of which shall for all purposes be considered an original of this Agreement. Execution and delivery of this Agreement by electronic means (including via e-mail or .pdf) shall be sufficient for all purposes and shall be binding on any person or Party who so executes.

14.     The Vice Chancellor for Legal Affairs acknowledges that she has actual authority to enter into this Agreement on behalf of the University Defendants and that any approvals and formalities required to authorize this Agreement have been completed prior to signature. By her signature, the Vice Chancellor for Legal Affairs binds the University Defendants and all employees, officers, agents, attorneys, affiliates, successors, assigns and all other representatives thereof.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date set forth above.


Date: _____

_____

Speech First, Inc.

By: _____


Date: 06/09/2022

_Jnn H Cornell_

_____

The University of Houston System

By: _Dona H. Cornell, VC Legal Affairs_

Case 4:22-cv-00523-DC Document 31 Filed 06/05/08/24 Page 30 of 44

**UNIVERSITY OF HOUSTON SYSTEM**
**ADMINISTRATIVE MEMORANDUM**

SECTION:   General Administration          NUMBER:  01.D.07

AREA:        Legal Affairs

SUBJECT:   Anti-Discrimination

1.     PURPOSE

    1.1.    This Policy provides the exclusive mechanism for the University of Houston System and its universities ("University") to manage the reporting of unlawful Discrimination and Harassment, as defined in this Policy, by providing a prompt, fair, and impartial investigation and resolution process. This Policy does not address allegations of sexual misconduct, which includes sexual harassment. (Please see SAM 01.D.08 (Sexual Misconduct), the applicable policy that addresses prohibited sexual misconduct and establishes a mechanism for processing complaints of sexual misconduct.)

    1.2.    Consistent with its commitment to addressing unlawful Discrimination and Harassment, the University complies with multiple laws that prohibit Discrimination and Harassment including, but not limited to, Title VII of the Civil Rights Act of 1964 ("Title VII"), Title IX of the Education Amendments of 1972 ("Title IX"), The Rehabilitation Act of 1973, The Americans with Disabilities Act of 1990, as amended, The Age Discrimination Act of 1975, and relevant state and local laws.

2.     POLICY

    2.1.    The University is committed to maintaining and strengthening an educational, working and living environment where students, faculty, staff, visitors, and applicants for admission or employment are free from Discrimination and Harassment of any kind. Discrimination and Harassment are antithetical to the standards and ideals of the University. The University will take appropriate action in an effort to eliminate Discrimination and Harassment from occurring, prevent their recurrence and address their effects.

    2.2.    The University is also committed to protecting, maintaining and encouraging both freedom of expression and full academic freedom of inquiry, teaching, service, and research (see SAM 01.D.15 (Freedom of Expression)).

3.     GENERAL DEFINITIONS

    3.1.    <u>Complainant</u> – An individual who may have experienced Discrimination, Harassment, or Retaliation by a Member of the University Community based on

their Protected Class. Bystanders who are not a member of the Protected Class may make reports of alleged Discrimination or Harassment per Section 6 of this Policy but are not considered Complainants under this Policy.

3.2.  <u>Discrimination</u> – Treating an individual or members of a Protected Class less favorably because of their membership in that class or having a policy or practice that has a disproportionately adverse impact on Protected Class members.

For examples of Discrimination, see Section 5.

3.3.  <u>Equal Opportunity Coordinator</u> – The person who is designated to coordinate efforts to comply with and implement this Policy. The Equal Opportunity Coordinator (or their designee) is responsible for conducting the administrative investigation of reports of Discrimination or Harassment and is available to discuss options, provide support, explain University policies and procedures, and provide education on relevant issues.

The Equal Opportunity Coordinators for each university are located at the following Equal Opportunity offices:

- University of Houston System/University of Houston
  Office of Equal Opportunity Services
  713-743-8835

- University of Houston – Downtown
  Office of Title IX/Equity & Diversity
  713-221-5771

- University of Houston – Clear Lake
  Office of Equity, Diversity, Inclusion – Title IX
  281-283-2305

- University of Houston – Victoria
  Office of Title IX and Equal Opportunity
  (361) 570-4835

In the event that there is a conflict of interest for a University's Equal Opportunity Coordinator, the UH System Equal Opportunity Coordinator will appoint another University's Equal Opportunity Coordinator or designee to serve in their place. If the System Equal Opportunity Coordinator has a conflict of interest, the Vice Chancellor for Legal Affairs will appoint another University's Equal Opportunity Coordinator to serve in their place.

