# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

State of ALABAMA, *et al.*,

        *Plaintiffs*,

v.

Miguel CARDONA, in his official capacity as the U.S. Secretary of Education, *et al.*,

        *Defendants*.

Case No. 7:24-cv-533-GWB

## DECLARATION OF DR. BROOKS A. KEEL
## (GEORGIA)

1. I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2. I am the President of Augusta University, a research institution of the University System of Georgia, a position I have held since July 8, 2015. I previously served as President of Georgia Southern University which is also an institution of the University System of Georgia.

3. The university system consists of 26 public colleges and universities in Georgia, overseeing an annual budget of $11.5 billion and serving more than 344,000 students. The university system and Augusta University specifically receive federal funding, participate in federal programs and are subject to the requirements of Title IX.

4. Augusta University received approximately $90,200,000 in federal funding in Georgia fiscal year 2023 (July 1, 2022 through June 30, 2023).

5. Augusta University serves over 10,000 students.

1

6. All of Georgia's public higher-education institutions are arms of the State and its alter ego.

7. I understand that, on April 29, 2024, the U.S. Department of Education published a new regulation under Title IX, titled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. That regulation, among other things, redefines "sex" to include gender identity and sexual orientation, broadens the definition of sexual harassment, and creates new enforcement procedures under Title IX.

8. Unless a court steps in, this new rule will harm Augusta University and other Georgia colleges and universities, and their students.

9. The rule conflicts with Georgia laws that govern public institutions of higher education. *See, e.g.*, O.C.G.A. § 20-3-48(a)(5) ("'Student-on-student harassment' means unwelcome conduct or expressive activity directed at a student that is so severe, pervasive, and objectively offensive that a student is effectively denied equal access to educational opportunities or benefits provided by the public institution of higher education. This term shall not apply to or govern any employment policy of a public institution of higher education relating to harassment.").

10. If schools do not bring their policies in line with the Department's rule, they face severe consequences. If any program or activity at one of Georgia's public higher-education institutions is determined not to be in compliance with the requirements of Title IX, the Department can terminate federal funding to that program or activity. Georgia's public higher-education institutions use federal funds for many purposes, including student loans, student grants, research, and veterans' affairs. The loss of federal funds to Georgia's public

higher-education institutions would require these institutions either to eliminate certain educational services currently offered or to seek new funding to pay for those services. And these proceedings—even just investigations by the federal government—are expensive, time-consuming, and distracting for schools, school officials, and the State.

11. On the other hand, compliance with the new rule is burdensome and costly. The rule is over a thousand pages long; it will take substantial time and money to review the rule and existing policies, to determine what the rule requires, and to act to come into compliance with it. To take just one example, virtually every public university in Georgia has a Title IX policy that tracks the 2020 rule—the lengthy regulation that this new rule will repeal and replace. *See,* Sexual Misconduct Policy for Students and Employees (augusta.edu).

12.    All those policies will have to be reviewed, rewritten, and reapproved, which is costly and burdensome. It will also take time and money to train officials on the rule and the new policies implementing it.

13.    The rule also substantially expands recipients' enforcement obligations. The rule not only adds responsibility over gender identity and sexual orientation and expands the definition of harassment, but also requires recipients "to promptly and effectively end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects"—even when not deliberately indifferent, even when there is no complaint (oral or written), even when the complaint is withdrawn. And it requires recipients to provide supportive measures when there is no complaint, during investigations and grievance procedures, and even after a complaint is dismissed. Following these broader requirements is

more onerous than following the current, narrower ones. If the rule goes into effect, compliance costs and burdens for Georgia schools will increase substantially.

14. The Department itself estimates that the compliance costs will be "$4.6 million to $18.8 million over ten years." 89 Fed. Reg. at 33,851, 33,861. It "acknowledges" that "it will take some time to review requirements and revise policies and procedures to align with [the rule's] requirements." *Id.* at 33,851. It will cost "time," and money "reading and understanding the regulations; revising policies; publishing notices of nondiscrimination; training Title IX Coordinators; updating training materials;" "conduct[ing] additional training"; and more. *Id.* at 33,851, 33,548. The Department also admits that recipients will see "an increase in Title IX complaints" they must administer, a "10 percent increase in the number of investigations" they must conduct, an "increase" in the "supportive measures" they must provide, and an "increase" in "responsiveness to all reports and complaints of sex discrimination." *Id.* at 33,483, 33,492, 33,850, 33,862, 33,868-69.

15. The rule also exposes Augusta University and other Georgia universities to litigation costs and liability. Lawsuits are expensive, time-consuming, and distracting for schools, school officials, and the State. And the threat of liability, including large awards of attorney's fees, can be devastating.

16. By expanding the definition of harassment and removing deliberate indifference as a liability requirement, the rule puts universities in a catch-22. If they do not adopt the Department's new definition of harassment, then they risk enforcement actions by the Department. But if they do adopt the Department's definition, then they risk lawsuits alleging that the definition violates the First and Fourteenth Amendments.

17.     The same is true for the rule's provisions reducing procedural protections for the accused. Some of these procedures are mandatory. And though some purport to be optional, universities will feel substantial pressure to adopt them because the Department can and has brought enforcement actions against recipients who lack them. *See* 89 Fed. Reg. at 33,636 (warning recipients that they can violate Title IX by having procedures that the Department deems insufficient); *Doe v. Univ. of Scis.*, 961 F.3d 203, 213 & n.6 (3d Cir. 2020) (describing how through enforcement actions the Department has coerced schools into adopting the single-investigator model). But if recipients decrease procedural protections for the accused, they risk litigation for sex-based discrimination or due-process violations. Federal courts have found these claims viable. *E.g.*, *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019); *Doe v. Univ. of Scis.*, 961 F.3d 203 (3d Cir. 2020); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940 (9th Cir. 2020); *Doe v. Regents of Univ. of Calif.*, 23 F.4th 930 (9th Cir. 2022).

18.     The same is also true for the rule's redefinition of "sex discrimination" to include gender identity. The rule requires eliminating female-only spaces, even in sensitive areas like bathrooms and locker rooms, which the Eleventh Circuit has said implicates women's "right" to privacy. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 804-08 (11th Cir. 2022) (en banc). Lawsuits alleging violations of the constitutional right to privacy have already been filed against schools that adopted the same policy. *E.g.*, *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018). The Sixth Circuit, moreover, has held that a university policy against "misgendering" violates the First Amendment. *See Meriwether v. Hartop*, 992 F.3d 492, 503-11 (6th Cir. 2021).

19. The Department acknowledges these costs and admits that each key component of the rule will impose on recipients at least "some … costs associated with litigation." 89 Fed. Reg. at 33,851 (definition of harassment); *id.* at 33,858 (inclusion of gender identity); *id.* at 33,876 (enforcement procedures).

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 10, 2024

Brooks A. Keel, Ph.D.
President, Augusta University