FILED
2024 Jun-05  PM 07:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

STATE OF ALABAMA *et al.*,

      Plaintiffs,

v.

MIGUEL CARDONA, in his official capacity as Secretary of Education, *et al.*,

      Defendants.

No. 7:24-cv-533-GMB

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR STAY OF EFFECTIVE DATE AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................4

I.     Title IX, Implementing Regulations, and Guidance........................................4

II.    Procedural History ........................................................................................6

LEGAL STANDARD...........................................................................................6

ARGUMENT ......................................................................................................7

I.     Plaintiffs Are Unlikely to Succeed on the Merits..........................................7

     A.    The Final Rule's Recognition that Title IX Prohibits Discrimination on the Basis of Gender Identity Is Compelled by the Statutory Text. ...................................................................7

     B.    The Final Rule's Limitations on Sex Separation and Differentiation Are Consistent with the Statutory Text and Reasonable............................................................................14

          1.    Section 106.31(a)(2) Is Properly Derived from the Statutory Text...........................................................15

          2.    Plaintiffs Do Not Show that the Department's Consideration of § 106.31(a)(2) Was Unreasonable. ..............18

     C.    Plaintiffs Do Not Show that the Department Failed To Consider Parental Rights with Respect to Any Provision of the Rule. .............27

     D.    The Final Rule's Definition of Hostile Environment Sex-Based Harassment Is Consistent with the Department's Statutory Authority, the APA, and the Requirements of First Amendment.......28

          1.    The Definition of Hostile Environment Sex-Based Harassment Is Not Contrary to Law Because Davis Does Not Define the Scope of the Department's Enforcement Authority. ..................................................................29

2.   The Definition of Hostile Environment Sex-Based Harassment in the Final Rule is Not Arbitrary and Capricious. ................................................................. 33

E.   Plaintiffs' Challenge to the Final Rule's Changes to Grievance Procedures Fails for Lack of Standing and on the Merits. ................. 37

1.   Plaintiffs Lack Standing to Challenge the Rule's Changes to Grievance Procedures. ......................................... 37

2.   The Changes to the Grievance Procedures Were the Result of Reasoned Decisionmaking. ....................................... 39

F.   The Final Rule's Delineation of the Scope of Title IX's Unambiguous Prohibition on Sex Discrimination Poses No Spending Clause Issue ............................................................. 48

G.   The Major Questions Doctrine Is Inapposite. .................................... 52

II.   Plaintiffs Have Not Established Irreparable Harm. ....................................... 53

III.   The Equities and Public Interest Weigh Against Preliminary Relief. ........... 55

IV.   Any Relief Afforded by the Court Should Be Limited in Accordance with the Administrative Procedure Act and Equitable Principles. ................. 57

CONCLUSION ....................................................................................... 59

# TABLE OF AUTHORITIES

## CASES

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*,
  75 F.4th 760 (7th Cir. 2023) ...................................................................9

*Adams v. School Board of St. John's County*,
  57 F.4th 791 (2022) ..................................................................... 10, 23

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ...................................................................58

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................30

*Ayotte v. Planned Parenthood of N. New England*,
  546 U.S. 320 (2006) ...................................................................59

*Benning v. Georgia*,
  391 F.3d 1299 (11th Cir. 2004) ...................................................................50

*Bhd. of Locomotive Eng'rs v. CSX Transp., Inc.*,
  522 F.3d 1190 (11th Cir. 2008) ...................................................................32

*Big Tyme Invs., L.L.C. v. Edwards*,
  985 F.3d 456 (5th Cir. 2021) ...................................................................56

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ................................................................... *passim*

*Bowers v. Bd. of Regents of the Univ. Sys. of Ga.*,
  No. 1:11-CV-228-ODE, 2012 WL 12893538 (N.D. Ga. Mar. 20, 2012),
  *aff'd*, 509 F. App'x 906 (11th Cir. 2013) ...........................................................9

*Califano v. Aznavorian*,
  439 U.S. 170 (1978) ...................................................................17

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ...................................................................58

*Cannon v. Univ. of Chi.*,
  441 U.S. 677 (1979) ...................................................................56

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 374 (2023) ....................58

*Caron Found. of Fla., Inc. v. City of Delray Beach*,
   879 F. Supp. 2d 1353 (S.D. Fla. 2012)................................................................56

*Copeland v. Ga. Dep't of Corrs.*,
   97 F.4th 766 (11th Cir. 2024).................................................................................36

*Cornish v. Dudas*,
   540 F. Supp. 2d 61 (D.D.C. 2008)........................................................................55

*Davis v. Monroe County Board of Education*,
   526 U.S. 629 (1999) .......................................................... 29, 30, 31, 49

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) ................................................................. 18, 39

*DHS v. New York*,
   140 S. Ct. 599 (2020) ............................................................................................58

*DHS v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ...................................................................................................25

*Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*,
   528 F.2d 645 (5th Cir. 1976)..................................................................................21

*DiMaio v. Democratic Nat'l Comm.*,
   520 F.3d 1299 (11th Cir. 2008)..............................................................................39

*Dixon v. Love*,
   431 U.S. 105 (1977) ...............................................................................................42

*Doe v. Kearney*,
   329 F.3d 1286 (11th Cir. 2003)..............................................................................41

*Eknes-Tucker v. Governor of Alabama*,
   80 F.4th 1205 (11th Cir. 2023)...............................................................................11

*Equity in Athletics, Inc. v. Dep't of Educ.*,
   675 F. Supp. 2d 660 (W.D. Va. 2009)...................................................................49

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................................................... *passim*

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .................................................................................25

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016), *as revised* (Jan. 28, 2016) .................................................39

*Florida v. Dep't of Health & Hum. Servs.*,
19 F.4th 1271 (11th Cir. 2021) ............................................................... 53, 54

*Franklin v. Gwinnett Cnty. Pub. Sch.*,
503 U.S. 60 (1992) ...................................................................................9

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ................................................................................35

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998) ........................................................................... 29, 31

*Georgia v. President of the U.S.*,
46 F.4th 1283 (11th Cir. 2022) ...................................................................54

*Grabowski v. Ariz. Bd. of Regents*,
69 F.4th 1110 (9th Cir. 2023) .....................................................................9

*Grayden v. Rhodes*,
345 F.3d 1225 (11th Cir. 2003) ..................................................................48

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ......................... 9, 17

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009) ..................................................................................9

*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993) ............................................................................. 29, 34

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
452 U.S. 264 (1981) ................................................................................53

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ................................................................. 4, 51, 52

*L.W. v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023) ..................................................................12

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
    814 F. App'x 125 (6th Cir. 2020) ................................................. 56, 57

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................... 38, 39

*Maryland v. King*,
    567 U.S. 1301 (2012) ..............................................................................54

*Meritor Sav. Bank, FSB v. Vinson*,
    477 U.S. 57 (1986) ..................................................................................9

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ..................................................... 12, 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) .......................................................... 18, 26, 39

*Muldrow v. City of St. Louis*,
    144 S. Ct. 967 (2024) .................................................................. 15, 16

*Munaf v. Geren*,
    553 U.S. 674 (2008) ..................................................................................6

*Nash v. Auburn Univ.*,
    812 F.2d 655 (11th Cir. 1987) ............................................... 41, 44, 47

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
    896 F.2d 1283 (11th Cir. 1990) ...........................................................55

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) ...............................................................................49

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................... 6, 55

*Pelcha v. MW Bancorp, Inc.*,
  988 F.3d 318 (6th Cir. 2021) .......................................................... 11, 12

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981) ................................................................................50

*Rowles v. Curators of University of Missouri*,
  983 F.3d 345 (8th Cir. 2020) ........................................................ 34, 35

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) ...............................................................................9

*Sampson v. Murray*,
  415 U.S. 61 (1974) .............................................................................58

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) .........................................................57

*South Dakota v. Dole*,
  483 U.S. 203 (1987) ...................................................................... 48, 49

*Speech First v. Cartwright*,
  32 F.4th 1110 (11th Cir. 2022) ............................................. 32, 33, 55

*Stanley v. Illinois*,
  405 U.S. 645 (1972) ...........................................................................41

*Swain v. Junior*,
  961 F.3d 1276 (11th Cir. 2020) ...........................................................6

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) .............................................................54

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ...........................................................................35

*United States v. Texas*,
  599 U.S. 670 (2023) ...................................................................... 57, 59

*Wages & White Lion Invs., L.L.C. v. FDA*,
  90 F.4th 357 (5th Cir. 2024) ..............................................................21

*Walters v. Nat'l Ass'n of Rad. Survivors v. Survivors*,
   473 U.S. 305 (1985) ...........................................................................42

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ...........................................................................52

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ...........................................................17

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................... 6, 53

**STATUTES**

20 U.S.C. § 1681 ............................................................. *passim*

20 U.S.C. § 1682 ................................................... 1, 4, 18, 55

20 U.S.C. § 1686 ................................................. 4, 10, 17, 18

42 U.S.C. § 2000e-2 .....................................................5, 8

**REGULATIONS**

34 C.F.R. § 106.2 ...........................................................34

34 C.F.R. § 106.10 ............................................. 7, 10, 14

34 C.F.R. § 106.31 ............................................. *passim*

34 C.F.R. § 106.33 ......................................... 16, 19

34 C.F.R. § 106.41 ...........................................................22

34 C.F.R. § 106.44 ......................................... 28, 44, 45

34 C.F.R. § 106.45 ......................................... 42, 43, 44, 46

34 C.F.R. § 106.46 ...........................................................40

1997 Sexual Harassment Guidance,
   62 Fed. Reg. 12,034 (Mar. 13, 1997) ...............................................30

Nondiscrimination on the Basis of Sex in Education Programs or Activities
   Receiving Federal Financial Assistance,
   85 Fed. Reg. 30,026 (May 19, 2020)................................................. 5, 31, 36, 45

Guaranteeing an Educational Environment Free From Discrimination on
   the Basis of Sex, Including Sexual Orientation or Gender Identity,
   Exec. Order No. 14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021)..............................5

Nondiscrimination on the Basis of Sex in Education Programs or Activities
   Receiving Federal Financial Assistance,
   87 Fed. Reg. 41,390 (proposed July 12, 2022)................................................. 5, 14

Nondiscrimination on the Basis of Sex in Education Programs or Activities
   Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria
   for Male and Female Athletic Teams,
   88 Fed. Reg. 22,860 (proposed Apr. 13, 2023) ........................................... 21, 22

Nondiscrimination on the Basis of Sex in Education Programs or Activities
   Receiving Federal Financial Assistance,
   89 Fed. Reg. 33,474 (Apr. 29, 2024)........................................................... *passim*

## OTHER AUTHORITIES

Administrative Procedure Act,
   S. Doc. No. 248, 79th Cong., 2d Sess. (1946)......................................................58

University of Alabama, Title IX and Sexual Misconduct Policy, Appendix -1-
   Processing of Reports of Prohibited Conduct Under Title IX Process
   (revised 2.22),
   https://perma.cc/T2FD-Q79P ...............................................................................47

## INTRODUCTION

Title IX prohibits recipients of federal funds from discriminating on the basis of sex in their education programs or activities. 20 U.S.C. § 1681(a). The Department of Education (Department) is charged with issuing rules effectuating Title IX. 20 U.S.C. § 1682. On April 29, 2024, the Department issued a rule titled Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the Final Rule or Rule).