3.4.  <u>Formal Complaint</u> – A document filed by a Complainant and accepted by the Equal Opportunity Coordinator alleging Discrimination or Harassment against a Respondent and requesting that the University investigate the allegation(s).

3.5.  <u>Harassment</u> – is either:

- Subjecting an employee on the basis of their membership in a Protected Class to unwelcome conduct that is severe or pervasive enough to alter the conditions of the employee's employment and create a hostile or abusive working environment; or

- Subjecting a student on the basis of their membership in a Protected Class to severe, pervasive, and objectively offensive treatment that denies the student equal access to education or creates an intimidating, hostile, or offensive educational environment..

For examples of Harassment, see Section 5.

3.6. <u>Member of the University Community</u> – Members of the University Community include:

- University faculty, staff, administrators, employees, and contractors;

- University students;

- Volunteers and participants in any University program or activity;

- Applicants for admission and/or employment; and

- Guests and visitors to campus, to any property owned or leased by the University, or to any property owned or leased by any University-Affiliated organization or group.

3.7. <u>Personal Advisor</u> – An individual serving as a personal advisor or support person to a named party in a report of Discrimination, Harassment, or Retaliation. Any named party is entitled to have one (1) Personal Advisor of their choice present during any meeting or proceeding related to the investigation. This advisor may be an attorney, provided at their own expense, with no cost to the University. Personal Advisors may attend any meeting, proceeding or hearing related to the investigation, but may not speak on behalf of the individual they are advising or be a witness.

3.8. <u>Protected Class</u> – A class of persons who are protected under applicable federal or state laws against Discrimination and Harassment on the basis of race, color, sex (including pregnancy), genetic information, religion, age (over 40), national origin, disability, veteran status, sexual orientation, gender identity or status, gender expression, or any other legally protected status.

3.9. <u>Resolution Agreement</u> – As part of the informal resolution process, when a report alleges a non-violent violation of this Policy, the Complainant and Respondent may resolve the report by agreement. Under a Resolution Agreement, the Respondent will participate in training or other conditions as set forth in the Resolution Agreement. The Resolution Agreement is not an admission of guilt or responsibility by the Respondent, and neither party has the right to appeal. The Equal Opportunity office will document that the terms of the Agreement have been met and update the parties as appropriate.

3.10.  Respondent – A party or person who is designated to respond to a report or Formal Complaint. Generally, the Respondent is the person alleged to be responsible for the prohibited Discrimination, Harassment, or Retaliation alleged in the complaint. The term "Respondent" may also be used to designate persons with administrative responsibility for procedures and policies in those areas covered in a complaint.

3.11.  Retaliation – Retaliation has the meaning set forth in Section 5.2.A of this Policy.

3.12.  Student – A person who: (a) is currently enrolled at the University; (b) is accepted for admission or readmission to the University; (c) has been enrolled at the University in a prior semester or summer term and is eligible to continue enrollment in the semester or summer term that immediately follows; (d) is attending an educational program sponsored by the University while that person is on University Premises; or (e) has engaged in prohibited conduct at a time when he/she met the criteria of (a), (b), (c), or (d).

3.13.  University-Affiliated Activity – Any activity that is initiated, aided, authorized or supervised by the University or by an officially-recognized organization of the University. This also includes activities performed within the scope of employment.

3.14.  University Premises – Buildings or grounds owned, leased, operated, controlled or supervised by the University.

4.  JURISDICTION

The University has jurisdiction over, and will respond to, allegations of Discrimination or Harassment occurring on the University's Premises, at University-Affiliated Activities, and where either the Complainant or Respondent is a student, faculty member, or staff member. In addition, if conduct occurs off University Premises between two University-Affiliated individuals, the University has jurisdiction.  Other than the University Police Department which may conduct a criminal investigation as appropriate, the University does not have jurisdiction over allegations between visitors or non-affiliated persons under this Policy.