Among other things, the Final Rule clarifies that "discrimination on the basis of sex" includes "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," 89 Fed. Reg. at 33,886, and that the definition of hostile environment sex-based harassment includes "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884. The Rule also makes changes to the Department's regulations regarding grievance procedures for complaints of discrimination under Title IX, while permitting schools to select the approach that best fits their specific circumstances.

Plaintiffs' challenges to the Rule fail on every proffered ground. The

Department's interpretation of discrimination "on the basis of sex" straightforwardly applies the Supreme Court's reasoning in *Bostock v. Clayton County*, 590 U.S. 644 (2020). *Bostock* concluded that Title VII's prohibition against sex discrimination encompasses discrimination on the basis of gender identity "because it is impossible" to discriminate against a person for being transgender "without discriminating against that individual based on sex." *Id.* at 660. That same reasoning applies to the nearly identical prohibition on sex discrimination in Title IX. Like *Bostock*, the Final Rule does not depend on a particular definition of "sex."

The Final Rule also appropriately recognizes distinctions between contexts in which Congress has specified exceptions to Title IX's prohibition on sex discrimination, and other contexts—such as restrooms—in which it has not and, consistent with Supreme Court precedent, that separate or different treatment based on sex does not constitute unlawful discrimination under Title IX if it does not cause harm.

The Rule's definition of sex-based harassment is consistent with Title IX and the Department's enforcement authority. The Department used a similar standard in its enforcement of Title IX for decades prior to regulatory changes made in 2020 and continues to use a similar standard in its enforcement of Title VI and Section 504 (prohibiting discrimination on the basis of race, color, national origin including shared ancestry and ethnic characteristics, and disability). 89 Fed. Reg. 33,642. And

courts and the Equal Employment Opportunity Commission (EEOC) have used a similar standard to identify harassment under Title VII's analogous provisions for decades. Plaintiffs fail to show that the Rule conflicts with any governing legal precedent, with the First Amendment, or that it is otherwise arbitrary or capricious.

Plaintiffs' argument that the Department violated the Administrative Procedure Act (APA) in promulgating certain provisions regarding recipients' grievance procedures also lacks merit. Plaintiffs do not establish that they have standing to challenge these portions of the Rule—which provide recipients with options for how to structure grievance procedures—and they also fail to show that the Department's promulgation of these provisions was in any way unreasonable.

In addition to Plaintiffs' lack of a likelihood of success on the merits, Plaintiffs also have not met their high burden to satisfy the other requirements for a stay or preliminary injunction. Plaintiffs' alleged harms are largely speculative and cannot establish irreparable injury justifying preliminary relief. Moreover, the public interest and balance of equities weigh against granting Plaintiffs' motion, as enjoining the Rule would substantially harm the Government's interest in preventing discrimination in federally funded educational programs and activities. Accordingly, the Court should deny Plaintiffs' motion.

## BACKGROUND

### I.     Title IX, Implementing Regulations, and Guidance

Title IX's nondiscrimination mandate states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). There are only a small number of "specific, narrow exceptions to that broad prohibition." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005); *see* 20 U.S.C. § 1681(a)(1)-(9) (listing educational institutions, organizations, or programs that are exempt or partly exempt from Title IX's prohibition on sex discrimination); *id.* § 1686 (permitting maintenance of sex-separate living facilities).

Title IX directs the Department to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." *Id.* § 1682. Title IX also sets forth an administrative enforcement scheme, which allows the Department to obtain voluntary compliance from (or, failing that, terminate the federal funds of) a recipient that fails to comply with the statute or the Department's implementing regulations, through a variety of means. *Id*.

Over the years, the Department has promulgated regulations effectuating Title IX, including in 2020, when it specified how recipients of federal funds must

respond to allegations of sexual harassment. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) [hereinafter 2020 Amendments].

One month after publication of the 2020 Amendments, the Supreme Court held that the prohibition on discrimination "because of … sex" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), necessarily encompasses discrimination because of sexual orientation and gender identity. *See Bostock*, 590 U.S. at 660. Following *Bostock*, President Biden directed the Department of Education to review the 2020 Amendments and existing agency guidance "for consistency with governing law." Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, Exec. Order No. 14,021, § 2, 86 Fed. Reg. 13,803 (Mar. 8, 2021).

After a considerable public engagement process, in July 2022 the Department issued a Notice of Proposed Rulemaking (NPRM). *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390 (proposed July 12, 2022). Following extensive review of the more than 240,000 public comments, the Department published the Final Rule, which goes into effect on August 1, 2024. *See* 89 Fed. Reg. at 33,476.

As relevant to this case, the Final Rule (1) clarifies the scope of prohibited sex discrimination under Title IX; (2) clarifies the limits of permissible different or

separate treatment on the basis of sex under Title IX; (3) clarifies the definition of sex-based harassment under Title IX; and (4) adjusts the Department's grievance procedure regulations.

## II.    Procedural History

Plaintiffs filed their complaint on April 29, 2024. ECF No. 1. Plaintiffs moved for a § 705 stay and preliminary injunction on May 8, 2024. Pls.' Mot., ECF No. 7.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy" that should "never be awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted); *see also Swain v. Junior*, 961 F.3d 1276, 1284 (11th Cir. 2020). A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The party seeking a preliminary injunction bears the burden to show: "a substantial likelihood of success on the merits," "irreparable injury will be suffered unless the injunction issues," "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party," and "if issued, the injunction would not be adverse to the public interest." *Swain*, 961 F.3d at 1284-85 (citation omitted). When the federal government is the defendant, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.   Plaintiffs Are Unlikely to Succeed on the Merits.

**A. The Final Rule's Recognition that Title IX Prohibits Discrimination on the Basis of Gender Identity Is Compelled by the Statutory Text.**

Once again, Title IX states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Final Rule recognizes, "Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). As the Department explained, "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" *Id.* at 33,802 (quoting *Bostock*, 590 U.S. at 655).

Plaintiffs argue that the Department's interpretation of Title IX violates the APA because they think it is inconsistent with the statutory text. *See* Mem. in Supp. of Pls.' Mot. (Pls.' Mem.) 11-15, ECF No. 7-1. To the contrary, the Department faithfully interpreted the statutory text in light of *Bostock*, which interpreted Title VII's provision making it unlawful, in relevant part, "for an employer . . . to discriminate against any individual . . . because of such individual's . . . sex," 590

U.S. at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Supreme Court explained that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656-57 (citation omitted). "[S]ex is necessarily a but-for cause" of discrimination on the basis of transgender status "because it is impossible" to discriminate against a person for being transgender "without discriminating against that individual based on sex." *Id.* at 660, 661 (emphasis omitted). If, for example, an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female," but "retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. "[T]he individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* That is so even assuming "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655.

*Bostock*'s reasoning applies with equal force to Title IX's prohibition on discrimination "on the basis of sex," 20 U.S.C. 1681(a), which employs materially identical text and a causation standard indistinguishable from Title VII's "because of . . . sex" language, 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has long used the phrase "on the basis of" interchangeably with Title VII's "because of" language when discussing Title VII's causation standard, including in *Bostock* itself. *See* 590

8

U.S. at 650 ("[I]n Title VII, Congress outlawed discrimination in the workplace on the basis of . . . sex."); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (explaining statutory phrase "based on" has the same meaning as the phrase "because of" (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63-64 & n.14 (2007))). Courts consistently rely on interpretations of Title VII's prohibition against discrimination "because of . . . sex" to interpret Title IX's textually similar provision. *See, e.g.*, *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)); *Bowers v. Bd. of Regents of the Univ. Sys. of Ga.*, No. 1:11-CV-228-ODE, 2012 WL 12893538, at *5 (N.D. Ga. Mar. 20, 2012) ("Although the elements of a Title IX gender discrimination claim have not yet been established in this circuit, other circuits have employed Title VII as a basis for evaluating Title IX claims."), *aff'd*, 509 F. App'x 906 (11th Cir. 2013). And as to the specific question at hand, several courts have already held that there is no difference between the two statutes that would require a different result. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023).

Plaintiffs rely on two Eleventh Circuit opinions and a handful of Sixth Circuit opinions to argue that *Bostock*'s reasoning does not apply to Title IX. *See* Pls.' Mem.

15-16. But none of these cases provide grounds to conclude that *Bostock*'s analysis of Title VII's prohibition of discrimination "because of" sex is inapplicable to Title IX's nearly identical prohibition.

In *Adams v. School Board of St. John's County*, the Eleventh Circuit held that a school district policy preventing a transgender boy from using the boys' restroom did not violate Title IX because "the School Board's policy fits squarely within [Title IX's] carve-out" allowing educational institutions to "'maintain[] separate living facilities for the different sexes'" and relevant implementing regulations. 57 F.4th 791, 811 (2022) (en banc) (quoting 20 U.S.C. § 1686); *see* pp. 17-18, *infra* (discussing Section 1686). But the Final Rule's provision setting forth the scope of sex discrimination (§ 106.10) does not address restrooms, *see* 89 Fed. Reg. at 33,886, which are instead addressed by a separate provision of the Rule (§ 106.31(a)(2)), *see infra* Part I.B. Nothing in *Adams* contradicts the Final Rule's clarification in § 106.10 that discrimination based on gender identity necessarily constitutes discrimination "on the basis of sex" under Section 1681 of Title IX, read in light of *Bostock*. *See Adams*, 57 F.4th at 808-09 (recognizing that "*Bostock* held that 'discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex'" and maintaining that this "statement is not in question in this appeal" (citation omitted)).