4.1.  Allegations Involving University-Affiliated Organizations

A.  If a Formal Complaint is made alleging that a University-Affiliated organization has violated this Policy, the Equal Opportunity office will notify the appropriate administrative department and/or adjudicative body over that organization to ensure a timely, equitable process to determine if a University-Affiliated Organization violated relevant University policies.

B.  The Equal Opportunity office will work in partnership with the appropriate adjudicative body should there be concurrent investigations involving individuals and organizations, including, but not limited to, sharing information with appropriate University administrators who have a legitimate need to know.

    C.     If a report is made involving a University-Affiliated Organization, the Equal Opportunity office will seek to identify any individuals who may be involved. The Equal Opportunity office will, in collaboration with the alleged victim whenever possible, determine whether a Formal Complaint will be filed against any identified individuals, as per this Policy.

4.2.    The process outlined in this Policy is separate from any criminal proceeding related to the reported behavior and may occur while criminal proceedings are ongoing.

4.3.    Proceedings under this Policy will not be dismissed or delayed because criminal prosecution is pending, criminal charges have been dismissed, or the criminal charges have been reduced.

4.4.    Proceedings may also continue if a party is no longer employed with or a Student of the University.

4.5.    To the extent that a concern is raised in an untimely manner (more than 180 calendar days from the last incident of Discrimination or Harassment) it is within the Equal Opportunity office's discretion not to pursue the matter.

4.6.    Reports Outside of University Jurisdiction

    If the University is notified that a Member of the University Community has reported an incident of Discrimination or Harassment, but the action occurred outside of the University's jurisdiction as described in this Section, the University will still take reasonable steps to ensure the individual's safety while on University Premises and to offer the individual information about resources both on and off University Premises.

5.    PROHIBITED CONDUCT

5.1.    Discrimination and Harassment

    Discrimination and Harassment are violations of this Policy and will not be tolerated. The University prohibits Discrimination and Harassment against any Member of the University Community based on their membership in a Protected Class.

    A.     Examples of Discrimination include, but are not limited to: denying an applicant employment because of their membership in a Protected Class, taking adverse employment or academic action against a person because of their Protected Class; denying admission to a University activity based on a person's Protected Class; failing to provide reasonable accommodations to a person with a documented disability, for pregnancy or related medical conditions (See SAM 01.D.16), and for a sincerely held religious belief.

    B.     Examples of Harassment include, but are not limited to: epithets or slurs, threatening, intimidating or hostile acts or statements, and display or

circulation (including through e-mail or virtual platforms) of written or graphic material in the learning, living, or working environment, as long as the conduct rises to the level where it is actionable under Section 3.5.

C.      An individual's subjective belief that behavior is intimidating, hostile, or offensive, in and of itself, is not sufficient to establish Discrimination or Harassment. The behavior must satisfy the standard for Discrimination or Harassmencreate a hostile environment from both a subjective and objective perspective such that it unreasonably interferes with, limits, or deprives a member of the university community of the ability to participate in or to receive benefits, services, or opportunities from the university's education or employment programs and/or activities. In determining whether a hostile environment existsDiscrimination or Harassment has occurred, the university will examine the context, nature, scope, frequency, duration, and location of incidents, as well as the relationships of the individuals involved, and apply the appropriate standard according to the applicable complaint resolution procedures.

D.      A minor verbal and nonverbal slight, snub, annoyance, insult or isolated incident including, but not limited to a microaggression, is not sufficient to establish Discrimination or Harassment.     General concerns of unprofessionalism should be addressed per normal departmental operating procedures. The Equal Opportunity office may refer concerns of general professionalism back to the supervisor(s) to review and address as appropriate.

5.2.    Retaliation

A.      Retaliation under this Policy includes, but is not limited to, any adverse employment or educational action taken for making a report of unlawful Discrimination or Harassment, or for otherwise participating under this Policy ("Retaliation").

B.      The University takes reports of Discrimination and Harassment very seriously and will not tolerate Retaliation against those who make reports of Discrimination or Harassment or who participate in the investigation or adjudication process.

C.      Any actual or threatened retaliation or any act of intimidation to prevent or otherwise obstruct the reporting of Discrimination or Harassment or the participation in proceedings relating to Discrimination or Harassment, may be considered a separate violation of this Policy and may result in disciplinary sanctions.