Plaintiffs emphasize that *Adams* "held that the original public meaning of Title

IX's use of 'sex' means biological sex," Pls.' Mem. 12; *see also* Pls.' Mem. 11-15 (arguing generally that sex is limited to "biological sex"), but *Bostock* likewise "proceed[ed] on the assumption that 'sex' . . . refer[ed] only to biological distinctions between male and female," 590 U.S. at 656, and the Final Rule operates equally well on the same assumption, 89 Fed. Reg. at 33,802, 33,804-05, 33,807. Regardless of how one defines sex, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660; *see also id.* at 660-61 (explaining "transgender status [is] inextricably bound up with sex").

*Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), a due process and equal protection case, and *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir. 2021), an Age Discrimination in Employment Act (ADEA) case, are inapposite for similar reasons. Neither case concerned whether Title VII's prohibition of discrimination "because of" sex is materially distinguishable from Title IX's prohibition of discrimination "on the basis of" sex, such that *Bostock*'s reasoning would not apply to the latter. *Eknes-Tucker* merely declined to rely on *Bostock*'s analysis of but-for causation under Title VII in interpreting the Equal Protection Clause, emphasizing that the latter is a constitutional provision, not a statutory protection, that does not contain the same language as Title VII. *See* 80 F.4th at 1228-29 ("Because *Bostock* therefore concerned a different law (with

11

materially different language) and a different factual context, it bears minimal relevance to the instant case."). And *Pelcha* declined to rely on *Bostock*'s analysis of but-for causation under Title VII in light of binding Supreme Court precedent interpreting the ADEA's causality requirement. *See* 988 F.3d at 323-24.

*L.W. v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023), also did not interpret Title IX. In reversing the preliminary injunction of a state law prohibiting healthcare providers from performing gender-affirming surgeries and administering hormones or puberty blockers to transgender minors the court considered whether the law would receive heightened review under the Equal Protection Clause. *Id.* 479-86. The court observed that *Bostock* "does not alter" its conclusion about whether the law should receive increased scrutiny, and suggested in dicta that *Bostock*'s reasoning applied only to Title VII, *id.* at 484-85. But contrary to Plaintiffs' assertion, Pls.' Mem. 14, this dicta—divorced from any analysis of Title IX's materially indistinguishable text—cannot overcome the textual analysis in *Bostock* itself. *See Bostock*, 590 U.S. at 654-55, 664-65.

Similarly, *Meriwether v. Hartop* was a fact-specific free speech case, which held that a university lacked a sufficient interest in disciplining a professor for certain classroom statements regarding transgender students. 992 F.3d 492 (6th Cir. 2021). The court explained that the university's Title IX interests were "not implicated" because there was "no indication at this stage of the litigation" that the professor's

speech inhibited students' "education or ability to succeed in the classroom." *Id*. at 511. The court also noted that "Title VII differs from Title IX in important respects," pointing to Title IX's provisions allowing for consideration of sex in athletic scholarships and maintenance of separate living facilities for different sexes. *See id.* at 510 & n.4. *Meriwether*, however, nowhere suggests that discrimination "because of . . . sex" in Title VII imposes a different causal standard or means something different from discrimination "on the basis of sex" in Title IX.

Plaintiffs also assert that *Bostock* permits discrimination against nonbinary, bisexual, or questioning individuals because they "do not remotely satisfy *Bostock*'s but-for test for sex discrimination." Pls.' Mem. 23. But *Bostock*'s reasoning clearly forecloses discrimination against bisexual and nonbinary students as well. It is impossible to define bisexuality without reference to sex—bisexuality necessarily entails consideration of "the sex of the person to whom they should be attracted." *See* 89 Fed. Reg. at 33,807. And it is impossible to discriminate against someone for being nonbinary without considering their nonconformity to sex stereotypes associated with their sex assigned at birth. *See id.* To the extent that Plaintiffs mean to suggest that discrimination against bisexual or nonbinary students is acceptable because it can be accomplished by discriminating equally against men and women, *Bostock* directly rejected this argument, holding that it is no "defense for an employer to say it discriminates against both men and women because of sex." 590

U.S. at 659. As the Supreme Court explained, "an employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally. But in both cases the employer fires an individual in part because of sex. Instead of avoiding Title VII exposure, this employer doubles it." *Id.*

As set forth above, the Department properly applied *Bostock*'s straightforward textual analysis in interpreting the plain language of Title IX's anti-discrimination provision. Plaintiffs thus are unlikely to succeed on the merits of their claims that the interpretation of sex discrimination to be codified at 34 C.F.R. § 106.10 is inconsistent with Title IX or exceeds the Department's authority.

### B. The Final Rule's Limitations on Sex Separation and Differentiation Are Consistent with the Statutory Text and Reasonable.

Plaintiffs also challenge the Final Rule's provision in § 106.31(a)(2) that, with limited exceptions, a recipient may not carry out otherwise permissible different or separate treatment on the basis of sex in a manner that prevents a person from participating in an education program or activity consistent with the person's gender identity. *See* 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)); Pls.' Mem. 19-26. That challenge fails: the Final Rule's adherence to the limited scope of Title IX's exceptions to the statute's general prohibition on sex discrimination follows naturally from the operative text and is not arbitrary or capricious.

14

1.  <u>Section 106.31(a)(2) Is Properly Derived from the Statutory Text.</u>

As the Final Rule explains, the Department's regulations have long specified that separate or different treatment on the basis of sex is generally prohibited under Title IX because such treatment is presumptively discriminatory. 89 Fed. Reg. at 33,814 (citing NPRM, 87 Fed. Reg. at 41,534; 34 C.F.R. § 106.31(b)(4), (7)). The regulations, however, also have long recognized limited contexts in which sex separation or differentiation is allowed. *Id.* The provision to be codified at § 106.31(a)(2) explains how recipients may carry out such separate or different treatment without running afoul of the statute's nondiscrimination mandate. In short, the Rule provides—consistent with Supreme Court precedent—that, save for in limited circumstances allowed by statute, Title IX's prohibition against sex discrimination forbids "distinctions or differences in treatment [on the basis of sex] that injure protected individuals." 89 Fed. Reg. at 33,814 (brackets in original) (quoting *Bostock*, 590 U.S. at 681).

This standard is consistent with the well-established principle that a discrimination claim requires a showing of some harm. As explained by the Department, "more than de minimis harm" simply means a "legally cognizable injury." 89 Fed. Reg. at 33,814. Contrary to Plaintiffs' argument, Pls.' Mem. 25, this standard aligns with the Supreme Court's recent decision in *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), which held that the phrase "[d]iscriminate against" in

Title VII does not establish "an elevated threshold of harm" but "refer[s] to 'differences in treatment that injure' employees." *Id.* at 974 (quoting *Bostock*, 590 U.S. at 681). The use of phrase "subjected to discrimination" in Title IX, 20 U.S.C. § 1681, likewise only requires a showing of "differen[ces] in treatment that injure[s]," *Muldrow*, 144 S. Ct. at 974 (citation omitted), which is consistent with the de minimis harm standard articulated in the Rule. "More than de minimis harm" simply means that a person must be "worse off" in some identifiable way. *Id.*; *see also id.* (citing *Bostock*, 590 U.S. at 681); *see generally* 89 Fed. Reg. at 33,814.

The Department explained that, except in certain contexts set forth below, a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally cognizable injury, *i.e.*, more than de minimis harm. 89 Fed. Reg. at 33,814. As Plaintiffs note, the Department has regulations that allow sex-separate "toilet, locker room, and shower facilities," among other things, Pls.' Mem. 11-12 (citing 34 C.F.R. § 106.33). The Department has long recognized that sex "separation in certain circumstances, including in the context of bathrooms or locker rooms, is not presumptively unlawful sex discrimination" because such sex-separate facilities generally impose no more than de minimis harm on students. 89 Fed. Reg. at 33,818; *see generally* 34 C.F.R. § 106.33. But consistent with federal court decisions and guidelines published by respected medical organizations, the Department concluded, based on the evidence before it, that sex separation that

prevents a person from participating in a program or activity consistent with their gender identity *does* cause more than de minimis harm. 89 Fed. Reg. at 33,816 (citing *Grimm*, 972 F.3d at 617-18; *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045-46 (7th Cir. 2017)); *id.* at 33,819 n.90 (citing guidelines published by medical organizations). Because preventing a student from using sex-separate restrooms or participating in single-sex classes consistent with their gender identity causes more than de minimis harm on the basis of sex, *id.* at 33,814, it is prohibited by Title IX. Contrary to Plaintiffs' suggestion, Pls.' Mem. 21, § 106.31(a)(2) does not incorporate a "redefinition of sex to include gender identity."

At the same time, the Department recognized that Congress specified a few limited contexts in which different or separate treatment based on sex is permitted, notwithstanding that it might cause more than de minimis harm. 89 Fed. Reg. at 33,819; *see, e.g.*, 20 U.S.C. § 1681(a)(6) (membership practices of certain social fraternities or sororities); *id.* § 1681(a)(4) (institutes focused on military training); *id.* § 1686 (educational institution's maintenance of "separate living facilities for the different sexes"). The Final Rule "clearly effectuates this basic congressional decision." *Califano v. Aznavorian*, 439 U.S. 170, 178 (1978). Because Congress did not except restrooms and locker rooms from the general prohibition on sex discrimination, the Department reasonably determined that sex separation in such

contexts can be consistent with Title IX only to the extent that any sex-based harm imposed is de minimis—*i.e.*, not discriminatory. 89 Fed. Reg. at 33,816; *see id.* at 33,821 (explaining that the statutory living facilities "carve-out" in 20 U.S.C. § 1686 is inapplicable to "other aspects of a recipient's education program or activity for which Title IX permits different treatment or separation on the basis of sex, such as bathrooms, locker rooms, or shower facilities," and noting that the latter are "regulations that the Department adopted under different statutory authority [20 U.S.C. §§ 1681-1682], and which have long been addressed separately from 'living facilities'"). In sum, § 106.31(a)(2) faithfully implements both Title IX's prohibition on different or separate sex-based treatment that causes cognizable harm and Title IX's carve-out of certain exemptions from its general prohibition on sex discrimination.