6.      REPORTING INCIDENTS

6.1.    Any person, regardless of whether they are the person being subjected to Discrimination or Harassment, may report Discrimination, Harassment, or

# Exhibit C

## **AGREEMENT**

This Agreement (the "Agreement") is entered into on the date of signature of the last signatory to this Agreement ("Effective Date") by and between Speech First, Inc. ("Speech First") on the one hand and the University of Texas at Austin (the "University") on the other (collectively, the "Parties"), as follows:

A.     WHEREAS, by complaint filed on December 13, 2018, Speech First brought claims against Gregory L. Fenves in his official capacity as President of the University of Texas at Austin, and others ("Defendants"), in the matter styled *Speech First, Inc. v. Fenves*, 1:18-cv-1078-LY (W.D. Tex.) ("Action");

B.     WHEREAS, on December 21, 2018, Speech First moved for a preliminary injunction relating to its claims concerning the University's verbal harassment policy, Acceptable Use Policy, Residence Hall Manual, and Campus Climate Response Team;

C.     WHEREAS, Defendants opposed Speech First's motion;

D.     WHEREAS, on June 4, 2019, the U.S. District Court for the Western District of Texas denied Speech First's motion and dismissed its case;

E.     WHEREAS, on October 28, 2020 (opinion revised November 9, 2020), the U.S. Court of Appeals for the Fifth Circuit vacated the district court's opinion and remanded for further proceedings.

F.     WHEREAS, the Parties have determined that it is in their mutual interests to amicably resolve all issues between them;

NOW, THEREFORE, in consideration of the foregoing and of the mutual undertakings of the Parties set out herein, the Parties agree as follows:

1.     With respect to the University's Acceptable Use Policy, in August 2019, the University removed the provision that stated, "Be civil. Do not send rude or harassing correspondence." The University will not reinstate the removed provision.

2.     With respect to the University's Residence Hall Manual, in August 2019, the University revised the provisions titled "Harassment" and "Incivility." The University will not reinstate the former provisions.

3.     With respect to the University's verbal harassment policy, in August 2019, the University amended its definition of verbal harassment. The University will not reinstate the former definition, and it will remove all references to the former definition from its policies. The University will delete Handbook of Operating Procedures 9-1810, Hate and Bias Incidents (Mar. 8, 2017), policies.utexas.edu/policies/hate-and-bias-incidents. The University will further amend the definition of verbal harassment by deleting §13-204(b)(1), deleting the second sentence of §13-204(c), and deleting the second sentence of §13-204(d).

4. With respect to the University's Campus Climate Reporting Team ("CCRT"), the University will discontinue the CCRT. The University is free to devise an alternative to the CCRT, but Speech First is free to challenge that alternative.

5. Within two (2) business days of the Effective Date, Speech First shall file a Notice of Dismissal in the form attached hereto, dismissing all claims pending against Defendants in the Action.

6. The Parties shall bear their respective attorneys' fees, costs, and expenses relating to the Action and this Agreement.

7. Nothing contained in this Agreement shall be deemed as an admission of any liability or lack of merit in any claim or defense, by any Party.

8. This Agreement represents the full and complete agreement between the Parties to resolve their dispute. Any representations, warranties, promises, or conditions, whether written or oral, not specifically incorporated into this Agreement shall not be binding on the Parties. All other discussions, negotiations, and writings have been and are merged into this Agreement.

9. Neither this Agreement nor any terms or provision hereof may be changed, waived, discharged, or terminated except by an instrument in writing duly signed by the Party against which enforcement of the change, waiver, discharge, or termination is sought.

10. This Agreement shall be governed and construed in accordance with the laws of the State of Texas applicable to contracts made and to be performed wholly within the State of Texas, without regard to its conflict-of-laws provisions.

11. All Parties hereto agree that in the event of any ambiguity or dispute regarding the interpretation of this Agreement, the Agreement will be interpreted as if each Party hereto participated equally in the drafting hereof.