### 2. Plaintiffs Do Not Show that the Department's Consideration of § 106.31(a)(2) Was Unreasonable.

Plaintiffs' contentions that the Department's consideration of § 106.31(a)(2) was arbitrary and capricious lack merit. Review under the arbitrary and capricious standard is "deferential." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019). The question for the Court is whether the agency's decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983).

***First***, the Department explicitly considered comments suggesting that the

Rule's de minimis harm provision is "in direct conflict" with 34 C.F.R. § 106.33, addressing toilet and other facilities, *contra* Pls.' Mem. 19, and reasonably determined that there is no such conflict. 89 Fed. Reg. at 33,820. Section 106.33 provides that "[a] recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." This provision remains in effect. 89 Fed. Reg. at 33,821. Section 106.31(a)(2) clarifies, however, that § 106.33 does not override Title IX's general prohibition on sex discrimination, which prohibits different or separate treatment that causes more than de minimis harm. 89 Fed. Reg. at 33,821; *see* pp. 15-18, *supra*. Accordingly, the Final Rule explains that "[r]ecipients continue to have discretion under these regulations to provide sex-separate facilities," but they must do so "consistent with Title IX's nondiscrimination mandate." 89 Fed. Reg. at 33,820. And although sex separation in the restroom context is "not presumptively unlawful sex discrimination" because it generally causes no cognizable harm, *id.* at 33,818, preventing a student from using restrooms consistent with their gender identity *does* cause such harm, *id.* at 33,814-16. Section 106.31(a)(2) thus makes clear that such discrimination is not permitted.

**<u>Second</u>**, Plaintiffs argue that § 106.31(a)(2) is arbitrary and capricious because the Department failed "to adequately define 'gender identity.'" Pls.' Mem.

21. The Department expressly considered this issue and determined that a formal definition was unnecessary, stating that it "understands gender identity to describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth." 89 Fed. Reg. at 33,809. And contrary to Plaintiffs' suggestion that this understanding would be "vague" or "unworkable," Pls.' Mem. 21, multiple courts have used "gender identity" consistent with this understanding, 89 Fed. Reg. at 33,809 (citing cases).

To the extent Plaintiffs' argument is that recipients will have difficulty determining a person's gender identity for purposes of complying with the Rule, Pls.' Mem. 22, the Department likewise reasonably considered and addressed that concern. *See* 89 Fed. Reg. at 33,819. As the Department noted, "many recipients rely on a student's consistent assertion to determine their gender identity, or on written confirmation of the student's gender identity by the student or student's parent, counselor, coach, or teacher." *Id.* The Department contrasted such practices with "requiring a student to submit to invasive medical inquiries or burdensome documentation requirements," which it specified would not be permissible because doing so "imposes more than de minimis harm." *Id.* And while Plaintiffs argue that the Department should require a specific procedure for determining a student's gender identity, Pls.' Mem. 22, allowing recipients flexibility in this regard is reasonable and does not violate the "fair notice" rule applicable in the administrative

enforcement context. *Cf. Wages & White Lion Invs., L.L.C. v. FDA*, 90 F.4th 357, 362, 380 (5th Cir. 2024) (en banc) (holding that FDA improperly "denied . . . one million flavored e-cigarette applications" based on lack of long-term studies where the "FDA never gave petitioners fair notice that they needed to conduct long-term studies on their specific flavored products"). That doctrine does not go to whether a regulation is arbitrary and capricious but rather provides that "[i]f a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." *Id.* (quoting *Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976)).

**_Third_**, Plaintiffs do not show that the Department's decision to leave the status quo in place with respect to eligibility for male and female athletics teams, and to address athletics through a separate rulemaking, was arbitrary and capricious.

As Plaintiffs acknowledge, Pls.' Mem. 20, the Rule is clear that it does not address students' eligibility to participate on male or female athletic teams. 89 Fed. Reg. at 33,816-17. Rather, in April 2023, the Department issued a separate notice of proposed rulemaking regarding the athletics regulations, which has not yet been finalized. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023).

As the Department has explained, "[u]ntil that rule is finalized and issued, the current regulations on athletics continue to apply," 89 Fed. Reg. at 33,817, contrary to Plaintiffs' implication, Pls.' Mem. 20.

Plaintiffs argue that it was unreasonable for the Department to address bathrooms separately from athletic teams because "the bathroom regulation was part of th[e] same batch of regulations" as the original athletics regulations promulgated in 1975. Pls.' Mem. 20. But Congress recognized by statute that athletics is a special context, *id.*; *see* Education Amendments of 1974, section 844, and the Department's athletics regulations have always tracked this determination that the unique circumstances of athletics merit a different approach, "governed by an overarching nondiscrimination mandate and obligation to provide equal athletic opportunities for students regardless of sex." 89 Fed. Reg. at 33,816 (citing 34 C.F.R. § 106.41(a), (c)). This approach allows that individual students may be excluded from a particular male or female team based on their sex, even when doing so may impose more than de minimis harm. *Id.* at 33,817. Nor do Plaintiffs demonstrate that "the validity of [§ 106.31(a)(2)] depends" on that separate rulemaking. Pls.' Mem. 21. While Plaintiffs assert that the Department could not "meaningfully consider the practicability or wiseness of its policy decisions" in the Final Rule "without factoring in sports," *id.*, they do not show that the Department's consideration of

22

§ 106.31(a)(2) was in any way inadequate.[1] Contrary to Plaintiffs' suggestion, Pls.' Mem. 20, the Final Rule thoroughly and logically explains why the de minimis harm standard in § 106.31(a)(2) does not apply to eligibility for sex-separate athletics teams, consistent with the Department's longstanding approach to athletics. 89 Fed. Reg. at 33,816-19.

**_Fourth_**, Plaintiffs also erroneously argue that the Rule is arbitrary and capricious because the Department failed to consider Plaintiffs' reasonable reliance interests. Pls.' Mem. 23-25.

Plaintiffs specifically argue that they "structured their athletics programs and intimate spaces based on [the] understanding" that Title IX's regulations "permit separation based on biological sex." Pls.' Mem at 23. As an initial matter, to the extent that Plaintiffs argue that the Rule undermines their reliance interest in structuring "their athletics programs," Pls.' Mem. 23, they are wrong because the Rule does not address students' eligibility to participate on male or female athletic teams. Plaintiffs' reliance assertions, many of which address athletics, are therefore largely irrelevant. _See, e.g._, Mackey Decl. ¶ 17, ECF No. 7-3; Purcell  Decl. ¶ 19, ECF No. 7-2; Woods Decl. ¶ 20, ECF No. 7-8; Sikes Decl. ¶ 15, ECF No. 7-4.

---

[1] In support of their assertion, Plaintiffs cite Judge Lagoa's concurrence in _Adams_, in which she criticized a hypothetical definition of "sex" to mean "gender identity." Pls.' Mem. 21 (citing _Adams_, 57 F.4th at 821 (Lagoa, J., concurring)). But this is inapplicable because as explained above, the Rule does not define "sex" to mean "gender identity," p. 17, _supra_.

In addition, the Department adequately addressed concerns about locker room and restroom facilities by explaining that nothing in the Rule requires recipients to construct new facilities or create new programs. 89 Fed. Reg. at 33,876. Although Plaintiffs generally assert that bathroom renovations would be expensive, Pls.' Mem. 25, they do not explain why the Rule would require them to incur such construction costs, which the Rule expressly disclaims. *See* 89 Fed. Reg. at 33,876 ("Compliance with final §106.31(a)(2) may require updating of policies or training materials, but will not require significant expenditures, such as construction of new facilities or creation of new programs."). In considering potential costs to recipients of compliance with the Final Rule, it was not unreasonable for the Department to assume that most recipients would not choose to incur construction costs, where they are not required to do so by the Rule.

Plaintiffs likewise fail to show that the Department inadequately addressed alternative policies with respect to § 106.31(a)(2). *See generally* Pls.' Mem. 23-24. For example, Plaintiffs allege the Rule inadequately considered single-occupancy bathrooms, Pls.' Mem. 24, but the Department did consider—and thoroughly addressed—comments regarding single-occupancy facilities. *See* 89 Fed. Reg. at 33,820. Specifically, the Department acknowledged that "access to gender-neutral or single-occupancy facilities may be helpful for accommodating students who do

not want to use shared sex-separate facilities," but also reiterated that the Rule neither requires nor prevents single-occupancy facilities. 89 Fed. Reg. at 33,820.

Finally, while Plaintiffs' declarants voice general policy objections to the Rule, *see, e.g.*, Woods Decl. ¶ 18; Sikes Decl. ¶ 15, and assert that there are conflicts between the Rule and certain state laws, *see, e.g.*, Mackey Decl. ¶ 16; Sikes Decl. ¶ 14, none identifies particular actions taken in reliance on those laws, let alone explains how the Rule would negate benefits derived from such actions or demonstrates that the Department failed to consider such information. *Cf. DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31 (2020) (faulting agency for failing to address reliance interests where individuals had "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children"). At bottom, the Department adequately considered the recipients' relevant reliance interest on past policies and practices and ultimately concluded that "the final regulations will not impose substantial new burdens that are not justified by the significant benefits the Department expects from implementation of the final regulations." 89 Fed. Reg. at 33,849; *see also FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (noting that judicial review under arbitrary-and-capricious standard is "deferential" and "simply ensures that the agency has acted within a zone of reasonableness").

*__Fifth,__* Plaintiffs are wrong to argue that the Department did not adequately

consider privacy concerns in promulgating the Rule. *See* Pls.' Mem. 24-25. The Department thoroughly considered these concerns, explaining that it "strongly agrees that recipients have a legitimate interest in protecting all students' safety and privacy." 89 Fed. Reg. at 33,820 (explaining that, under § 106.31(a)(2), "a recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity"). The Department reasonably concluded, however, that there is no "evidence that transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest." *Id.* The Final Rule notes, for example, that federal courts have rejected "unsubstantiated and generalized concerns that transgender persons' access to sex-separate spaces infringes on other students' privacy or safety." *Id.* (citing cases).

In sum, Plaintiffs are far from meeting the high bar of showing under arbitrary and capricious review that the Department "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that r[an] counter to the evidence before the agency, or [was] so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43.

**C. Plaintiffs Do Not Show that the Department Failed To Consider Parental Rights with Respect to Any Provision of the Rule.**

Plaintiffs do not demonstrate that the Department failed to adequately address concerns about parental rights with respect to any portion of the Rule. *See generally* Pls.' Mem. 26.