12. This Agreement may be signed in two original counterparts, each of which shall for all purposes be considered an original of this Agreement. Execution and delivery of this Agreement by electronic means (including via e-mail or .pdf) shall be sufficient for all purposes and shall be binding on any person or Party who so executes.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date set forth above.

Date: 12/22/20

Speech First, Inc.

By: Nicole K. Neily, president

Date: 12/22/20

University of Texas at Austin

By: Jay Hartzell, President

# Exhibit D

## AGREEMENT AND RELEASE

This Agreement and Release ("Agreement") is entered into on the date of signature of the last signatory to this Agreement ("Effective Date") by and between Speech First, Inc. on the one hand and Oklahoma State University ("University") on the other (together, the "Parties"), as follows:

A.　WHEREAS, by complaint filed on January 10, 2023, Speech First brought the matter styled *Speech First, Inc. v. Shrum*, No. 5:23-cv-00029 (W.D. Okla.) ("Action") asserting claims against Kayse Shrum, in her individual capacity and official capacity as President of Oklahoma State University; Aleigha Mariott, in her individual capacity and official capacity as Director of Student Support and Conduct for Oklahoma State University; Doug Hallenbeck, in his individual capacity and official capacity as Vice President of Student Affairs for Oklahoma State University; Raj Murthy, in his individual capacity and official capacity as Chief Information Officer for Oklahoma State University; Jackson Landrum, in his individual capacity and official capacity as Director of Equal Opportunity for Oklahoma State University; Billy G. Taylor, Rick Davis, Jimmy Harrel, Joe Hall, Cary Baetz, Blayne Arthur, Rick Walker, Jason Ramsey, Jarold Callahan, and Trudy Milner, all in their individual capacities and official capacities as members of the OSU/A&M Board of Regents ("Defendants");

B.　WHEREAS, on January 10, 2023, Speech First moved for a preliminary injunction against the University's harassment policy in the Code of Conduct (hereinafter "harassment policy"); the provision in the University's "Appropriate Use Policy" concerning "transmitting political campaigning" messages sent by students (OSU Policy 3-0601) (hereinafter "computer policy"); and the University's Bias Incident Response Team, *see* Doc. 3;

C.　WHEREAS, on January 18, 2023, Speech First and Defendants filed a stipulated dismissal of Speech First's claims against all Defendants other than Shrum, *see* Doc. 5;

D.　WHEREAS, on January 18, 2023, Speech First and Defendants further stipulated that any injunctive or declaratory relief or attorney's fees awarded in this action to Speech First against Shrum would apply to and be binding on Oklahoma State University, *see* Doc. 5;

E.　WHEREAS, on February 7, 2023, Defendants responded to Speech First's preliminary injunction motion and moved to dismiss Speech First's complaint under Federal Rule of Civil Procedure 12(b)(1), *see* Docs. 24-25;

F.　WHEREAS, on February 17, 2023, Speech First filed an amended complaint against Shrum, in her official capacity only, *see* Doc. 27;

G.　WHEREAS, on March 3, 2023, Defendants moved to dismiss Speech First's amended complaint under Rule 12(b)(1), *see* Doc. 29;

H.　WHEREAS, on April 10, 2023, the United States District Court for the Western District of Oklahoma granted Defendants' motion to dismiss and denied Speech First's preliminary injunction motion as "moot," *see* Doc. 35;

I.      WHEREAS, on April 10, 2023, Speech First timely appealed the District Court's grant of Defendants' motion to dismiss, *see* Doc. 37;

J.      WHEREAS, on June 16, 2023, the University changed the computer policy prohibition on "transmitting political campaigning" messages to apply to employees only and no longer to nonemployee students, *see* perma.cc/6CY6-SZ4M;

K.      WHEREAS, on February 9, 2024, the United States Court of Appeals for the Tenth Circuit reversed the district court's judgment and remanded to the district court for further proceedings consistent with its opinion, *see* Judgment, No. 23-6054 (10th Cir. Feb. 9, 2024);

L.      WHEREAS, on February 29, 2024, the parties settled the issues between them regarding the computer policy, which settlement is attached as Exhibit B, and jointly stipulated to the dismissal of Count III of the complaint with prejudice, *see* Doc.46;

M.      WHEREAS, the Parties have determined that it is in their mutual interests to amicably resolve the issues between them;

NOW, THEREFORE, in consideration of the foregoing and of the mutual undertakings of the Parties set out herein, the Parties agree as follows:

1.      The University will revise the harassment policy. Under the revised policy, "harassment" is defined as follows: "Harassment: Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity." The University will not revert to the version of the harassment policy in place at the time this Action was filed. The University will take reasonable steps to remove all references to that version of the harassment policy from its websites and other publications.