Contrary to Plaintiffs' assertion, *id.*, the Department thoroughly considered parental rights and drafted the Final Rule to respect the fundamental role of parents in bringing up their children, and without disturbing any existing parental rights. *See, e.g.*, 89 Fed. Reg. at 33,821 (explaining that "nothing in Title IX or the final regulations may be read in derogation of any legal right of a parent . . . to act on behalf of a minor child"); *see also id.* at 33,835-36, 33,531. Because the Rule neither creates nor disturbs parental rights, but rather acknowledges that such rights are determined by state and other law, the Department declined to address hypotheticals raised by commenters. *See*, *e.g.*, *id.* at 33,821, 33,835 (describing commenters' concerns). Instead, the Rule reiterated the "importance of strong and effective partnerships between recipients and parents, guardians, or caregivers" and clarified how the Rule works to "safeguard those interests." *Id.* at 33,835.

Responding to Plaintiffs' specific concerns about parental access to information: the Rule explains that "nothing in these final regulations prevents a recipient from disclosing information about a minor child to their parent who has the legal right to receive disclosures on behalf of their child." 89 Fed. Reg. at 33,822;

27

*see also id.* at 33,890 (to be codified at 34 C.F.R. § 106.44(j)(2)). Contrary to Plaintiffs' characterization, the Rule does not "trump[] parents' rights" under FERPA, Pls.' Mem. 26. The Rule "override[s]" FERPA only "when there is a direct conflict with Title IX." 89 Fed. Reg. at 33,692 n.54. Here, there are no such conflicts because the Rule is consistent with parental rights under FERPA. *See also id.* at 33,539 ("These Title IX regulations do not interfere with a parent's or guardian's rights under FERPA to obtain records or access information involving their child."). The Rule's several pages of discussion of concerns related to parental rights belie Plaintiffs' accusation that the Department failed to consider "parents' right to make decisions about the care, custody, and control of their children," Pls.' Mem. 26.

### D. The Final Rule's Definition of Hostile Environment Sex-Based Harassment Is Consistent with the Department's Statutory Authority, the APA, and the Requirements of First Amendment.

The Final Rule defines hostile environment sex-based harassment, in relevant part, as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884. The definition in the Final Rule is consistent with "relevant judicial precedent, and . . . with congressional intent and the Department's longstanding interpretation of Title IX and resulting enforcement practice prior to the 2020 amendments." *Id.* at 33,490. In

addition, this language "closely tracks longstanding case law defining sexual harassment," *id.* at 33,494 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)), and aligns with the definition used by the EEOC. *Id.* at 33,516.

Plaintiffs nevertheless argue that the Final Rule's harassment definition is unlawful because (1) the definition is inconsistent with the definition in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), Pls.' Mem. 27-30; and (2) in promulgating the definition, the Department failed to consider and respond to significant comments. These arguments are incorrect.

> 1. The Definition of Hostile Environment Sex-Based Harassment Is Not Contrary to Law Because *Davis* Does Not Define the Scope of the Department's Enforcement Authority.

Plaintiffs' reliance on *Davis* is misplaced because *Davis* addressed the standard that a plaintiff must meet to bring a private action for damages, 526 U.S. at 650; it did not limit the Department's enforcement authority. 89 Fed. Reg. at 33,499. The Supreme Court's articulation of the scope of the private cause of action in Title IX focused on the fact that this cause of action is implied, rather than an express creation of Congress. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998). Explaining that "[t]he requirement that recipients receive adequate notice of Title IX's proscriptions . . . bears on the proper definition of 'discrimination' in the context of a private damages action," *Davis* thus held that "funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual

harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." 526 U.S. at 650. The Supreme Court's baseline presumption that "implied causes of action are disfavored," *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009), provides an additional reason the Court may have been hesitant to craft a broad standard in *Davis*.

Plaintiffs fail to explain why the *Davis* standard must apply in the distinct context of administrative enforcement and cite no authority for this proposition. Title IX and its implementing regulations do not allow the Department to sue for damages, rendering *Davis*'s analysis of when to allow recovery of damages on theories of *respondeat superior* and constructive notice inapposite. Indeed, after observing that Congress "entrusted" Federal agencies to "promulgate rules, regulations, and orders to enforce the objectives" of Title IX, 526 U.S. at 638, *Davis* repeatedly and approvingly cited the Department's then-recently published guidance regarding sexual harassment, *see id.* at 647-48, 651 (citing 1997 Sexual Harassment Guidance, 62 Fed. Reg. 12,034 (Mar. 13, 1997)). That guidance stated that schools could be found to violate Title IX if the relevant harassment "was sufficiently severe, persistent, or pervasive to create a hostile environment." 1997 Sexual Harassment Guidance, 62 Fed. Reg. at 12,040.

The *Davis* Court did not suggest that the Department's enforcement standard

had to exactly mirror that case's holding. And more generally, both *Gebser* and *Davis* contemplated that the standard for private suits would be *different* than the standard for the Department's enforcement efforts. *See Davis*, 526 U.S. at 639 ("[W]e are asked to do more than define the scope of the behavior that Title IX proscribes. We must determine whether [the facts] can support a private suit for money damages."); *Gebser*, 524 U.S. at 284 ("Because the private right of action under Title IX is judicially implied, we have a measure of latitude to shape a sensible remedial scheme . . ."); *see also* 85 Fed. Reg. at 30,033 (2020 Amendments) ("Neither *Gebser* nor *Davis* opined as to what the appropriate conditions (e.g., definition of sexual harassment, actual knowledge) and liability standard (e.g., deliberate indifference) must or should be for the Department's administrative enforcement.").

Neither are Plaintiffs correct to suggest that the Final Rule's definition of hostile environment sex-based harassment conflicts with the First Amendment and that only the *Davis* standard respects principles of free speech. *See* Pls.' Mem. 27-28. The *Davis* majority had no concerns its holding would interfere with First Amendment rights, and only discussed the issue to correct a misunderstanding by the dissent. *See Davis*, 526 U.S. at 652; *contra* Pls.' Mem. 27-28 (citing Justice Kennedy's dissent).

Similarly, Plaintiffs are incorrect to argue the Final Rule's refining the

harassment standard to include conduct that "limits" a person's ability to participate in an activity exceeds the Department's statutory authority because it differs from the holding in *Davis*, Pls.' Mem. 29, *see* 89 Fed. Reg. at 33,884. As the Department explained, including conduct that "limits or denies" participation is compelled by the text of Title IX. "If Title IX only covered exclusion from participation or denial of access, there would have been no reason for Congress to add 'be denied the benefits of,'" because "be excluded from" would have supplied the necessary standard. *Id.* at 33,511. The "limits or denies" standard in the Final Rule gives effect to every word in the statute without rendering any words redundant or superfluous. *See, e.g.*, *Bhd. of Locomotive Eng'rs v. CSX Transp., Inc.*, 522 F.3d 1190, 1195 (11th Cir. 2008) (noting "the rules of statutory construction require courts to give meaning to every word and clause in a statute" and that courts must similarly avoid surplusage).

Plaintiffs rely on *Speech First v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022), but as the Final Rule explains, this case is inapposite. 89 Fed. Reg. at 33,505. At issue in *Speech First* was a policy that, among other things, prohibited "a wide range of 'verbal, physical, electronic, and other' expression concerning any of (depending on how you count) some 25 or so characteristics," and "reache[d] not only a student's own speech, but also her conduct 'encouraging,' 'condoning,' or 'failing to intervene' to stop another student's speech." 32 F.4th at 1125. In contrast to the Final

Rule, "[t]he policy, in short, [was] staggeringly broad," *id.*, and it was not "tailored to harms that have long been covered by hostile environment laws," 89 Fed. Reg. at 33,505 (discussing *Speech First*, 32 F.4th 1110). Plaintiffs provide no basis for their contention that, despite the clear differences in definitions, the Final Rule is in tension with *Speech First*. Plaintiffs are accordingly unlikely to succeed on their claim that the Rule's definition of hostile environment sex-based harassment violates First Amendment rights.

  2. <u>The Definition of Hostile Environment Sex-Based Harassment in the Final Rule is Not Arbitrary and Capricious.</u>

  Plaintiffs allege the Final Rule's definition of hostile environment sex-based harassment is arbitrary and capricious for three reasons: (1) it allegedly contravenes the *Davis* standard; (2) it allegedly infringes on protected speech in violation of the First Amendment; and (3) the Department allegedly failed to address comments about misgendering. Each assertion is incorrect, particularly under the deferential arbitrary-and-capricious standard, pp. 39-40, *infra*.

  ***First***, Plaintiffs are wrong to argue that the Department failed to adequately address *Davis*. Pls.' Mem. 31. As discussed above, the Department expressly considered *Davis.* As the Department explained in the Final Rule, the Department's enforcement authority is not limited to conduct that itself gives rise to private damages liability. 89 Fed. Reg. at 33,490. *See supra* Part I.D.1.

  ***Second***, Plaintiffs' argument that the Final Rule failed to adequately consider

First Amendment concerns raised by commentors is belied by the record. The Department extensively considered First Amendment concerns, which is more than adequate to meet the arbitrary and capricious review standard because it shows that it considered the correct issues in its analysis. *See* 89 Fed. Reg. at 33,492-97, 33,500-11, 33,514-16, 33,542, 33,559, 33,570-71, 33,616, 33,810, 33,828, 33,838.

The Rule also raises no overbreadth concerns. The definition "covers only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits" a person's ability to participate in the recipient's education program or activity. *Id.* at 33,503. The Supreme Court has upheld Title VII's anti-harassment provisions that apply a similar standard "without acknowledging any First Amendment concern." *Id.* at 33,505 (citing *Harris*, 510 U.S. at 23). Indeed, Plaintiffs cite no case in which a court has held unconstitutional a definition of harassment analogous to the hostile environment sex-based harassment definition to be codified at 34 C.F.R. § 106.2. Further narrowing the Rule's scope, the harassment definition is evaluated based on the "the totality of the circumstances. . . . to ensure that no element or relevant factual consideration is ignored." *Id*. at 33,506.