2.      The University will disband the Bias Incidents Response Team. The University will not reinstate the Bias Incidents Response Team or create another similar entity with responsibility for "bias incidents." The University will take reasonable steps to remove all references to the Bias Incidents Response Team from its websites and other publications.

3.      For and in consideration of the University's undertakings set forth in paragraphs 1 and 2, the sufficiency of which is hereby acknowledged, and intending to be legally bound, Speech First does hereby remise, release, and forever discharge and completely and absolutely release the University and Defendants (collectively, the "Released Parties") from the claims, causes of action, and requests for relief that were brought or could have been brought to challenge the harassment policy and Bias Incidents Response Team in the Action. The Released Parties are each entitled to enforce this Agreement against Speech First without regard for whether the Released Party is a party to this Agreement. In the event that the University revises the policies or practices challenged in the Action in the future, Speech First and its members do not release any right to challenge the revised policies or practices.

4.      Within three (3) business days of the Effective Date, Speech First will file a joint stipulation of dismissal in the form attached as Exhibit A to this Agreement, dismissing the Action with prejudice.

5.      The University shall pay Speech First's costs, expenses, and attorneys' fees in the amount of $18,000 within thirty (30)days of Speech First's filing of the joint stipulation of dismissal.

6.      Speech First did not challenge, in this Action, the definition of sexual harassment in section 1.02(o) of the University's Interim Title IX – Sexual Misconduct Policy (hereinafter "Title IX sexual-harassment definition"). Should the University change that definition to mirror the governing definition promulgated by the United States Department of Education via notice-and-comment rulemaking under Title IX or the Violence Against Women Act, Speech First will not challenge that revised definition in any claim or suit against the Released Parties.

7.      Nothing contained in this Agreement shall be deemed as an admission of any liability or lack of merit in any claim or defense by any Party.

8.      This Agreement represents the full and complete agreement between the Parties to resolve their dispute regarding the harassment policy, Bias Incidents Response Team, and Title IX sexual-harassment definition. Any representations, warranties, promises, or conditions, whether written or oral, not specifically incorporated into this Agreement shall not be binding on the Parties. All other discussions, negotiations, and writings have been and are merged into this Agreement.

9.      Neither this Agreement nor any terms or provision hereof may be changed, waived, discharged, or terminated except by an instrument in writing duly signed by the Party against which enforcement of the change, waiver, discharge, or termination is sought.

10.     This Agreement shall be governed and construed in accordance with the laws of the State of Oklahoma applicable to contracts made and to be performed wholly within the State of Oklahoma, without regard to its conflict-of-laws provisions. All Parties agree that this Agreement and any disputes arising therefrom arise out of the same transaction or occurrence that is the subject matter of the Action and further agree that any disputes with respect to this Agreement are properly heard by the district court in the Action.

11.     The Parties agree that, in the event of any ambiguity or dispute regarding the interpretation of this Agreement, the Agreement will be interpreted as if each Party participated equally in its drafting.

12.     The Parties represent, knowing that all other Parties will rely on such representation, that each signatory has the right, power, and authority to: (i) sign this Agreement and Release; (ii) bind itself to the terms of this Agreement and Release; (iii) with respect to Speech First, to so bind its members, successors, and assigns; and (iv) to receive the consideration set forth in this Agreement and Release.

13.     This Agreement can be signed in two original counterparts, each of which shall for all purposes be considered an original of this Agreement. Execution and delivery of this Agreement by electronic means (including via e-mail or .pdf) shall be sufficient for all purposes and shall be binding on any person or Party who so executes.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

Date: 4/15/24                SPEECH FIRST, INC.

By: _____

Cherise Trump, Executive Director

Date: 04/03/24              OKLAHOMA STATE UNIVERSITY

By: _____

Kayse M. Shrum, D.O., President