Plaintiffs' disagreement with the Department's analysis of First Amendment case law falls far short of establishing that the Final Rule is arbitrary or capricious. The Department's consideration of *Rowles v. Curators of University of Missouri*,

983 F.3d 345 (8th Cir. 2020), was reasonable. 89 Fed. Reg. at 33,494. As the Department explained, the *Rowles* court "rejected the plaintiff's vagueness challenge, explaining the policy 'provided adequate notice of what conduct is prohibited' and used language with 'common usage and understanding.'" *Id.* (quoting *Rowles*, 983 F.3d at 356, 358) (internal alterations omitted). Plaintiffs say this case is inapposite because graduate students—like the plaintiff in *Rowles*—"are arguably more like employees of the university." Pls.' Mem. 32-33 (citation omitted). Thus, say Plaintiffs, "a lower standard might be justified for regulating their speech." Pls.' Mem. 32-33. In fact, the Supreme Court has repeatedly concluded that this "lower standard" does indeed apply to "employees of the university"—such as professors and teachers. *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 419-20 (2006) (although public employees may speak on matters "of public concern," employers may also limit speech where "necessary . . . to operate efficiently and effectively"). This is also true of students in public schools, whose speech is similarly more regulated than that of the general public. *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). Plaintiffs therefore cannot distinguish *Rowles* by arguing the standard applied in that case is different from the standard that applies to teachers and students regulated by the Final Rule. And, in any event, Plaintiffs' disagreement with the holding of *Rowles* does not make the Department's conclusions—after a thorough discussion of this case and

35

others—arbitrary or capricious. *See* 89 Fed. Reg. at 33,494-95; pp.39-40, *infra* (arbitrary and capricious review is narrow).

Finally, Plaintiffs complain that the Rule differs from the 2020 Amendments, which adopted the *Davis* standard. Pls.' Mem. 28-29. But in 2020, the Department merely explained that it preferred the *Davis* standard, not that the *Davis* standard was the only possibility or somehow compelled by law. *See* 85 Fed. Reg. at 30,036 ("The Department chooses to return to the premise expressed [in earlier guidance]"). When an agency changes policy, an agency need not demonstrate "that the reasons for the new policy are better than the reasons for the old one," but only that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, the Department has done precisely that.

***Third***, Plaintiffs are wrong to suggest that the Department failed to address comments about misgendering. *Contra* Pls.' Mem. 36-37. The Rule acknowledged that, under some circumstances, misgendering can be one form of hostile environment sex-based harassment, but "whether verbal conduct constitutes sex-based harassment is necessarily fact-specific." 89 Fed. Reg. at 33,516; *see, e.g.*, *Copeland v. Ga. Dep't of Corrs.*, 97 F.4th 766, 778 (11th Cir. 2024) (holding in the Title VII context that frequent misgendering can evidence a hostile environment). Plaintiffs complain this definition is arbitrary and capricious and risks chilling

protected speech, but the Rule addresses this, too: in general, "a stray remark, such as a misuse of language, would not constitute harassment under this standard." Pls.' Mem. 36-37 (citation omitted). Plaintiffs suggest some kind of contradiction there, Pls.' Mem. at 37, but the Final Rule is logically and internally consistent: as the Supreme Court has long recognized in the analogous Title VII context, *see, e.g.*, 89 Fed. Reg. at 33,494, "severe or pervasive" verbal harassment can create a hostile environment, yet "stray remark[s], such as a misuse of language" would not rise to this "severe or pervasive" standard.

Accordingly, Plaintiffs have not shown that the Rule's definition of sex-based harassment is arbitrary, capricious, or in excess of statutory authority.

### E. Plaintiffs' Challenge to the Final Rule's Changes to Grievance Procedures Fails for Lack of Standing and on the Merits.

Plaintiffs argue that the Rule "illegally changes" certain grievance procedures, raising "due process concerns," and does so without reasonably justifying the change or "reasonably considering the relevant issues." Pls.' Mem. 37. On the contrary, the Department has authority to change its requirements for grievance procedures, and its changes were the result of reasoned decisionmaking.

1. Plaintiffs Lack Standing to Challenge the Rule's Changes to Grievance Procedures.

As an initial matter, Plaintiffs are not injured by the challenged provisions relating to grievance procedures, which generally provide recipients with multiple

options. To establish standing, a plaintiff must show that it has suffered or will imminently suffer an "injury in fact" "caused" by the challenged government action that a favorable decision would likely "redress." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-62 (1992). Any potential injury to Plaintiffs would be attributable to the independent choices of recipients, not the Final Rule. Plaintiffs thus lack standing to challenge these provisions.

That is because the relevant portions of the Final Rule do not compel recipients to adopt any particular procedures. The provisions Plaintiffs challenge generally only give schools additional discretion—including the discretion to continue using the procedures currently in effect (presumably Plaintiffs' preferred procedures). And while the Rule adjusts some requirements for the standard of proof, recipients can still use either the preponderance of the evidence standard or the clear and convincing evidence standard (in the latter case, as long as they use the clear and convincing evidence standard in all comparable proceedings). Nor do Plaintiffs allege anywhere—including in their declarations—that any specific school would be prevented by the Final Rule from using its preferred grievance procedures.

Because the relevant portions of the Rule do not compel any particular procedures, any injury related to grievance procedures would be attributable to the independent choices of recipients, not the Rule. As to the state governments in their capacity as recipients of relevant federal funds, the Rule leaves it up to the State to

decide what procedures to employ (or what related laws to enact). And as to the organizations, even assuming they have affected student-members, any purported injury would not be caused by the Department, but rather by a school's independent and intervening decision about what grievance procedures to employ as permitted by the Rule. *See DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1302 (11th Cir. 2008) (noting that an injury must not be the "result of the independent action of some third party not before the court" (quoting *Lujan*, 504 U.S. at 560-61)).

2.  The Changes to the Grievance Procedures Were the Result of Reasoned Decisionmaking.

Even if Plaintiffs could establish standing, their challenge to the grievance provisions would fail on the merits. Review under the arbitrary and capricious standard is "deferential." *Dep't of Com.*, 139 S. Ct. at 2569. The question for the Court is whether the agency's decision "was the product of reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29, 52; "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives," *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016), *as revised* (Jan. 28, 2016). When an agency changes its position, it must "display awareness that it *is* changing position." *Fox Television Stations*, 556 U.S. at 515. This "conscious change of course" will itself indicate that the agency "*believes* [the new policy] to be better," which is all that is required. *Id.* This is not an especially searching analysis—the agency "need not demonstrate to a court's satisfaction that

the reasons for the new policy are *better* than the reasons for the old one" and an agency "need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* The Department clearly met this standard here.

***Live Questioning at a Hearing*[2]** – Plaintiffs' challenge involves the procedures required at postsecondary institutions involving allegations of sex-based harassment. The Rule requires postsecondary institutions to use live questioning in most circumstances, but allows postsecondary institutions "the option to determine whether to use live hearings with questioning by an advisor or some other form of live questioning." *See* 89 Fed. Reg. at 33,732-33, 87 Fed. Reg. at 41,503-09; *see also* 89 Fed. Reg. at 33,894-95 (to be codified at 34 C.F.R. § 106.46(f)). This change will allow schools to decide whether to provide live questioning through a live hearing or through separate meetings with the parties. The Rule in no way *prevents* schools from using adversarial live questioning (also referred to as cross-examination) as Plaintiffs seem to prefer. Pls.' Mem. 37-40. "[N]othing in § 106.46(f)(1) or elsewhere in the final regulations precludes a postsecondary institution from choosing to use a live hearing with questioning by an advisor, either because it is

---

[2] Plaintiffs' background section, Pls,' Mem. 8, also incorrectly asserts that the Rule will limit the "attendance" of respondents' advisor. That is wrong—like the 2020 Amendments, the Rule requires that a postsecondary institution must "not limit the choice or presence of the advisor for the complainant or respondent in any meeting or proceeding." 89 Fed. Reg. at 33,894 (to be codified at 34 C.F.R. § 106.46(e)(2)).

required under applicable Federal or State case law or for any other reason[.]" 89 Fed. Reg. at 33,737. And while Plaintiffs raise due process concerns, Pls.' Mem. 39, there is no due process concern where schools retain the flexibility to utilize adversarial live questioning, which is appropriate given that due process is flexible and the process due will vary based on the circumstances, *Doe v. Kearney*, 329 F.3d 1286, 1295 (11th Cir. 2003) (citing *Stanley v. Illinois*, 405 U.S. 645, 650-51 (1972)); *see also Nash v. Auburn Univ.*, 812 F.2d 655, 660 (11th Cir. 1987).

The Department adequately explained its decision to make this change. The Department clearly recognized that it was diverging from the prior regulations, and explained its reasons for preferring the change, which is all that is required. *Compare Fox Television Stations*, 556 U.S. at 515, *with* 89 Fed. Reg. at 33,737 ("[T]he Department recognizes that these final regulations depart from the 2020 amendments with respect to the requirement of live hearings . . . ."), *and id.* at 33,374 (the Department considered factors including "impact on respondents," "impact . . . on reporting," "the goal of ensuring that Title IX grievance procedures are prompt and equitable and provide the parties, including the respondent, with a meaningful opportunity to be heard," "reliable outcomes," and "potential financial and administrative burden[s]" on postsecondary institutions).

The Department's thorough consideration included the costs and burdens of live hearings. 89 Fed. Reg. at 33,732-33. As the Department recognized, it is

appropriate to weigh any "marginal gains" to due process against the "societal cost" of a particular procedure, such as administrative efficiency or the potential to deter complainants. 89 Fed. Reg. at 33,367 (quoting *Walters v. Nat'l Ass'n of Rad. Survivors*, 473 U.S. 305, 321 (1985), and *Dixon v. Love*, 431 U.S. 105, 114 (1977)). The Department properly did so here. *See id.* While Plaintiffs express concern that having separate meetings may actually be *more* burdensome for schools, Pls.' Mem. 40, the Department explained that schools are best positioned to understand their unique needs. That is why a school can choose live hearings if it prefers, 89 Fed. Reg. at 33,735, or can use live hearings for some types of complaints and another form of live questioning for others, *id.* at 33,891-92 (to be codified at 34 C.F.R. § 106.45(b)(8)).

**_Single-Investigator Model_** – The Department also carefully considered its decision to give schools the option of using a single-investigator model. *Cf.* Pls.' Mem. 40-42. The Department demonstrated an awareness that it was changing position, and explained why it views its new position increasing a school's choice is preferable, which is all that is required. *Fox Television Stations*, 556 U.S. at 515. For example, the Department "learned that requiring separate staff members to handle investigation and adjudication is burdensome for some recipients in a way that undermines their ability to ensure their education programs or activities are free from sex discrimination under Title IX," 89 Fed. Reg. at 33,662. In response to these

comments, and in recognition of the variety of types of recipients' and their relative capacities, the Department explained that "permitting, but not requiring, the single-investigator model . . . in conjunction with the other measures designed to ensure equitable treatment of the parties . . . offer[s] recipients reasonable options to structure their grievance procedures in compliance with Title IX, while accommodating each [recipient's] administrative structure, educational community, and applicable Federal and State case law and State or local legal requirements." *Id.*

***Access to Evidence*** – The Rule does not "remove the right" of students to access the evidence against them, Pls.' Mem. 42—to the contrary, the Rule requires schools to provide parties with access to evidence on request and to provide parties notice of this right. "A recipient must provide an equal opportunity to access either the relevant and not otherwise impermissible evidence, or an accurate description of this evidence." 89 Fed. Reg. at 33,892 (to be codified at 34 C.F.R. § 106.45(f)(4)(i)). In the latter case, a school "must further provide the parties with an equal opportunity to access the relevant and not otherwise impermissible evidence upon the request of any party"), *id.* at 33,894; *see also* 89 Fed. Reg. at 33,682 (to be codified at 34 C.F.R. § 106.45(c)(1)(iv)) (notice of the right). Notably, the Department added these further options in response to commentor feedback. 89 Fed. Reg. at 33,695. And the Department considered and addressed due process concerns, *id.*, and explained why a flexible approach is superior to alternatives—"the description option may be more

appropriate for complaints involving younger students and individuals facing less severe consequences, allowing the recipient to streamline the investigation process while ensuring that the parties have a meaningful opportunity to be heard," *id.* Again, this approach is consistent with the flexible nature of due process. *Nash*, 812 F.2d at 660.

**_Initiation of Investigation_** – Plaintiffs confuse notice to respondents with the initiation of a complaint by the Title IX coordinator. Pls.' Mem. 43. Plaintiffs allege that "[t]he accused need only receive an 'oral' statement . . . ," Pls.' Mem. 43, but the provision Plaintiffs cite defines a *complaint*, not the required notice to respondents. Notice to respondents—which must be in writing—is governed by 34 C.F.R. § 106.45(c), which Plaintiffs do not even cite or discuss, and thus cannot meaningfully object to.

Nor is there anything unreasonable about the fact that a school may initiate an investigation based on an oral complaint or, under extraordinary circumstances, no complaint at all. The Rule lists eight non-exhaustive factors a recipient's Title IX Coordinator must consider in determining whether specific facts warrant an investigation in the absence of a complaint, 89 Fed. Reg. 3,889 (to be codified at 34 C.F.R. § 106.44(f)(1)(v)(A)(1)-(8)). The Final Rule also makes clear that even after considering these eight factors, Title IX Coordinators are permitted "to initiate complaints only in the circumstances of an imminent and serious threat to the health

or safety of the complainant or other person or conduct that would prevent a recipient from ensuring equal access to its education program or activity on the basis of sex." 89 Fed. Reg. at 33,596, *see also id*. at 33,889 (to be codified at 34 C.F.R. § 106.44(f)(1)(v)(B)). These circumstances are, accordingly, very limited and likely to be rare. Nor is a school's obligation to act in certain circumstances in the absence of a written complaint new in the Rule—under the 2020 regulations, schools were already required to respond to sexual harassment based on actual knowledge that could be the result of oral reporting or even personal observation. 34 C.F.R. § 106.44(a), 85 Fed. Reg. at 30,574. In fact, the Rule and its eight non-exhaustive actors provide *more* clarity than the 2020 Amendments about the circumstances in which a Title IX Coordinator should initiate the grievance process, which is one reason the Department decided to make this change. 89 Fed. Reg. at 33,594.

**_Standard of Proof_** – Plaintiffs also take issue with the portions of the Rule addressing the standard of proof in grievance proceedings.[3] The Final Rule continues to permit recipients to use either the preponderance of the evidence standard or the clear and convincing evidence standard. Given that the clear and convincing standard remains an option if "the recipient uses [that] standard of proof in all other comparable proceedings, including proceedings relating to other discrimination

---

[3] Plaintiffs refer to the evidentiary standard used in grievance proceedings as the "burden of proof," but that is not how the term is used in the Rule. *See* 89 Fed. Reg. at 33,520.

complaints," 89 Fed. Reg. at 33,893 (to be codified at 34 C.F.R. § 106.45(h)(1)), the Rule is certainly not a "de facto ban," *contra* Pls.' Mem. 44.

Presumably Plaintiffs prefer the clear and convincing evidence standard, although they nowhere explain why. In contrast, the Department explained its reasoning at length, 89 Fed. Reg. at 33,700-06, including citing the conclusions of several courts that the preponderance of the evidence satisfies the requirements of due process when a school evaluates allegations of sexual harassment, 89 Fed. Reg. at 33,701. That Plaintiffs may not agree does not make the Department's approach unreasonable. And contrary to Plaintiffs' assertion that the Department "nowhere explains," Pls.' Mem. 44, the meaning of "comparable proceeding," in fact that is also extensively discussed in the Rule. *See* 89 Fed. Reg. at 33,704-05 ("[W]hat proceedings are comparable may depend on a recipient's student code of conduct, but certainly would include, but not be limited to, proceedings related to complaints of other types of discrimination involving the same category of respondents (*e.g.*, students or employees).").

Further demonstrating Plaintiffs' lack of standing to challenge these changes, Plaintiffs do not identify a single school that would be thwarted in its desire to use Plaintiffs' preferred standard (presumably the clear and convincing evidence standard). For example, the University of Alabama currently uses the preponderance of the evidence standard for sexual misconduct proceedings, including proceedings

regarding sexual harassment or sex-based discrimination, and presumably prefers that standard. *See* University of Alabama, Title IX and Sexual Misconduct Policy, Appendix -1- Processing of Reports of Prohibited Conduct Under Title IX Process § B.3.c (revised 2.22), https://perma.cc/T2FD-Q79P ("The standard used to determine whether the Respondent is responsible for Prohibited Conduct is preponderance of the evidence, . . . .").

*   *   *

Throughout their discussion of grievance procedures, Plaintiffs criticize generally the Department's choice to provide schools with greater flexibility regarding grievance procedures and cite varied case law from across the country on due process throughout their discussion of grievance procedures. Pls.' Mem. 44-46. But Plaintiffs' cases are generally *inconsistent* with the conclusions of the Eleventh Circuit. *Compare, e.g.*, Pls.' Mem. 38 (collecting out-of-circuit cases on cross-examination), *with Nash*, 812 F.2d at 660, 664 (cross-examination not required for veterinary students' suspension hearing); *compare* Pls.' Mem. 42 (collecting out-of-circuit cases on notice and access to evidence), *with Nash*, 812 F.2d at 663 (due process did not require students to receive advance notice of evidence that would be offered against them); *see also* Pls.' Mem. 41 (collecting only out-of-circuit cases on the single-investigator model).

At most, Plaintiffs can show only that the requirements of due process are

varied and highly fact-specific. This is unsurprising: "[t]he Supreme Court has often noted that due process is a flexible concept that varies with the particular circumstances of each case." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). Moreover, the Rule acknowledged and considered these different views on due process, 89 Fed. Reg. at 33,634-36, 33,736-37, which is all the APA requires. Indeed, the varied and fact-specific nature of due process further supports the Department's decision to return choices to schools regarding grievance procedures, as each school will know the most about its needs.

Finally, contrary to Plaintiffs' assertion, Pls.' Mem. 45, the Department explicitly considered the cumulative effect that would result from all of the grievance procedures required by the Rule. *See, e.g.*, 89 Fed. Reg. at 33,633-48 (spending at least fifteen pages discussing the overall "framework" for grievance procedures across multiple provisions).

### F. The Final Rule's Delineation of the Scope of Title IX's Unambiguous Prohibition on Sex Discrimination Poses No Spending Clause Issue

Plaintiffs are also incorrect in contending that the Final Rule violates the Spending Clause. The Spending Clause grants Congress broad power to achieve its policy aims through conditioned offers of funding, so long as those conditions are, *inter alia*, (1) not unduly coercive, and (2) "unambiguous[]." *See South Dakota v. Dole*, 483 U.S. 203, 207-08, 211 (1987). The focus of a Spending Clause inquiry is typically on a *statute*, not an implementing regulation, because the Spending Clause

limits *Congress's* authority to condition federal funds. Title IX has long been held to be consistent with the Spending Clause. *Davis*, 526 U.S. at 640. Here, however, Plaintiffs argue that if the Rule effectuates Title IX, then the Rule's alleged infirmities would render it or Title IX invalid under the Spending Clause. Pls.' Mem. 15-17. This theory largely restates Plaintiffs' other merits arguments, and is wrong.

Plaintiffs devote one sentence to arguing the Rule is unduly coercive, Pls.' Mem. 16, but their explanation is inadequate. A statute may be unconstitutionally coercive if it "pass[es] the point at which 'pressure turns into compulsion,'" *NFIB v. Sebelius*, 567 U.S. 519, 580 (2012) (quoting *Dole*, 483 U.S. at 211), and generally a state is expected to simply decline the offer of funds, *id.* at 579 (Roberts, C.J.). Plaintiffs do not meet that high bar: Although Plaintiffs cite without explanation four declarations mentioning that the states receive *some* federal education funding, they make no effort to put that amount in the context of their overall budgets or the Supreme Court's case law. *Cf. Dole*, 483 U.S. at 211. Particularly in the context of this facial challenge, Plaintiffs cannot show that they have been unduly coerced. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 675 F. Supp. 2d 660, 674 (W.D. Va. 2009) (holding that Title IX and certain implementing regulations did not violate the Spending Clause because of the enforcement process and that there are penalties "less drastic than the withholding of federal funding").

Nor is there any issue with ambiguity of Title IX's provisions. The relevant provision in the Final Rule merely delineates the scope of Title IX's unambiguous prohibition on sex discrimination, based on the statutory language's plain meaning. *See* 89 Fed. Reg. at 33,802. "Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds," *NFIB*, 567 U.S. at 579, so long as it does so "unambiguously," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The requirement of unambiguity requires that Congress "make the existence of the condition itself" "explicitly obvious," not that Congress list all ways in which a recipient could fail to comply. *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (citation omitted). Indeed, "so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Id.* at 1306.

Here, this standard is met because Title IX unambiguously prohibits any form of sex-based discrimination not specifically excepted by statute. *See* 20 U.S.C. § 1681(a) ("No person . . . shall, on the basis of sex, be excluded from . . . ."). Because it is "impossible" to discriminate against a person for being transgender "without discriminating against that individual based on sex," *Bostock*, 590 U.S. at 660, Title IXs prohibition on sex-based discrimination necessarily includes discrimination because of gender identity. Plaintiffs in essence argue that certain

50

obligations imposed by the Rule are not ones they expected, Pls.' Mem. 16, but Plaintiffs were on notice that they were barred from discriminating based on sex, and "the fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock*, 590 U.S. at 674 (cleaned up); *see also id.* at 688 (Alito, J., dissenting) ("According to the Court, the text is unambiguous."). Indeed, in 2005, the Supreme Court rejected an analogous argument that Title IX did not cover retaliation because it was not specifically mentioned in the statute, concluding that specific forms of discrimination not mentioned in the statute—such as retaliation—were nonetheless discrimination. *Jackson*, 544 U.S. at 175; *see also id.* ("Because Congress did not list *any* specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered.").

Plaintiffs also criticize the Rule for not providing exhaustive guidance, Pls.' Mem. 17, but the Department addressed each topic and provided considerable guidance to recipients. While the Department noted that some "hypothetical factual scenarios raised by commenters require case-by-case determinations," 89 Fed. Reg. at 33,822 (addressing comments regarding the intersection between Title IX and

parental rights),[4] an agency's inability to address all hypothetical applications of a new regulation does not give rise to a Spending Clause violation. *Cf. Jackson*, 544 U.S. at 175 (concluding Title IX prohibited retaliation despite lack of an affirmative mention of retaliation).

### G. The Major Questions Doctrine Is Inapposite.

Contrary to Plaintiffs' assertions, this case does not implicate the major questions doctrine. *See* Pls.' Mem. 17-18. That doctrine is reserved for only "extraordinary" cases, "in which the history and breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). This is not such a case. The Department does not contend that Congress gave it the authority to decide as a matter of policy whether Title IX prohibits discrimination based on gender identity. Instead, like the Supreme Court's decision in *Bostock*, the relevant portions of the rule reflect "policy decisions" made by "Congress . . . itself" in the unambiguous text of the statute. *Id.* at 723 (citation omitted). Accordingly, just as the Supreme Court did not invoke the major-questions doctrine when it endorsed the EEOC's

---

[4] S*ee also supra* Part I.D.2 ("third" paragraph further addresses Plaintiffs' arguments about misgendering); *supra* Part B.2 ("second" paragraph further addresses Plaintiffs' arguments about gender identity); pp.13-14, *supra* (further addresses Plaintiffs' arguments about nonbinary individuals).

interpretation of Title VII in *Bostock*, there is no basis for invoking it here.

## II.     Plaintiffs Have Not Established Irreparable Harm.

Plaintiffs also fail to establish the imminent irreparable harm needed to justify a preliminary injunction. A plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*

*First*, Plaintiffs argue that the Rule imposes irreparable harms because it conflicts with Plaintiff-States' laws and policies. But regardless of whether the Plaintiff-States' laws or policies conflict with the Final Rule, "it is black-letter law that the federal government does not 'invade[ ]' areas of state sovereignty 'simply because it exercises its authority' in a way that preempts conflicting state laws." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981)). "Indeed, to conclude otherwise would mean that a state would suffer irreparable injury from all federal laws with preemptive effect." *Florida*, 19 F.4th at 1292. Accordingly, it is the federal government, not the State Plaintiffs, that faces significant irreparable harm, if it is prevented from administrating the Rule. *See*

*Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (reasoning that if the Government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury").

*Second*, Plaintiffs claim that Plaintiff-States will suffer irreparable harm in the form of unrecoverable compliance costs in the lead up to the Final Rule's effective date of August 1, 2024. Although compliance costs could amount to irreparable harm, they cannot be "'speculative' and 'conclusory.'" *Georgia v. President of the U.S.*, 46 F.4th 1283, 1302 (11th Cir. 2022) (quoting *Florida*, 19 F.4th at 1292). Here, Plaintiffs' evidence in support of the alleged compliance costs fails to meet that standard. To support their claim of compliance costs, Plaintiffs provide declarations that outline the type of routine and standard costs associated with compliance with any new federal regulation. *See, e.g.*, Sikes Decl. ¶ 10 ("It will also take time and money to train officials on the rule and the new policies implementing it."). Thus, at most, the evidence states the obvious: a new regulation will likely require regulated parties to undertake *some* activities to assure compliance. Such assertions do not justify the extraordinary relief in the form of a preliminary injunction. *Cf. Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (compliance with the regulation would lead to permanent closure of power plants).

*Lastly*, Plaintiffs argue—in a single sentence—that the "Private Plaintiffs' members will suffer irreparable harm in the form of chilled speech and the loss of

their First and Fourteenth Amendment rights." Pls.' Mem. 47. For the reasons discussed above, the Rule does not pose constitutional concerns at all, but regardless of the merits, Plaintiffs also cite no evidence to show that any purported constitutional injuries are "imminent." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Without any concrete evidence of impending injury, mere fears of such violations are at most a "possibility," which is insufficient to establish irreparable harm. *Nken*, 556 U.S. at 435. Moreover, *Speech First, Inc.* is inapposite because that court was considering an "ongoing violation" of the First Amendment from a policy that was already in effect, as well as a broader policy that banned "condoning" or "failing to intervene" to stop the speech of others. 32 F.4th at 1126.

## III.    The Equities and Public Interest Weigh Against Preliminary Relief.

The balance of equities and the public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Here, these combined factors strongly counsel against issuing the requested preliminary relief. The Final Rule implements the Department's authority to enforce the statutory objectives of Title IX. *See* 20 U.S.C. § 1682. "There is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008). The public interest favors allowing the Department to fulfill these responsibilities.

Moreover, Title IX mandates that "[n]o person" be subjected to sex discrimination in any education program or activity. Granting preliminary relief would significantly harm the Government's interests in preventing such discrimination. Sex discrimination in educational environments has devastating consequences, including the effects of harassment based on sexual orientation and gender identity,. *See generally, e.g.*, 89 Fed. Reg. at 33,478-80 (summarizing personal stories submitted by commenters). The Final Rule therefore effectuates Title IX's important goals of "avoid[ing] the use of federal resources to support discriminatory practices [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). Needless to say, preventing sex discrimination is in the public interest. *See Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1374 (S.D. Fla. 2012).

Conversely, Plaintiffs have failed to show they face significant imminent and irreparable harm. *See supra* Part II. At most, Plaintiffs identify standard compliance costs. *See id.* But regardless, compelling non-monetary government interests measure up against even serious economic harm. *See, e.g.*, *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 470 (5th Cir. 2021) (allowing the state government's restrictions with respect to the operations of bars in response to COVID-19 despite financial harms to the bars); *League of Indep. Fitness Facilities & Trainers, Inc. v.*

*Whitmer*, 814 F. App'x 125, 129 (6th Cir. 2020) (unpublished) (weighing Plaintiffs' "very real risk of losing their businesses" against "the Governor's interest in combatting COVID-19").

In sum, the balance of the equities and the public interest weigh in favor of denying the requests for a preliminary injunction, and the Court may deny the motion on this basis alone. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

## IV.     Any Relief Afforded by the Court Should Be Limited in Accordance with the Administrative Procedure Act and Equitable Principles.

While Defendants dispute that any relief is necessary for the reasons explained above, any relief afforded must be appropriately limited, as Plaintiffs implicitly recognize in requesting, in the alternative, relief running specifically to the Plaintiff-States. Pls.' Mem. 49.

The Court should not issue preliminary relief that extends beyond Plaintiffs or beyond portions of the Rule as to which the Court has found that Plaintiffs have established a likelihood of success. The better view is that the APA does not authorize any specific remedies, including vacatur—remedies are addressed in § 703 of the APA, which says nothing about "set aside" but refers to the existing forms of relief. *Cf. United States v. Texas*, 599 U.S. 670, 693-99 (2023) (Gorsuch, J., concurring in the judgment).

But in any event, relief should be limited by traditional equitable principles, including that "injunctive relief should be no more burdensome to the defendant than

necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *cf., e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc), *cert. granted*, 144 S. Ct. 374 (2023). "At a minimum, a district court should think twice—and perhaps twice again—before granting universal anti-enforcement injunctions against the federal government." *Arizona v. Biden*, 40 F.4th 375, 395-96 (6th Cir. 2022) (Sutton, C.J., concurring).

Alternatively, Plaintiffs seek a § 705 stay as an interim measure. Pls.' Mem. 48-49. But contrary to Plaintiff's argument, a § 705 stay would raise all the same problems as a nationwide injunction if it applied universally to parties not before the Court. *See DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay). Furthermore, like other APA provisions, section 705 "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). Plaintiffs do not identify, and the Government has not found, any pre-APA practice of district courts granting universal stays of agency regulations. Consistent with that backdrop, Congress contemplated that any relief under section 705 "would normally, if not always, be limited to the parties," Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. at 277 (1946). And even if Section 705 did authorize universal preliminary relief, such an "extraordinary remedy" that applied to non-parties should at minimum "demand truly extraordinary circumstances to justify it."

*Texas*, 599 U.S. at 702 (Gorsuch, J., concurring in the judgment).

Finally, the Final Rule is severable. *See* 89 Fed. Reg. at 33,848 ("[R]emov[ing] any 'doubt that it would have adopted the remaining provisions of the Final Rule' without any of the other provisions, should any of them be deemed unlawful."). Plaintiffs have challenged only certain portions of the Rule; the remainder should be permitted to go into effect, as intended, on August 1, 2024. As the Supreme Court explained, courts should "enjoin only the unconstitutional applications of a statute while leaving other applications in force, . . . or . . . sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-29 (2006) (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a § 705 stay and preliminary injunction.

Dated: June 5, 2024                    Respectfully submitted,

Brian M. Boynton
Principal Deputy Assistant Attorney
General

Emily B. Nestler
Assistant Branch Director

/s/ *Rebecca Kopplin*
REBECCA KOPPLIN
Cal. Bar No. 313970

Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street NW
Washington, DC 20004
Phone: 202-514-3953
Fax: (202) 616-8470
E-mail:
Rebecca.M.Kopplin@usdoj.gov

*Counsel for Defendants*